IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARILYN F. QUIRIN, as Executor of the Estate of RONALD J. QUIRIN, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 13-cv-02633 |
| LORILLARD TOBACCO CO., et al., | ) ) | Judge Joan B. Gottschall |
| Defendants. | ) ) | |

**DEFENDANT GEORGIA-PACIFIC LLC'S MOTION *IN LIMINE* NO. 2 TO EXCLUDE THE TESTIMONY, WORK PRACTICE STUDIES, AND TYNDALL LIGHTING VIDEOTAPES OF PLAINTIFF'S EXPERT JAMES R. MILLETTE, PH.D.**

Pursuant to Rules 702 and 703 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and its progeny, Defendant Georgia-Pacific LLC ("Georgia-Pacific") moves this Court *in limine* to exclude the testimony of Plaintiff's expert James R. Millette, Ph.D., his work practice studies and Tyndall lighting videotapes.

### I. INTRODUCTION

In 2011, Ronald Quirin was diagnosed with pleural mesothelioma, a rare cancer of the lining of the lung. Plaintiff contends that Mr. Quirin's disease was caused by his alleged exposure to asbestos-containing products, including his alleged bystander exposure to Georgia-Pacific joint compound while working as a telephone installer and supervisor.

Plaintiff has retained microscopist James Millette to provide expert testimony regarding the formulation of Georgia-Pacific's joint compound and fiber release levels. As part of Dr. Millette's testimony, Plaintiffs may attempt to introduce work practice studies and related

videotapes using Tyndall lighting[1] during mixing, application, and sanding of joint compound. These videotapes depict products and work conditions which are entirely different from those allegedly encountered by Mr. Quirin, a fact Dr. Millette readily concedes. Deposition of James Millette ("Millette Dep.") at 203 (attached as **Ex. A**).

Dr. Millette's testimony relating to Mr. Quirin's alleged exposure to Georgia-Pacific joint compound is inadmissible. He bases his opinions on tests of two joint compound products — one of which was not even manufactured by Georgia-Pacific – which are different from the exposure conditions alleged here. *Id.* In addition, Plaintiff cannot establish that Dr. Millette employed a generally-accepted and reliable methodology. The work practice studies, videotapes, and testimony of Dr. Millette should be excluded from evidence because they are irrelevant, do not demonstrate a substantial similarity to the conditions of Mr. Quirin's alleged exposure, are misleading and unduly prejudicial, and are thus inadmissible.

## II.     FACTUAL BACKGROUND

### A.    Georgia-Pacific's Joint Compound

Joint compound is a product used to join the seams between wallboards in residential and commercial construction. Joint compound is applied wet to the seams, allowed to dry, and then sanded to create a smooth finish.

Georgia-Pacific first sold joint compounds with chrysotile in 1965, when it acquired the Gypsum Bestwall Company. Georgia-Pacific LLC's Responses to Plaintiffs' General Issue Interrogatories to All Defendants at 2 (attached as **Ex. B**). In 1973, Georgia-Pacific began changing its joint compound formulations to remove chrysotile. *Id.* at 17, 21. It ceased manufacturing all chrysotile-containing products by 1977. *Id.* During the time that Georgia-

---

[1] "Tyndall lighting" is a lighting technique that "allows the viewer to see particles not visible to the naked eye under normal circumstances." *Blandford v. A-Best Prods. Co.,* 2006 Ohio 1332 (Ohio Ct. App. Mar. 26, 2006).

Pacific sold some joint compound products with chrysotile fibers, they contained, at most, 7% chrysotile. *Id.* This low level of *chrysotile* stands in sharp contrast with insulating, fireproofing, and other surfacing materials, many of which contained 95 to 100 percent *amphibole* asbestos, which is known to cause mesothelioma.[2] *See*, *e.g.,* Health Effects Institute-Asbestos Research, *Asbestos in Public and Commercial Buildings* (Table 4-2) at 4-4 (1991).

### B. Mr. Quirin's Alleged Exposures

Plaintiff alleges that Mr. Quirin was exposed to asbestos-containing products: (1) from 1953 to 1957, while serving as a Machinist Mate aboard the USS Tolovana; (2) from 1953 to 1957, while smoking Kent cigarettes with Micronite filters; and (3) from 1957 to 1986, while working for Illinois Bell as a telephone installer and supervisor. Deposition of Ronald Quirin ("Quirin Dep.") at 14-16, 41-43, 167, 172 (attached as **Ex. C**).

Mr. Quirin was not a drywall installer. In fact, Plaintiff does not claim that he ever used joint compound himself, either at work or at home. Instead, Plaintiff claims that Mr. Quirin occasionally worked near drywallers while installing phone lines or supervising installation or repair of phone lines. *Id.* at 78. He claimed he sometimes saw drywall workers use USG or Georgia-Pacific joint compound, although he could not remember where, and he conceded that the normal sequencing of trades during construction usually isolated telephone installers from drywall finishers. *Id.* at 120-21, 173-74. Mr. Quirin's co-workers confirmed that they usually

---

[2] There are two basic types of asbestos fibers: serpentine (chrysotile) and amphibole (tremolite, actinolite, amosite, crocidolite, and anthophyllite). Victor L. Roggli, et al. (eds.), Pathology of Asbestos-Associated Diseases, at 2 (New York, Springer Science+Business Media, Inc., 2d ed., 2004). The two fiber types have important mineralogical and structural differences that substantially influence toxicity. *See Gideon v. Johns-Manville Sales Corp.*, 761 F.2d 1129, 1145 (5th Cir. 1985) ("all asbestos-containing products cannot be lumped together in determining their dangerousness"); *Celotex Corp. v. Copeland*, 471 So. 2d 533, 538 (Fla. 1985) ("Asbestos products … have widely divergent toxicities, with some asbestos products presenting a much greater risk of harm than others."). All types of amphibole asbestos are significantly more potent than chrysotile in causing mesothelioma. *See, e.g.,* Hodgson, J.T., Darnton, A., "The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure," *Ann. Occ. Hub.*, 44(8): 565-601 (2000).

would be done with their work before the drywall installers did theirs. Deposition of Jac Williamson at 100-02 (attached as **Ex. D**); Deposition of Daniel DiFazzio at 27 (attached as **Ex. E**). During his employment with the phone company, Mr. Quirin also worked directly with asbestos-containing mastic/cement and sealants, including telephone vault sealer. Quirin Dep. at 64-68, 71.

In contrast to his alleged occasional and intermittent bystander exposures to chrysotile from joint compound, Mr. Quirin had substantial exposures to amphibole asbestos. From 1953 to 1957, Mr. Quirin was a Machinist Mate[3] on board the USS Tolovana, a World War II era vessel. *Id.* at 14-18. He recalled working on pumps and valves in pump rooms and personally removing pipe insulation to access the flanges to these pumps and valves, and was also nearby while other sailors did similar work. *Id.* at 20-36. Mr. Quirin testified that his work released dust and caused his work area to become dusty. *Id.* The products on board Navy vessels usually contained high levels of amosite asbestos (90%), and it is estimated that the Tolovana had more than 10 tons of amosite asbestos insulation. *See* Report of Thomas McCaffery ("McCaffery Rpt.") at 5 (attached as **Ex. F**).

### C. Dr. Millette's Proposed Testimony

Dr. Millette intends to testify that Mr. Quirin was exposed to asbestos fibers when drywallers mixed, sanded and cleaned up joint compound during his visits to various construction sites. Millette Dep. at 205. Dr. Millette does not rely on any study of bystander exposure to Georgia-Pacific dry-mix joint compound, but would have to extrapolate exposure levels from his study on some other manufacturer's (Bondex) joint compound. *Id.* Further,

---

[3] Of the 20 specialties evaluated, the U.S. Navy identified Machinist Mates as the second most likely rank to develop asbestos-related diseases. *See* Report of Thomas McCaffery ("McCaffery Rpt.") at 8 (attached as **Ex. F**); Report of James Rock ("Rock Rpt.") at 24 (attached as **Ex. G**).

4

he does not know any of the particulars of Mr. Quirin's alleged exposure to Georgia-Pacific joint compound – the proximity, duration, ventilation, *etc.* – and concedes that he cannot quantify Mr. Quirin's bystander exposure. *Id.* at 216-17, 227-28.

Dr. Millette's testimony about Mr. Quirin's exposure to Georgia-Pacific joint compound is speculative and will not be helpful to jury. The Court should exclude Dr. Millette's testimony relating to Georgia-Pacific, any work practice study performed by his company, and any Tyndall lighting videotapes allegedly depicting the mixing, application, and sanding studies of joint compound.[4]

### III. ARGUMENT & CITATION OF AUTHORITY

#### A. The Standard for Admissibility of Expert Testimony

Federal Rule of Evidence 702 provides that:

> [A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Further, any proffered expert opinion must meet Rule 703's requirement that the facts or data upon which the expert bases his or her opinion or inference be "of a type reasonably relied upon by experts in the particular field." *See* FED. R. EVID. 703.

Under Rule 702, a district court has an obligation to act as gatekeeper to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. *See also Myers v. Illinois Central R.R. Co.*, 629 F.3d 639, 644-45 (7th Cir. 2010). This means that "the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's

---

[4] Dr. Millette concedes that his Tyndall lighting videos would not be relevant to this case, and has testified that he does not intend to use them during the trial of this case. *Id.* at 203-04.

methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*").

This gatekeeper function requires a court to assess the reasoning and methodology underlying the expert's opinion and determine whether it is both scientifically valid and applicable to a particular set of facts. *Daubert*, 509 U.S. at 592-93. The Supreme Court has made clear that "where [an expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question[,] … the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (*quoting Daubert*, 509 U.S. at 592). "[A]n inference or assertion must be derived by the scientific method … [and] must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known." *Id*. Expert testimony should be excluded if it is speculative or conjectural. While a party "need not prove that the expert is undisputably correct or that the expert's theory is 'generally accepted' in the scientific community," the proponent of the opinion testimony must show that the methods employed by the expert in reaching his conclusions are scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements. "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data by the *ipse dixit* of the expert.").

To determine whether an expert opinion is reliable, the court may consider four nonexclusive factors: (1) whether the opinion is susceptible to testing and has been subjected to such testing; (2) whether the opinion has been peer reviewed; (3) whether there is a known

6

potential rate of error associated with the methodology used and whether there are standards controlling the technique's operation; and (4) whether the theory has been accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94. Where a proffered expert's testimony fails to satisfy any of these factors, the testimony is unreliable and must be excluded. *In re Meridia Prods. Liab. Litig.*, 328 F. Supp. 2d 791, 805-06 (N.D. Ohio 2004) (rejecting testimony based on vague assertions and circular logic). Several courts have considered a fifth factor: whether the expert developed his opinions specifically for litigation. *See, e.g., Daubert II*, 43 F.3d at 1317. These courts have been less deferential to opinions developed solely for an adversarial proceeding where large sums of money are at stake, particularly where the opinions have not been subjected to the peer review process. *See, e.g., Daubert II*, 43 F.3d at 1317.

Plaintiff, as the proponent of Dr. Millette's testimony, bears the burden of proving its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10. A swearing contest is not enough to justify admission of the expert's testimony. Moreover, the expert's self-validation of his own testimony and opinions is insufficient to satisfy Plaintiff's burden. *Joiner*, 522 U.S. at 146; *Kumho Tire*, 526 U.S. at 157.

### B. Dr. Millette's Testimony and Experiments Relating to Georgia-Pacific Joint Compound Must Be Excluded

Dr. Millette's experiments were generated for asbestos litigation. They are based on techniques that are neither reliable nor generally accepted in the relevant scientific community. Indeed, Dr. Millette bases his testimony, at least in part, on testing using indirect transmission electron microscopy ("TEM"), which he uses to determine the amount of airborne asbestos fibers released during the mixing and sanding phases of his study. *See* August 19, 2009 MVA Work Practice Study at 2 (attached as **Ex. H**). Dr. William Longo, who has collaborated on studies and published articles with Dr. Millette and who also frequently testifies for asbestos plaintiffs, has

7

previously admitted that indirect TEM is not recognized by OSHA as an acceptable process for determining fiber release. *See* Deposition of William Longo in *Faulconer v. Georgia-Pacific Corp.* at 65 (relevant pages attached as **Ex. I**). Other courts have recognized that indirect sampling methods are not reliable. *In re Armstrong World Industries, Inc., et al.*, No. 00-04471 at page 8 (Bankr. D. Del. 2002)(barring Dr. Millette's testimony while concluding "that the indirect method is not a scientifically valid method of *quantifying* the level of asbestos contamination in a room or building.")(attached as **Ex. J**).

Dr. Millette's "methodology" is also flawed because he does not have an adequate factual basis to determine Mr. Quirin's dose. Thus, Dr. Millette can offer no opinion regarding Mr. Quirin's risk of disease from exposure to joint compound. Instead of doing any case-specific testing or calculations, Dr. Millette only offered generalized speculative opinions about Mr. Quirin's alleged exposure to Georgia-Pacific joint compound. Millette Dep. at 216-17. Plaintiff cannot meet her burden of showing that Dr. Millette employed a reliable scientific methodology.

Moreover, Dr. Millette's techniques, work practice studies and videotapes were developed exclusively for litigation and have never been subjected to the peer review process by which scientific reliability is evaluated by a researcher's peers. As such, they are inherently suspect. Dr. Millette makes his living as an expert for plaintiffs. He is therefore a self-interested and biased witness, and his *ipse dixit* is not sufficient to establish reliability or general acceptance. Testimony by one expert to justify the validity of his own opinions does not satisfy the *Daubert* standard. *See Joiner*, 522 U.S. at 146; *see also People v. Kelly*, 549 P.2d 1240, 1248 (Cal. 1976); *State v. Cary*, 230 A.2d 384 (N.J. 1967). The Court should exclude Dr. Millette's testimony, studies and videotapes.

8

C. **The Conditions in Dr. Millette's Work Studies and Videotapes Are Not Substantially Similar to the Conditions Alleged Here**

Dr. Millette's work studies and videotapes are experiments conducted outside of court, and outside the presence of Georgia-Pacific. In order to admit such evidence at trial, Plaintiff must demonstrate substantial similarity between the conditions in the experiment and those at issue in the litigation. As one noted commentator on the rules of evidence has explained:

> Courts require that the filmed events be prepared under, and demonstrate, conditions "substantially similar" to the event in question as shown by admitted evidence. The extreme vividness and verisimilitude of pictorial evidence is truly a two-edged sword. Not only is there danger that the jury may confuse art with reality. The impressions generated by the evidence may prove particularly difficult to limit by judicial instruction or, if the film is subsequently deemed inadmissible, to expunge by instruction.

2 McCormick on Evidence § 216 (7th ed. 2013).

These videos were not created for this case, and there are significant and obvious differences between the video simulations and Mr. Quirin's alleged exposure. Dr. Millette admits as much. In his testing, Dr. Millette mixed Bondex dry mix joint compound, applied it to a piece of drywall, and sanded the compound after it dried. All of this was conducted within the confines of a small, enclosed room where special lighting and a black background enhanced the visibility of dust particles that would normally not be visible. Deposition of James R. Millette, Ph.D in *Meshnick* ("Millette *Meshnick* Dep.") at 167-169 (relevant pages attached as **Ex. K**)).

Plaintiff, on the other hand, alleges that Mr. Quirin was exposed to USG and Georgia-Pacific joint compound intermittently as a bystander during commercial and residential construction. Quirin Dep. at 120-21. Mr. Quirin never mixed, applied or sanded joint compound himself, yet Plaintiff offers Dr. Millette to opine about Mr. Quirin's exposure based on Bondex tests showing direct exposures that are admittedly dissimilar to the conditions involved in open, commercial and residential construction. Such evidence will not "assist the trier of fact," and Dr.

Millette's opinions simply amount to undefined and unquantifiable exposure evidence regarding Mr. Quirin.

Although the record is lacking any reliable evidence of Mr. Quirin's bystander exposure as a telephone installer or supervisor, the circumstances of each construction site would be far different from Dr. Millette's studies and videotapes. For instance, sometimes construction sites would have open windows or doors or would be subject to natural wind. In addition, the size of the room, distance from sanding or mixing and the amount of product mixed and sanded will affect the amount of fiber released. There is no doubt that Dr. Millette's studies are designed to record fiber release in only the most extreme environments rather than simulating the reality of residential or commercial construction conditions. Most significantly, these videos can only show that there was visible dust in the air when joint compound is sanded. There is no dispute that when joint compounds are sanded – even those that contain no asbestos – they create some dust. The videos cannot show what percentage of the dust, if any, was asbestos fibers, as opposed to non-asbestos dust, or what percentage of the dust was actually composed of respirable fibers. Moreover, these tapes are not focused on an exposure scenario involving a bystander who is not working directly with the material and who is in the general vicinity, at best, only intermittently. As even Dr. Millette concedes, his Tyndall lighting videotapes do not depict circumstances similar to the exposures alleged by Mr. Quirin.

Because the conditions and circumstances of Dr. Millette's studies and Tyndall videotapes are not substantially similar to the conditions under which Mr. Quirin was allegedly exposed, the Court should exclude Dr. Millette's videotape and work studies, and his related testimony.

### D. Other Courts Have Excluded Similar Evidence

Numerous other courts have rejected the use of similar "simulation" videotapes and testimony. Here is just a sampling:

- *Bello v. Anco Insulations, Inc.,* No. 559,507, slip op at 4 (La. Dist. Ct., 19th Jud. Dist., East Baton Rouge Parish Oct. 19, 2010) (excluding videotapes because the circumstances of plaintiff's exposure were different from the simulation).

- *In re Baltimore Personal Injury Asbestos Cases (Jocelyn Farrar)*, No. 24X08000394, (Md. Cir. Ct., Baltimore City Oct. 21, 2009) (Georgia-Pacific work practice studies and videos excluded; videos showed circumstances that were not appropriate to plaintiff's alleged exposures, would be confusing to the jury, and were created solely for litigation).

- *In re Baltimore Personal Injury Asbestos Cases (Jocelyn Farrar)*, No. 24X08000394, (Md. Cir. Ct., Baltimore City Oct. 15, 2009) (Georgia-Pacific work practice studies and videos excluded because they are not probative and are prejudicial).

- *O'Connell v. Bondex Int'l, Inc.,* No. 04-L-0676 (Ill. 3d Cir. Ct., Madison Cty. Feb. 22, 2006) (work practice simulation video excluded; the video's prejudicial effect far outweighs any probative value, even as a demonstration to the jury, because the amount of dust shown lacks any scientific showing that it is all asbestos).

- *Tyre v. CSX Corp.*, No. 16-2002-CA-4837 (Fla. Cir. Ct., 4th Jud. Cir., Duval Cty. Sept. 22, 2003) (excluding expert testimony and holding that work practice studies and videotapes were irrelevant, misleading and unduly prejudicial).

- *Ball v. Consolidated Rain Corp.*, 756 N.E.2d 1280 (Ohio Ct. App. 2001) (expert testimony and video had been improperly admitted because the experiment was not designed to show the level of asbestos exposure allegedly encountered by plaintiffs).

- *In re Lamar Cty. Asbestos Litig.*, No. (Tex. 6th Cir. Ct., Lamar Cty. July 5, 2001) (striking expert and videos from evidence; the tests were not scientifically reliable and amounted to inadmissible "junk science").

- *King v. AlliedSignal Inc.*, No. 24242C-03 (Va. Cir. Ct., Newport News Feb. 1, 2001) (motion to exclude expert testimony and work practice simulation video granted; the video was misleading because the circumstances of the alleged exposure – location and ventilation, among other factors – were different).

- *Lewis v. John Crane*, No. 306774 (Calif. Super. Ct., San Francisco Cty. Apr. 3, 2000) (excluding Longo and Hatfield videotapes because they had "an air of doom and gloom about them as a result of the use of moon suits and respirators [and] [t]he enclosed tents and the movement of the persons in them").

- *Grego v. Trailmobile Trailers*, No. 996240 (Calif. Super. Ct., San Francisco Cty. Feb. 10, 2000) (excluding expert testimony and simulation videotape because there was "insufficient foundation to show that the simulation was sufficiently similar" to plaintiffs' exposure, the prejudicial effect of the evidence outweighed its probative value, and the evidence would be confusing to the jury).

- *Carlson v. Lear Siegler*, No. 979595 (Calif. Super. Ct., San Francisco Cty. Aug. 13, 1998) (expert testimony was inadmissible because its probative value was clearly outweighed by the confusion of the issues before the jury).[5]

In each of those cases, the "demonstrations" and videotapes were essentially the same as Dr. Millette's videotapes here. As those courts ruled, these "experiments" and videotapes are unreliable and irrelevant.

### E. Dr. Millette's Testimony and Work Practice Studies Must Be Excluded Because They Are Irrelevant, Misleading, Confusing and Unduly Prejudicial

Dr. Millette's work studies and videotapes show Tyndall lights illuminating quantities of airborne dust. These are not only irrelevant because they are not substantially similar to the working Mr. Quirin's conditions, they would also mislead jurors rather than assist them. First, Tyndall lighting is not a tool to measure concentrations of respirable fibers and will be misleading because it just shows unmeasured quantities of many different substances in floating dust. Millette *Meshnick* Dep. at 167. Second, the Tyndall lighting videotapes are patently misleading because the material used in the videotaped testing and studies is not a Georgia-Pacific product.

There is a significant risk that jurors will look at these videotapes and draw the conclusion that all of the dust shown is a consequence of the particular work performed, that the dust shown is all or nearly all asbestos, and that workers in such an area would be breathing in all of the dust. Further, the individual in the videotapes is encased in a sealed suit with a portable

---

[5] Georgia-Pacific has copies of these and other similar rulings available for the Court's review upon request.

breathing device, suggesting to the jury that such gear should have been required at all times when working with joint compound, regardless of the date and corresponding government-mandated exposure levels. The appearance of the worker in a body suit with full respiratory headgear would, by itself, be highly inflammatory and designed to scare the jury.

Other plaintiffs' experts in Dr. Millette's field, including Dr. Longo and Mr. Hatfield, have acknowledged the limitations and questionable probative value of similar videotapes. For example, Dr. Longo has testified that:

- His videotapes do not allow the jury to differentiate between that portion of the dust cloud, illuminated by the Tyndall lighting which is asbestos and that which is not. *Wosk vs. Allied Signal, Supreme Court of the State of New York*, County of New York, No. 117097-97, March 16, 1999, at 46 (attached as **Ex. L**).

- There is no governmental standard indicating the use of Tyndall lighting to quantify or qualify asbestos fiber release in an occupational setting. *Lambert vs. John Crane*, United States District Court for the District of Indiana, No. 94-1540-C-B/G, September 11, 2000, at 46 (attached as **Ex. M**).

- The high intensity lighting used produces heat and the dust particles suspended in the hot air would rise upwards (and, hence, into the breathing zone of the worker). *Gilbert vs. Bendix Corp.*, Court of Common Pleas of Northhampton County, Pennsylvania, No. 96-C-3489, August 11, 1998, at page 259 (attached as **Ex. N**).

Similarly, Mr. Hatfield has testified that Tyndall lighting does not identify asbestos from non-asbestos nor does it permit anyone to determine how much of the particulate matter that is seen in the videotape is respirable size asbestos fibers. *Cook vs. AC&S, Inc.*, January 20, 2000, at 104 and 171 (attached as **Ex. O**).

Taking these admissions from Dr. Millette's peers and collaborators into consideration, and his own concession during his deposition in this case, there is simply no probative value in the studies. Plaintiff is basically left with a video demonstration of how sanding creates dust. This information is not beyond the knowledge of the jurors and, therefore, expert testimony on the subject is neither appropriate, nor necessary. Allowing Dr. Millette to testify and show the

13

videotaped demonstrations to the jury will only unfairly prejudice the jury and waste this Court's time with the presentation of needless cumulative evidence. There is no adequate factual or legal basis to permit Plaintiff to play these videotapes, which are offered for the sole purpose of convincing the jury that Georgia-Pacific's joint compound product was very dusty and – without adequate factual basis – released dangerous concentrations of asbestos fibers into the ambient air. The jury will not be able to disregard that image, which is precisely why Plaintiff may seek to introduce these videotapes into evidence. Any probative value attributed to the studies and testimony is far outweighed by the prejudice that would result.

Because the danger of misleading the jurors is great under these circumstances, the Court should exclude Dr. Millette's work practice studies, videotapes and related testimony under FED. R. EVID. 403 (relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence); *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1271, 1276-77 (7th Cir. 1988) (evidence properly excluded under balancing test of Rule 403).

### F. The Court Should Exclude Dr. Millette's Testimony as to Georgia-Pacific

An expert opinion that is not based on sufficient facts and data is inadmissible under Rule 702(1) and *Daubert*. *See, e.g., Smith v. Ford Motor Co.*, 2013 WL 214378 (D. Utah Jan. 18, 2013). Here, Dr. Millette's opinions about Mr. Quirin's alleged exposure to Georgia-Pacific joint compound are not based on sufficient facts or data and are therefore inadmissible.

Dr. Millette knows nothing about the circumstances of Mr. Quirin's alleged exposures to Georgia-Pacific joint compound – the frequency, duration, proximity, or levels of exposure – and concedes that he cannot quantify Mr. Quirin's bystander exposure. *Id.* at 216-17, 227-28. He does not know how many times Mr. Quirin was in the vicinity of drywall workers, or how

close, or for how long. He does not know how many times Mr. Quirin was allegedly exposed as a bystander to Georgia-Pacific joint compound specifically. Instead, he proposes to extrapolate exposure levels from other studies, none of which involved Georgia-Pacific joint compound. *Id.*

Dr. Millette's opinion is nothing but sheer speculation that will not be helpful to jury. The Court should therefore exclude Dr. Millette's testimony relating to Georgia-Pacific, any work practice study performed by his company, and any Tyndall lighting videotapes allegedly depicting the mixing, application, and sanding studies of joint compound.

## IV. CONCLUSION

For the foregoing reasons, Georgia-Pacific respectfully requests that the Court exclude from evidence the work practice studies, Tyndall videotapes, and the testimony of Dr. Millette in its entirety.

Dated: August 1, 2013

Respectfully submitted,

/s/ Michael W. Drumke
Michael W. Drumke
Attorney for Defendant Georgia-Pacific LLC
Swanson, Martin & Bell, LLP
330 North Wabash Avenue
Suite 3300
Chicago, Illinois 60611
Telephone: (312) 321-9100
Facsimile: (312) 321-0990
E-mail: mdrumke@smbtrials.com

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARILYN F. QUIRIN, as Executor of the Estate of RONALD J. QUIRIN, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 13-cv-02633 |
| LORILLARD TOBACCO CO., et al., | ) ) | Judge Joan B. Gottschall |
| Defendants. | ) ) | |

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 1, 2013, I electronically filed Georgia-Pacific LLC's Motion *in Limine* No. 2 with this Court's ECF system, which will send notification of this filing to all counsel of record.

                                             /s/ Michael W. Drumke
                                             Michael W. Drumke
                                             Attorney for Defendant Georgia-Pacific LLC
                                             Swanson, Martin & Bell, LLP
                                             330 North Wabash Avenue
                                             Suite 3300
                                             Chicago, Illinois 60611
                                             Telephone: (312) 321-9100
                                             Facsimile: (312) 321-0990
                                             E-mail: mdrumke@smbtrials.com