**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MARILYN F. QUIRIN, as Executor of the Estate of RONALD J. QUIRIN, Deceased, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 13-cv-02633 |
| v. | ) ) | Judge Joan B. Gottschall |
| LORILLARD TOBACCO COMPANY, *et al.*, | ) ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANT UNION CARBIDE CORPORATION'S MOTION *IN LIMINE* TO
PRECLUDE DR. CARL BRODKIN FROM TESTIFYING THAT EXPOSURE TO
UNION CARBIDE ASBESTOS WAS A CAUSE IN FACT OR A
"SUBSTANTIAL FACTOR" IN CAUSING PLAINTIFF'S MESOTHELIOMA**

Pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579

(1993), Defendant Union Carbide Corporation ("Union Carbide") respectfully moves the Court,

*in limine*, for an order precluding Plaintiff's causation expert, Dr. Carl Brodkin, from offering

expert testimony or opinion that Mr. Quirin's alleged exposure to Union Carbide Calidria

asbestos in joint compounds[1] participated in causing his mesothelioma or was a "substantial

factor" in bringing it about.

## I.   INTRODUCTION

Dr. Carl Brodkin is expected to testify at trial that Mr. Quirin's alleged exposure to Union

Carbide Calidria asbestos caused his mesothelioma merely because, as Dr. Brodkin puts it, "[i]t's

the aggregate dose [of asbestos] that increases the risk and causes the disease." Dec. 17, 2012

Dep. Tr. at 239:16-17 (attached as Exhibit 1) ("Brodkin Dep."). This theory—that *all* exposures

---

[1]   The facts of this case, and Union Carbide's participation in the asbestos business more generally, are set forth in Union Carbide's Motion for Summary Judgment and related pleadings.

to asbestos contribute to causing mesothelioma because each exposure contributes to an individual's aggregate asbestos *dose*— has been exposed by numerous courts as "inadmissible speculation that is devoid of responsible scientific support." *Smith v. Ford Motor Co.*, 2013 WL 214378, at *2 (D. Utah Jan. 18, 2013) (attached as Exhibit 2). Indeed, a Washington state court precluded Dr. Brodkin from offering *the very same* causation opinions that Plaintiff seeks to admit here, finding that his practice of extrapolating "assessment[s] of causation in a particular case" from the purported "dose-response" relationship that exists generally between asbestos exposure and *risk* of developing mesothelioma "is not a sound scientific methodology." *Free v. Ametek et al.*, No. 07-3-04092-9 SEA (Wash. Super. Ct Feb. 29, 2008), at 5 ("*Ametek* Order") (attached as Exhibit 3).[2] Courts in numerous jurisdictions have now excluded similar opinions in asbestos litigation as fundamentally at odds with prevailing legal standards for establishing causation. *See Smith*, 2013 WL 214378, at *5.[3]

---

[2]     *Ametek* was decided under Washington law, which continues to apply the "general acceptance" standard set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). Nevertheless, the *Ametek* court's findings regarding the unscientific nature of Dr. Brodkin's causation opinions are equally applicable in a *Daubert* context. Accordingly, Union Carbide has attached a copy of the *Ametek* Order to this Motion for the Court's review.

[3]     The *Smith* court cited the following cases: *Betz v. Pneumo Abex, LLC*, 44 A.3d 27 (Pa. 2012); *In re Toxic Substances Cases*, 2006 WL 2404008 (Pa. Com. Pl. Aug. 17, 2006) (attached as Exhibit 4); *Butler v. Union Carbide Corp.*, 712 S.E.2d 537 (Ga. Ct. App. 2011); *Moeller v. Garlock Sealing Techs., LLC*, 660 F.3d 950 (6th Cir. 2011); *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (Tex. 2007); *Smith v. Kelly–Moore Paint Co., Inc.*, 307 S.W.3d 829 (Tex. App.—Ft. Worth 2010); *Georgia-Pacific Corp. v. Stephens*, 239 S.W.3d 304 (Tex. App.—Houston [1st Dist.] 2007); *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488 (6th Cir. 2005); *Wills v. Amerada Hess Corp.*, 379 F.3d 32 (2d Cir. 2004). Testimony based on the "every exposure" theory of causation was also rejected in *Bartel v. John Crane*, 316 F. Supp. 2d 603, 611 (N.D. Ohio 2004); *In re W.R. Grace & Co.*, 355 BR. 462 (Bkrtcy D. Del. 2006); *Basile v. American Honda Motor Co., Inc.*, 2007 WL 712049, at *2 (Pa. Com. Pl. Feb. 22, 2007) (attached as Exhibit 5); *Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216, 226-27 (Pa. 2007); *Moeller v. Garlock Sealing Technologies, LLC*, 660 F.3d 950, 954-55 (6th Cir. 2011); *Holcolm v. Georgia Pacific, LLC*, 289 P.3d 188, 197 (Nev. 2012); *Sclafani v. Air and Liquid Systems Corp.*, 2013 WL 2477077, at *4-5 (C.D. Cal. May 9, 2013) (attached as Exhibit 6); and *Anderson v. Ford Motor Co.*, --- F.Supp.2d ----, 2013 WL 3179497 (D. Utah June 24, 2013) (attached as Exhibit 7).

The same result should follow here. To our knowledge, no court applying Illinois law has ever held—or even suggested—that an exposure to asbestos (or any other environmental agent) can be deemed a cause in fact of a plaintiff's injury merely because the exposure contributed in some undefined manner to the plaintiff's aggregate dose, and thereby in some undefined way to the *risk* that such an injury could occur. Dr. Brodkin's methodology of substituting "risk" for "cause" thus seeks to circumvent the legal standard that Plaintiff must meet to establish legal causation, which by definition cannot assist the jury to make findings that are consistent with Illinois law. Dr. Brodkin's conclusion that Mr. Quirin's alleged exposure to Calidria asbestos "caused" his mesothelioma amounts to nothing more than *ipse dixit* disguised as expert testimony, as Dr. Brodkin admittedly "ha[s] not done a supply specific assessment" with respect to Calidria asbestos and thus relies on "no information" whatever regarding Mr. Quirin's alleged exposure to Calidria compared to his exposures to asbestos from numerous other sources—many of which, unlike Calidria, contained highly carcinogenic amphibole asbestos. Brodkin Dep. at 175:12-17; *see also id* at 41:6-15 (acknowledging that amphiboles are "several times more potent than chrysotile in causing mesothelioma").

Finally, the methodology that Dr. Brodkin relies upon in reaching his causation opinions is applied nowhere outside the courtroom in asbestos litigation, and is therefore precisely the type of "unscientific speculation offered by a genuine scientist" that is inadmissible under *Daubert*. *Segle v. Stegmiller*, 2012 WL 1570129, at *1 (N.D. Ill. May 3, 2012) (quoting *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir. 1996)) (attached as Exhibit 8).[4] For each of these reasons, Dr. Brodkin must be precluded from giving his causation opinions at trial.

---

[4] For purposes of this Motion, Union Carbide does not challenge Dr. Brodkin's training or qualifications as an expert generally. As demonstrated below, the causation opinions he has proffered in this case are inadmissible on other grounds.

## II.     ARGUMENT

### A.     Dr. Brodkin's Causation Opinion Would Not Assist The Jury To Make Factual Determinations In Accordance With Illinois Tort Law.

As a threshold matter, Dr. Brodkin's causation opinion is inadmissible because it seeks to short-cut the legal standard for causation that Plaintiff must satisfy to meet her burden of proof. Courts applying Fed. R. Evid. 702 routinely preclude experts from offering testimony that is "contrary to law," because such testimony "cannot be said to be… helpful to the trier of fact." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005); *accord Clements-Jeffrey v. City of Springfield*, 2011 WL 3207363, at *5 (S.D. Ohio July 27, 2011) (excluding expert testimony "found to be contrary to law, and thus inadmissible") (attached as Exhibit 9); *Anderson v. Dairy Farmers of Am., Inc.*, 2010 WL 3893601, at *11 (D. Minn. 2010) ("[The expert's] mitigation opinion is contrary to law and therefore would not be helpful to a finder of fact in deciding the issues in the case.") (attached as Exhibit 10).

In *Nolan v Weil-McLain*, the Illinois Supreme Court made clear that while "asbestos plaintiffs face unique challenges in showing causation," there is no "exception for asbestos cases which relieve[s]… plaintiffs from meeting the same burden as all other tort plaintiffs" and that evidentiary rules governing asbestos litigation cannot supplant "black-letter, general principles of tort causation law." 910 N.E.2d 549, 558 (Ill. 2009) (citing *Thacker v. UNR Indus., Inc.*, 910 N.E.2d 549, 558 (Ill. 2009)). Thus, *Nolan* "reaffirm[s] the axiomatic rule that a plaintiff alleging personal injury in any tort action—including asbestos cases—must adduce sufficient proof that the defendant caused the injury." *Id.* To meet this standard, Plaintiff must demonstrate that each defendant's conduct was a "cause in fact" of Mr. Quirin's injuries, *i.e.*, that it was "a material element and a substantial factor in bringing" them about. *Krywin v. Chicago Transit Auth.*, 938 N.E.2d 440, 447 (Ill. 2010). And it is well settled as a matter of Illinois law that "[c]onduct is a

material element and a substantial factor if, absent the conduct, the injury would not have occurred." *Id.*; *accord Abrams v. City of Chicago*, 811 N.E.2d 670, 675 (Ill. 2004).

Dr. Brodkin's causation opinion cannot be squared with these governing legal principles because it specifically *disclaims* any attempt to "pars[e] out" a single exposure or exposure sub-set attributable to a particular defendant and determine whether those exposures can be deemed a but-for cause of Mr. Quirin's mesothelioma. *See* Brodkin Dep. at 239:18-240:10. Nor can Dr. Brodkin "say one way or the other" whether Mr. Quirin's alleged exposure to asbestos from any particular source likely would have caused his injuries on its own, as his testimony regarding Kent brand cigarettes attributable to Defendant Lorillard Tobacco Company illustrates:

> Q So is it your opinion that Mr. Quirin's alleged Kent cigarette smoking in and of itself would not have been sufficient to cause his mesothelioma?
>
> A. I can't say that one way or the other. I don't think medical science has a way of addressing that question. Mr. Quirin's exposure to asbestos smoking the Kent micronite filters between 1954 and 1956 in my opinion is a significant exposure. I've identified it as a component part of his exposure. That exposure is not as great as the cumulative exposure he had including all occupational exposures. So the exposure to Kent micronite did increase his mesothelioma, but it's the aggregate of his exposure in the environmental as well as the occupational setting that resulted in his total risk and caused his mesothelioma.
>
> *So I have no way of parsing out a single component, whether it be Kent micronite or some other component.*

Brodkin Dep. at 239:18-240:10 (emphasis added).

Instead, Dr. Brodkin's theory appears to be that merely showing that each defendant's asbestos or asbestos-containing product contributed to Mr. Quirin's aggregate asbestos dose, thereby adding—by some unspecified amount—to his "total risk," makes that exposure a substantial causation factor. *Id.* at 240:7. But we are aware of no toxic tort case arising under Illinois law that has ever held or otherwise suggested that an undefined increase in *risk* can be

equated with factual *causation*. Nor is it appropriate to consider such a causation framework for asbestos litigation *only*. The Supreme Court reiterated in *Nolan* that Illinois law has "not carve[d] out an exception for asbestos cases which relieved those plaintiffs from meeting *the same burden as all other tort plaintiffs*." 910 N.E.2d at 558 (emphasis added). Because Dr. Brodkin's testimony would do nothing to assist the jury to decide questions of proximate cause in accordance with Illinois law, it is not "relevant to the task at hand." *Daubert*, 509 U.S. at 597.

### B. Dr. Brodkin's Causation Opinion Is Improper Because It Amounts To Nothing More Than An *Ipse Dixit* Value Judgment Of How "Cause" Should Be Defined In Asbestos Litigation.

Dr. Brodkin's failure to base his opinions on *any* information specific to Mr. Quirin's alleged exposure to Calidria asbestos also ignores the well-established tenet that "expert testimony must be rejected if it lacks an adequate basis in fact." *Nunez v. BNSF Ry. Co.*, 2012 WL 2874059, at *4 (C.D. Ill. July 13, 2012) (citing *Cella v. United States*, 998 F.2d 418 (7th Cir. 1993)) (attached as Exhibit 11). As noted above, Dr. Brodkin has failed to perform any type of "specific assessment" with respect to Calidria (*see* Brodkin Dep. at 175:12-20), and he is "[a]bsolutely not" able to determine whether Calidria asbestos—or any other alleged exposure in Mr. Quirin's exposure history—actually participated in "caus[ing] his disease." *Id.* at 239:13-15; *see also id.* at 240:9-10 ("I have no way of parsing out a single component, whether it be [Mr. Quirin's exposure to crocidolite asbestos from Kent cigarettes] or some other component.").[5]

Dr. Brodkin's conclusion that *each* of these exposures can nevertheless be characterized as a "cause" appears to be based upon his surmise that because each exposure to asbestos

---

[5]     Irrespective of any attempt by Dr. Brodkin to characterize Mr. Quirin's alleged exposures to asbestos from other sources or other defendants' products, Dr. Brodkin readily conceded that he has made no such attempt with respect to Union Carbide or Calidria asbestos. *See id.* at 175:12-17 ("Q. And so if I understand your answer correctly, sir, with respect to Calidria chrysotile, you have no information as to Mr. Quirin's alleged dose; is that correct? A. That's true. I have not done a supply specific assessment.").

contributes to an individual's aggregate asbestos dose, and "the aggregate [dose]… result[s] in [the individual's] total risk," then each exposure must participate causally, at least in cases where mesothelioma actually develops. *Id.* at 240:4-8. But that is not a scientific opinion: none of the scientific literature that Dr. Brodkin purports to rely upon stands for the proposition that mesothelioma actually develops biologically as a result of an individual's "total risk" or "aggregate dose" of asbestos, much less that an individual exposure can be deemed causal solely on the basis that it contributes to either. Rather, the opinion derives from Dr. Brodkin's own value judgment as to how the concept of "cause" should be defined in the context of asbestos litigation, and accordingly is no more scientific than an opinion claiming that each defendant "caused" Mr. Quirin's injuries because each defendant held a market share in asbestos sales during his alleged exposure period and could have been a source of his exposure—a *legal* theory of causation that has been rejected in asbestos litigation and dismissed out of hand in Illinois.[6]

The court in *Smith*, *supra*, is the latest to pull the curtain back on this attempted sleight of hand and lay bare the unscientific nature of Dr. Brodkin's methodology. There, the court found that "[w]hen carefully examined," the "all exposures" theory "is precisely the kind of testimony the Supreme Court [of the United States] observed as being nothing more than the 'ipse dixit of the expert.'" 2013 WL 214378, at *2 (quoting *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997)). Just as Dr. Brodkin would attempt to do here, the plaintiffs' expert in *Smith* opined that each defendant's asbestos must be "rule[d]… in" as a causal agent, "boldly stating that Mr. Smith's mesothelioma was caused by his total and cumulative exposure to asbestos, *with all* exposures and all products playing a contributing role." *Id.* at *3 (emphasis in original, internal quotations

---

[6]    *See, e.g.*, *White v. Celotex Corp.*, 907 F.2d 104, 106 (9th Cir. 1990) (finding market share theories of liability "entirely inappropriate in asbestos litigation"); *Smith v. Eli Lilly & Co.*, 560 N.E.2d 324, 337 (Ill. 1990) (concluding "that market share liability is not a sound theory, is too great a deviation from our existing tort principles and should not be applied" in DES litigation).

omitted). But this theory "asks too much from too little evidence as far as the law is concerned," and "seeks to avoid not only the rules of evidence but more importantly [plaintiffs'] burden of proof." *Id.* Indeed, the court aptly compared the proffered opinion to

> a homicide detective who discovers a murdered man from a large family. Based on his and other detectives' training and experience the detective knows that family members are often the killer in such cases. When asked if there are any suspects the detective says he cannot rule out any of the murdered man's relatives. This would be reasonable, but it would not allow the detective to attribute legal liability to every family member on the basis of such a theory.

*Id.* As *Smith* makes clear, the premise that an asbestos exposure or exposure sub-set *could* have participated in causing mesothelioma by virtue of its incremental contribution to the *risk* of developing the disease cannot by itself support a finding of causation: "Just because we cannot rule anything out does not mean we can rule everything in." *Id.* at *3. Thus, the "all exposures" theory "does virtually nothing to help the trier of fact decide the all-important question of specific causation" and accordingly is inadmissible as expert testimony. *Id.* at *4.

Similarly, in *Betz v. Pneumo Abex LLC*, the Supreme Court of Pennsylvania squarely rejected the contention that an expert can draw scientifically valid conclusions about the causal role of a particular asbestos exposure by relying on the premise that "[e]ach of the exposures to asbestos contributes to the total dose that causes mesothelioma." 44 A. 3d 27, 31 (Pa. 2007).[7] The plaintiff's expert in *Betz* offered a variety of analogies in an attempt to support such an inference: that exposures act cumulatively like "marbles into [a] glass of water until the water finally overflows"; that it is impossible to discern whether "General Eisenhower" or "every troop in the field" should be credited with winning the Second World War; and that because one

---

[7]     Although *Betz* was decided under the law of Pennsylvania, a *Frye* jurisdiction, the court cited the *Daubert* standard a number of times, with particular emphasis on its requirement that expert testimony derived from the scientific method must be properly "grounded in testing." 44 A.3d at 47; *see also id.* at 48 n.21 & n.23.

cannot be sure whether "every blow" or "just the last blow that [a] boxer took" resulted in his knock-out, it must be presumed that "the cumulative effect of all the blows would be the cause." *Id.* at 35. But while certain of these analogies could be said to be "true in a figurative and honorary fashion," the court "fail[ed] to see" how they "b[ore] any connection whatsoever to science." *Id.* at 57. Rather, the use of such analogies simply "convey[ed]" that the underlying theory they are designed to support is "inconsistent with both science and the governing standard for legal causation." *Id.*; *see also Butler v. Union Carbide Corp.*, 712 S.E.2d 537, 539, 541 (Ga. Ct. App.), *cert. denied* (Ga. 2011) (affirming exclusion of proffered expert opinion that "[t]o the extent" the plaintiff "was exposed to any of" the defendants' asbestos-containing products, "they contributed in a cumulative fashion to his total asbestos dose, which is what caused his mesothelioma"; adopting trial court's *Daubert* ruling that such an opinion "was not the product of reliable principles and methods").

This Court should join the numerous courts cited above, and preclude Dr. Brodkin from offering expert opinions in this case that are ultimately rooted in his personal philosophy of how "cause" should come to be defined in asbestos litigation. Such opinions are "not admissible under Rule 702" because they are "purely speculative." *United States v. Vance*, 2011 WL 2633842, at *6 (N.D. Ill. July 5, 2011) (quoting *United States v. Davis,* 772 F.2d 1339, 1333-43 (7th Cir. 1985)) (attached as Exhibit 12).[8]

### C. Dr. Brodkin's Causation Opinion Also Fails To Meet The *Daubert* Standard For Admission Of Expert Testimony.

At bottom, Dr. Brodkin concludes that causation can be ascribed to Calidria asbestos without any "specific assessment" of its alleged role in Mr. Quirin's exposure history because

---

[8] For much the same reasons, Dr. Brodkin also should be precluded from offering an opinion that Mr. Quirin's alleged exposure to Calidria asbestos was "substantial" or a "substantial factor."

"[m]esothelioma is a dose response disease" and any exposure necessarily contributed to Mr. Quirin's "aggregate dose." Brodkin Dep. at 175:16-17; 239:15-17. That is precisely the type of unscientific methodology that lacks a "reliable foundation" and should be excluded under "the gatekeeping function *Daubert* has imposed on trial judges." *Richman v. Sheahan*, 415 F. Supp. 2d 929, 932 (N.D. Ill. 2006).

The gatekeeping inquiry mandated by *Daubert* requires courts "to make a determination as a precondition to admissibility, that proffered scientific evidence rests on a reliable foundation ...." *Id.* at 932 (citing *Daubert*, 509 U.S. at 589, 597). In this respect, "[t]he focus is not on the expert's conclusions, but on the underlying methodology." *Id.* at 933 (citing *Daubert*, 509 U.S. at 593-95)). In *Daubert*, the Supreme Court provided a non-exhaustive list of several factors that may "bear upon the [reliability] inquiry," including (1) whether a theory or technique can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation. 509 U.S. at 593-94. In addition, while it is no longer "the exclusive test for admissibility" of expert testimony, "general acceptance" of an expert's methodology is another factor that may bear upon the Court's reliability analysis. *See Richman*, 415 F. Supp. 2d at 933 n.4. At bottom, the "[e]ssential[ ] purpose of the rule in *Daubert* is 'to make sure that when [scientific experts] testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work.'" *Murata Mfg. Co. v. Bel Fuse, Inc.*, 2008 WL 656045, at *5 (N.D. Ill. Mar. 5, 2008) (quoting *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318 (7th Cir. 1996)) (attached as Exhibit 13).

Dr. Brodkin's Calidria causation opinion easily fails to meet this standard because nowhere outside of the courtroom in asbestos litigation do members of the scientific community

attempt to draw reliable conclusions about the causal relationship between a disease—*e.g.*,

mesothelioma—and a specific environmental factor suspected to be toxic—*e.g.*, asbestos in

certain joint compounds—without first conducting a thorough assessment of the exposure and

comparing it to that of other suspected causal agents. Indeed, as several courts have recognized,

> A scientifically-reliable methodology that is recommended by the
> World Health Organization and the National Academy of Sciences
> for drawing a sound conclusion as to the relationship between an
> individual's disease and a specific factor suspected of causing that
> disease entails a three-step process. This three-step process
> includes: (1) a determination of the plaintiff's level of exposure to
> the toxin in question, (2) from a review of the scientific literature,
> proof that the toxin is capable of producing the illness, or general
> causation, and the level of exposure to the toxin which will
> produce that illness ( i.e., the dose-response relationship) must be
> ascertained, and (3) establishment of specific causation by
> demonstrating the probability that the toxin caused the particular
> plaintiff's illness, which involves weighing the possibility of other
> causes of the illness.

*Parker v. Mobil Oil Corp.*, 16 A.D.3d 648, 651 (N.Y. App. Div. 2005). "This three-step process

has been acknowledged in numerous cases as generally accepted and reliable." *Id.* (citing cases).

As explained in the attached affidavit of Dr. Suresh Moolgavkar, an expert in the carcinogenicity

and epidemiology of asbestos, applying a reliable methodology in mesothelioma cases requires

"estimating the additional risk, if any, imposed by the exposure at issue after taking into account

the probability that the disease occurred spontaneously and the probability that other exposures,

including other asbestos exposures and ionizing radiation, caused the disease." *See* Moolgavkar

Affidavit at ¶ 94 (attached as Exhibit 14).[9] Brodkin has done no such analysis here.

---

[9] The scientific methodology outlined by Dr. Moolgavkar stands in stark contrast Dr. Brodkin's method, which equates a presumed, but unproven, increase in risk associated with every exposure, regardless of dose, with substantial factor causation. Under the scientific method, causation can be inferred only by determining the fraction of a person's total disease risk attributable to an exposure. This method requires examining the *relative contribution* to dose and risk that an exposure provides – analyses that Dr. Brodkin made no attempt to undertake.

In fact, Dr. Brodkin freely admits to ignoring the first criterion identified in *Parker*—an assessment of Mr. Quirin's alleged "level of exposure" to Calidria asbestos—and his analysis sidesteps the second and third criteria as well. Instead, Dr. Brodkin simply reasons that if mesothelioma can be attributed to an individual's *aggregate* exposure to asbestos, it follows that mesothelioma can be attributed to individual asbestos exposures or exposure sub-sets on the ground that they necessarily contributed in some manner to the individual's aggregate asbestos dose. However, that proposition is in no way generally accepted in the fields of medicine, pathology, or epidemiology—or any other scientific discipline, for that matter. And to the extent such a theory amounts to anything more than Dr. Brodkin's own brand of "common sense," it certainly cannot be falsified or validated through scientific testing—the *Daubert* reliability factor that "has been recognized as the most important." *U.S. Automated Sprinkler Co. v. Reliable Automated Sprinkler Co.*, 2010 WL 1266659, at *3 (S.D. Ind. Mar. 25, 2010) (citing *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002)) (attached as Exhibit 15). Indeed, it is difficult, if not impossible, to imagine what empirical data could support—or refute—whether Dr. Brodkin's conceptualization of "cause" is the right one. This should "indicate[ ]" to the Court that Dr. Brodkin's "proffered opinions cannot fairly be characterized as scientific knowledge" and "amount to nothing more than unverified statements unsupported by scientific methodology." *Chapman*, 297 F.3d at 688.

Given the nature of Dr. Brodkin's methodology, it is not surprising that he has failed to make any type of "specific assessment" of the risk associated with Mr. Quirin's alleged exposure to Calidria in comparison with his total risk or his risk from other exposure sources. This, too, renders Dr. Brodkin's "opinion on specific causation inherently unreliable." *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1162 (E.D. Wash. 2009). Much like Dr. Brodkin

would attempt to do here, the medical expert precluded from giving testimony in *Henricksen* had opined that the plaintiff's cancer was caused by an exposure to benzene, but had never "attempt[ed] to quantify dose or even estimate Henricksen's exposure." *Id.* Rather, the expert had simply "presume[d] that exposure to benzene in gasoline can cause [the plaintiff's cancer] and that Henricksen's exposure was sufficient." *Id.* Because Dr. Brodkin's Calidria opinion rests on the very same type of impermissible presumption, "there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 1154 (quoting *Joiner*, 522 U.S. at 146).

Equally important for *Daubert* purposes is the fact that Dr. Brodkin's opinions are based on an underlying factual premise that neither the medical nor the scientific communities have ever validated: that all exposures to asbestos resulting in some non-zero contribution to an individual's aggregate asbestos dose actually increase the risk of developing mesothelioma. As the court in *Butler v. Union Carbide Corp.* held in excluding similar testimony under the federal *Daubert* standard followed by Georgia state courts, the "'any exposure' theory is, at most, scientifically-grounded speculation: an untested and potentially untestable hypothesis." 712 S.E.2d 537, 552 (Ga. App. 2011). In fact, as explained by Dr. Moolgavkar, contrary to Dr. Brodkin's no-safe-level hypothesis, "there is excellent affirmative epidemiologic evidence that exposure to low levels of chrysotile asbestos does not increase the risk of mesothelioma." *See* Moolgavkar Affidavit at ¶ 94. Dr. Brodkin fails to address this and further fails to take into account available studies showing "no evidence that exposure to joint compound increases the risk of mesothelioma." *Id.* at ¶ 61; *see also id.* at ¶ 97 (noting that Dr. Brodkin "ignores the large body of epidemiologic literature showing that exposure to low levels of chrysotile asbestos does not increase the risk of mesothelioma and does not add to the risk imposed by other exposures."). This scientific evidence is particularly relevant for assessing the causal role of Mr. Quirin's

alleged exposures to Calidria asbestos—a pure form of short-fiber chrysotile asbestos uncontaminated with tremolite or other amphibole types of asbestos. *See id.* at ¶¶ 43-52 (noting that amphibole asbestos is substantially more potent than chrysotile asbestos and explaining the problem of amphibole contamination in studies of chrysotile asbestos); *see also* Brodkin Dep. at 41:6-15. Dr. Brodkin's failure to take into consideration the relative potency differences among Mr. Quirin's various asbestos exposures in deeming them all substantial contributing factors renders his causation opinion unreliable and inadmissible. *Id.* at ¶ 97("Dr. Brodkin has not critically evaluated whether Mr. Quirin's alleged bystander exposure to chrysotile asbestos added to the substantial risk imposed by his total amphibole exposure.").

Throughout his deposition, Dr. Brodkin referred to statements and regulations promulgated by the EPA and OSHA, among other agencies, as evidence that low-dose exposures to chrysotile asbestos can be hazardous. *See* Brodkin Dep. at 151:10-21; 176:13-19. Safety regulations of this sort are "typif[ied]" by "speculation, conflicts in evidence, and *theoretical extrapolation*" by agencies acting under their prophylactic mandate to "protect[ ]… the public health." *Ethyl Corp. v. EPA*, 541 F.2d 1, 24 (D.C. Cir. 1976) (emphasis added). As a result, "[t]he agencies' threshold of proof is reasonably lower than that appropriate in tort law, which 'traditionally makes more particularized inquiries into cause and effect' and requires a plaintiff to prove 'that it is more likely than not that another individual has caused him or her harm.'" *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 198 (5th Cir. 1996) (citation omitted). Thus, courts regularly exclude as methodologically unsound opinions that involve extrapolation from epidemiological studies reporting an elevated risk of disease at very high exposures to conclude that a plaintiff's much lower exposure caused disease.[10] As a result, Dr. Brodkin's references to

---

[10]    *See Betz*, 44 A.3d at 33.

14

"regulatory standards are not probative of [a] scientific analysis." *Ametek* Order, at 3.

In short, Dr. Brodkin should be precluded from offering an opinion or expert testimony to the effect that Mr. Quirin's alleged exposure to Calidria asbestos participated in causing his mesothelioma merely because it contributed to his aggregate asbestos dose and/or "total risk," or that the exposure was otherwise "substantial" or a "substantial factor." Such testimony amounts to Dr. Brodkin's personal value judgment of what constitutes "cause," defies the standards for admission of expert testimony established in Fed. R. Evid. 702 and *Daubert*, and in any event is plainly incompatible with causation standards that are firmly established in Illinois tort law.

## III. CONCLUSION

For the reasons set forth above, Union Carbide respectfully requests that this Court issue an Order granting its motion *in limine* to preclude Dr. Carl Brodkin from offering expert testimony or opinion that Mr. Quirin's alleged exposure to Union Carbide Calidria asbestos participated in causing his mesothelioma or was a "substantial factor" in bringing it about.

Dated: August 1, 2013

Respectfully submitted,
By: s/ Richard F. Bulger_____

Richard F. Bulger
Mayer Brown LLP
71 S. Wacker Drive
Chicago, Illinois 60606-4637
Telephone (312) 782-0600
Facsimile (312) 701-7711

Thomas J. Morel
Kirkland & Ellis LLP
300 N. LaSalle Street
Chicago, IL 60654
Telephone (312) 862-2000

Tobin J. Taylor
Heyl Royster Voelker & Allen
19 S. LaSalle St., Suite 1203
Chicago, IL 60603
Telephone (312) 853-8700

ATTORNEYS FOR UNION
CARBIDE CORPORATION

## CERTIFICATE OF SERVICE

I, Richard F. Bulger, an attorney, hereby certify that on August 1, 2013, I caused a true and correct copy of the foregoing DEFENDANT UNION CARBIDE CORPORATION'S MOTION *IN LIMINE* TO PRECLUDE DR. CARL BRODKIN FROM TESTIFYING THAT EXPOSURE TO UNION CARBIDE ASBESTOS WAS A CAUSE IN FACT OR A "SUBSTANTIAL FACTOR" IN CAUSING PLAINTIFF'S MESOTHELIOMA to be filed and served electronically via the court's CM/ECF system.

s/ Richard F. Bulger_____
Richard F. Bulger
Mayer Brown LLP
71 S. Wacker Drive
Chicago, Illinois 60606-4637
Telephone (312) 782-0600
Facsimile (312) 701-7711

# EXHIBIT 1

Transcript of the Testimony of

**Carl A. Brodkin, MD MPH FACOEM**
December 17, 2012

**Quirin v. Alcatel-Lucent USA, et al.**
No. 12 L 005290



**<u>Byers and Anderson, Inc.</u>**
**Court Reporters/Video/Videoconferencing**
**Seattle/Tacoma, Washington**

scheduling@byersanderson.com
www.byersanderson.com

One Union Square: 600 University Street, Suite 2300 Seattle, WA 98101-4128
Seattle: **206 340-1316**  Toll Free: **800 649-2034**
Old Town District: 2208 North 30th Street, Suite 202 Taccoma, WA 98403-3360
Tacoma: **253 627-6401**  Fax: **253 383-4884**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

COUNTY DEPARTMENT, LAW DIVISION

RONALD J. QUIRIN and MARILYN )
QUIRIN, )
                               )
             Plaintiffs, )
                               ) No. 12 L 005290
         vs. )
                               )
ALCATEL-LUCENT USA, INC., et al., )
                               )
             Defendants. )
                               )

DEPOSITION OF CARL A. BRODKIN, MD MPH FACOEM

December 17, 2012

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square     2208 North 30th Street, Suite 202

600 University St.   Tacoma, WA 98403

Suite 2300           (253) 627-6401

Seattle, WA 98101    (253) 383-4884 Fax

(206) 340-1316       scheduling@byersanderson.com

(800) 649-2034       www.byersanderson.com

**Page 2**

```
 1          APPEARANCES
 2   For the Plaintiffs:
 3       B. Scott Kruka
         Waters & Kraus
 4       3219 McKinney Avenue
         Dallas, TX  75204
 5       214.357.6244
         214.357.7252 Fax
 6       skruka@waterskraus.com
 7
     For the Defendant Georgia-Pacific:
 8
         Scott B. Pfahl
 9       King & Spalding
         1180 Peachtree Street NE
10       Atlanta, GA  30309-3521
         404.572.3514
11       404.572.5137 Fax
         spfahl@kslaw.com
12
13   For Defendant Lorillard Tobacco Company:
14       Elizabeth Raines
         Hughes Hubbard
15       2345 Brand Boulevard
         Kansas City, MO  64108-2663
16       816.709.4160
         816.709.4198 Fax
17       hugheshubbard.com
18
19   For Defendant Ingersoll-Rand Company:
20       Eric P. Hall
         Hepler Broom
21       130 North Main Street
         Edwardsville, IL  62025
22       618.307.1242
         618.656.1364 Fax
23       eric.hall@heplerbroom.com
24
25
```

**Page 4**

```
 1        APPEARANCES:  (Continuing.)
 2   For Defendants Lucent and ATT:
 3       Daniel W. Lageman
         Edwards Wildman Palmer LLP
 4       One Giralda Farms
         Madison, NJ  07940
 5       973.520.2300
         866.955.8983
 6       dlageman@edwardswildman.com
 7
     For Defendant Renaissance Oakbrook Hotel, LLC:
 8
         David A. Cyr
 9       Johnson & Bell
         33 West Monroe Street
10       Suite 2700
         Chicago, IL  60603-5404
11       312.372.0770
         312.372.9818
12       cyrd@jbltd.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1        APPEARANCES:  (Continuing.)
 2   For Defendant Union Carbide Corporation:
 3       Eric D. Cook
         Wilcox & Salvage
 4       440 Monticello Avenue
         Suite 2200
 5       Norfolk, VA  23510
         757.628.5500
 6       757.628.5566 Fax
         ecook@wilsav.com
 7
 8   For Defendant Crane Co.:
 9       Stephen K. Milott
         Gunty & McCarthy
10       150 South Wacker Drive
         Suite 1025
11       Chicago, IL  60606
         312.541.0022
12       312.541.0033 Fax
         smilott@guntymccarthy.com
13
14   For Defendants Imo Industries, Inc., Warren
         Pumps, LLC, Parker Hannefin and Molex
15       Industries, Inc.:
16       Drew Schilling
         Heyl Royster Voelker & Allen
17       120 West State Street
         PO Box 1288
18       Rockford, IL  61105
         815.963.4454
19       815.963.0399 Fax
         dschilling@heylroyster.com
20
21   For Defendant Hollingsworth & Vose Company:
22       Eric N. Shor
         Nutter McClennen & Fish
23       155 Seaport Boulevard
         Boston, MA  02210-2604
24       617.439.2734
         617.310.9734
25       eshor@nutter.com
```

**Page 5**

```
 1           EXAMINATION INDEX
 2   EXAMINATION BY:           PAGE NO.
 3   MR. PFAHL                    9
 4   MR. LAGEMAN                141
 5   MR. HALL                   151
 6   MR. MILOTT                 156
 7   MR. COOK                   173
 8   MR. SHOR                   195
 9   MR. SCHILLING               201
10   MS. RAINES                 203
11   MR. MILOTT                 243
12   MR. PFAHL                  243
13
14           EXHIBIT INDEX
15   EXHIBIT NO.   DESCRIPTION        PAGE NO.
16   Exhibit No. 1   Folder containing Mr.      14
                     Quirin's deposition
17                   testimony.
18   Exhibit No. 2   Folder containing coworker   15
                     declaration and deposition
19                   testimony.
20   Exhibit No. 3   Folder containing pathology   15
                     documents.
21
     Exhibit No. 4   Folder containing            16
22                   chronological medical
                     records.
23
     Exhibit No. 5   Folder containing medical    16
24                   records.
25
```

Carl A. Brodkin, MD MPH FACOEM
December 17, 2012

EXHIBIT INDEX (Continuing.)
EXHIBIT NO.    DESCRIPTION              PAGE NO.

Exhibit No. 6    Folder containing billing       18
documents.
Exhibit No. 7    Folder containing Kent          18
Micronite documents.
Exhibit No. 8    Folder containing Western       19
Electric documents.
Exhibit No. 9    Folder containing Lucent        19
Technologies documents.
Exhibit No. 10   Folder containing Motorola      20
documents.
Exhibit No. 11   Folder containing               20
Georgia-Pacific documents.
Exhibit No. 12   Folder containing United        20
States Gypsum documents.
Exhibit No. 13   Folder containing Crane         21
Company documents.
Exhibit No. 14   Folder containing               21
Ingersoll-Rand documents.
Exhibit No. 15   2-page document containing      22
cover letters to Waters &
Kraus dated 12/14/12 and
12/15/12.
Exhibit No. 16   3-page document containing      22
cover letters to Dr. Brodkin
from Waters & Kraus dated
10/5/12, 11/8/12 and
12/10/12.
Exhibit No. 17   Curriculum Vitae of Dr.         22
Brodkin.
Exhibit No. 18   64-page document containing     88
handwritten notes.

EXHIBIT INDEX (Continuing.)
EXHIBIT NO.    DESCRIPTION              PAGE NO.

Exhibit No. 27B   Folder from Charles Burns       201
marked Kent
Micronite/Hollingsworth &
Vose.
Exhibit No. 27C   Folder from Charles Burns       201
marked Kent Micronite
Discovery.
Exhibit No. 27D   Folder from Charles Burns       201
marked Dr. Longo testimony
8/18/95, Micronite v.
Raybestos.
Exhibit No. 27E   Folder from Charles Burns       201
marked Trial Testimony of
Douglas Hallgren, Horowitz
versus Raybestos.
Exhibit No. 28    Folder labeled William          201
McGuire.
Exhibit No. 28A   Folder from William McGuire     201
labeled Lorillard Cases Death
Certificates.
Exhibit No. 28B   Folder from William McGuire     201
labeled Trial Testimony of
Douglas Hallgren, Cox versus
Asbestos Corp.
Exhibit No. 28C   Folder from William McGuire     201
labeled Owens-Corning
Testimony of Kent
Micronite/Testimony of Mark
Risler, Ph.D.

EXHIBIT INDEX (Continuing.)
EXHIBIT NO.    DESCRIPTION              PAGE NO.

Exhibit No. 19   14-page article,                80
Environmental Exposure to
Asbestos and the
Exposure-Response
Relationship with
Mesothelioma.
Exhibit No. 20   9-page article, Blood           83
Superoxide Dismutase and
Plasma Malondialdehyde Among
Workers Exposed to Asbestos.
Exhibit No. 21   7-page article, Mesothelioma    85
in Egypt.
Exhibit No. 22   14-page article, Mesothelioma   89
in Drywall Finishing Workers.
Exhibit No. 23   3-page article, Discussion on   90
"Mesothelioma in Drywall
Finishing Workers."
Exhibit No. 24   9-page article, The CARET       93
Asbestos-Exposed Cohort:
Baseline Characteristics and
Comparison to Other
Asbestos-Exposed Cohorts.
Exhibit No. 25   11-page article, "Re-Creation   107
of Historical
Chrysotile-Containing Joint
Compounds.
Exhibit No. 26   20-page article, A             118
Biopersistence Study
Following Exposure to
Chrysotile Asbestos Alone or
in Combination with Fine
Particles.
Exhibit No. 27   Folder marked Charles Burns.   201
Exhibit No. 27A   Folder from Charles Burns      201
marked Kent Micronite/P.
Lorillard documents.

1    BE IT REMEMBERED that on Monday,
2  December 17, 2012, at 600 University Street, Suite 2300,
3  Seattle, Washington, at 9:43 a.m., before BARBARA
4  CASTROW, CCR, RPR, appeared CARL A. BRODKIN, MD MPH
5  FACOEM, the witness herein;
6          WHEREUPON, the following proceedings
7  were had, to wit:

8

9          <<<<<< >>>>>>

10

11  DR. CARL A. BRODKIN,      having been first duly sworn
12                           by the Certified Court
13                           Reporter, testified as
14                           follows:

15

16          EXAMINATION

17  BY MR. PFAHL:

18  Q  Good morning, Dr. Brodkin.

19  A  **Good morning.**

20  Q  My name is Scott Pfahl.  I'm here for Georgia-Pacific,

21     and we have met on a number of occasions and recently

22     within the last month or so.  And today we're here in the

23     Quirin matter, correct?

24  A  **Yes, that's my understanding.**

25  Q  I will try not to go over old ground we've already plowed

Carl A. Brodkin, MD MPH FACOEM
December 17, 2012

**Page 10**

1   through to the extent that I can.  And I will try to
2   cover things that you've done in this case and to the
3   extent new things that I wanted to talk to you about.
4   And I will lead off, and then others will ask you
5   questions.
6       First of all, as you always do, you have brought
7   with you a number of records, documents, case materials.
8   And for the record let's go ahead, if we can, and
9   identify those things, and we can mark as exhibits the
10  various parts on the record that you brought with you.
11  A  Sure.  And to hopefully simplify things, on the -- on
12  Page 3 of a subgroup of notes entitled Clinical Summary
13  and Materials Reviewed, I have cataloged the materials I
14  reviewed.  And they include a direct examination of
15  Mr. Quirin's x-ray and imaging studies, and I do have a
16  page of notes from my examination of those, a direct
17  telephonic interview with Mr. Quirin, and I have my notes
18  from that interview, review of medical records, and my
19  notes should be another subsection of the documents you
20  received from my office, pathologic reports, billing
21  documents, deposition testimony, including three volumes
22  of Mr. Quirin's deposition, and then two coworkers,
23  Daniel Di Fazzio and Jack Williamson, Mr. Quirin's naval
24  personnel documents, a work history sheet and various
25  discovery documents.

**Page 11**

1       I have brought in notes from those discovery
2   documents, but to the extent that I pulled any of those
3   discovery documents and looked at them in this case, I
4   did bring them in with me today.
5   Q  With respect to the materials you brought with you, you
6   have what is a case specific file, correct?
7   A  I do, yes.
8   Q  And let's set aside your notes, which for many are in the
9   nature of a report, for the time being, and let's
10  identify the other materials you brought with you --
11  A  Sure.
12  Q  -- today.
13  A  Yes, the case specific file for Mr. Quirin is in an
14  expandable Redweld, six-inch Redweld, and it basically
15  includes manila folders from the materials that I spoke
16  to you about earlier.  I can just read through them, if
17  it would be useful?
18  Q  Sure.
19  A  The first one is entitled Work History Sheet and Naval
20  Documents.  The second one is Deposition Testimony of
21  Ronald Quirin.  The next is Coworker Declarations and
22  Depositions.  That would refer to Mr. Di Fazzio and
23  Mr. Williamson.  Pathology is the next folder.
24  Chronologic Medical Records is the next folder, and then
25  Comprehensive Medical Records is the next folder.

**Page 12**

1   Billing Documents is the next folder.
2       And then there's some discovery documents that I
3   received in this case.  The first one is Kent Micronite,
4   Including MAS Testing from July of 2012, and MVA Testing
5   by Millette from September of 2010.
6       And then the next manila folder is Western Electric.
7   The next is Lucent Technologies.  The next is Motorola.
8   The next is Georgia-Pacific.  The next is United States
9   Gypsum, the next is Crane Co.  And the next is
10  Ingersoll-Rand.
11      And then I have another two sets of expandable
12  Redwelds in a box adjacent to me that includes materials
13  in broad overview relevant to Kent micronite filter
14  exposure.
15  Q  If you wouldn't mind handing me your Redweld?
16  A  Sure.
17  Q  (Peruses documents.)  And the first manila folder was
18  Work History Sheet and Naval Documents for Mr. Quirin --
19  Quirin or Quirin?
20  A  I say Quirin.
21  Q  He didn't object --
22  A  He didn't object when I said it.
23  Q  For Mr. Quirin.  These -- this is just the standard work
24  history sheet that we all have through production.  I
25  would be inclined not to mark it unless somebody else

**Page 13**

1   would like me to.
2       And then the other item in the Work History folder
3   was the naval documents.  And I believe this was produced
4   also in discovery.  I will make a note here for the
5   record that there are some Post-its on here.
6       And, Doctor, you put the Post-its on the naval
7   records?
8   A  Correct.  All Post-its on the documents are mine.
9   Q  There's a Post-it which just indicates the ship, which is
10  the Tolovana?
11  A  Yes.
12  Q  And then also a date, and that's when he was first
13  assigned to the Tolovana as far as you understand?
14  A  Correct.
15  Q  And there's another Post-it 9/4/53, and I'm not sure what
16  is written on this one.  If you could just identify that
17  for us?
18  A  (Peruses documents.)  That is the assignment to Great
19  Lakes.  That was the naval station for training.
20  Q  Okay.  That's the training date?
21  A  Yes, or probably enlistment date, close to it.
22  Q  And finally mechanic rating is indicated?
23  A  Yes.
24  Q  And I will set that aside.  If anybody would like it to
25  be marked, they may ask for it to be marked.

**Page 14**

1     Now, there is a folder that you identified as
2 Mr. Quirin's deposition testimony, and here there are a
3 number of markings and Post-its that you have put on the
4 testimony that you reviewed; is that correct?
5 A  That's correct.
6 Q  And I take it that you did that as a way to help you find
7 things should you need to look at the testimony again?
8 A  Yes.  They are identifying Post-its, and they refer to
9 markings on the page.  They also are the basis for my
10 coming back and taking notes.
11     So the 23 pages of Occupational and Environmental
12 History certainly would reflect those Post-its, but they
13 do identify specific pages.
14 Q  All right.  There are portions that are circled, you have
15 underlining, stars by some of the testimony, correct?
16 A  Yes.
17 Q  And since that -- this contains those type of personal
18 markings, then we'll go ahead and mark as Exhibit No. 1,
19 the Quirin testimony which has your notations on them.
20           (Exhibit No. 1 marked
21           for identification.)
22
23 Q  (By Mr. Pfahl)  The next folder is the coworker
24 declaration and deposition testimony.  Similarly, you
25 have made marginalia markings on these items, correct?

**Page 15**

1 A  That's true.
2 Q  And there are also Post-its there with identifying
3 information?
4 A  Yes, a similar process.
5 Q  I will mark that as Exhibit No. 2.
6           (Exhibit No. 2 marked
7           for identification.)
8
9 Q  (By Mr. Pfahl)  There's a third manila folder entitled
10 Pathology that you identified earlier?
11 A  Yes.
12 Q  And it appears that there are similar types of marginalia
13 and Post-it notes on the pathology documents that you
14 have?
15 A  Correct.
16 Q  So that we can memorialize all of this, I will mark that
17 as Exhibit 3.
18           (Exhibit No. 3 marked
19           for identification.)
20
21 Q  (By Mr. Pfahl)  Another folder that you have in your
22 Redweld is the chronological medical records.  These have
23 marginalia and Post-its on them as well, correct?
24 A  Yes.
25 Q  Now, you have a broader set of medical records?

**Page 16**

1 A  Correct.
2 Q  The chronology -- chronologic medical records that are in
3 this folder, are those a subset of the larger group you
4 were provided?
5 A  Yes.
6 Q  Were these -- the records and the chronology in that
7 folder, are these records that you, yourself, pulled or
8 were they pulled for you?
9 A  I didn't pull them.  I received them as a separate group
10 of documents.  But I certainly have gone through the
11 comprehensive medical ones, and they are a subsection.
12 Q  I will mark the subset as Exhibit 4.
13           (Exhibit No. 4 marked
14           for identification.)
15
16 Q  (By Mr. Pfahl)  And then we have the broader set of
17 medical records for Mr. Quirin.  And during your review
18 of the broader set, you have put some Post-its and also
19 made some marginalia comments, correct?
20 A  Yes.
21 Q  And I will mark those as Exhibit 5.
22           (Exhibit No. 5 marked
23           for identification.)
24
25 Q  (By Mr. Pfahl)  The next folder is entitled Billing

**Page 17**

1 Documents.  And there are Post-its that are attached
2 throughout the record set and also, it appears, some
3 summary Post-its on the front of the first page?
4 A  Yes.  The Post-its on the front page are my opinions
5 about the cost of care.  So they are substantive summary
6 Post-its.  They basically are summations of the
7 individual page billing documents, and they reflect the
8 cost of care indicated in the documents.
9     There's a second Post-it that indicates some
10 estimated additional costs of care --
11 Q  If you want to take a look?  (Produces document.)
12 A  Sure.
13     Mr. Quirin indicated to me that he received six
14 cycles of chemotherapy.  The billing I received only
15 covers the initial two.  So I made an estimate for four
16 additional cycles of carboplatin and Alimta.
17     And then on the third Post-it, I have anticipated
18 some costs, end of life care, palliative care, that
19 typically would be associated with mesothelioma and have
20 provided a total of all those costs as well.
21 Q  For the folks on the phone, what is your total estimated
22 costs for those types of future treatments?
23 A  Sure.  The anticipated costs in the future is $70,000,
24 the estimated additional cost of four cycles of
25 chemotherapy is $42,800, the partial existing costs is

**Page 18**

1     **$291,366, and the total of all of those is $404,166.**
2     **Those are estimates within a range of uncertainty.**
3  Q  I will mark then the billing records with the Post-its
4     and marginalia as Exhibit 6.
5         (Exhibit No. 6 marked
6         for identification.)
7
8  Q  (By Mr. Pfahl) There is another folder, manila folder,
9     that has a title of Kent Micronite. And in here, there's
10     an expert report from MAS, as well as an MVA expert
11     report?
12  **A  Yes.**
13  Q  And both of these contain marginalia and Post-its with
14     notes on them, right?
15  **A  That's correct.**
16  Q  I will go ahead and mark that as Exhibit 7.
17         (Exhibit No. 7 marked
18         for identification.)
19
20  Q  (By Mr. Pfahl) The next folder is titled Western
21     Electric. This contains a two-page document, Memorandum
22     for Record, and you have some Post-its on here, as well
23     as some marginalia, correct?
24  **A  Yes.**
25  Q  And I will mark that as Exhibit No. 8.

**Page 19**

1         (Exhibit No. 8 marked
2         for identification.)
3
4  Q  (By Mr. Pfahl) The next folder is Lucent Technologies.
5     In here, you have Defendant Lucent Technologies Responses
6     to Plaintiff's Supplemental Interrogatories and Requests
7     For Production. This was in the Robert M. Taylor versus
8     Bondex matter, which was in Harris County, Texas. And
9     here you have, it looks like, the full interrogatory
10     response; is that correct?
11  **A  That's my understanding. I don't know if it's the full**
12     **interrogatory response, but I was provided this document.**
13  Q  It looks like it stops at Page 16 of 16. There's
14     marginalia here, as well as Post-its, correct?
15  **A  Yes.**
16  Q  And I will go ahead and mark that as Exhibit 9.
17         (Exhibit No. 9 marked
18         for identification.)
19
20  Q  (By Mr. Pfahl) The next folder is -- has the title
21     Motorola on it. It is the affidavit of Timothy Bratton.
22     You have some marginalia here, as well as Post-its?
23  **A  Yes.**
24  Q  And I will mark that as Exhibit No. 10.
25     ///

**Page 20**

1         (Exhibit No. 10 marked
2         for identification.)
3
4  Q  (By Mr. Pfahl) The next folder is Georgia-Pacific. You
5     have 1995 Response to Interrogatories that were provided
6     to you; is that correct?
7  **A  Yes, not in this case.**
8  Q  No, right.
9  **A  But I certainly considered them, so I brought them in.**
10  Q  I will mark that as Exhibit 11.
11         (Exhibit No. 11 marked
12         for identification.)
13
14  Q  (By Mr. Pfahl) The next folder is United States Gypsum.
15     These are Defendants' Answers to Interrogatories and
16     Requests For Production In Re: All Asbestos-Related
17     Personal Injury or Death Cases Filed or to Be Filed in
18     Dallas County, Texas. And I will mark that as Exhibit
19     12.
20         (Exhibit No. 12 marked
21         for identification.)
22
23  Q  (By Mr. Pfahl) The next folder refers to Crane Company.
24     And these are responses to interrogatories from the case
25     of Steven Haley In Re Bridgeport Asbestos Litigation. I

**Page 21**

1     will mark those as Exhibit 13.
2         (Exhibit No. 13 marked
3         for identification.)
4
5  Q  (By Mr. Pfahl) And the final file in the Redweld is
6     Ingersoll-Rand, a manila folder. This has Amended
7     Responses to Plaintiff's General Order 129 Standard
8     Interrogatories. This is In Re Complex Asbestos
9     Litigation Superior Court of California, County of San
10     Francisco, as well as some responses to interrogatories
11     from the Eldon Dickerson and Ruth Dickerson case,
12     Cuyahoga County, Ohio. And I will mark that as Exhibit
13     14.
14         (Exhibit No. 14 marked
15         for identification.)
16
17  Q  (By Mr. Pfahl) And it looks like you have a folder in
18     front of you, a manila folder. Is that just your report?
19  **A  Yeah. I mean, this is part of the Redweld as well, but**
20     **it includes my comprehensive notes, it includes all**
21     **correspondence, including the cover sheets for the notes,**
22     **as well as covers for all the materials I received, as**
23     **well as my CV.**
24  Q  Can I go ahead and see that folder?
25  **A  Sure. (Produces documents.)**

**Page 22**

1  Q  I'm going to mark as Exhibit 17 two transmittal cover
2     sheets.  One is dated December 14th, 2012, the other is
3     December 15th, 2012, and these refer to the forwarding of
4     your notes to Mr. Henderson of Waters & Kraus, correct?
5  A  Yeah.  I may have missed Exhibit 15 and 16.  I'm not sure
6     about that.
7  Q  No, you didn't.  I did.  Thank you.
8        All right.  Exhibit 15 are those two cover sheets.
9                    (Exhibit No. 15 marked
10                    for identification.)
11
12 Q  (By Mr. Pfahl)  Exhibit 16 will be Waters & Kraus
13    transmittal letters to you, which identify the various
14    documents, records and materials that were provided, it
15    looks like, beginning first October 5, 2012; November 8,
16    2012; December 10, 2012.
17 A  Yes.
18                    (Exhibit No. 16 marked
19                    for identification.)
20
21 Q  (By Mr. Pfahl)  Exhibit 17 will be a copy of your CV.
22       And, Doctor, is this up to date?
23 A  Yes.
24                    (Exhibit No. 17 marked
25                    for identification.)

Page 22

**Page 23**

1  Q  (By Mr. Pfahl)  And finally we come to your notes,
2     comprehensive notes.  I know that you want those back,
3     but can we mark as 18 the full set of your comprehensive
4     notes?
5  A  Sure.  And we can make a high quality copy here today,
6     and then I will take -- I need to take the originals
7     back, but that's fine.
8  Q  Absolutely.  But that will be 18.
9  A  Sure.
10 Q  Now, have we identified and/or marked all of the
11    materials that you brought with you in your Quirin file?
12 A  Yes.
13 Q  You mentioned that you also had some additional materials
14    that relate to Kent and micronite filters; is that
15    correct?
16 A  That's correct, from other cases I've evaluated.
17 Q  Would you mind just identifying for the record, and
18    Counsel may ask you to mark those today, but those
19    materials that relate to Kent that you brought with you
20    that you felt were pertinent to your opinions in this
21    case?
22 A  Yes.  There are two Redwelds, one for Mr. Burns, which is
23    a case I evaluated previously, as well as a Mr. William
24    McGuire, who I evaluated previously.
25       I did receive various discovery documents in those

Page 23

**Page 24**

1     cases that do inform my opinion about Kent micronite.  So
2     I certainly perused them in my review of this case and
3     brought them in today.
4  Q  Okay.  And have you made reference to those additional
5     materials in your detailed notes?
6  A  Yes.  There are notes I've taken from those documents in
7     the past, and I've actually brought those notes with me.
8     These aren't notes I created in this case, but they
9     certainly inform my opinion about this case, so I've
10    included them in my discovery documents that I've
11    reviewed in the notes.
12 Q  And with respect to your Kent notes, do you have those
13    handy?
14 A  Yes.  Notes that would relate to Kent are in the
15    clinical -- well, they are in a subgroup of notes called
16    Exposure Related Documents Reviewed and Considered for
17    Kent Micronite.  And they would be a subset of notes
18    going from Page 1 to 4.  So that would refer to those
19    notes.
20       There is also a reference list that informs my
21    opinion about exposures related to Kent micronite in the
22    list of articles I've considered, and that would be on
23    the last page of the list.  It begins with Dodson and
24    Hammar, Inhalation Toxicology, 2006, at the top and would
25    end in Millette, MVA 2010.

Page 24

**Page 25**

1        The other notes that relate to Kent micronite really
2     would relate to Mr. Quirin in his occupational and
3     environmental history.
4  Q  Just so I understand, the four pages of notes that are
5     identified as Exposure-Related Documents Reviewed and
6     Considered, those follow your reference and reliance
7     list?
8  A  Yes, they would have been faxed after that.
9  Q  And the specific references in those four pages are based
10    upon a review of the additional Kent materials that you
11    brought with you, but were not in the Quirin file?
12 A  That's correct, yes.  Those notes would refer to that.
13 Q  And do you have a set of notes, handwritten notes, that
14    you have over in the files in the box that relate to Kent
15    that you reviewed?
16 A  No.  I do have a list of articles that inform my opinion
17    about Kent, and they are in the list of articles that I
18    provided in this case.  It's a cumulative list that I
19    keep.  I did add the two references I received in this
20    case, Rigler and Longo, MAS 2012 and Millette, MVA 2010
21    to the list, but it is a cumulative list.  I have used it
22    in other cases as well.
23 Q  I think what I'm going to do is find a place for those.
24 A  On a break, maybe we can put them back in there.  It
25    might be easier.

Page 25

1  Q   All right.  Doctor, we've now identified and marked
2      everything you brought with you, correct?
3  A   Yes.
4  Q   It appears from some of the cover sheets from Waters &
5      Kraus that you were contacted in October of this year;
6      does that sound about right?
7  A   That's correct, early October.
8  Q   And generally speaking, did you have any specific charge
9      or direction?
10 A   Yes.  I had a chance to speak to Mr. Gibbs Henderson in
11     early November of this year after receiving some of the
12     initial documents, and my understanding is that I was
13     being asked to perform a medical evaluation of Ronald
14     Quirin that would include his diagnosis, his occupational
15     and environmental medical history, any asbestos-related
16     effects, including mesothelioma, if there were
17     asbestos-related effects, the scientific and medical
18     evidence of causation, his clinical course and treatment,
19     whether it was reasonable and necessary, the cost of
20     care, whether that was reasonable and necessary, as well
21     as potentially state of the art issues.
22 Q   With respect to medical evaluation, obviously you relied
23     upon medical records that were provided to you?
24 A   Correct.
25 Q   You also had a telephone interview with Mr. Quirin?

1  A   Yes.  In my conversations with Mr. Henderson later in
2      December, I did ask for an opportunity to interview
3      Mr. Quirin to understand his medical history.  I also had
4      a couple of questions for him for his occupational and
5      environmental history.  So I called him on December 12th
6      of this year.
7  Q   And obviously you didn't meet him in person, correct?
8  A   Correct.
9  Q   Is that something that you requested to do or gave some
10     thought?
11 A   I requested it.
12 Q   And is there any reason why you didn't have a chance to
13     meet with him in person?
14 A   Well, if an individual lives close to my clinic, which is
15     over in Kirkland across the lake, I would certainly
16     arrange to evaluate that person in clinic and take the
17     interview in clinic and do a direct examination as well.
18        For someone in a distant location who is ill and
19     can't travel, that usually is not possible or practical.
20        So in lieu of that, if possible, I like to do a
21     telephonic interview, at least to understand the clinical
22     course of their illness and perhaps ask any questions I
23     have about the occupational history.  But the most
24     important thing is to really understand from the
25     individual the course of their illness.

1         So that's what I did.  I do rely on the medical
2      records for the objective examinations, which I've done
3      in Mr. Quirin's case.
4  Q   Did you speak to any of Mr. Quirin's treating physicians
5      about their care and treatment of Mr. Quirin?
6  A   No.
7  Q   Now, you indicated that you wanted to speak with
8      Mr. Quirin because you wanted to follow up on a couple of
9      items.  One was medical history?
10 A   Yes.
11 Q   And was he able to clarify that to your satisfaction?
12 A   Well, he certainly updated his medical history, which was
13     useful, and certainly we went over his current symptoms
14     and how he was being followed by Dr. Alikhan, his
15     oncologist, and what the plans were for follow-up.  So,
16     yes, I certainly updated it.
17        He also confirmed his past medical history and
18     history of present illness.  So certainly I correlated
19     that with his deposition, as well as the medical records.
20 Q   And did you find that your discussion with Mr. Quirin
21     about his past history was consistent with the medical
22     records that you saw?
23 A   Well, I would say overall it was consistent in terms of
24     the types of medical conditions he had been treated for,
25     some borderline or mild hypertension, borderline

1      diabetes, some arthritis in his knees.  Those certainly
2      correlated with the medical records.
3         He indicated to me and confirmed that he was a
4      former smoker.  That certainly correlated with his
5      deposition and medical records.  As is common, there
6      certainly is variation in the pack years reported in the
7      medical records and what he reported to me.
8         But I would say the overall timeframe of smoking is
9      quite consistent.  He reported a use of half a pack per
10     day.  In the medical records, it was heavier, a pack a
11     day or perhaps more.  So some of the providers had a
12     higher cumulative pack year than he was reporting.  But
13     his reporting was very consistent with the deposition and
14     the interview.
15 Q   And did you have any -- or glean any additional
16     information from Mr. Quirin in the interview about his
17     occupational and environmental history or potential
18     exposure?
19 A   I did go over a couple of points.  Mr. Quirin indicated
20     to me in the interview that, you know, while he had a
21     very good memory of the types of things he did, his
22     memory as to specific dates were somewhat limited.
23        But he did go over some of his activities.  We
24     talked about the bystander exposure to drywallers.  I
25     wanted to get a feel for how often he was exposed to

**Page 30**

1 drywallers. I would say his answers were not more
2 specific than the deposition. He indicated it was quite
3 often.
4     I did clarify the type of sanding he was near. It
5 was pole sanding. That was not asked of him in the
6 deposition. And I tried to get a feel for dry-mix
7 compound versus premixed, and I would say he was not more
8 specific than he was in the deposition. He occasionally
9 saw premix, most of it was dry mix.
10     The other area we talked about was cable vaults. I
11 wanted to get a little bit more understanding of what he
12 did with that. And I think his description was
13 consistent with his deposition testimony. Again, he
14 wasn't specific as to, you know, the exact number of
15 times he did it or the specific years, but he did
16 indicate it was something he did frequently, particularly
17 in the late 1960s when he was on a cable crew, and he did
18 it at other times as well.
19     And he described the cable vaults to me as being
20 associated usually with the larger telephone systems with
21 switchboards and key sets where cables would enter these
22 holes, and they would have to be filled.
23     And then I went over his subsequent work history
24 after he was a telephone installer and supervisor because
25 that really wasn't covered much in the deposition. He

**Page 31**

1 did indicate he worked for about four years in the late
2 80s as a sheriff's deputy, transported prisoners to court
3 in the Chicago area.
4     And then when he relocated to North Carolina in the
5 1990s, he worked as a night supervisor at a grocery store
6 doing some stocking and cashier work.
7     And then between about 1999 and around 2006, he was
8 a supervisor at Wal-Mart part time.
9     And we talked about his environmental history. He
10 did not do any vehicle mechanical work, any brake work.
11 That was not reviewed in the deposition. He didn't do
12 any home remodel projects of significance. He did elude
13 to one project where he assisted his son, I think, on a
14 wall using drywall joint compound that was covered in the
15 deposition.
16     We went over his cigarette smoking history. I've
17 indicated that before. We talked about the start of his
18 cigarette smoking, his experience in the Navy, how he
19 smoked and the brands he smoked. We went over his use of
20 Kent micronites in the Navy. That's all indicated on
21 Page 2 of my interview notes.
22     But I would say really it was quite consistent with
23 what he indicated in the deposition.
24 Q  Thank you.
25     MR. PFAHL: Off the record for a

**Page 32**

1 minute.
2     (Discussion off the record.)
3
4 Q  (By Mr. Pfahl) All right. Dr. Brodkin, with respect to
5   your evaluation of Mr. Quirin and his various diagnoses,
6   did you come to any conclusions?
7 A  Yes, and I do have a section in my notes that would have
8   been faxed in the second group that summarizes my
9   diagnosis and assessment based on all the evidence.
10   That's a group of notes, subset of group of notes, from
11   Page 1 to 8. It should be in the second group that you
12   received.
13     The first line would be diagnosis malignant pleural
14   mesothelioma, left side. And basically --
15 Q  Let me see if I can catch up with you.
16 A  Sure.
17 Q  (Peruses documents.)
18 A  It would probably be after Clinical Summary and Materials
19   Reviewed in the second set of notes that you got. This
20   is what it looks like. (Indicating.)
21 Q  (Peruses documents.)
22 A  That's the first set.
23 Q  Oh, okay. All right. Thank you.
24     And I'm sorry I interrupted to find out where we
25   were, but this the third page of materials that we

**Page 33**

1 received this morning, which was the second set of
2 documents that you -- or notes that you sent to Waters &
3 Kraus, correct?
4 A  Yes. It is a second group.
5 Q  And I'm sorry. I interrupted you. Please go ahead.
6 A  No problem. Basically, it does provide my diagnosis and
7   the bases for my diagnoses in the subgroup of notes. But
8   I did diagnose malignant pleural mesothelioma on the left
9   side. It's my opinion that it is causally related to
10   various occupational exposures that he encountered in the
11   course of his naval service, as well as subsequent career
12   as a telephone installer and supervisor with additional
13   environmental exposure to the Kent micronite cigarettes
14   between mid 1954 to mid 1956 to a high degree of medical
15   certainty.
16     And then the bases for the exposure are really a
17   consideration of the nature and extent of asbestos
18   exposure, and I do provide a detailed discussion of that
19   in the notes.
20     Then the clinical and epidemiologic evidence for
21   asbestos-related mesothelioma, thirdly, a consideration
22   of latency, and fourth, a consideration of differential
23   diagnosis assessing whether there are any other risk
24   factors for mesothelioma or clinical deterioration.
25 Q  With respect to your diagnosis of mesothelioma, you

**Page 34**

1  indicated there was a left-sided pleural, correct?
2  A  Correct.
3  Q  Did you find evidence of any other asbestos-related
4     diseases for Mr. Quirin?
5  A  No, not in his medical records or in my review of his
6     radiographic and imaging studies.  Certainly the
7     malignant mesothelioma is a signal marker for asbestos
8     exposure, but in terms of nonmalignant markers, I didn't
9     see any evidence of plaques on the contralateral right
10    side or evidence for asbestosis.
11       He didn't have a high resolution CT scan, but
12    certainly there was no indication in any of the treating
13    physicians or in my review that he would have had a
14    preexisting asbestosis.
15 Q  You indicated -- well, in your notes I believe you stated
16    that you felt that he met the Helsinki criteria for
17    attribution of his disease to asbestos exposure?
18 A  Yes.  Based on the nature and extent of exposure, which
19    is a significant occupational and environmental history
20    of exposure.  And then based on the clinical evidence of
21    pathologically proven mesothelioma, as well as a
22    consideration of the epidemiologic studies indicating
23    risk for mesothelioma in similar workers and a
24    consideration for the differential diagnosis, those are
25    all considerations that would meet the Helsinki criteria

**Page 35**

1     for an asbestos-related malignant mesothelioma.
2  Q  You indicated that his course of disease was important to
3     you in your determination of the diagnosis and potential
4     cause, correct?
5  A  Well, the course of the disease is important clinically
6     in terms of the diagnosis.  I would say an
7     asbestos-related mesothelioma wouldn't have a course
8     distinct from a non-asbestos-related mesothelioma.  But
9     the course of the illness is important, as well as the
10    pathology in terms of establishing the diagnosis
11    clinically.  So I do consider that.
12 Q  All right.  And with respect to diagnosis, itself,
13    whether or not a mesothelioma is caused by exposure to
14    asbestos or ionizing radiation, that wouldn't matter to
15    the actual diagnosis of the disease, correct?
16 A  Not in terms of the pathologic diagnosis.  Obviously
17    those risk factors would be important in terms of
18    causation and in terms of considering them.
19 Q  With respect to treatment, the actual cause of a
20    mesothelioma, be it asbestos or some other cause, would
21    be irrelevant for determining the treatment course,
22    correct?
23 A  That's right.  The treatment for a malignant mesothelioma
24    would be the same regardless of the cause.  It would be
25    based on staging, clinical issues, efficacy of treatment.

**Page 36**

1  Q  There are some references in the second set of notes that
2     were provided, and they were forwarded to us this
3     morning, medical treatment reasonable and necessary is a
4     reference.  You are being asked to give an opinion as to
5     the reasonable and necessary nature of his treatment; is
6     that right?
7  A  Correct.
8  Q  What are your opinions with respect to that?
9  A  My opinion is that the treatment Mr. Quirin received was
10    reasonable and necessary.  Basically, the consideration
11    following his pathologic diagnosis in December of 2011
12    with a biopsy that was done by thoracoscopy was whether
13    he would benefit from surgical therapy.
14       A PET scan was done in January of 2012 that
15    indicated the disease was fairly circumscribed to the
16    left hemithorax.  There wasn't evidence of mediastinal
17    lymphatic spread.
18       So I think given that, the consideration for a
19    radical pleurectomy decortication procedure was
20    reasonable, and that was done at the University of
21    Chicago in February of 2012.
22       Unfortunately, intraoperatively they did find more
23    advanced disease.  Two of his five mediastinal lymph
24    nodes were positive for metastases.  His tumor had
25    extended into the peritoneum transdiaphragmatically and

**Page 37**

1     had extended into the pericardium as well.
2        So he was a Stage IV advanced mesothelioma.  That
3     wasn't known prior to the surgery, but it certainly was
4     an effective debulking procedure, and I agree with the
5     adjuvant chemotherapy based on the extent of disease.
6     And certainly carboplatin in a 70-plus-year-old man would
7     be reasonable, along with Alimta.
8  Q  There's a reference in your notes to life expectancy?
9  A  Yes.  Certainly a consideration of his life expectancy as
10    a 77-year-old male before his diagnosis of mesothelioma.
11    I've also provided some estimates in my clinical
12    discussion based on his current diagnosis of
13    mesothelioma.
14 Q  With respect to your estimates of Mr. Quirin's life
15    expectancy now, what are they?
16 A  In terms of his advanced stage mesothelioma, he has a
17    predominantly epithelial mesothelioma.  There's a small
18    component that is sarcomatoid.  But for epithelial
19    mesothelioma, overall life expectancy is 12 to 18 months
20    from diagnosis.  Even with the surgical multimodal
21    therapy, only 38 percent over all individuals survive
22    beyond two years.  So he has a very limited guarded
23    prognosis.  He's approximately 13 months into his
24    presentation, so he has an extremely guarded prognosis.
25 Q  And his life expectancy in the absence of mesothelioma?

**Page 38**

1      MR. MILOTT:  I'm going to object to
2  the expertise that this witness doesn't have to make that
3  response.
4      THE WITNESS:  I considered the
5  actuarial life expectancy of a 77-year-old man and
6  whether Mr. Quirin specifically had any medical
7  conditions that would adversely impact that actuarial
8  life expectancy.
9      And essentially the mild hypertension was controlled
10  with medication.  His diabetes was well controlled,
11  actually borderline controlled with diet.  His
12  cholesterol levels were well controlled.
13      Other than that, you know, with some benign colon
14  polyps and some degenerative arthritis in his knees, he
15  really had no significant limitations, certainly had no
16  clinically significant cardiovascular disease or prior
17  respiratory disease that would adversely impact his life
18  expectancy.
19      So I think the actual -- the actuarial life
20  expectancy of about nine years for a 77-year-old male
21  would apply to Mr. Quirin.
22 Q  (By Mr. Pfahl)  You mentioned that you also have some
23  opinions with respect to the costs of his treatment and
24  future treatment.
25      Did we talk about those as it relates to the notes

**Page 39**

1  that you identified for us earlier or do you have
2  additional opinions in that regard?
3 A  No, I indicated the estimates based on my review of the
4  billing documents and the medical records and
5  interviewing Mr. Quirin.
6 Q  Now, you mentioned at the beginning that you also had an
7  understanding that you would be asked to give some
8  opinions in general about state of the art; is that
9  right?
10 A  Yes.
11 Q  And to this point, what have you been asked to do as it
12  relates generally to state of the art?
13 A  Well, my opinions regarding medical state of the art are
14  really the evolution of knowledge about diseases caused
15  by asbestos over time, and that would date from the early
16  1900s to the current time as that knowledge evolved.
17      And, similarly, it would include the communication
18  of that knowledge in terms of recommendations.  Many of
19  the articles that I've indicated in my reference review
20  list refer to state-of-the-art articles that inform my
21  opinion about that evolution of knowledge.
22 Q  With respect to the evolution of knowledge, do you hold
23  any opinions as to the knowledge level for medical
24  causation as it relates to asbestos-containing joint
25  compound products?

**Page 40**

1 A  I have indicated a number of articles that inform my
2  opinion about that.  They would be on the fifth page of
3  the reference list.  It would start with Dement, Journal
4  of American Society of Testing Materials, and end in
5  Kinkhead and Carpenter at the bottom.  It's a page that
6  relates to joint compound generally.
7      But there are a number of articles that reflect that
8  evolution of knowledge.  One I've indicated is Hueper in
9  Occupational Tumors, 1942, where it's discussed that wall
10  board and related cements and plasters are sources of
11  asbestos exposure, and the chapter indicates concern for
12  pulmonary malignancy, lung cancer and asbestosis.
13      And then Hueper in Annals of New York Academy of
14  Sciences, 1965, addresses mesothelioma in addition to
15  lung cancer and asbestosis.  And the Hueper and Hendry
16  articles in that volume discuss joint filler compounds.
17      So those would be two articles that would
18  specifically address medical concerns.  I would say Soule
19  in the Gypsum Association, 1973, discusses exposure
20  levels with mixing and sanding and does indicate that
21  minimal nonoccupational exposure is sufficient to cause
22  mesothelioma.  So that concern is expressed.
23      And then, of course, you know, based on studies in
24  the 1970s, The Consumer Product Safety Commission's paper
25  in the Federal Registry, 1977, regarding risks of various

**Page 41**

1  asbestos-related diseases, including mesothelioma
2  associated with joint compound.
3 Q  Doctor, we've spoken before about asbestos fiber type
4  potency?
5 A  Yes.
6 Q  And I don't want to rehash all that, but generally
7  speaking you are of the belief that amphibole asbestos
8  fibers are more carcinogenic on a fiber-per-fiber basis
9  than are chrysotile fibers, correct?
10 A  My opinion based on my review of the medical evidence is
11  that amphibole fibers are several times more potent than
12  chrysotile in causing mesothelioma.  That wouldn't apply
13  for lung cancer or asbestosis, but for the disease end
14  point mesothelioma, yes, in the range of about threefold
15  increased potency.
16      But certainly all the fiber types including
17  chrysotile are potent carcinogens.
18 Q  With your -- excuse me.
19      With respect to your opinions about chrysotile and
20  potency for cancer, does it matter to you in your opinion
21  about chrysotile and its ability to cause various
22  cancers, including mesothelioma, as to the location of
23  where the chrysotile was mined?
24 A  Well, the location where chrysotile was mined certainly
25  is reflected in some of the epidemiologic studies, and

Page 42

1 those areas certainly inform my opinion that chrysotile
2 is potent in causing mesothelioma because there are
3 certain areas where relatively pure chrysotile was either
4 mined or the end products -- or manufactured and the end
5 products were conducted on relatively pure chrysotile.
6     So certainly areas of the world where that occurred,
7 and I have reviewed a number of them on the reference
8 reliance list, but, you know, they would include
9 certainly the Quebec experience where in the Township of
10 Asbestos there's relatively pure chrysotile.  In the
11 South Carolina and North Carolina textile industry, there
12 was relatively pure chrysotile.  In the mining and
13 milling areas of Balangero, Italy, there are high
14 incidences of mesothelioma.
15     In Chungking, China, Yano certainly has documented
16 high risk for mesothelioma in workers exposed to
17 relatively pure chrysotile.  The same would be true for
18 Zimbabwe miners and millers.  So -- and there are other
19 industries as well.  I mean, if you look at the New
20 Orleans asbestos cement industry, there were areas of
21 plants where chrysotile was used, and they certainly
22 experienced mesothelioma, workers in those plants.
23     So in looking at those areas, it certainly informs
24 my opinion that chrysotile is a potent cause of
25 mesothelioma.  I guess, you know, Madkour would be

Page 43

1 another, a plant in Egypt that, you know, over time there
2 were various fiber types used, but certainly he reports
3 chrysotile asbestos cement pipe and reports numerous
4 cases of mesothelioma.
5 Q  Now, in your opinion can anthophyllite cause mesothelioma
6 in humans?
7 A  Yes.  That's not a commercially used fiber type, but it
8 is an amphibole, so yes.
9 Q  And so, yes, anthophyllite can cause mesothelioma in
10 humans in your opinion?
11 A  It would have the properties of an amphibole, so yes.
12 Q  Now, you mentioned a number of different either mines or
13 areas where chrysotile was used and mesotheliomas were
14 reported.  My question -- let me try to re-ask this and
15 be more specific for you.
16     In your understanding of chrysotile and its relation
17 to mesothelioma in humans, does your opinion vary at all
18 as to the potency for chrysotile to cause mesothelioma in
19 humans depending on whether or not that chrysotile was
20 mined in the Carey Canadian mine in Canada or in a mine
21 in South Africa?
22 A  No.  As a physician in occupational and environmental
23 medicine, it doesn't.  In my opinion, I certainly would
24 cite Lancet, 2009, in terms of the International Agency
25 For Research and Cancers's position on asbestos as a

Page 44

1 known human carcinogen.  The fiber types are not
2 distinguished in terms of their ability to cause cancer.
3     So clinically it's really not a consideration.  I
4 mean, even if something is a mixed fiber type, it's
5 really the dose that's most important.  But I certainly
6 would consider, you know, qualitatively if there's
7 exposure to an amphibole versus chrysotile, I mean, there
8 is some relative potency difference.
9     Now, in terms of contaminants, no, that's really not
10 something I spend a lot of time with.
11 Q  Oh, okay.  That's what I wanted to ask you though.  The
12 relative level of a contaminant in chrysotile like
13 tremolite, for example, it sounded from your answer like
14 that would be at a level where it would not affect your
15 opinion on the potency of chrysotile to cause
16 mesothelioma; is that correct?
17 A  Well, I think when one is dealing with contaminants,
18 certainly the main clinical effect is going to be the
19 major fiber type present.
20     So it's the dose of asbestos that's important to my
21 consideration in terms of, you know, the intensity and
22 the duration qualitatively in the occupational and
23 environmental history.  That's what I consider.
24     Certainly the presence of amphibole as a contaminant
25 may increase the risk.  I mean, it presents an amphibole

Page 45

1 fiber and some potential for a mixed fiber exposure to
2 the extent there is contamination.  But in certainly a
3 trace contaminant, it's going to be the major dose
4 response of chrysotile that's the risk for the disease
5 outcome, not the contaminant.
6     I mean, the contaminant is something I would
7 consider that, you know, maybe there is some degree of
8 mixed fiber, but it's going to be a much smaller effect
9 than the dose of chrysotile in my opinion.
10 Q  Okay.  Now, if we have a product that has chrysotile in
11 it as one of the constituents, and under that
12 circumstance, so you have an end user using a product
13 that has chrysotile in it, does your opinion about an
14 exposure to the chrysotile in a product where it is
15 respirable, does your opinion vary at all with respect to
16 which mine the chrysotile came from that ultimately went
17 into use in the product?
18 A  In broad overview, no.  I mean, if I had specific
19 information and a product description or material safety
20 data sheet, I would consider it to inform my opinion
21 about the fiber types.  I wouldn't discard it.
22     But it is the dose.  The intensity and duration is
23 the major driver of risk, not the contamination.  So it
24 would be a minimal consideration.
25 Q  Right.

**Page 46**

1    So it would not be a significant consideration in
2  your opinion as to the potential for an
3  asbestos-containing product to cause mesothelioma where
4  the asbestos is chrysotile if the chrysotile came from --
5  or was Calidria chrysotile as opposed to Johns-Manville
6  chrysotile from Canada?
7  A  No, it wouldn't. If I were designing an experiment to
8  look -- or looking up an experiment to inform my opinion
9  about the effects of pure chrysotile, I certainly would
10  look for something like Calidria, which is, you know, a
11  NIOSH model pure chrysotile to look at that effect.
12    But in terms of clinically looking at disease risk,
13  no, I wouldn't distinguish between the two.
14  Q  Have you reviewed any studies that analyzed bulk ore
15  samples from the Carey Canadian mine area of Canada?
16  A  I've read medical articles regarding Carey Canadian
17  mines. It's my understanding that those have relatively
18  pure chrysotile. But I'm not a mineralogist. I mean, I
19  don't spend a lot of time looking at mineralogic studies
20  of these various mines. To the extent they are reported
21  in the medical literature, you know, I have some
22  awareness of them.
23  Q  And just to clarify, even if there were studies that
24  analyzed ore samples from Carey Canadian mines, the mine
25  area, and found no asbestiform amphiboles in it, that

**Page 47**

1  would not change your opinion that chrysotile from the
2  Carey Canadian mine is capable of causing mesothelioma in
3  humans, correct?
4  A  That's true. And it is my understanding that asbestos
5  mined from the Carey mines is relatively pure chrysotile.
6  Q  Under your diagnosis and assessment you have on Page 6,
7  you have a reference for epidemiologic evidence for
8  asbestos-related meso?
9  A  Yes.
10  Q  It says, "Epidemiologic studies of vessel-based workers,"
11  and I will just stop there.
12    Are you aware of epidemiologic studies that find
13  that merchant seamen who worked aboard World War II era
14  military or naval vessels are at an increased risk for
15  developing mesothelioma?
16  A  Yes. And, basically, this paragraph on Page 6 is making
17  reference to my reference reliance list of articles. And
18  on Page 3, the article -- well, the articles beginning
19  with Polakoff and Horn, 1979, and ending in IARC, Lancet,
20  2009, review much of that literature. But, yes,
21  certainly seamen working aboard older vessels in
22  historically relevant periods may have experienced
23  asbestos exposure, and there are a number of studies here
24  that indicate increased risk for mesothelioma.
25  Q  All right. Your notes are clear, which is much

**Page 48**

1  appreciated. But can you in a thumbnail identify for us
2  those ways that you believe Mr. Quirin was exposed to
3  asbestos during his time aboard the Tolovana?
4  A  Yes. That certainly would be reviewed in the
5  occupational and environmental history subsection of my
6  notes from the first day -- or the first group of notes
7  that I forwarded. And I discuss the 1953 to 1957 fireman
8  and machinist mate part of Mr. Quirin's career. And this
9  really would relate to the May 1954 to 1957 period aboard
10  the USS Tolovana.
11    And it would go through Page 6. That experience
12  aboard the USS Tolovana and the sources of asbestos
13  exposure and activities are discussed in that section of
14  the notes.
15    But in broad overview, Mr. Quirin was an auxiliary
16  machinist's mate and fireman. He was responsible for
17  equipment, which was mainly pumps and valves in the non
18  engine room, non fire room areas of the vessel, which
19  were three pump rooms forward, mid ship and aft, as well
20  as the deck winches.
21    And his job was to maintain and repair them. And in
22  the process of doing that, he described regularly working
23  with gasket and packing material that during that
24  timeframe in the hot steam-powered applications that he
25  was working with would have to a high degree of medical

**Page 49**

1  certainty represented asbestos-containing materials.
2    In addition, to access the equipment he encountered
3  insulation, including asbestos blankets and insulation
4  cement that he mixed and removed, as well as removal of
5  some pipe covering that also would have represented
6  asbestos-containing materials.
7    So those would have been regular sources of exposure
8  when he was working with the pumps and valves in the pump
9  rooms and the deck winches, as well as some of the other
10  areas, the laundry area and the well deck.
11  Q  He indicated that from time to time and apart from the
12  work he did with gaskets and flanges and pumps, that he
13  would have to repair pipe insulation, steam pipe
14  insulation, correct?
15  A  Yes.
16  Q  He described that as being half rounds?
17  A  Yes.
18  Q  And he would have to cut those from time to time so that
19  they fit into an area of damaged insulation?
20  A  Yes, he did that.
21  Q  And have you reviewed any naval product specification
22  records that would indicate what type of piping
23  insulation was called for for hot or steam pipe
24  applications?
25  A  Well, I haven't reviewed any specifications for the

Carl A. Brodkin, MD MPH FACOEM
December 17, 2012

**Page 50**

```
 1    Tolovana, and I don't usually review naval specifications
 2    because I'm not a naval vessel expert.  So I don't review
 3    those type of documents typically.
 4         But certainly from the medical literature, it's my
 5    understanding during those timeframes that they likely,
 6    aboard a naval vessel, World War II era, would have
 7    represented some mixed fiber exposure, likely a
 8    combination of chrysotile and amosite.
 9  Q  And you are familiar with 85 mag products?
10  A  Yes.
11  Q  And that was 85 magnesium and 15 percent asbestos
12    products?
13  A  Yes, 85 magnesia and 15 percent either chrysotile or
14    amosite.
15  Q  Okay.  Based on his description of the steam pipes and
16    the locations where he was replacing insulation, would
17    you expect that those applications would have been -- or
18    would have called for amosite asbestos?
19  A  Well, it's likely they included mixed fiber.  I mean, I
20    can't speak to the specific breakdown of those
21    components.  I mean, overall, you know, both of those
22    fiber types were used aboard naval vessels, and it's my
23    opinion they would have been used in insulation material
24    aboard that vessel.  But I can't really speak to the
25    percentages of them.
```

**Page 51**

```
 1         I mean, chrysotile was overall by far the most
 2    widely used insulation material in North America.  But in
 3    a naval vessel specification, it certainly would have
 4    included amosite in the insulation.
 5  Q  And based upon your review of the testimony and
 6    information that you have, you assume that Mr. Quirin was
 7    exposed to -- or had a mixed fiber exposure during his
 8    time on board on the Tolovana?
 9  A  It's my assessment based on my consideration of
10    Mr. Quirin's occupational and environmental history that
11    he did experience a mixed fiber exposure during his naval
12    vessel activities as I've described them.
13  Q  Thank you.
14         Now, in your epidemiologic section of the diagnosis
15    and assessment, we were looking at vessel-based workers.
16    There's also a reference there to mechanic and
17    machinists?
18  A  Yes.
19  Q  And do you have reference to epidemiologic studies which
20    would show an increase in the instance for mesothelioma
21    for mechanics and machinists?
22  A  Yes.  On the fourth page of my reference list, beginning
23    with Teschke, Canadian Journal of Public Health, 1997,
24    and ending in Gennaro, Scandinavian Journal of Work and
25    Environmental Health, 1994, I review studies that inform
```

**Page 52**

```
 1    my opinion about increased risk of mesothelioma among
 2    machinists and mechanics.
 3  Q  And under what circumstances other than as Mr. Quirin has
 4    described himself would mechanics and machinists come
 5    into contact with asbestos-containing materials?
 6  A  Well, not unlike Mr. Quirin, machinists are tasked with
 7    maintenance and repair of equipment that in historical
 8    periods in hot applications typically involved
 9    asbestos-containing materials, and not unlike Mr. Quirin
10    would include gaskets, packing and insulation.
11  Q  Oh, and I meant to ask you in your opinion what was the
12    makeup of the cement product that he mixed and applied
13    over top of the pipe insulating material?
14  A  The insulating cement mud would have been likely short
15    fiber chrysotile.  But, again, I can't be specific.  I
16    mean, I don't have the specific material descriptions for
17    those.  Is it possible there could be mixed fiber?  Yes.
18    But I would say in most of those applications, it would
19    be short fiber chrysotile.
20  Q  Based upon your knowledge of the industry, would you
21    expect asbestos, amphibole asbestos, to be used where the
22    insulating material, the cement material, would be
23    exposed to the seawater?
24  A  That I really can't speak to.  That would be a technical
25    question that I just don't know the answer to.
```

**Page 53**

```
 1  Q  Well, the next group is construction workers utilizing
 2    drywall/plastering materials?
 3  A  Sure.
 4  Q  And we've talked at some length about those type of
 5    studies, so I'm going to move on for now.
 6  A  Sure.
 7  Q  Then you have chrysotile-exposed workers --
 8  A  Yes.
 9  Q  -- after that as another group?
10         Can you identify for me who the chrysotile-exposed
11    workers are?
12  A  Yes.  We talked about them to some degree in my response
13    to a previous question about areas in the world where
14    there was relatively pure chrysotile.  But those articles
15    are reviewed on the seventh and eighth page of my
16    reliance list.  It includes a number of those articles
17    that I spoke to and certainly informs my opinion that
18    workers working with chrysotile in general are at
19    increased risk for mesothelioma.
20  Q  Then next you have crocidolite-exposed individuals?
21  A  Yes.
22  Q  As a sub -- as a group.
23         And do you have epidemiological studies that refer
24    to crocidlite workers or exposed workers?
25  A  Yes.  In that same group of notes, certainly I have a
```

14 (Pages 50 to 53)

**Page 54**

1   number of articles that look at crocidolite as a specific
2   fiber, and certainly that would start with Wagner in
3   British Journal of Industrial Medicine, 1960, and I have
4   cited that experience in the North West Cape of South
5   Africa.
6        And then on the final page of the reference list,
7   there are a number of articles that look at
8   crocidolite-exposed workers.  Some of them are associated
9   with the Kent micronite filter, others are associated
10  with chrysotile gas mask workers, workers using
11  chrysotile to fabricate gas masks, both in Britain and
12  Canada.  So they certainly inform my opinion about --
13  Q   Chrysotile gas masks or crocidolite?
14  A   Well, chrysotile and crocidolite and comparing them.
15  Q   In the supplemental -- what I will say supplemental Kent
16  materials that you have with you, do you have any
17  documents that relate to disease associated with
18  manufacturing of Kent filters?
19  A   On the final page of my notes, there certainly are
20  articles that inform my opinion about that.  It certainly
21  would include the Talcott, New England Journal of
22  Medicine, 1999, article.  Let me see if I can find it
23  here. (Peruses documents.)  Yeah, it's about a third of
24  the way down on the last page.
25       But it looked at the Massachusetts cohort of

**Page 55**

1   cigarette filter manufacturers that were exposed to
2   crocidolite, and of the 33 workers, 5 developed
3   mesothelioma.  So 15 percent incidence, that's among the
4   highest rates in the world for development of
5   mesothelioma.
6        I guess the other area, and I haven't specifically
7   written down these -- these articles, but certainly
8   asbestos cement manufacturing has been studied
9   extensively and would include crocidolite exposure, and
10  there are a number of articles by Magnani that look at
11  the experience with mesothelioma in the Eternit mines in
12  Casale Monferrato, Italy.
13       And they report in the range of about a six percent
14  mesothelioma rate among that working population, also
15  among the highest in reported working groups.
16       The other groups that I've indicated that I've
17  talked about are the crocidolite gas mask workers, and
18  Acheson in British Journal of Industrial Medicine, 1982,
19  observed a rate three to four times higher than the
20  chrysotile-exposed gas mask workers.
21       And McDonald and McDonald in Environmental Research,
22  1978, found a high rate of mesothelioma, 4.5 percent,
23  among crocidolite gas mask workers.
24       So those articles, and there are others as well,
25  would certainly inform my opinion that crocidolite is a

**Page 56**

1   potent cause of mesothelioma.
2        And I guess just to be responsive to your question
3   in terms of ancillary materials, I have in my notes
4   indicated industrial hygiene investigations at the
5   Massachusetts plant that manufactured the crocidolite
6   filters for the Kent micronite, and certainly they cite
7   health concerns as well.  That would be in the group of
8   notes labeled Exposure Related Documents for Kent
9   Micronite.
10       And on Page 3 of that subgroup, industrial hygiene
11  evaluation of H&V Specialties Company, Hollingsworth &
12  Vose Specialties Company, it's an evaluation of the West
13  Groton, Massachusetts, plant.  And they certainly talk
14  about significant asbestos exposure levels and concern
15  for illness with a recommendation for medical exams and
16  chest x-rays among exposed workers.
17       MR. PFAHL:  We've been going for a
18  little while.  Do you want to take a break, five minutes?
19       THE WITNESS:  Sure.  Five minutes.
20       MR. KRUKA:  Okay.
21       (Recess from 11:07 to 11:16.)
22
23  Q   (By Mr. Pfahl)  Dr. Brodkin, you have a reference on Page
24  6 of your Occupational and Environmental History to work
25  practice and hygiene.  And, again, this relates to the

**Page 57**

1   timeframe when Mr. Quirin worked aboard the Tolovana and
2   was in the Navy, correct?
3   A   Yes.
4   Q   You indicate that there was no use of respiratory
5   personal protective equipment provided to him, correct?
6   A   That's correct.
7   Q   And he also testified that he had no asbestos-containing
8   material hazard training with the Navy; is that right?
9   A   Correct.
10  Q   With respect to the state-of-the-art studies and articles
11  that you are aware of that relate to asbestos-related
12  disease and causation, for those studies, articles, that
13  were published before 1953, is there any reason why in
14  your opinion that the Navy would have been unaware of
15  those same articles?
16  A   I don't know why the Navy would be unique compared to any
17  other entity in having access to that medical
18  state-of-the-art knowledge.  Certainly from the time of
19  Merewether and Price in 1930, methods to control asbestos
20  exposure had been provided and discussed and in follow-up
21  studies and certainly communicated by various entities,
22  including the National Safety Council and the Industrial
23  Hygiene Foundation.  I don't know why the Navy wouldn't
24  have access to that as compared to other entities.
25  Q   Let's go ahead and turn over in your Occupational and

1    Environmental History to the post Navy work and exposure
2    that Mr. Quirin may have had.  And the first item was as
3    a deliveryman, and you didn't identify any
4    asbestos-containing materials that Mr. Quirin was exposed
5    to during that short activity, correct?
6  A  Correct.
7  Q  And then that takes us to about 1957 where he becomes a
8    telephone installer, and he joins the International
9    Brotherhood of Electrical Workers at the local in the
10   area where he worked, right?
11 A  Yes, he did.
12 Q  With respect -- or as a thumbnail, what is your
13   understanding as to how Mr. Quirin may have been exposed
14   to asbestos-containing materials initially as a telephone
15   cable installer or telephone installer and repairman,
16   which by my reading was 1957 to about 1966, during that
17   timeframe?
18 A  Yes.  That period certainly is discussed in conjunction
19   with the follow-up period when he was a supervisor in
20   1967 and thereafter on the subset of Occupational and
21   Environmental History notes beginning at Page 7 and going
22   through to Page 20 and certainly detail the sources and
23   activities that would expose Mr. Quirin to asbestos
24   either through direct use of the material or a bystander
25   to use of asbestos-containing material.

Page 58

1       In terms of direct use, which you referred to in
2    your question, that would be the installer period,
3    that -- that activity would relate primarily to his work
4    with cable vaults.
5       And on Page 11 of the Occupational and Environmental
6    History, I discuss the cable hole filler compounds.  And
7    the discovery documents indicate that prior to 1974,
8    those were asbestos-containing.  And it was Mr. Quirin's
9    practice to mix the dry compound to, basically, secure
10   and waterproof the cable in the holes.
11      And that was a process that took about five minutes
12   to mix the compound.  It was powdery and generated dusty
13   conditions that he felt that he breathed.
14      And certainly he describes visible dust, and I've
15   cited a number of quotes from his deposition where he
16   indicates that.
17      And that would have been -- there would have been
18   periods of fairly regular exposure to that in the
19   installer period, which is the 1957 to 1966 period,
20   particularly around 1966 for a six-month period when he
21   worked on a construction gang, worked on numerous sites
22   where he was performing that type of activity.
23      The other activity that he did with the cable vaults
24   that would have exposed him to asbestos was in
25   fabricating the gaskets between the cover and the hole,

Page 59

1    the hole cover gasket.
2       And the Lucent discovery documents indicate that
3    fire-resistant materials were used in that capacity.  So
4    it's likely that the gasketing material would have been
5    asbestos during that period.  And he does describe use of
6    a ball peen hammer for that activity that would expose
7    him to asbestos directly.  So -- and removal of those
8    gaskets also could result in exposure.
9       In terms of direct use of materials, the only other
10   potential exposure directly would be the spackle that he
11   was provided to repair walls.  That's really not further
12   characterized in the discovery documents, so not all
13   spackles were asbestos-containing.
14      If what he's describing is a joint compound, in my
15   opinion it likely would have been asbestos containing,
16   but I don't think it's sufficiently characterized where I
17   can say to a reasonable degree of medical certainty that
18   was an asbestos-containing material.  So I call that a
19   potential source.  If there was asbestos in that, he
20   would have been exposed in the mixing procedure.
21 Q  With respect to the spackle, he identified a ready mix
22   product that came in a small can or that some of his
23   coworkers described that way as well, correct?
24 A  There were ready mix formulations, including a wood
25   filler, various paste, premixed compounds.  Those would

Page 60

1    not be identified exposure.  I mean, even if they were
2    asbestos containing in that form, he didn't describe an
3    activity that would generate airborne fibers.
4  Q  He indicated that to the extent he used spackle to patch
5    some holes, that that was usually done without having to
6    sand; is that right?
7  A  Right.  It wasn't his practice to sand.
8  Q  And so in your estimation, a possible exposure for him
9    would be if he was using or mixing up dry joint compound
10   products in order to patch holes; is that right?
11 A  Yeah.  I mean, during that period, if he was using a
12   joint compound, it likely would have been asbestos
13   containing.  But to me, the term "spackle" is really
14   broader than joint compound.  That's why I call it a
15   potential exposure.
16 Q  Then in 1967, Mr. Quirin becomes a supervisor, right?
17 A  Correct.
18 Q  And what is your understanding as to his likely or
19   potential exposures to asbestos moving forward, 1967 and
20   beyond, as a supervisor?
21 A  As a supervisor, his exposures would all have been of a
22   bystander nature.  In terms of the cable vault work, he
23   did describe being in proximity to workers that did that
24   work, so this would be bystander, not direct exposure for
25   those materials.

Page 61

16 (Pages 58 to 61)

Page 62

1    In addition, I discuss bystander exposure really
2  during the whole period that Mr. Quirin was an installer
3  and a supervisor, and there wouldn't have been much
4  difference between his being an installer or a supervisor
5  on the sites because he was basically in proximity to
6  some other trades, primarily drywallers, that used
7  asbestos-containing joint compounds that would have
8  spanned the period of 1957 to '67 as an installer, but
9  also would have spanned a period '67 to about '77 when
10  asbestos was removed from most of those materials.
11    So that's a 20-year period, whether he was an
12  installer or a supervisor, where there would have been
13  bystander exposure to other trades.
14    And one that is discussed by Mr. Quirin and his
15  coworkers is a very frequent exposure to workers
16  performing drywall finishing, whether it's mixing,
17  sanding or sweeping.  There were also exposures to
18  ceiling tile workers, cutting ceiling tiles, and at
19  various times it's likely that some of those were
20  asbestos containing.  They also described some proximity
21  to insulation workers or work in attics that might have
22  exposed them to insulation.
23    Now, Mr. Di Fazzio describes a lot of that as
24  fiberglass batting, but there was blown-in insulation,
25  which certainly at times could have represented

Page 63

1  asbestos-containing material.  And certainly
2  Mr. Williamson describes work that Mr. Quirin did around
3  Celotex, which likely was a chrysotile-containing
4  insulation for many of the applications.
5    So there would have been intermittent exposure in my
6  opinion to asbestos in some ceiling tiles and in some
7  insulation material, you know, at least on an
8  intermittent basis, and then relatively regular exposure
9  to drywall joint compound that would have contained
10  asbestos, and all of that would have been as a bystander.
11    And he would have continued to have bystander
12  exposure to the cable hole filler compound, at least up
13  to 1974 when there apparently was a transition to
14  non-asbestos material.
15  Q  With respect to joint compound and his bystander exposure
16  to joint compound products or finishing, you said that in
17  your estimation that would have been regular exposure; is
18  that right?
19  A  Yes.  Now, Mr. Quirin did not have the resolution of
20  memory of saying, you know, it was a specific number of
21  times per interval, but he certainly describes it as
22  being something that he saw quite often on work sites.
23  Mr. Di Fazzio who worked with him in the '69 to '71
24  timeframe, this would be when he was a supervisor, he
25  described it variously as one to two times every couple

Page 64

1  of weeks.
2    He also indicated in his deposition that, you know,
3  at times it was more.  It could be five days in a row or
4  on some projects it could be three weeks in a row.  But
5  it was something that was in my assessment that was
6  regularly encountered on job sites because of what
7  Mr. Di Fazzio did, the pre-wiring activity, basically
8  doing the telephone wiring during the active construction
9  period.
10  Q  All right.  Now, with respect to Mr. Quirin's exposure as
11  a bystander to asbestos from joint compound products, was
12  the testimony sufficient enough for you to determine the
13  number of days out of a month that Mr. Quirin was on
14  average exposed to asbestos from joint compound products?
15  A  I would say Mr. Quirin's testimony wasn't to that
16  resolution.  And I did ask him those same questions or
17  similar questions when I interviewed him.  His
18  description was that it was quite often, but it wasn't
19  the resolution of his memory to say, you know, it was --
20  it occurred at a specific rate.
21  Q  Okay.  You will agree with me that there was testimony
22  from Mr. Quirin, Mr. Di Fazzio and Mr. Wilkinson --
23  Williamson that the standard protocol -- or not protocol,
24  but the procedure in which for new construction
25  installation of the lines would occur was one where the

Page 65

1  electricians would go in and put conduit or piping,
2  especially for commercial projects, and then the phone
3  lines would come in after the electricians, and this was
4  done while the walls were open, correct?
5  A  What you describe I think they consistently indicated
6  would be the ideal sequence of events.  They also
7  indicated that that frequently didn't happen, and they
8  would have to essentially adapt to the other workers on
9  the sites, whatever the stage of construction was.
10  Q  Well, they talked about the fact that that was the ideal
11  sequence, it was also the one that happened most
12  frequently, didn't they?
13  A  It certainly did happen, and that was the ideal sequence.
14  Q  And so they said that most of the time, though, it wasn't
15  precisely defined, but most of the time they are not
16  working where there are closed walls and drywallers are
17  finishing the walls while they are trying to fish wire,
18  correct?
19  A  It's certainly not something that happened all the time
20  on work sites.  I mean that, I think, was consistent
21  among the coworkers and Mr. Quirin.
22  Q  And then with respect to the work that was going on,
23  Mr. Quirin and the coworkers, they didn't testify that
24  they would just sit around and watch drywallers mixing up
25  joint compound for use on walls, right?

17 (Pages 62 to 65)

**Page 66**

1  A  No. I mean, they were actively working doing their
2  installations.
3  Q  Right. So they were aware of the fact that drywallers
4  would take bags and mix them up, and they called it a
5  mixing bucket or a mixing -- I'm trying to -- a tub?
6  A  Mud tub, yes.
7  Q  Mud tub, right.
8  But they didn't say they would just sit there next
9  to guys who were pouring in the joint compound and watch
10  them do it, right?
11  A  No, it was something they were aware of and they
12  observed, but it was in the course of their work
13  activities.
14  Q  Right.
15  The same thing with respect to sanding, they
16  would -- they would describe the drywallers would sand
17  after the mud would dry, they would sand it, correct?
18  A  True.
19  Q  And you said Mr. Quirin indicated in your phone call with
20  him that was usually pole sanding?
21  A  Yes.
22  Q  He didn't indicate how many times he was fishing line
23  through walls in the same room where the drywallers were
24  pole sanding?
25  A  No, but I did ask him the circumstance, and he said they

**Page 67**

1  were often in the same common space or in an adjacent
2  room, not always, but that was something he commonly
3  observed.
4  Q  In your estimation would Mr. Quirin have had the same
5  exposure to asbestos on a dose level as the guys who were
6  actually sanding the joint compound if they were in a
7  room that's 100 feet away from him?
8  A  No. That bystander exposure would be less, and certainly
9  the exposure really relates to the radius from the
10  distance of the activity and the time that's elapsed from
11  the activity.
12  I have cited a study by Nicholson that informs my
13  opinion, a NIOSH investigation, that was reported in the
14  American Industrial Hygiene Association Conference in
15  1974. That's on Page 3 of my Diagnosis and Assessment
16  section. And it does provide measurements they took at
17  bystander distances for various specified radiuses and
18  specified times after the drywalling.
19  I would say on average, those would be less than the
20  direct exposures, but they are certainly significant
21  depending on the radius and time elapsed.
22  Q  And based on Mr. Quirin's testimony or his interview with
23  you, did you have an understanding as to the frequency
24  with which he was in a common room when drywallers were
25  sanding joint compound?

**Page 68**

1  A  Not to the resolution of a specific rate or times per
2  week or month. He, again, indicated that he basically
3  worked around the drywallers and often in the same large
4  rooms or adjacent rooms, but his memory was not to the
5  resolution of a specific number of times.
6  Q  Did Mr. Quirin testify as to the number of times that he
7  was in the same room or adjacent to drywallers when they
8  were sweeping up joint compound dust?
9  A  No, it was an activity that he generally described as
10  seeing or observing quite often in the course of his
11  work, but not to the resolution of a specific number of
12  times.
13  Q  Based on Mr. Quirin's testimony, would you be able to
14  calculate a dose on a fiber-per-cc-year basis for
15  Mr. Quirin from his exposure to asbestos from joint
16  compound products?
17  A  Well, it's not something I do as part of my practice, so
18  it's a bit of a moot question. It's not something I
19  would do as an occupational and environmental medicine
20  physician. But I do certainly read fiber cc year dose
21  reconstruction dose calculations. Anyone that was doing
22  that would have to obviously make estimates and
23  assumptions that would be necessarily within a range of
24  uncertainty because there just isn't that specificity of
25  testimony.

**Page 69**

1  Q  Right. In terms of -- based upon your review of all the
2  testimony and talking to Mr. Quirin, you didn't see
3  enough specificity with respect to the variable of
4  frequency or the variable of proximity to the activity
5  that would allow a dose reconstruction or estimation,
6  correct?
7  A  Well, I think one could estimate it, but I think -- and
8  typically it's industrial hygienists that do this type of
9  dose reconstruction.
10  But they would have to make certain assumptions that
11  they would have to state up front within a range of
12  uncertainty. I mean, certainly there's a degree of
13  testimony that indicates that this was a circumstance
14  that occurred on a regular basis. I mean, Mr. Quirin
15  describes it as quite often. I think Mr. Di Fazzio gives
16  a greater resolution of it.
17  But it is something that happened in my assessment
18  on a regular basis, but it's not to the specificity of a
19  certain number of times.
20  Q  And Mr. Di Fazzio testified about being in a building
21  where joint compound work or drywallers were finishing
22  drywall, but he described being in a different part of
23  the building at the time, right?
24  In other words, he was aware they were on the third
25  floor, but he was on the fifth floor while pulling wires,

**Page 70**

1    that kind of thing?

2  A  That's a circumstance that could happen as well.  I mean,

3    their distances varied depending on the job site.  So at

4    times they were in a common room, at times they were in

5    an adjacent room, at times they were more remote, at

6    times it wasn't going on at all.

7  Q  You have references to US Gypsum and Georgia-Pacific?

8  A  Yes, those are the two products that Mr. Quirin indicated

9    he recalled.

10  Q  Okay.  And he also admitted that those weren't

11    necessarily the only two joint compound products that

12    were ever used around him, right?

13  A  I think that's fair.  It's the ones that he and his

14    coworkers recalled, but not to the exclusion of others

15    they might not have recalled.

16  Q  And do you have an understanding based on Mr. Quirin's

17    testimony as to the general timeframe when he saw -- or

18    he would see one of these products more than the other?

19  A  He did clarify in direct testimony that the US Gypsum --

20    I think I've indicated this on my notes.  (Peruses

21    documents.)  On Page 14 of the Occupational and

22    Environmental History, that the US Gypsum would have been

23    in the earlier period of his career when he was an

24    installer.  He said he saw that frequently.  And then he

25    clarified in his direct testimony that Georgia-Pacific

**Page 71**

1    became the dominant brand that he saw on larger

2    commercial projects when he was a supervisor.

3       Again, his memory was not to the specificity of

4    giving any definite years or time span, but that was his

5    general recollection.

6  Q  And when Mr. Quirin was a supervisor, he would send out

7    crews to multiple job sites during the day each day,

8    correct?

9  A  Yes.

10  Q  And he would go, and he would visit those crews at least

11    one time a day at the work sites, correct?

12  A  At least once, yes.

13  Q  And he mentioned that he had about an hour in the morning

14    and an hour at the end of the day that he would be in his

15    office doing desk work?

16  A  True.

17  Q  And it was described by Mr. Quirin, as well as his

18    coworkers, that depending on the demands of the

19    particular job and what was going on at the time, he may

20    spend five minutes at a job site?

21  A  There are times when he would spend five minutes,

22    although, the typical span would be a much wider range, 5

23    to 30 minutes, even up to 3 hours if it was a complex

24    project.

25  Q  Right.  And that would depend, if he had to be there to

**Page 72**

1    troubleshoot something at a job, it may demand more of

2    his time, right?

3  A  Yes.

4  Q  But this isn't the situation where he's spending --

5    typically where he's spending all day at one job site?

6  A  As a supervisor, 1967 and afterwards, I would say not.

7    He was visiting multiple job sites where he would spend

8    variable periods of time in the 5 to 30 minutes up to 3

9    hours.

10  Q  And some of the times when he would go and visit job

11    sites as a supervisor, he was talking to customers to

12    make sure they were happy with what was going on?

13  A  Yes, or providing estimates.

14  Q  Right.  So he wasn't always with his crew who were

15    working on the job site, correct?

16  A  Right.  He might be on the job site doing some other

17    activities.

18  Q  You mentioned some insulation exposures.  Do you recall

19    Mr. Quirin indicating that there were times when they

20    would have to drag lines through the attic in order to

21    install phones?

22  A  That's true.

23  Q  And back in the 50s and early 60s, there were products

24    called vermiculite insulation that was used in attic

25    insulation --

**Page 73**

1  A  It was one --

2    -- blown in?

3  A  It was one type of insulation that could be used.  There

4    were multiple ones.  It could be fiberglass.  It could be

5    cellulose.  It could be foam.  It could be vermiculite.

6  Q  Now, Mr. Williamson indicated that he was a -- or

7    actually involved with the union and was a safety officer

8    for the union?

9  A  He later became a safety officer later in his career.

10  Q  Yeah.  Well, it was during the 70s, right?

11  A  I would have to look at the deposition to the exact point

12    in time, but certainly it was after a decade or so of

13    work at least.

14  Q  He indicated that the union held periodic safety

15    meetings?

16  A  He did, yes.

17  Q  And Mr. Quirin indicated that he attended those safety

18    meetings as well?

19  A  He did indicate he attended some, yes.

20  Q  And Mr. Quirin indicated that he didn't recall asbestos

21    being discussed at any of the safety meetings?

22  A  That's correct.

23  Q  Now, the Selikoff and Mount Sinai group did a lot of

24    industrial hygiene work with insulating unions in the New

25    York/New Jersey area, correct?

**Page 74**

1  A  Correct, beginning in the 1960s.

2  Q  Right. And they began publishing by the mid 1960s

3  findings of increase of disease and asbestos-related

4  disease for insulators, correct?

5  A  Yes.

6  Q  And that was something that was communicated to the

7  insulation union workers through their publications,

8  correct?

9  A  That's my general understanding. I can't say I've

10  studied union publications to speak to that with any

11  direct knowledge, but it is my understanding from reading

12  the medical literature that certainly one of

13  Dr. Selikoff's purposes was to communicate findings and

14  concerns for the insulators.

15  Q  And I believe Mr. Williamson testified that he did have

16  an understanding at some point in his role as a safety

17  official with the union that asbestos was something that

18  could be dangerous or harmful? I will put it that way.

19  A  Well, the way Mr. Williamson put it when he was asked was

20  sometime around the mid 1970s, he learned that asbestos

21  was something, I think he put it, that you should stay

22  away from. I don't think it was to the specificity of

23  certain hazards or diseases, but certainly there was some

24  aspect of communication in terms of that.

25  Q  What is the earliest article or study that you are aware

**Page 75**

1  of that was published in the peer-reviewed medical

2  literature that raised a concern about asbestos exposure

3  in the construction trades?

4  A  Well, I mean to some extent in terms of the materials

5  used in the construction trade, that would date to

6  Merewether and Price in part, too, where they would

7  discuss not just their textile findings, but other

8  materials such as insulation materials that could be used

9  in construction.

10  And certainly in 1932, Merewether and Price talked

11  more about that. But I would say in many of the articles

12  I cite on the first page of my reference reliance list,

13  they talk about state of the art. Many of the reviews of

14  asbestos-containing materials would relate to materials

15  used in the construction trade with that date from 1930

16  onward.

17  Q  Can you give me specifics in terms of products that would

18  have been used in the construction trade that would have

19  been talked about from the 1930s onward?

20  A  Well, certainly insulation, use of various cements, water

21  pipes, potentially in the mechanical aspects of the

22  heating trades for construction, gaskets and packing as

23  well, as well as rope material. Those would be the

24  general types of materials discussed in these articles

25  over time.

**Page 76**

1  Q  And would there have been anything to keep the

2  International Brotherhood of Electrical Workers from

3  learning about those articles?

4  A  While I can't speak to what the IBEW knew and when they

5  knew it because I haven't investigated that. I don't

6  know -- I don't have a reason to think they would have a

7  different access to the medical literature than any other

8  entity.

9  Q  And do you know whether or not the IBEW monitored at all

10  the developments that were going on in the 60s with

11  respect to the asbestos insulation workers?

12  A  I can't speak to that. I haven't investigated it.

13  Q  But it was your understanding that neither Mr. Quirin's

14  employer, nor his union provided any kind of personal

15  protective equipment for him as it would relate to

16  asbestos exposure?

17  A  That's true. During the course of his work as an

18  installer and supervisor, he did not receive asbestos

19  hazard training to his recollection, nor did he use any

20  personal protective equipment in terms of respiratory

21  protection.

22  Q  With respect to Mr. Quirin and his bystander exposure or

23  potential to bystander exposure to asbestos-containing

24  materials, did you stop the exposure timeframe at 1978?

25  A  Basically by 1977, in terms of, well, new insulation, it

**Page 77**

1  would be very unlikely that it would be asbestos

2  containing during that timeframe. And certainly for the

3  drywall joint compound, it unlikely would involve

4  asbestos-containing materials after 1977.

5  For the ceiling materials, that's probably variable,

6  but as you get past '77, it would be much less frequent.

7  Q  With respect to repair jobs that Mr. Quirin would have

8  supervised, is it possible that his crew could have been

9  exposed to asbestos in place if they had to tear open

10  something, put a new bracket and chip off insulation or

11  some spray material in order to put on a new bracket?

12  A  It's possible there could be intermittent exposures after

13  1977. I think it would be much less frequent, less

14  likely, but on remodel projects, it's possible.

15  Q  In addition to Mr. Quirin's occupational environmental

16  history -- or not in addition to, but as part of, you

17  also have references to his childhood timeframe?

18  A  Yes, as part of the environmental history.

19  Q  And there you make reference to Mr. Quirin's father who

20  worked for the Chicago and North Western Railroad, and

21  you note that he worked on engines. You didn't know what

22  he did.

23  Based upon your review of the medical literature, do

24  you have an understanding as to whether or not asbestos

25  materials were used on locomotive engines or along with

1  locomotive engines?
2  A  Well, prior to 1960 to the extent there were steam
3  locomotives being worked on, there certainly is potential
4  for exposure in terms of insulation material.  Again, the
5  history is not well characterized here because Mr. Quirin
6  didn't visit his work site and didn't know what his
7  father did other than work on engines, which is pretty
8  vague in terms of railroad work.
9  Q  Do you assess Mr. Quirin's father's work on engines,
10  railroad engines, as being a potential exposure where he
11  may bring asbestos materials home on his clothing?
12  A  Well, it's one thing I considered.  That's why I make a
13  note on Page 21 that in addition to it not being
14  characterized, Mr. Quirin indicated that his father
15  didn't bring his work clothes home.
16     It doesn't allow me to identify an exposure there,
17  because even if he did work on engines in a way that did
18  expose him to insulation, there's not a cogent root of
19  exposure in terms of an indirect pathway.  It's possible,
20  but I can't say to a reasonable degree of medical
21  certainty that it happened based on that information.
22  Q  And then you make reference to surrounding industrial
23  sites.
24  A  Yes, in terms of --
25  Q  What was the reference there about?

Page 78

1  project.
2  Q  And the remainder of your notes refer to -- not the
3  remainder, but the remainder on Page 22 refer to the Kent
4  cigarettes; is that right?
5  A  Yes, and general cigarette smoking.
6               (Exhibit No. 19 marked
7                for identification.)
8
9  Q  (By Mr. Pfahl)  Dr. Brodkin, I'm going to hand you an
10  article that I've marked as Exhibit 19.  This is one you
11  made a reference to earlier?
12  A  Yeah, the Madkour.
13  Q  This is from The Eastern Mediterranean Health Journal,
14  Volume 15 from 2009.  For the record, the title is
15  Environmental Exposure to Asbestos and the
16  Exposure-Response Relationship with Mesothelioma?
17  A  Right.
18  Q  And that's the article you made reference to earlier?
19  A  True.
20  Q  In the abstract, it says, "An epidemiological and
21  environmental study was carried out in Shubra, El-Kheima,
22  K-H-E-I-M-A, city, greater Cairo."  Right?
23  A  Yes.
24  Q  And if we turn over to the introduction on Page 26?
25  A  (Complies.)

Page 80

1  A  Yeah, he indicated in his deposition that where he parked
2  on Child -- well, near the Child Street Illinois Bell
3  office, that there was a Johns-Manville plant a couple of
4  blocks away.  He didn't know what it was doing.  He
5  didn't see dust from it.  It's really not a characterized
6  site.  I've noted it.  It's a possible source of area
7  exposure.
8     But without knowing more, I certainly wouldn't have
9  an opinion about that to a reasonable degree of medical
10  certainty.
11  Q  And didn't he refer to that plant as one that
12  manufactured insulating products?
13  A  Well, he was asked questions about that.  He didn't know
14  what it manufactured would have been my assessment of his
15  answer.  He just didn't know what it did.
16  Q  And I take it you haven't Googled the Johns-Manville
17  plant in Wheaton, Illinois, to see what they were
18  manufacturing?
19  A  I haven't investigated that plant.  I really don't know
20  anything about it.
21  Q  You make reference to one home remodel project where he
22  helped out his son; is that right?
23  A  Yes.
24  Q  And this was one wall that was done?
25  A  Yeah, my interpretation was that it was a fairly limited

Page 79

1  Q  If you look at the right-hand column with me, the first
2  full paragraph there is "Data obtained from."  Do you see
3  that?
4  A  Yes.
5  Q  And if we go down to the third sentence there, it begins,
6  "Workers employed"?
7  A  Yes.
8  Q  That sentence states, "Workers employed since 1948 by the
9  Egyptian asbestos company Sigwart at the mills in greater
10  Cairo (El Maasara and Shubra El-Kheima) had an increased
11  risk of mesothelioma, as did former residents of Shubra
12  El-Kheima who were not directly employed in the milling
13  of asbestos."
14     Do you see where I've read that?
15  A  Yes.
16  Q  And so this gives us a reference point in terms of what
17  they are talking about in terms of what they are talking
18  about for the workers.
19     And if we look at the next page, 27, under Methods
20  and Location on the left-hand column?
21  A  Right.
22  Q  It says, "This epidemiological and environmental study
23  was carried out in Shubra El-Kheima city, greater Cairo,
24  to evaluate the prevalence of MPM," which would be
25  malignant pleural mesothelioma, right?

Page 81

21 (Pages 78 to 81)

**Page 82**

1  A  Right.

2  Q  "Shubra El-Kheima is an industrial city at the northern

3  boundary of Cairo, just upwind from downtown Cairo. It

4  has an area of about 30 kilometers. This city was

5  considered the focal point of the highest environmental

6  exposure to ambient asbestos fibers due to the operation

7  of a large asbestos manufacturing plant (the Sigwart

8  Company plant)."

9  And then it has a figure there which shows its

10  location.

11  A  Right.

12  Q  It says, "The Sigwart plant is an asbestos manufacturing

13  plant using chrysotile asbestos. It was constructed in

14  1948, and its main products were asbestos cement pipes

15  and reinforced concrete products. The study included six

16  areas in the near vicinity of Sigwart plant."

17  And I will stop there. All right?

18  A  Yes.

19  Q  And so here's a reference to the plant, its location and

20  the products that it manufactured, correct?

21  A  Right.

22  Q  And in this study, it makes reference to chrysotile

23  asbestos?

24  A  That's correct.

25  Q  All right. And that's why it's of interest to you?

**Page 83**

1  A  Well, it's of interest because it certainly is an

2  area-based study and a population-based study of

3  asbestos, and I think it adds additional information

4  about chrysotile asbestos.

5  (Exhibit No. 20 marked

6  for identification.)

7

8  Q  (By Mr. Pfahl)  I'm going to hand you Exhibit 20. This

9  is a study from Dr. Kamal, K-A-M-A-L, and others from the

10  American Journal of Industrial Medicine, 1992. This is

11  titled Blood Superoxide Dismutase and Plasma

12  Malondialdehyde -- I don't even know what that is. Can

13  you help me with that?

14  A  Malondialdehyde.

15  Q  Thank you -- Among Workers Exposed to Asbestos.

16  Have you seen this article before?

17  A  I have. I have seen this.

18  Q  You have. Okay. Somebody has shown it to you?

19  A  Well, they've shown it to me, and I have it. So yes.

20  Q  So if we look over on 354, there's a reference in the

21  bottom section Subjects and Methods, right?

22  A  Right.

23  Q  It says, "Subjects were 97 asbestos-exposed workers (mean

24  duration of exposure equals 19.8 plus or minus 8.3 years)

25  randomly selected from Sigwart Company manufacturing

**Page 84**

1  cement asbestos pipes in Shobra El Kheima (a suburb of

2  Cairo). Their job entails transporting the asbestos

3  bales from the store, opening them manually, feeding them

4  together with cement in the mixing machine, supervising

5  the transportation of the mixture to the production

6  machine, transporting the produced pipes to water

7  containers and cutting the pipes into different lengths

8  according to the requested orders. Subjects had no fixed

9  workplace as they interchanged their workplace according

10  to the needed situation. The asbestos used (70 percent

11  white asbestos chrysotile and 30 percent blue asbestos

12  crocidolite) was imported from the United States, Canada

13  and Brazil."

14  Do you see where I managed to try and read that?

15  A  You've read it correctly, yes.

16  Q  And in this -- here in 1992, they are making reference to

17  the fact that in the manufacture of the cement pipes,

18  they used chrysotile and crocidolite, correct?

19  A  They do indicate that in this section, yes. And -- well,

20  maybe -- I don't know if you have a question about it,

21  but certainly this is, as they say, a large facility, 30

22  kilometers squared. And certainly I'm relying on Madkour

23  in terms of the description of it being chrysotile

24  asbestos because in large complexes there can be

25  different processes.

**Page 85**

1  And certainly Hughes and Weill looked at the

2  asbestos cement industry in New Orleans that used in

3  areas chrysotile and in areas amphibole. So I'm really

4  relying on Madkour's description of that chrysotile

5  asbestos. I'm aware from Kamal that use of crocidolite

6  occurred in a specific area at the site as well.

7  Q  Well, as it relates to the environmental exposures in the

8  surrounding neighborhoods, the fact that there was

9  crocidolite used would be an important factor in

10  determining what asbestos type may have resulted in the

11  increased incidence of mesothelioma among people who

12  lived near the Sigwart plant but didn't work there,

13  correct?

14  A  I think it's a fair consideration. It does require some

15  knowledge of the site in terms of assessing that, which I

16  don't have. I mean, I can't speak to it. Certainly in

17  citing Madkour, I am relying on his description, but I am

18  aware that other things happened at the broader site.

19  (Exhibit No. 21 marked

20  for identification.)

21

22  Q  (By Mr. Pfahl)  Let me hand you another article. This

23  one I've marked as Exhibit 21. And it's an article from

24  Eldin, E-L-D-I-N, and others titled Mesothelioma in

25  Egypt.

1    And first off, does this look familiar to you?
2 **A I don't have it. Whether I've ever been shown it, I**
3 **can't tell you. I don't -- I mean, I don't have a**
4 **working memory of it as I sit here, so I would have to**
5 **read it to speak to it.**
6 Q Sure. Let's look at Page 42, the second page.
7 **A (Complies.)**
8 Q Under the heading Asbestos in Egypt, do you see that?
9 **A Yes.**
10 Q It says, "Asbestos was used since a long time (2000-3000
11    BCE) as embalmed bodies of Egyptian pharaohs were wrapped
12    in asbestos clothes to offset the ravages of time.
13    Industrialization utilizing asbestos started in Egypt
14    since 1948 by Sigwart Company in El Maasara, South Cairo.
15    Data quoted from the introduction of a training course
16    made by Sigwart Company in 1980 for its employees showed
17    that this industry started by using chrysotile (white
18    asbestos), crocidolite (blue asbestos) and amosite (brown
19    asbestos). Asbestos-using factories steadily increased
20    in number and by the year 2004, 14 asbestos factories
21    were present in Egypt. Data about these factories
22    obtained from the information network of the Central
23    Organization for Industrialization (COFI) is summarized
24    in Table 1."
25    It says, "At present, white asbestos only is used in

Page 86

1    this industry and is imported from Russia and Canada."
2    Do you see that reference?
3 **A Yeah.**
4 Q Now, this is from the other plant, the other Sigwart
5    plant. There's a reference here to El Maasara, correct?
6 **A Yeah, they speak about a site south of Cairo, where in**
7 **Madkour they talk about the site being north of Cairo.**
8 Q Right. So in this one, they are referring to the site
9    south of Cairo, which was referred to in Madkour as
10    having an increased incidence of meso, correct?
11 **A Well, in Madkour, they describe Shubra El-Kheima as an**
12 **industrial city at the northern boundary of Cairo. I'm**
13 **not sure exactly what you are referring to in terms of**
14 **south.**
15 Q Oh, I'm sorry. I was looking back at that introduction.
16 **A Oh, okay.**
17 Q We referred to the fact that it says, "Workers employed
18    since 1948 by the Egyptian asbestos company Sigwart at
19    the mills in greater Cairo, El Maasara and Shubra
20    El-Kheima."
21 **A Oh, okay.**
22 Q That's the reference.
23 **A All right.**
24 Q And here they are referring to the El Maasara facility,
25    which there's a reference to being -- having all three

Page 87

1    commercial asbestos types, correct?
2 **A Yes.**
3    MR. PFAHL: Let's go off the record
4    for a moment.
5    (Discussion off the record.)
6    (Recess from 12:09 to 1:03.)
7    (Exhibit No. 18 marked
8    for identification.)
9
10    MR. PFAHL: Let's go ahead and go back
11    on the record.
12 Q (By Mr. Pfahl) Dr. Brodkin, I wanted to follow up on a
13    couple of things before I launch into something new.
14    First of all, your fee for your case review and
15    preparation of a report and testimony, what is that
16    currently?
17 **A My rates are all by the hour. For all preparatory**
18 **activity it's $550 per hour; a deposition is $650 per**
19 **hour.**
20 Q And do you have an estimate of the number of hours you've
21    spent up to today in reviewing the material, talking with
22    counsel, preparing your notes and to the extent necessary
23    re-reviewing things to prepare for today's deposition?
24 **A Yes. My medical evaluation was about 43 hours, and I**
25 **spent about 6 hours preparing yesterday for the**

Page 88

1    deposition.
2 Q I had asked you about dose estimations generally -- well,
3    as it related to joint compound. Do you recall that?
4 **A Yes.**
5 Q Is it fair to say that you have not undertaken the task
6    of trying to perform a dose reconstruction estimate for
7    Mr. Quirin for -- on a fiber-per-cc-year basis, so a
8    cumulative basis, to any particular asbestos-containing
9    material or source?
10 **A That's true. Doing fiber cc year reconstructions is not**
11 **part of my practice, and I have not done it in this case**
12 **and not for any product entity.**
13 Q And just to clarify, you have not done that for
14    Mr. Quirin as it would relate to any particular branded
15    product, correct?
16 **A Correct.**
17    **(Exhibit No. 22 marked**
18    **for identification.)**
19
20 Q (By Mr. Pfahl) I'm going to mark as Exhibit 22 a copy of
21    an article that I know you are familiar with. For the
22    record, this is an article by McCoy and others from the
23    Journal of ASTM International, Volume 8, No. 1. It's
24    titled Mesothelioma in Drywall Finishing Workers from
25    2011.

Page 89

23 (Pages 86 to 89)

1  **A  Yes, I'm familiar with it.**
2  Q  And just by way of background, in the abstract it says,
3  "In this manuscript, we evaluate the context in which
4  workers were exposed to drywall joint compound based on
5  the state of the art of the construction industry during
6  the post-World War II era through the 1970s and conduct a
7  review of the scientific literature associated with the
8  drywall trade and occupational exposure to airborne
9  asbestos from drywall finishing work practices."
10  **A  Yes.**
11  Q  Do you see where I've read that?
12    And you have written in conjunction with some other
13  physicians something in the nature of a comment about
14  this article; is that right?
15  **A  Yes, I did with some of my co-investigators from CARET**
16  **did submit a peer-reviewed commentary on this article.**
17  Q  I'm going to hand you Exhibit 23.
18    (Exhibit No. 23 marked
19    for identification.)
20
21  Q  (By Mr. Pfahl)  And I'm sure you will find that to be
22  familiar?
23  **A  Yes.**
24  Q  For the record, Exhibit 23 is an article by Dr. Brodkin
25  and others titled Discussion on "Mesothelioma in Drywall

1  Finishing Workers," by McCoy, et al.
2  It's from the Journal of ASTM International, Volume
3  8, No. 8.  And this was published in 2012, correct?
4  **A  I believe this was 2011.**
5  Q  And I'm looking at 2012.  That's when I printed it off.
6  **A  Yeah, it's copyrighted from the Journal of ASTM 2011.**
7  Q  So the same year that the McCoy article came out, you and
8  others responded to it?
9  **A  Yes, specifically some of my co-investigators at CARET.**
10  Q  Right.  Dr. Cullen for one?
11  **A  Yes.**
12  Q  Dr. Balmes?
13  **A  Correct.**
14  Q  Was Dr. Redlich, was she one of your co-investigators in
15  CARET?
16  **A  Yes, Dr. Redlich at Yale is a CARET co-investigator.**
17  Q  And Dr. Hammar, who is also here in Seattle?
18  **A  Yes.**
19  Q  Now, you mentioned that your discussion as it's titled or
20  comment was peer reviewed; is that correct?
21  **A  Yes.**
22  Q  Was the McCoy article peer reviewed?
23  **A  Yes.**
24  Q  And that went through the same process as your commentary
25  so far as you know?

1  **A  Yes.**
2  Q  Let's look at the introduction of your commentary.  How
3  do you prefer me to refer to this?
4  **A  Well, you can call it discussion, discussion or**
5  **commentary.**
6  Q  All right.  In the introduction about, let's see, it's
7  halfway through the sentence after the first citation?
8  It begins, "Our experience."
9  **A  Okay.**
10  Q  Do you see where I am?  It says, "Our experience does not
11  support the authors' conclusion of 'lack of a
12  relationship' between mesothelioma and drywall finishing
13  work.  Specifically, among 4,060 asbestos-exposed
14  participants in the Beta Carotene and Retinol Efficacy
15  Trial (CARET cohort), plasterboard workers numbering 136
16  or 3 percent were defined as a high-risk trade -- along
17  with asbestos insulators, sheet metal workers,
18  plumbers/pipefitters, boilermakers and various shipyard
19  trades -- due to their historic asbestos exposure."
20    Correct?
21  **A  Yes.**
22  Q  Then you refer to your CARET study that was published in
23  the American Journal of Industrial Medicine, right?
24  **A  Well, there have been numerous publications of CARET, but**
25  **I do reference the 1996 study, which involved a review of**

1  **the cohort in the New England Journal of Medicine and the**
2  **Journal of the Cancer Institute.  And the Journal of the**
3  **National Cancer Institute is one cited in Reference 3.**
4  Q  Well, the one where you are referring to the plasterboard
5  workers as being defined as a high-risk trade is to the
6  1997 CARET publication, right?
7  **A  That's correct, the American Journal of Industrial**
8  **Medicine.**
9  Q  And let me hand over Exhibit 24.
10    (Exhibit No. 24 marked
11    for identification.)
12
13  Q  (By Mr. Pfahl)  Exhibit 24 is from the American Journal
14  of Industrial Medicine from 1997.  The title is The CARET
15  Asbestos-Exposed Cohort:  Baseline Characteristics and
16  Comparison to Other Asbestos-Exposed Cohorts, and you are
17  one of the several coauthors of this study?
18  **A  Yes.  A number of the CARET co-investigators are authors.**
19  Q  All right.  In the abstract there, it says, "The Carotene
20  and Retinol Efficacy Trial (CARET) was a double-blind,
21  placebo-controlled trial of the daily administration of
22  25,000 international units of vitamin A and 30 milligrams
23  of B-carotene for the prevention of lung cancer.  Of
24  close to 18,500 participants, more than 4,000 were
25  asbestos-exposed men recruited from shipyard and

**Page 94**

1  construction trades at five study centers in the United
2  States."
3  Do you see that?
4  **A  Yes.**
5  Q  All right. And the reference in your discussion piece
6  about the McCoy article referred to 4,060 asbestos
7  workers?
8  **A  Correct.**
9  Q  And that's where we get the reference here as to more
10  than 4,000 asbestos workers?
11  **A  Correct, the asbestos exposed cohort, yes.**
12  Q  Let me have you turn over to 574 of the CARET article.
13  **A  (Complies.)**
14  Q  On the left-hand column in that first carry-over
15  paragraph at the top?
16  **A  Okay.**
17  Q  The first sentence, full sentence, there says, "The trial
18  had followed a total of 18,314 participants for a mean of
19  4.0 years, when active intervention was halted in
20  January, 1996, because of a higher rate of lung cancer in
21  the participants receiving the study vitamins than those
22  receiving placebo," citing Omenn. That's the 1996 study?
23  **A  Correct.**
24  Q  Or a publication I should say.
25  **A  Correct.**

**Page 95**

1  Q  And here you stop -- you actually stopped the study
2  because you were getting higher incident rates with the
3  study group than the controls; is that right?
4  **A  The intervention was discontinued in 1996. So the**
5  **follow-up part of the study continued.**
6  Q  Sure. You still wanted to follow the participants.
7  **A  Sure.**
8  Q  But you stopped giving them the vitamins?
9  **A  That's right.**
10  Q  And did you ever determine an association between the
11  vitamin administration and the higher incidence of lung
12  cancer?
13  **A  Well, the intervention participants did have a higher**
14  **rate of cancers, as well as some non cancer end points,**
15  **cardiovascular disease. It wasn't statistically**
16  **different than the placebo group, but given the fact that**
17  **there was a higher incidence, it would be very unlikely**
18  **that if we were to have carried out the study longer,**
19  **that there would have been a benefit. That's why it was**
20  **discontinued.**
21  **I don't think it allows any, although there's been**
22  **much discussion, as to why anti-oxidant vitamins are not**
23  **effective. It's not clear that there was a significant**
24  **difference in adverse effects based on the vitamins. It**
25  **wasn't statistically different.**

**Page 96**

1  Q  All right. So it was an observation, and since you
2  didn't find there to be any benefit, you, you meaning you
3  the study participants, decided -- or physicians decided
4  just to halt administration of the vitamins, right?
5  **A  Well, we had a meeting of the -- of all the scientific**
6  **committees of CARET in 1996. We met together and made a**
7  **decision jointly.**
8  Q  Let me have you look with me at Materials and Methods.
9  **A  (Complies.)**
10  Q  It's on 574, left-hand column, under Materials and
11  Methods and there's Overview of the Study?
12  **A  Okay.**
13  Q  And I will start with about the third sentence which
14  begins, "The asbestos-exposed cohort was recruited." Do
15  you see where I am there?
16  **A  Yes.**
17  Q  It says, "The asbestos-exposed cohort was recruited by
18  five CARET study centers located in Baltimore, New Haven,
19  Portland, San Francisco and Seattle." I should say
20  Portland, Oregon, I guess, to distinguish that from
21  Maine. "Potential subjects were identified from multiple
22  sources including clinic medical records, union
23  membership rosters, workers' compensation lists, the US
24  Navy and attorneys." And I will stop there.
25  To what degree were attorneys involved in

**Page 97**

1  identifying potential study subjects? Do you recall?
2  **A  I don't. At the time that recruitment started, which was**
3  **in the late 80s, I had just started my fellowship in**
4  **occupational medicine. So I actually joined the study a**
5  **couple of years later.**
6  **I can't give you the breakdown for that. I just**
7  **don't know it.**
8  Q  Well, by 1996 or 1997, had you started to work at all as
9  a consultant in asbestos-related injury, personal injury,
10  cases?
11  **A  Well, from 1993, I had been subpoenaed as an expert in**
12  **various cases. So yes, by 1996 I had.**
13  Q  By 1996, had you served as a medical causation expert in
14  injury claims brought by asbestos-exposed individuals
15  against asbestos-containing product manufacturers? Do
16  you recall?
17  **A  Perhaps on a few occasions. Most of the cases I would**
18  **have done by then were workers' compensation cases, but**
19  **there may have been some. I would really have to look to**
20  **see.**
21  Q  Now, if we look at that same paragraph?
22  **A  Yeah.**
23  Q  About halfway through the next sentence, which is broken
24  up a bit by semicolons, there's a reference to
25  "occupational asbestos exposure beginning at least 15

**Page 98**

1  years previously." Do you see that reference?
2  **A** Yes.
3  **Q** All right. Right after that it says, "Asbestos exposure
4  was accepted only if the participant had (1) worked in a
5  trade known to be at high risk of asbestos exposure for a
6  minimum of 5 years at least 10 years previously, or (2) a
7  chest radiograph that demonstrated changes consistent
8  with asbestos-related disease and an occupational history
9  consistent with substantial asbestos exposure. CARET
10  defined high-risk trades as asbestos insulators, sheet
11  metal workers, plumbers/pipefitters, plasterboard
12  workers, boilermakers, shipyard electricians, ship
13  scalers and ship fitters," end quote.
14  All right. And so those were the high-risk trades?
15  **A** Those were the designated high-risk trades, yes.
16  **Q** And were you involved in defining the designated
17  high-risk trades at all?
18  **A** No. The parameters for entry into CARET, again, would
19  have been in the late 80s before I started my fellowship.
20  So no.
21  **Q** Do you know what the -- what criteria were used to
22  designate a trade as a high-risk trade?
23  **A** My understanding is that it was based on historical
24  evidence of significant asbestos exposure in that trade.
25  The purpose of CARET was to recruit individuals at high

**Page 99**

1  risk for developing cancer either by virtue of smoking or
2  having heavy asbestos exposure. So there would have been
3  either medical industrial hygiene evidence or both that
4  these were individuals with a significant history of
5  asbestos exposure during those historic periods.
6  **Q** Did the criteria to be determined or to be defined as a
7  high-risk trade require that there be occupational
8  epidemiology demonstrating an increase in lung cancer or
9  other types of cancers for those groups, those cohorts?
10  **A** I don't think it was based on a particular algorithm that
11  required an epidemiologic study. It was based on the
12  experience within those trades.
13  Now, it could include epidemiology, but it would
14  include industrial hygiene and medical -- occupational
15  medicine experience as well.
16  **Q** Looking at the tables on 577, Table 4 indicates High-Risk
17  Trade Distribution: CARET Asbestos-Exposed Cohort, and
18  that's the distribution of the various trades amongst the
19  five study centers?
20  **A** Correct.
21  **Q** And then Table 5 is Distribution of Parenchymal and
22  Pleural Abnormalities: CARET Asbestos-Exposed Subjects,
23  correct?
24  **A** Correct.
25  **Q** And here the chest radiograph results are not broken out

**Page 100**

1  by trade, correct?
2  **A** That's correct.
3  **Q** So it would just be the study center that would have a
4  certain percentage that would be identified, for example,
5  positive parenchymal results, right?
6  **A** That's correct, based on the x-ray readers.
7  **Q** And the 1997 study refers to results from the chest
8  radiographs. It also refers to pulmonary function
9  results; is that right?
10  **A** Yes.
11  **Q** Respiratory symptoms, correct?
12  **A** Yes.
13  **Q** And, again, that would be based upon study center
14  location, not the individual trades; is that right?
15  **A** To my knowledge, respiratory symptoms, I have
16  investigated and published on respiratory symptoms in the
17  CARET cohort, there's never been a breakdown by trade to
18  my knowledge.
19  **Q** In this particular article about the CARET cohort,
20  there's no reference to any of the study subjects
21  involved in the high-risk trades as having experienced
22  mesothelioma; is that right?
23  **A** Well, you couldn't enter CARET if you had a history of
24  preexisting cancer. Basically, this was a study to
25  prevent initial cancer, so that would have been an

**Page 101**

1  exclusion criteria.
2  **Q** Right. So if you had lung cancer -- already had lung
3  cancer or mesothelioma, you wouldn't be in this study?
4  **A** Right.
5  **Q** On the last page, 580, on the left-hand column, the
6  second full paragraph, "There are several limitations,"
7  do you see where I am?
8  **A** Yes.
9  **Q** "There are several limitations to the use of this cohort
10  to study the natural history of asbestos-related lung
11  disease. First, there exists the potential for
12  respondent bias in terms of misclassifying the extent of
13  asbestos exposure in this cohort of men who volunteered
14  for a prospective randomized chemoprevention trial to
15  reduce the incidence of lung cancer."
16  And what is it about the nature of the study that
17  might result in respondent bias about misclassifying
18  asbestos exposure?
19  **A** Well, if there had been inaccurate reporting of their
20  occupational history and, you know, a desire to enter the
21  trial, an active intervention trial to prevent cancer,
22  could it have influenced responses. I think it's a
23  discussion of that.
24  **Q** Oh, okay. So people may want to get into the study when
25  they hear something might involve cancer prevention?

26 (Pages 98 to 101)

**Page 102**

1  A  Yes.  I mean, there could be a potential bias.
2  Q  With respect to your discussion of the McCoy paper then,
3  the fact that you are referring to these high-risk trades
4  as including plasterboard workers, that was as was
5  defined in your article from 1997, right?
6  A  Correct.
7  Q  And it was a function of asbestos exposure or potential
8  exposure as opposed to somebody who's in a known cohort
9  with an increased incidence rate for lung cancer, right?
10  A  Well, again, these were individuals that by virtue of
11  their work were recognized as having high historic
12  exposures to asbestos.  That's how they became
13  participants in CARET.
14  Q  You indicate in the discussion, it says, "At the time of
15  the initial analysis in 1996, 23 mesothelioma cases had
16  occurred in the CARET cohort."  Is that correct?
17  A  Yes, that's correct.
18  Q  So these are cases where mesotheliomas are developed
19  among the study participants following their initial
20  entry into the study?
21  A  Correct.  They would be incident cases where they
22  developed during the course of the study.
23  Q  And out of the 23 cases, you said one case was among a
24  plasterboard worker; is that right?
25  A  Well, as of 2011 when this article was written, there's

**Page 103**

1  been a longer follow-up of the CARET cohort.  There are
2  now 40 cases of meso within the CARET cohort.  It was one
3  of those 40.  I can't tell you if it was one of the 23,
4  but it's one of the existing 40 cases.
5  Q  Oh, I'm sorry.  And you did mention that, and I misread
6  it.  It says with 40 total cases, currently one
7  includes -- is a plasterboard worker; is that it?
8  A  Correct.
9  Q  And I believe you told me in a previous deposition that
10  you weren't in a position to state whether or not
11  plasterboard work was that person's only exposure to
12  asbestos, correct?
13  A  Correct.
14  Q  In the next paragraph, you refer to the Stern study; is
15  that right?
16  A  Yes.
17  Q  And we've talked about that before.  That's the plasterer
18  cement mason cohort?
19  A  Correct.
20  Q  All right.  Do you agree with the representation by McCoy
21  on Page 5 of the McCoy article at Table 1 where there's a
22  reference to that Stern study, and there is a "measure of
23  effect" column which indicates there are four observed
24  mesothelioma deaths with a PMR equal to 188?  Do you see
25  where I am?

**Page 104**

1  A  Yeah, you read it correctly.
2  Q  Okay.  And there's a footnote there that says, "Expected
3  rates for mesothelioma were unavailable.  PMR was not
4  statistically significant.  Two of the four mesothelioma
5  deaths were in plasterers."
6  Do you see the footnote, first off?
7  A  I do, yes.
8  Q  Do you agree with McCoy's representation that the PMR was
9  not statistically significant?
10  A  Well, yes, but it's not -- I don't think it's a complete
11  representation of the Stern study.  The Stern study
12  analyzed -- it's correct that it didn't do a PMR analysis
13  of mesothelioma only.  It did a PMR of all respiratory
14  cancers that was statistically significant.  So that's
15  what the Stern study found.
16  The other thing is that while there were four cases
17  of mesothelioma derived from I believe it was the
18  pathologic data, the nosologists review of the death
19  certificates indicated likely 40 mesotheliomas, and that
20  discussion is not represented in McCoy's article.
21  Q  And with respect to nosologists would be the death
22  certificate statements or findings, I guess?
23  A  Yes, it would be the death certificate findings.
24  Q  All right.  And the calculation that Stern did, a PMR,
25  though, was based upon the pathological findings; is that

**Page 105**

1  right?
2  A  I believe so, yes, and the PMR was 188.
3  Q  In your discussion of McCoy, you also refer to
4  Fischbein's study, correct?
5  A  Yes.
6  Q  And that was the second of two studies -- well, the
7  second of two articles where the Mount Sinai group
8  followed some professional drywallers, right?
9  A  Yes.
10  Q  So you had Rohl as the lead author in the first article
11  that was published, which was a fiber release and
12  exposure study?
13  A  Yes, a Science 1975 study.
14  Q  And then in 1979, Fischbein's article came out, and that
15  discussed some parenchymal abnormalities; is that right?
16  A  That's right.
17  Q  Among other things?  They also had the exposure data?
18  A  They also re-summarized the exposure data from the
19  earlier study.
20  Q  And do you recall if Fischbein controlled for other
21  potential causes of parenchymal abnormalities that may be
22  read on a chest x-ray?
23  A  Well, the design was a cross-sectional study, and they
24  had readers who did an ILO classification.  I don't think
25  there was an analysis beyond that.

1 Q  In your discussion of McCoy and today you've also
2 mentioned the reference to the IARC publication?
3 A  Yes.
4 Q  And in particular the 2009 publication and its statement
5 that all of the various asbestos types cause
6 mesothelioma, right?
7 A  Yes, all the major commercial fiber types.
8 Q  All right.  As you sit here today, do you recall what
9 epidemiological studies that IARC relied upon or
10 indicated that it relied upon to make a finding of
11 chrysotile's relationship with mesothelioma?
12 A  The IARC position paper published their conclusions based
13 on their review of the evidence.  They didn't cite
14 specific epidemiological studies.  Their conclusions were
15 based on the totality of the scientific evidence, but it
16 wasn't a review or citation of individual studies.
17 Q  Do you recall if IARC indicated what its standard was or
18 whatever standard it applied in making a statement about
19 chrysotile and its ability to cause mesothelioma?
20 A  They -- they cited it as a known Group 1, a human
21 carcinogen for all fiber types.  Their process of doing
22 that is published through the World Health Organization
23 in terms of what a Group 1, Group 2, Group 3 carcinogen
24 is, possible, probable or known human carcinogen.  It's
25 based on a weighting of the evidence.  But you would have

Page 106

1 to refer to the specific IARC publications for that.
2 Q  And you don't recall what -- if they have different
3 weights assigned to human epidemiology versus in vitro
4 studies versus animal studies, for example?
5 A  IARC would consider all of that.  They would consider the
6 toxicological data, as well as the epidemiologic data, as
7 well as the mechanistic data.
8 Q  Do you know if they would -- do they rate it differently
9 though?
10 A  Well, based on -- based on the data, for example, if
11 there's toxicologic evidence that a substance is
12 carcinogenic but not human evidence, it's not going to be
13 a known human carcinogen.  It may end up on the possible
14 list based on toxicologic data alone.  But there would
15 have to be more.  There would have to be human data to be
16 a known human carcinogen.
17              (Exhibit No. 25 marked
18                 for identification.)
19
20 Q  (By Mr. Pfahl)  I'm going to hand you another article.  I
21 will pass that over.  This is titled Re-Creation of
22 Historical Chrysotile-Containing Joint Compounds by
23 Brorby, B-R-O-R-B-Y, and others.  It's from Inhalation
24 Toxicology, Volume 20, 2008.
25      Dr. Brodkin, let me have you just look at that and

Page 107

1 see if you are familiar with this article at all.
2 A  (Peruses documents.)  Well, I can tell you just sitting
3 here, I don't have a working memory of it.  It's not to
4 say I haven't seen it before.  But, I mean, if you have
5 specific questions, you can certainly guide me to.
6 Q  Sure.  First of all, the authors Brorby and Sheehan are
7 from Exponent, as is Greene.  Are you familiar with
8 Exponent?
9 A  Yes.  I mean, I can't say I have worked with them, but I
10 have heard of them, sure.
11 Q  And what is your understanding of Exponent?
12 A  Well, I mean, I can't give you a comprehensive
13 description of Exponent.  But they certainly provide
14 professionals experienced in toxicology, industrial
15 hygiene, occupational medicine-related disciplines to
16 address health-related questions.  But I can't give you
17 any more specifics about that.
18 Q  Fair enough.
19      Do you know if they are involved in providing expert
20 consulting in litigation like you do?
21 A  I have seen their name associated with that.  I have seen
22 Exponent reports in association with litigation in the
23 past.
24 Q  And Aeolus, the reference to Berman, are you familiar
25 with that company at all?

Page 108

1 A  I would say not.
2 Q  And then the last author of this is Holm, and he works
3 for Georgia-Pacific?  Do you see that?
4 A  I see it, yes.
5 Q  And in the -- under the Introduction, there's a reference
6 underneath there toward the bottom that says, "This
7 research was primarily funded by Georgia-Pacific LLC who
8 has been in litigation related to joint compound"?
9 A  Oh, where is that?
10 Q  Oh, I'm sorry.  I didn't do a good job of pointing that
11 out.  (Indicating.)
12 A  Yes, I see that.
13 Q  All right.  And in 2008, you were certainly aware that
14 Georgia-Pacific had been involved in asbestos-related
15 personal injury litigation, correct?
16 A  Yes.
17 Q  And you have been involved in some of those cases,
18 correct?
19 A  Yes.
20 Q  And so in looking at this paper, based upon Mr. Holm's
21 involvement and the funding from Georgia-Pacific, it
22 wouldn't be a surprise to you that this would be a study
23 that was being prepared in part to help defend against
24 litigation, right?
25 A  That would likely be my assessment based on what has been

Page 109

28 (Pages 106 to 109)

**Page 110**

1  stated here.
2  Q   Now, would that affect your review of the study?
3  A   It wouldn't affect the review of the study.  I mean, I
4  would review the study for its own merits and
5  methodology.  You know, I mean, if there were
6  methodologic problems --
7  Q   Sure.
8  A   -- it can raise a question in terms of the funding
9  source.  But, no, the study has to stand alone, and
10  that's independent of the funding source.
11  Q   All right.  And so -- right.  The science has to be sound
12  regardless of how it's funded?
13  A   Right.
14  Q   Whether it's NIOSH or Georgia-Pacific, right?
15  A   True.
16  Q   And Inhalation Toxicology is a peer-reviewed journal,
17  right?
18  A   Yes.
19  Q   And so peer reviewers are going to read this and take a
20  look at the underlying scientific methods and protocols,
21  correct?
22  A   That should be the process.
23  Q   And you've done peer review yourself, correct?
24  A   Often, yes.
25  Q   And so that's something that you do as you are interested

**Page 111**

1  regardless of who the authors are is reviewing it and
2  finding out if the methods that were employed are ones
3  that are known to be reliable or that the protocol that
4  is used appears to be reliable; is that right?
5  A   Correct.  You would assess for reliable and valid
6  methodology.
7  Q   Let me have you look at the abstract with me.  This says,
8  "Chrysotile-Containing joint compound was commonly used
9  in construction of residential and commercial buildings
10  through the mid 1970s.  However, these products have not
11  been manufactured in the United States for more than 30
12  years."  Right?
13  And you agree with that?  By 2008, it had been about
14  30 years or more since asbestos-containing joint
15  compounds were being manufactured and sold; is that
16  right?
17  A   Yeah, I think that would comport with my understanding.
18  Q   It says, "Little is known about actual human exposures to
19  chrysotile fibers that may have resulted from use of
20  chrysotile-containing joint compounds because few
21  exposure and no health effect studies have been conducted
22  specifically with these products."
23  Do you agree with the author's statement there?
24  A   No, just on the basis of that statement alone.  Obviously
25  I haven't read the whole article, or if I have, you know,

**Page 112**

1  I don't recall it.  So I'm just speaking to the line
2  itself.
3  Certainly by the time this was published,
4  everything -- you know, the publications I have cited
5  from the 1970s would have been known to the authors that
6  certainly document exposure associated with
7  chrysotile-containing joint compounds.  So I don't agree
8  with that statement.
9  And then in terms of health effects, just, again,
10  reacting to the line --
11  Q   Sure.
12  A   -- I don't know the context of the article, certainly the
13  Fischbein study would have been known, and certainly
14  Stern, Lehman, Reuter, Leigh, Rodelsperger, those studies
15  would have been known, certainly in terms of lung cancer
16  risk, Journal of Occupational Medicine in 1976 would have
17  been known.  So I don't really understand the statement
18  "no health effect studies have been conducted."
19  Now, maybe they are referring to, you know, a
20  specific product as opposed to joint compounds in
21  general, but I wouldn't agree with the statement as it
22  would relate to joint compounds in general.
23  Q   Let's look at the next sentence.  It says, "Because
24  limited amounts of historical joint compounds were
25  available and the stability or representativeness of aged

**Page 113**

1  products suspect, it is currently impossible to conduct
2  meaningful studies to better understand the nature and
3  magnitude of potential exposures to chrysotile that may
4  have been associated with historical use of these
5  products.  Therefore, to support specific exposure and
6  toxicology research activities, two types of
7  chrysotile-containing joint compounds were produced
8  according to original formulations from the late 1960s."
9  And I will just stop there.
10  Do you have any disagreement with the author's
11  statement that there's too little historical samples of
12  joint compound out there to really be of value for
13  studying its exposure and effects?
14  A   Boy, that I can't really speak to.  Yeah, it's not an
15  area that I have looked at.  Again, I don't -- in terms
16  of their sentence, I don't understand why they are saying
17  there should be an issue about the nature and magnitude
18  of potential exposure to chrysotile from joint compounds
19  because I think that was studied in some depth from the
20  1970s and forward.
21  So I'm not sure why they have the need to do this,
22  but in terms of there actually being the joint compound,
23  I can't speak to that.
24  Q   All right.  So you think that the studies that have been
25  published up to 2008 firmly establish that exposure to

Carl A. Brodkin, MD MPH FACOEM
December 17, 2012

**Page 114**

1 chrysotile solely from joint compound products causes
2 mesothelioma in humans?
3 **A Well, I think the studies indicate there's a significant**
4 **risk associated with working with joint compounds. And,**
5 **of course, I would cite the studies on my reliance list.**
6 **Now, does that mean there couldn't have been**
7 **additional exposures within an occupational setting?**
8 **That's possible. I mean, a number of these studies have**
9 **spoken about that.**
10 **But, for example, certainly Leigh in American**
11 **Journal of Industrial Medicine identified plasterers as a**
12 **high-risk trade using joint compound, but they may have**
13 **used other materials as well.**
14 **So, you know, this is an issue of occupational**
15 **activity. Someone who was restricted just to drywall**
16 **would be a much smaller group like Fischbein's study of**
17 **drywallers.**
18 Q And there are far fewer studies of cohorts that are just
19 drywall workers, right?
20 **A Correct.**
21 Q And where you have them, as you have said before, like in
22 the Robinson study and the Wang/Dement study, they are
23 fairly limited in number, aren't they?
24 **A That's right. They are going to be much smaller groups**
25 **which for a disease like asbestosis certainly may be**

**Page 115**

1 **amenable to looking at disease states like asbestosis,**
2 **but for a rare disease like mesothelioma, it's not going**
3 **to offer a very powerful study.**
4 Q And in fact in Robinson and Wang, they had groups of --
5 or cohorts of drywallers, but they didn't have any
6 mesotheliomas in those groups, though, that doesn't
7 surprise you, right?
8 **A Right. The studies really weren't well designed to look**
9 **for a rare disease outcome like that.**
10 Q You need a lot more people, don't you?
11 **A Correct.**
12 Q Let me read on after that, the end of that sentence that
13 says from the late 1960s. Do you see where we were?
14 **A Yeah.**
15 Q It says, "To the extent possible, ingredients were the
16 same as those used originally with many obtained from the
17 original suppliers. The chrysotile used historically in
18 these products was primarily Grade 7RF9 from the Philip
19 Carey mine. Because this mine is closed, a suitable
20 alternative was identified by comparing the sizes and
21 mineral composition of asbestos structures in a sample of
22 what has been represented to be historical joint compound
23 (all of which were chrysotile) to those in samples of
24 three currently commercially available Grade 7 chrysotile
25 products. The re-created materials generally conformed

**Page 116**

1 to original product specifications (e.g. viscosity,
2 workability, crack resistance), indicating that these
3 materials are sufficiently representative of the original
4 products to support research activities."
5 And do you see where I have read that?
6 **A Yes.**
7 Q All right. Now, let me ask you about their substitution
8 of a Grade 7 chrysotile that's not from the Philip Carey
9 mine. I believe, as we talked about before, looking at
10 exposure and then even a physiological response to dust
11 from an asbestos-containing product, it wouldn't matter
12 to you if they used Philip Carey, Johns-Manville,
13 Calidria, Brazilian chrysotile or chrysotile from
14 Balangero, right?
15 **A In terms of health effects, it doesn't bother me that**
16 **they would use other chrysotile. I mean, the Grade 7**
17 **indicates that these may have had a propensity for**
18 **shorter fibers, although, there's still a very wide range**
19 **of lengths.**
20 **So trying to standardize for length of fiber may be**
21 **somewhat of an issue. But the fact that it's chrysotile**
22 **doesn't bother me, per se, from one mine versus another.**
23 Q Let me have you turn over to 1044. Just a couple of
24 questions there.
25 **A (Complies.)**

**Page 117**

1 Q What I was going to ask I think we've covered because
2 they substituted in a chrysotile, but it was of the same
3 grade that was used in historical chrysotile samples,
4 right?
5 And then you understand from the -- at least the
6 abstract that we've read is that the intention here was
7 to reconstitute a product for further study?
8 **A That seems to be the goal, yes.**
9 Q Okay. And you haven't -- or you just don't recall
10 reading this in its entirety, but do you have -- based on
11 your recollection, do you have any disagreement with the
12 author's representation that the recreated materials
13 generally conformed to original specifications such that
14 they thought it was sufficiently representative of the
15 original to support their research activity?
16 **A Well, I mean, I understand that that's their goal. I**
17 **would say this is probably a little bit outside my area**
18 **as a physician because it really has to deal more with**
19 **material science, and that's not my area.**
20 **I mean, I'm reading with interest what they say**
21 **about the health effects, and I don't agree with them.**
22 **But in terms of the technical issues of recreating this,**
23 **it's really not my area of expertise in terms of the**
24 **physical properties, but they certainly are discussing**
25 **their approach.**

**Page 118**

1 Q To your knowledge have other companies funded research
2 that have looked at health effects from a particular
3 chrysotile-containing product?
4 A The studies that I have seen in the epidemiologic
5 literature have not spoken to product-specific
6 information. I know that the Rohl study looked at, I
7 believe, 25 different products, but they don't discuss,
8 you know, product specific exposure measurements.
9 Q Are you familiar with asbestos-containing material or
10 product manufacturers that have funded studies whether it
11 be just chrysotile studies or other types of studies that
12 relate to asbestos-related disease?
13 A The one I'm most familiar with is, well, Soule in the
14 Gypsum Association, 1973. I mean, that was an industrial
15 hygiene study to look at exposure measurements, but it
16 certainly was addressing health concerns.
17 (Exhibit No. 26 marked
18 for identification.)
19
20 Q (By Mr. Pfahl) Dr. Brodkin, I'm going to hand you
21 Exhibit 26. This is an article from Bernstein and
22 others. It's Inhalation Toxicology or published in
23 Inhalation Toxicology from 2008 as well. The title is A
24 Biopersistence Study Following Exposure to Chrysotile
25 Asbestos Alone Or in Combination With Fine Particles.

**Page 119**

1 And my first question is does this look like an
2 article that you have read before or studied before?
3 A I may well have seen it. I don't have a working memory
4 of it as I sit here. So, again, I would have to -- I'm
5 glad to comment on specific lines, but it's not from a
6 working memory of it.
7 Q All right. Sure.
8 And if we look at the reference to Inhalation
9 Toxicology, Volume 20 -- if you still have that handy?
10 A Yes.
11 Q You will see that that's the same publication as the
12 Brorby article we just discussed?
13 A The same volume, yes.
14 Q The same volume. Right.
15 And this study would have gone through peer review
16 as well, correct?
17 A Yes, Inhalation Toxicology is a peer-reviewed journal.
18 Q Do you know or -- well, first of all, do you know David
19 Bernstein?
20 A I know the name, but, no, not personally.
21 Q Are you familiar with the nature of his work?
22 A You know, I really couldn't speak to that. I haven't
23 researched it, I mean, other than what they've indicated,
24 that he's a consultant in toxicology.
25 Q You see that Holm is another one of the authors here?

**Page 120**

1 A Right.
2 Q Just like he was with the other paper?
3 A Right.
4 Q And Georgia-Pacific is identified as his employer?
5 A Yes.
6 Q And down at the very bottom of the left-hand column,
7 there's a reference that says, "This research was
8 sponsored by a grant from Georgia-Pacific"? Do you see
9 that?
10 A I see it, yes.
11 Q And so, again, you understand that Georgia-Pacific is
12 funding this study, right?
13 A That appears to be the case.
14 Q All right. And it would be your assumption based upon
15 the involvement in the company and even one of the
16 authors who was employed by them that this is likely done
17 in some respects in order to defend against asbestos
18 personal injury litigation?
19 A Well, they don't state that here. So, I mean, I guess I
20 can't really speak to that. I mean, it's possible it
21 could be used for that. I just don't know enough about
22 this article to really speak to that.
23 Q Sure. Let's look at some of it and see if it helps, and
24 if there are areas which you feel that you are not ready
25 to comment on, just tell me. All right?

**Page 121**

1 A Okay.
2 Q As background, let's look at the abstract. It says, "In
3 designing a study to evaluate the inhalation
4 biopersistence of chrysotile asbestos that was used as a
5 component of a joint compound, a feasibility study was
6 initiated to evaluate the short-term biopersistence of
7 the chrysotile alone and of the chrysotile in combination
8 with the sanded reformulated joint compound.
9 "Two groups of Wistar rats were exposed to either
10 7RF3 chrysotile," which is identified as Group 2, "or to
11 7RF3 chrysotile combined with aerosolized sanded joint
12 compound (Group 3). In addition, a control group was
13 exposed to filtered air."
14 Do you see how I muddled through on that
15 particular --
16 A You have read it correctly.
17 Q All right. You are being kind.
18 So do you understand generally that this is an
19 animal exposure -- inhalation study?
20 A It appears to be, yes.
21 Q And have you done animal inhalation studies yourself?
22 A No. I've relied on them in terms of understanding the
23 biologic and toxicologic evidence for disease, but I
24 don't conduct animal studies personally.
25 Q All right. But you've read and you are familiar with

**Page 122**

1  animal studies?

2  **A  Yes, and I do rely on them.**

3  Q  All right.  And they do inform your opinion about

4  biological plausibility or biologically plausible

5  sequelae to exposures to things like asbestos?

6  **A  Yes, and other substances, yes.**

7  Q  Sure.  Let's take a look at the introduction.  It says,

8  "The inhalation biopersistence study was originally

9  developed in order to quantify the rate at which fibers

10  clear from the lung."  And then there's a reference to

11  Bernstein and Musselman.

12     "Since its inception, numerous synthetic and natural

13  mineral fibers have been evaluated using this protocol

14  design," referring to Bernstein and Reigo.  "For

15  synthetic mineral fibers, the biopersistence of the

16  fibers longer than 20 microns was found to be highly

17  correlated with pathological response in chronic

18  inhalation studies and with tumorigenic potential in

19  chronic intraperitoneal injection studies.  More

20  recently, commercial chrysotile evaluated under the same

21  protocol was found to clear rapidly from the lungs with

22  clearance half-times of fibers longer than 20 microns

23  ranging from 0.3 to 11.4 days depending on chrysotile

24  fiber type.  However, these studies always involve the

25  exposure of the pure bulk product without the addition of

**Page 123**

1  any secondary aerosol to the test atmosphere."  And I

2  will stop there.

3     The animal studies that you are familiar with that

4  look at a biological response to asbestos, those have

5  been injection and intraperitoneal area or they would

6  include --

7  **A  Well, they include injection studies either into the**

8  **pleura or peritoneal membranes or they can be through an**

9  **inhalation methodology.**

10  Q  Right.

11     Would you agree with the authors that those types of

12  studies used pure bulk chrysotile as opposed to

13  chrysotile and some other particulate?

14  **A  Most of the toxicologic studies that I'm aware of would**

15  **study a pure fiber type to compare with other fiber types**

16  **or controls.  So it wouldn't typically be a mixture.**

17  **Now, I can't say that in all cases, but most studies are**

18  **designed that way.**

19  Q  All right.  The next paragraph states, "We set out to

20  evaluate the biopersistence of the commercial chrysotile

21  asbestos that was used through the mid-1970s in a joint

22  compound intended for sealing the interface between

23  adjacent wall boards.  An inhalation biopersistence study

24  was designed to include not only the chrysotile component

25  of the joint compound alone but also the sanded

**Page 124**

1  particulate component, as real-life exposure to abraded

2  wall board would result in concomitant exposure to both

3  chrysotile fibers and joint compound particles.  The

4  inclusion of the sanded particulate fraction was

5  considered important in order to determine whether any of

6  the particular components of the joint compound

7  influenced the biopersistence or pathological response to

8  the chrysotile."

9     Do you see where I have read that?

10  **A  Yes.**

11  Q  And you understand that what they want -- the hypothesis

12  here is to see whether or not the asbestos dust -- well,

13  the dust that's created from sanding asbestos-containing

14  joint compound and that would be inhalable, whether or

15  not that would be biologically different than just

16  inhaling chrysotile fibers?

17  **A  I understand that that is a hypothesis that is being**

18  **looked at, yes.**

19  Q  All right.  So do you agree with them that if you are

20  interested in determining whether or not inhaling joint

21  compound dust that would consist of particles of a joint

22  compound in addition to just chrysotile, that combining

23  the two and comparing it with just pure chrysotile would

24  be an important step to determine whether or not you have

25  a biological distinction?

**Page 125**

1  **A  Well, I understand the nature of the question.  You know,**

2  **in terms of the study design, again, this isn't my area**

3  **in terms of animal toxicology.  I mean, there are a lot**

4  **of issues that go into using a mixture instead of a pure**

5  **fiber to make sure that it's not confounded by the total**

6  **particulates in some way.**

7     **But I understand the question.  I mean, you know, in**

8  **terms of the study design, one wants to look at a mixture**

9  **of materials compared to the pure fiber type and see if**

10  **there's a difference.  So I understand that.**

11  Q  All right.  And so you can understand what they want to

12  try to accomplish here in terms of a hypothesis and

13  seeing what the results say?

14  **A  Yes.  I mean, I think I have expressed that.**

15  Q  Let's go ahead and look at the methods.

16  **A  (Complies.)**

17  Q  You see where the methods are in the left-hand column of

18  1010?

19  **A  Yes.**

20  Q  And then there's a reference Sanded M971/974 powder?  Do

21  you see that reference there?

22  **A  Yes.**

23  Q  And before it talks about the chrysotile.  We discussed

24  that when we were looking at the reformulation study.  If

25  you just want to take a moment to refresh your

Page 126

1 recollection. But they didn't have Philip Carey
2 chrysotile?
3 **A Right.**
4 Q So they ended up using Johns-Manville 7RF3 chrysotile?
5 **A Right.**
6 Q They consider that to be the most similar to the Carey
7 chrysotile, right?
8 **A I think that was the objective.**
9 Q And then, again, let's look to the next column. The
10 first full paragraph there says, "The reformulated
11 compound was applied according to the instructions of the
12 original material to pieces of drywall, the ends of which
13 were sealed with tape. A notched trowel was used for
14 application. The material was allowed to dry for at
15 least 48 hours and then sanded. Individual boards were
16 sanded for approximately 20 to 30 minutes. Four
17 different boards were needed to obtain sufficient mass of
18 material for the studies. Aluminum oxide medium 120-grit
19 sandpaper was used to generate the sample. The sanded
20 material was collected in a large Ziploc bag, and the bag
21 was sent off for study." This study, right?
22 **A Uh-huh, yes.**
23 Q All right. So you can see what they are doing is they
24 reformulated the joint compound, they put it on a wall,
25 they sanded it and gathered up the dust?

Page 126

1 **A Yes, I think that's fair.**
2 Q All right. If you want to turn over to Page 1012 with
3 me?
4 **A (Complies.)**
5 Q Animal Exposure, left-hand column. This will just give
6 us some -- a reference here. It says, "Three groups of
7 laboratory rats (groups 1, 2 and 3) were exposed," it
8 should have "sic" put in there, "for six hours per day
9 for five days."
10 Do you see that reference?
11 **A Yes.**
12 Q So I will read it without their typo. "Three groups of
13 laboratory rats were exposed for six hours a day for five
14 days"?
15 **A Right.**
16 Q Group 1 filtered air, group 2 a fixed-exposure to
17 well-characterized fibers of chrysotile 7RF3 and group 3
18 a fixed-exposure level of well-characterized fibers of
19 chrysotile 7RF3 mixed with sanded powder.
20 **A Yes.**
21 Q Correct?
22 And that will just give us a reference. I want to
23 move along.
24 Let's go to Page 1015, left-hand column under
25 results. "Validation of lung digestion and counting

Page 127

1 procedures," do you see where I am?
2 **A Yes.**
3 Q I see you flipping over. Are there things you want to
4 review?
5 **A Well, I haven't -- I don't have a working memory of this**
6 **article, so I'm trying to get through it. I mean, I'm**
7 **certainly looking at what you are reading.**
8 Q Okay. Under the Results section Validation of the Lung
9 Digestion and Counting Procedures, it says, "Validation
10 of lung digestion and counting procedures is essential to
11 the legitimacy of this type of study, although it was
12 often absent from early studies. Such validation
13 provides confidence that there is no significant
14 alteration of the fiber length or distribution during
15 fiber recovery." Let me just stop there.
16 Are you familiar enough with this type of study to
17 understand what they are referring to from a validation
18 standpoint?
19 **A Well, again, I don't as part of my practice conduct lung**
20 **digestion or counting. So from this technical aspect,**
21 **it's not really my area.**
22 Q Let me refer to the next paragraph. It says, "The only
23 method suitable for validation of chrysotile fiber
24 recovery would be a parallel analysis using a noninvasive
25 measurement technique such as confocal microscopy and

Page 128

1 comparison of these results with those obtained following
2 transmission electron microscopy examination of the
3 digested lungs. This type of comparative analysis of the
4 fiber number and size distribution is planned for the
5 main study. Previous studies using the same procedures
6 used here have confirmed that the fiber recovery
7 procedures do not significantly alter the fiber size
8 distribution or number of the chrysotile fibers."
9 And then there are references to three other
10 Bernstein studies. Do you understand what they are
11 referring to with respect to the confocal microscopy?
12 **A No. This really is not my area.**
13 Q All right. I just wanted to see.
14 **A I mean, I understand, you know, the concept of**
15 **microscopic analysis and, you know, transmission electron**
16 **microscopy and the limitation of those modalities, but**
17 **it's not something I perform as part of my practice.**
18 Q No, I understand. And you don't know -- well, do you
19 know whether or not confocal microscopy can take 3D --
20 essentially, like, 3D images and be able to pick out
21 fibers in a particular space?
22 **A No, I can't speak to that.**
23 Q Okay. Fair enough.
24 Turn over to 1017 with me.
25 **A (Complies.)**

Page 129

**Page 130**

1  Q  Down in the bottom of the right-hand column, there's a
2     heading Lung Fiber Burden.  Do you see that?
3  A  Yes.
4  Q  And the paragraph which begins on 1017 and then carries
5     over states, "The number, concentration and size
6     distribution of the chrysotile fibers and lungs of the
7     rats from group 2 chrysotile exposure," and I'm over on
8     to 1019 now, "and group 3 chrysotile and sanded component
9     immediately after the termination of a five-day exposure
10    defined as day zero, and at three days following
11    cessation of exposure, day three, are presented in Tables
12    5 and 6 respectively.  The data for each animal
13    individually and group meanings are shown for each
14    parameter.  As shown in Table 5 immediately following
15    cessation of exposure zero days, there was a mean of 27.2
16    million WHO fibers remaining in the lungs of the rats in
17    group 2, which received only chrysotile.  Rats from group
18    3, which received both chrysotile and the sanded powder,
19    had only 2.3 million WHO fibers at the same time point,
20    zero days.  Similarly, there were a mean of 0.44 million
21    fibers longer than 20 microns in length from rats of
22    group 2 and a mean of 0.037 million fibers longer than 20
23    microns in length from rats of group 3.  Across all size
24    ranges, there was approximately an order of magnitude
25    difference in the mean number of each size category of

**Page 131**

1     fibers remaining in the lungs of group 2 as compared to
2     group 3."
3        Do you see where I have read that?
4  A  Yes.
5  Q  All right.  And so they are reporting that at the
6     measurement points that they have, zero days and three
7     days post exposure, the fibers remaining in group 3, the
8     combined exposure rats, was an order of magnitude
9     approximately less than the fibers that remained in the
10    chrysotile only rats; is that how you read that?
11 A  They have reported that, yes, as their observation.
12 Q  Let me have you turn over to the discussion on 1025.  The
13    right-hand column.
14 A  (Complies.)
15 Q  You see it's Biopersistence of the 7RF3 Chrysotile is the
16    heading?
17 A  Yes.
18 Q  The second paragraph there says, "In the current
19    comparative study, identical fiber aerosol generation
20    systems were used for each exposure group with the only
21    difference being that in group 3, a separate aerosol
22    generator produced an aerosol of micronized sanded
23    material that was added in the airstream to the
24    chrysotile aerosol.  The aerosol fiber number and size
25    distributions were similar in group 2 and 3 as presented

**Page 132**

1     earlier.
2        "Care was taken in the experimental design to ensure
3     that the fiber number and size distribution of the
4     chrysotile of the aerosols of the two exposure groups
5     were similar.  Therefore, based upon the exposure
6     aerosols and the dynamics of lung deposition, the number
7     and size of fibers deposited in the lungs was expected to
8     be similar in both groups.  However, the numbers of
9     fibers remaining in the lungs at both the first and
10    second sacrifice time points, immediately after the end
11    of exposure and three days later, were quite different
12    between the two exposure groups."
13       All right.  Do you see that?
14 A  Uh-huh.
15 Q  They are referring to that order of magnitude difference
16    that we saw, right?
17 A  Yes.
18 Q  It says, "Influence of the sanded aerosol on fiber
19    clearance.  As has been described previously, chrysotile
20    fiber clearance is related to the interaction of the
21    mineral structure of the fiber with lung environment and
22    cells."  Bernstein and Hoskins from 2006.  "Long fibers
23    with low biosolubility are the most pathologically active
24    fiber size category, and clearance of these fibers is
25    very slow due to the inability of macrophages to

**Page 133**

1     phagocytose them completely, leading to a frustrated
2     phagocytosis."  Let me just stop there.
3        Do you agree with the reference that low
4     biosolubility long fibers are very slow to clear the
5     lungs?
6  A  Fiber length can be a factor in clearance.
7  Q  And can biosolubility be a factor?
8  A  Yes.
9  Q  So if you have long amphibole fibers, you expect their
10    clearance to be much longer than that for short
11    chrysotile fibers, correct?
12 A  That's well known, and certainly half-life in the lung is
13    different.  In other systems, the pleura, it's different,
14    but in the lung, that's true.
15 Q  Let me read on here.  "Chrysotile is a rolled silicate
16    sheet with magnesium on the outside of the sheet and
17    silica on the inside."  I will stop there.
18       Do you agree with that description of chrysotile?
19 A  Well, I'm aware that chrysotile is a hydrated magnesium
20    silicate.  They are getting into some fairly technical
21    physical structural differences that are a little bit
22    beyond my expertise.  I would say that's more of a
23    mineralogic physical issue.
24 Q  Okay.  Fair enough.
25       It says, "Longer chrysotile fibers are shortened in

Page 134

1 the lungs, and this is considered to be a consequence of
2 the action of the lung environment on the chemical
3 structure of the chrysotile fibers."
4    Do you see that?
5 **A Yes.**
6 Q Do you agree with that statement generally?
7 **A Yes. I mean, I think it's been well demonstrated that**
8 **there is a difference in kinetics with chrysotile in the**
9 **lung.**
10 Q The next sentence says, "The dual action of both the lung
11 surfactant and the acid environment of the macrophage
12 phagolysosome may leach the magnesium layer and break
13 apart the silica bonds. This causes longer fibers to
14 break into smaller fibers and particles which can then be
15 fully phagocytosed and cleared by the macrophage."
16    Do you see where I read that?
17 **A Yes.**
18 Q Would you agree with that description?
19 **A Well, certainly macrophage clearance is one mechanism of**
20 **clearing fibers.**
21 Q All right. And do you know if chrysotile fibers break
22 down in the lung surfactant?
23 **A I mean, that's a pretty specific physical question that I**
24 **can't say that I've studied to any extent.**
25 Q You defer to someone like a Dr. Brody, for example?

Page 135

1 **A Right. I mean, someone who has basically modelled this**
2 **type of experiment and measured half-lives within the**
3 **lung would be better able to answer that question.**
4 Q Let's look over on the right-hand column, Macrophages and
5 Biopersistence. Do you see where I am?
6 **A Yeah.**
7 Q It says, "The finding that the total number of fibers
8 present in the lungs of the animals in group 3
9 (chrysotile and sanded material) is approximately an
10 order of magnitude less than in group 2 (chrysotile
11 alone) is intriguing. This difference was evident
12 immediately at the end of the five-day exposure period
13 suggesting that there had been accelerated clearance
14 during ongoing exposure to the combined fiber/particle
15 exposure."
16    Would you agree that the findings that they had do
17 suggest that there was some type of an accelerated
18 clearance for the combined exposure rats compared to the
19 chrysotile-only rats?
20 **A Well, I think the observation they are discussing is that**
21 **there is evidence of a change in clearance between the**
22 **two groups. I think, you know, the issue in the**
23 **discussion is why. And I guess I'm a little**
24 **uncomfortable speaking to that because, again, we're**
25 **outside my area. But, I mean, there would be all sorts**

Page 136

1 of questions as to the rat's response to a different
2 **particulate load, what could be the confounding factors,**
3 **is it a true difference in clearance. I mean, these are**
4 **areas that are outside my area really.**
5 Q Let me ask you about the next paragraph that begins, "In
6 seeking." Do you see where I am?
7 **A Yes.**
8 Q It says, "In seeking an explanation for this rather
9 paradoxical finding of increased clearance of fibers
10 during concomitant exposure to particles in group 3, we
11 noted that histopathological examination of the lung
12 showed increased macrophage numbers in group 3 as
13 compared to group 2. The pathologists reported that the
14 increased number of alveolar macrophages in group 3 may
15 be considered as a reaction to the inhaled fiber powder
16 mixture."
17    Do you see where I have read that?
18 **A Yes.**
19 Q And so what they did recognize is there was an increased
20 macrophage response in the mixed particle, correct?
21 **A Right.**
22 Q And can that help explain the more rapid breakdown of
23 chrysotile fibers in your opinion?
24 **A Well, I think they have offered another hypothesis. I**
25 **mean, I don't think -- I mean, they are positing that**

Page 137

1 that could be a possible explanation. I'm wondering if
2 **they have all the controls they need to really make those**
3 **kinds of conclusions.**
4    I mean, they have one group with a mixture and one
5 **group with pure fiber. I would like to see some other**
6 **controls with other mixtures to really sort of speak to**
7 **what the actual mechanism is. But, I mean, they are**
8 **discussing possibilities here.**
9 Q And your preference would be to know whether or not if
10 you had chrysotile and some other kind of particulate as
11 a combined exposure?
12 **A Exactly. I mean, there seems to be a conclusion here**
13 **that if you put this particular mixture that would be in**
14 **joint compound and inhale it into the lungs, that somehow**
15 **the clearance is affected.**
16    It raises the question, well, is that unique to
17 **joint compound? Is there something going on with the**
18 **mixture or the physical reaction? I mean, choosing your**
19 **controls is important. I mean, these aren't the kinds of**
20 **experiments I do, but it's something one wonders about.**
21 Q Let's look at the bottom of the paragraph beginning with
22 the sentence, "The fact that there is greater." Do you
23 see where I am? It's about seven lines up from the
24 bottom.
25 **A Oh, okay. (Peruses documents.) Yeah.**

35 (Pages 134 to 137)

1  Q  It says, "The fact that there is greater clearance of the
2  long chrysotile fibers in the combined exposure group
3  means that there must be more rapid leaching and breakage
4  of these long fibers as the macrophages intend to engulf
5  them.  The accelerated disintegration of the chrysotile
6  fibers in the lungs of the rats receiving the combined
7  exposure could be explained by two factors:  The
8  increased numbers of macrophages present in these lungs
9  and the macrophages could have a greater ability to cause
10 leaching and breakage.  The greater numbers of
11 macrophages mean that the total amount of long fibers
12 inside macrophage phagosomes is increased, and so the
13 total 'acid stress' applied to these chrysotile fibers is
14 greater.  The reasoning that there is greater potential
15 for individual macrophages to cause disintegration is
16 supported by the finding of a mild degree of
17 inflammation, as indicated by the increased numbers of
18 macrophages seen in the lungs of the combined group.
19 Exposure to particles leads to the induction of
20 inflammation," reference the Silver, Schaible, Haas, "and
21 a macrophage infiltrate typical of inflammation was
22 documented in the lungs of the combined exposure.  During
23 inflammation macrophages undergo 'activation,' a change
24 in differentiation status to more active secretory and
25 functional phenotype.  Of special relevance here is the

Page 138

1  finding that phagosomes of active macrophages rapidly
2  become more acidic than those of resting macrophages by
3  about 1 pH unit," citing Schaible.
4      Do you see where I have read that?
5  A  Yes.
6  Q  Okay.  And here they are talking about the increased
7  number of macrophages and also an increase in total acid
8  stress in the area, right?
9  A  Yes, that is discussed.
10 Q  And do you believe that that is a biologically plausible
11 explanation for why there can be increased fiber
12 dissolution in the combined group as opposed to just the
13 chrysotile only group?
14 A  Well, I think it's a reasonable discussion of possible
15 mechanisms.  I don't think this experiment is designed to
16 really answer the question.  I think it's a discussion of
17 possible mechanisms.  I think in that context, it's a
18 reasonable discussion.  But I don't know that this study
19 is really designed to provide any specific answers.
20 Q  But from a biological standpoint, having more macrophages
21 and macrophages that are more activated could explain the
22 greater -- the greater chrysotile fiber clearance that
23 was seen in the combined group; would you agree?
24 A  It could, yes.  That could be a mechanism.  But, you
25 know, I don't want to overgeneralize about this study,

Page 139

1  and I don't think perhaps the authors have.
2      But, I mean, I come at these articles from a health
3  perspective, and, you know, it begs the question you want
4  to see, well, you know, what was the impact on the lung,
5  was there evidence of tissue injury, fibrosis, because
6  increased inflammation can result in increased injury as
7  well.
8      But this study is very limited to clearance.  So I
9  think there's a discussion of it.  And I don't see a
10 problem with that, but I don't think the study is
11 necessarily designed to really answer why they see this
12 change in clearance.
13 Q  But they did provide some observations?
14 A  Sure.
15 Q  And one of the observations was increased clearance in
16 the combined group, right?
17 A  Yes.
18 Q  And they also had the observation that there was a
19 greater macrophage response in the combined group?
20 A  True.
21 Q  And they had -- that was -- strike that.
22      MR. PFAHL:  All right.  Let's go off
23 the record for a minute.
24      (Discussion off the record.)
25      (Recess from 2:23 to 2:33.)

Page 140

1      EXAMINATION
2  BY MR. LAGEMAN:
3  Q  I'm looking here at what I believe is Page 11 of what
4  we've been calling the notes.  It describes Plaintiff's
5  work with a product identified as cable hole filler
6  compound.
7  A  Yes, that's a subsection of the Occupational and
8  Environmental History notes.
9  Q  Okay.  I just want to talk just briefly about this.  I
10 represent Lucent and AT&T in this matter.  I'm having a
11 little bit of difficulty understanding the actual notes
12 section at the bottom.
13      Would you mind just explaining to me the
14 significance of this -- of this section, what you are
15 actually stating here?
16 A  Sure.  I guess I will just read it and explain as I go.
17 "Identified asbestos exposure during mixing Western
18 Electric asbestos filled bags cable hole filler media."
19 What I'm really referring to is the discovery document
20 from Western Electric that describes that media as
21 asbestos-containing at least until 1974, and that's
22 reviewed in another group of notes for the discovery
23 documents.  But that's what I'm referring to.
24      And then it says --
25 Q  Memorandum of record, is that what we're talking about

Page 141

36 (Pages 138 to 141)

Page 142

1  here?
2  A  That's correct, yes.
3  Q  Okay.
4  A  And then it says at the bottom, "Cutting/Ball peen hammer
5  of the cover compressed gasket."  And what I'm referring
6  to is Mr. Quirin using the ball peen hammer to cut a hole
7  cover gasket between the cover and the cable vault.  And
8  I refer to that as being described as a metal cover, and
9  then I note that it's fire resistant.
10      And on the left-hand column, I note that the Lucent
11  discovery describes as fire-resistant application
12  consistent with asbestos.  And I'm referring, again, to
13  the discovery documents where they talked about a
14  material being used between the cover and the cable vault
15  as being asbestos-containing.
16 Q  Okay.  Well, let's just take them one by one.  I just
17  want to first talk about the cable -- well, what the
18  plaintiff refers to as cable hole filler compound.
19 A  Okay.
20 Q  Correct me if I'm wrong -- well, why don't you just tell
21  me what the basis is for your conclusion that that
22  specific product, which he identified as being exposed
23  to, contained asbestos?
24 A  Well, the basis is the discovery document from Western
25  Electric, the Memorandum of Record.  It's indicated in

Page 143

1  response to a March, 1974, memo that the Western Electric
2  had asbestos-filled bags used as temporary cable hole
3  filler media.
4      So my assessment of that is that that material would
5  likely be asbestos containing at least until 1974 when
6  the memo discusses phasing it out or cancelling it.
7  Q  So what you are stating is that the R-9440
8  asbestos-filled bags which are referred to in that
9  Memorandum of Record are in fact what is identified as
10  cable hole filler compound in your notes; is that
11  correct?
12 A  Yes.  In terms of Mr. Quirin's description of using it,
13  it would fit with that material or that type of material.
14 Q  Okay.  So based on his description and the description of
15  the asbestos-filled bags, you made a determination that
16  those two products are in fact one and the same?
17 A  Well, I haven't concluded that it's specifically R-9440,
18  but certainly it describes the application of that as
19  being asbestos-containing material.  And certainly in the
20  Lucent Technologies discovery document, they talk about
21  the importance of it being a fire-resistant material.
22 Q  Okay.  The actual filler compound, we're not -- I'm
23  staying away from the gaskets.  So we'll talk about that
24  in a second.
25 A  Okay.

Page 144

1  Q  Are there any other grounds for your conclusion that the
2  cable hole filler compound as identified by plaintiff
3  is -- contains asbestos other than that it has a similar
4  description to the asbestos-filled bags?
5  A  No, it really is that description of it as a cable hole
6  filler medium that is the basis for the opinion.
7  Q  Okay.  Could you -- do you have any experience or
8  knowledge of how these asbestos-filled bags are used to
9  fill these cable holes?
10 A  Well, my determination is really from Mr. Quirin's
11  description.  It's not from any other use of that
12  material.
13 Q  Okay.  So because you determined that they are the same
14  product, and your determination would match up with how
15  Mr. Quirin described using it?
16 A  Well, yes.  I mean, they are basically describing a very
17  specific application, cable vaults.  And not only cable
18  vaults, but the action of putting a cable through a hole
19  in the cable vault.  That's a pretty specific activity.
20      And the description of Mr. Quirin mixing that and
21  applying it certainly would indicate that that's the type
22  of material being used, at least that's my determination
23  to a reasonable degree of medical certainty.
24 Q  So is it correct that you believe that the
25  asbestos-filled bags contain the material that Mr. Quirin

Page 145

1  describes as mixing to form the sort of sealant that was
2  used to cover these holes?
3  A  That would be my assessment.
4  Q  And, again, that's based solely on the descriptions that
5  you read in Mr. Quirin's testimony and in speaking with
6  him and in this Memorandum For Record that you were
7  provided?
8  A  That's correct.  And, yes, certainly he described that.
9  And I guess I would add to that just my discussion with
10  him in the interview just reviewing his occupational
11  history.
12 Q  Sure, sure.
13      Now, in another document that I have here discussing
14  the document -- that is summarizing the documents you
15  were provided, you refer to the asbestos cable hole bags
16  R-440 as being called blue pillows; is that correct?
17 A  There is a description that is in the Lucent Technologies
18  discovery material of asbestos cable hole bags, yes, that
19  are described as blue pillows by one individual.  I
20  believe in the interrogatories, they note that that is a
21  term used for kale wool.  They describe asbestos cable
22  hole bags that were used between the cable vault covers
23  for fire insulation protection, but they seem to
24  distinguish that between the blue pillows.
25 Q  Okay.  I just want to move on briefly then to these

**Page 146**

1  gaskets that you have discussed. I don't have -- I'm not
2  familiar with the documents that you referenced, but I
3  believe you stated that it was with regards to a metal
4  cable vault cover that was coated with a heat-resistant
5  material; is that correct?
6  A  Well, that description is from Mr. Quirin's deposition.
7  He did indicate he used a metal cable vault cover, at
8  least at some point.
9  Q  Okay. Now, how does the gasket -- if you could just
10  explain to me conceptually where this heat resistant
11  gasket would be located at least based on your
12  understanding of what you have reviewed.
13  A  Based on Mr. Quirin's description, it would be cutting a
14  gasket that would fit between the hole and the cover. So
15  it would be a gasket between those two materials.
16  Q  And are we talking about a vault cover or a manhole
17  cover?
18  A  Well, my interpretation would be a hole cover in terms of
19  use of that gasket.
20  Q  Are you aware of where the hole -- I mean, would it be a
21  hole, say, between a cable vault and outside or a hole
22  from an underground duct to a cable vault?
23  A  Well, again, the cable vault isn't something I have
24  independently investigated, so it's really Mr. Quirin's
25  description of that. It was a cover material. It seemed

**Page 147**

1  consistent with the outside, but I don't want to over
2  interpret that. It was his description.
3  Q  Okay. So the cover then rested on what was described
4  as -- or what was believed to be an asbestos-containing
5  gasket?
6  A  Well, Mr. Quirin didn't describe it as
7  asbestos-containing. But certainly the description of
8  the need for a heat resistant/fire resistant material for
9  that application and the use of asbestos cable hole bags
10  would be consistent with it being an asbestos-containing
11  gasket during that period.
12  Q  Are there other heat -- to the best of your knowledge,
13  are there other heat-resistant materials that could have
14  been just as easily used?
15  A  Well, during that period of the 1960s in terms of
16  heat-resistant gaskets, that would be typical asbestos
17  containing. I mean, that would be the most likely. I
18  mean, I can't -- and certainly Lucent Technologies
19  describes material in that application as being asbestos.
20  So that would be my conclusion.
21  Q  Now, do you have any independent documents that discuss
22  this or reviewed any independent documents that discuss
23  this gasket or are you basing your opinions solely on the
24  testimony of Mr. Quirin and the fact that these gaskets
25  were described as being heat resistant?

**Page 148**

1  A  No, it is Mr. Quirin's description, as well as the
2  discovery descriptions.
3  Q  Okay. And, again, which specific discovery documents
4  referred to a heat-resistant gasket?
5  A  That would be in my file labeled Lucent Technologies.
6  It's an interrogatory. I believe it's in the Taylor
7  case.
8  Q  Okay.
9  A  It's been made Exhibit 9.
10  Q  Okay. I apologize. I don't have the exhibits with me
11  right now. Was that a Lucent or a Western Electric
12  document or was that just a response to an interrogatory?
13  A  I believe it was a Lucent response to an interrogatory.
14  We're going to try to pull it out so we can be more
15  specific about it.
16  Q  Thank you. I would appreciate that.
17  A  (Peruses documents.) It's Defendant Lucent Technology,
18  Inc.'s Responses to Plaintiff's Supplemental
19  Interrogatories and Requests For Production in Taylor v.
20  Bondex, Harris County, Texas. And the date is March 6th,
21  2007, on that.
22  Q  Does that have -- strike that.
23      Hello?
24  A  Yes.
25  Q  Okay. So it's a written response then? There's no Bates

**Page 149**

1  stamped document?
2  A  That's correct.
3  Q  Okay. And the exact language of the response just
4  references a heat-resistant gasket?
5  A  Well, this interrogatory talks about a lot of
6  different -- well, various asbestos-containing cables and
7  thermostats that in my opinion are not applicable to
8  Mr. Quirin's case, and I have not identified them as
9  exposures.
10      But in terms of the asbestos cable hole bags, it
11  does talk about a fire-resistant application. That's on
12  Page 13 of the document. And it indicates that it was
13  heat resistant. It was designed as a cable vault cover
14  for fire insulation protection and could contain
15  asbestos.
16  Q  And that is the basis for your opinion that it was
17  properly identified as an asbestos-containing material?
18  A  Right. I mean, they call it asbestos cable hole bags,
19  R-440.
20  Q  Well, we're not talking about the bags. We're talking
21  about the gaskets.
22  A  No, I understand. But --
23  Q  Okay.
24  A  -- certainly this indicates a hot fire-resistant
25  application.

Page 150

1 Q  Well, I guess I just want to make sure we're
2 differentiating between the two.  I mean, the
3 asbestos-containing bags do use the word "asbestos."  Is
4 the word "asbestos" used with regard to these gaskets in
5 any way?
6 A  No.  Mr. Quirin did not identify them as asbestos.  He
7 didn't know what the content was.
8 Q  And did this discovery response that you were reviewing
9 reference asbestos specifically with regards to this
10 gasket?
11 A  No.
12 Q  Would it be safe to say that the primary basis of your
13 opinion that it contained asbestos is because it uses the
14 word "heat resistant"?
15 A  Fire heat-resistant application, yes.  That's the basis
16 that it's likely asbestos.
17            MR. LAGEMAN:  Okay.  I have no further
18 questions.  Thank you very much.
19            THE WITNESS:  Thank you.
20            MR. HALL:  This is Eric Hall.  I can
21 go.
22            THE WITNESS:  Good afternoon.
23 ///
24 ///
25 ///

Page 151

1            EXAMINATION
2 BY MR. HALL:
3 Q  Can you hear me okay?
4 A  Yes.  You are a little soft, but I can hear you.
5 Q  Okay.  I will try to speak up a bit.
6      Earlier there was a discussion about chrysotile as a
7 causation for mesothelioma, and it's your opinion that
8 chrysotile can cause mesothelioma, correct?
9 A  Correct.
10 Q  But you would agree that that's not a universally held
11 opinion, wouldn't you?
12 A  I would say it's a fairly large consensus opinion, and
13 we've already cited IARC.  But there are other
14 organizations in addition to the broader World Health
15 Organization, the societies of epidemiology, EPA, OSHA,
16 NIOSH, ATSDR, and others.
17      There certainly is a discussion and debate about the
18 relative potency of fibers.  But I would say while some
19 hold the opinion that chrysotile may not cause
20 mesothelioma, I would say that opinion would be unusual.
21 It would be certainly in the minority.
22 Q  But you certainly have seen the opinions either in
23 scientific literature or by specific scientists; isn't
24 that correct?
25 A  Well, the opinion I usually see is that it would require

Page 152

1 a very high dose of chrysotile, some have that opinion,
2 to cause mesothelioma.
3      The opinion beyond that that it can't cause
4 mesothelioma period, I would say is a much more unusual
5 opinion.  Some may have that opinion, but I wouldn't call
6 that part of the consensus.  I think that is a more
7 extreme opinion.
8 Q  Are you aware of any fiber burden analysis in this case?
9 A  I am not.  In looking at Mr. Quirin's radical pleurectomy
10 pathology, I did not -- I did not see that there was any
11 evidence that there was lung tissue to assess fiber
12 burden.  So I don't believe there is.
13 Q  Have you seen your -- the expert witness disclosure in
14 this case?
15 A  No.
16 Q  Oh, okay.  Well, there's some parts I want to ask you
17 about, and that may go very fast.  It says that you have
18 expertise and training in biostatistics, epidemiology,
19 toxicology and industrial hygiene.
20      I wanted to know if you have any actual -- any
21 certifications in either of those -- any of those,
22 biostatistics, epidemiology, toxicology or industrial
23 hygiene?
24 A  My certification would be within -- my board
25 certification in occupational and environmental medicine

Page 153

1 and my master's in public health and environmental
2 health, that requires a demonstration of training and
3 expertise in terms of biostatistics, epidemiology,
4 toxicology and industrial hygiene, as well as
5 occupational and environmental medicine, but it's within
6 the field of occupational and environmental medicine.
7 Q  In other words -- yeah, in other words, it's part of your
8 training as a doctor, but, for instance, you are not a
9 certified industrial hygienist?
10 A  I'm not a certified industrial hygienist, but it's really
11 a little more specific than a doctor certification
12 because in occupational and environmental medicine, to
13 become board certified in that specialty, it does require
14 significant coursework as well as four months of on-site
15 practicum interacting with industrial hygiene.  So it's
16 more rigorous than physicians in other fields would
17 receive in terms of training.
18 Q  Okay.  I understand.
19      It has in your disclosure that you may testify that
20 defendants knew or should have known that their
21 asbestos-containing products or the use of
22 asbestos-containing products could cause disease.
23      I'm here for Ingersoll-Rand.  Do you have any
24 opinions relating to Ingersoll-Rand's knowledge of
25 asbestos-related hazards?

1 A Well, to clarify, my opinions regarding state-of-the-art
2 knowledge really relate to medical knowledge as it
3 evolved over time. I am not a corporate investigator. I
4 do not investigate what companies knew and when they knew
5 it. So I really cannot speak to that.
6 Now, I may be provided interrogatories that give me
7 information about an entity's knowledge, and I can speak
8 to whether that would be commensurate with medical
9 knowledge at the time, and I could address hypotheticals
10 like that as well. But I haven't undertaken for any
11 entity in this case to investigate what they knew and
12 when they knew it, and that would be true for
13 Ingersoll-Rand.
14 Q Okay. And so far the information that you have for
15 Ingersoll-Rand is contained in Exhibit 14; is that right?
16 A Yes, that's correct.
17 Q Okay. And have you seen any dose reconstruction
18 information for any of the exposures in this case?
19 A As I indicated in a prior response, I have not performed
20 a fiber cc year cumulative calculation. That's not part
21 of my practice of occupational medicine, and I have not
22 done that for any specific product or seen reports
23 regarding that.
24 Q There's a portion in here that says that Dr. Brodkin will
25 testify as to the following specific issues, and one of

1 those issues is ethical aspects of hazard communication,
2 warnings and the state of the art for the medical and
3 scientific literature regarding asbestos.
4 Do you have any specific training relating to
5 warnings and their sufficiency as far as, say,
6 governmental regulations?
7 A No. I would say my assessment of warnings is really part
8 of the occupational and environmental history to assess
9 whether hazard communication did occur and if it did, did
10 it impact an individual worker's behavior in a way that
11 would affect exposure. So it's really through the
12 occupational and environmental history.
13 While I have written about ethics in occupational
14 medicine, I would say that's fairly broad in terms of
15 obligations to report hazards. But in terms of the
16 hazard communication process, it's not through the
17 regulatory process that I have any expertise because I'm
18 not a regulatory expert.
19 Q And I'm guessing that you don't have any opinions at this
20 point as to whether any company in this case ever failed
21 to comply with any regulations?
22 A The word "fail" to me implies a legal liability question.
23 I'm not a legal expert to address that. I certainly can
24 address from an occupational medicine perspective what
25 should happen in terms of controlling exposures and

1 reducing disease risks, but I cannot speak from it in
2 terms of regulatory requirements or liability.
3 MR. HALL: Okay. Those are all the
4 questions I have for you. Thanks.
5 THE WITNESS: Thank you.
6 MR. MILOTT: Doctor, this is Steve
7 Milott. Can you hear me?
8 THE WITNESS: Yes. Thank you.
9
10 EXAMINATION
11 BY MR. MILOTT:
12 Q Doctor, how long was your conversation with Mr. Quirin?
13 A I've indicated the times on my notes. I believe it was
14 40 minutes.
15 Q And you had a single conversation for 40 minutes with
16 Mr. Quirin; is that correct?
17 A Correct.
18 Q And when was that conversation?
19 A It was December 12th of this year.
20 Q As far as you know, that conversation occurred after you
21 were hired by his lawyers and after he filed this
22 lawsuit; is that right?
23 A That would be my understanding.
24 Q What is the job of an actuarial? Do you know?
25 A Actuarial evaluations are part of a mathematical

1 statistical analysis of various populations in terms of
2 what predictions can be made in terms of demographic
3 parameters. In terms of the health parameters, life
4 expectancy is one of the parameters that's looked at.
5 Certainly I rely on that in terms of the Social Security
6 Administration life tables.
7 Q Are you done?
8 A Yes.
9 Q Okay. Do you know what education or training an actuary
10 has in order to become a professional in that area of
11 expertise?
12 A Well, I can't speak to the specific educational
13 requirements, but it would require a firm foundation in
14 mathematics and statistics.
15 Q Do you have a firm foundation in mathematics and
16 statistics in order to become an actuary?
17 A I am not an actuary. I have not performed any actuarial
18 analysis. I have relied on an actuarial analysis done by
19 the Social Security Administration in terms of their life
20 tables, but I am not an actuary.
21 Q And you don't have any education in that field, correct?
22 A No, I do not consider myself an actuary.
23 Q Am I correct?
24 A You are correct.
25 Q And you don't have any specialized training in that

1 field; is that correct?
2 A That's true.
3 Q You told us that you believe that amosite asbestos is
4 about three times more carcinogenic than chrysotile; is
5 that correct?
6 A I didn't say that. I said in terms of mesothelioma, it's
7 three times more potent than chrysotile. In terms of
8 lung cancer, there would be no potency difference.
9 Q And in terms of -- and thank you for clarifying that, and
10 I apologize for asking my question the way I did.
11 You know that there are other experts in molecular
12 biology, for example, who opine that amosite is about 100
13 times more potent a carcinogen than chrysotile in the
14 analysis of mesothelioma; isn't that correct?
15 A I'm aware that there are opinions that there are greater
16 potency differences in terms of amosite and chrysotile.
17 I'm not sure which analysis you are referring to in terms
18 of a 100 times. I know Hodgson and Darnton in Applied
19 Occupational Hygiene did make that estimate of
20 difference.
21 I would note that that has been heavily criticized
22 in terms of their reliance on exposure information that
23 is likely not specific enough to make that particular
24 conclusion. That's been heavily criticized by Rodgers
25 and others. But some do have that opinion.

Page 158

1 Q And do you believe that those who hold the opinion that
2 amosite is about 100 times more potent for purposes of
3 mesothelioma, a carcinogen over chrysotile, are wrong; is
4 that correct?
5 A It's my opinion that the evidence doesn't support that
6 difference in relative potency. And then there are
7 opinions on the other side. Certainly Nicholson and
8 Smith and Wright have made opinions that -- or reached
9 opinions that there's no potency difference between
10 amosite and chrysotile in terms of mesothelioma.
11 I disagree with that as well. I think there is some
12 relative potency difference. But it would not be in the
13 order of a 100 times in my opinion based on the totality
14 of the evidence.
15 Q Well, let me ask you this: If at trial the plaintiff's
16 counsel was to put another one of their experts on the
17 stand to say that the potency difference is about 100
18 times more in the case of amosite over chrysotile, you
19 would disagree with that expert in terms of a
20 mesothelioma finding, correct?
21 A Yes, I have a different conclusion. It would make no
22 difference if they were plaintiffs or defense expert.
23 Q And you know that amosite asbestos was the primary type
24 of thermal insulation used and installed on World War II
25 era warships, correct?

Page 159

1 A I am aware that amosite was one of the fiber types used
2 in insulation aboard Navy vessels. I wouldn't conclude
3 that it's the dominant one. I haven't done an inventory
4 of insulation fiber types aboard naval vessels. It's not
5 really my area. But certainly amosite was used in that
6 application.
7 Q You would defer to naval experts as to how much amosite
8 or chrysotile was used in the application of thermal
9 insulation aboard World War II era warships, correct?
10 A Well, certainly someone who had inventoried them. There
11 may be vessel to vessel variation as well. It would have
12 to be someone knowledgeable about that as well.
13 Q Well, you know that amosite insulation existed in
14 tonnages aboard World War II era warships, correct?
15 A Well, I'm aware that insulation could be measured in
16 tonnages aboard vessels, whether it's amosite or
17 chrysotile. Again, it's really outside my area. I have
18 not assessed tonnages aboard the naval vessels.
19 Q So you just don't know what the tonnage might have been
20 of amosite asbestos on Mr. Quirin's ship; is that
21 correct?
22 A That's true. I have not investigated that.
23 Q Do you know that amosite asbestos was the primary source
24 of thermal insulation applied to the steam lines on World
25 War II era warships though; isn't that correct?

Page 160

1 A Well, my answer would be the same. I'm certainly aware
2 that it likely would have been a component of the
3 material used for insulation in steam applications.
4 Again, I can't speak to whether it had a primary role.
5 It may have in some applications, it may not in others.
6 Q Do you know whether amosite asbestos was used on cold
7 lines on World War II era warships?
8 A I'm not specifically aware of that. It's not to say that
9 it wasn't. But certainly in terms of the medical
10 industrial hygiene literature, my conclusion would be it
11 likely would be involved in hot applications. It's not
12 to say it wouldn't be used in cold applications, but I
13 wouldn't assume it was.
14 Q You just don't know; isn't that correct?
15 A Well, again, I haven't investigated specific
16 applications, but I would not reach a conclusion that a
17 cold application would be asbestos containing.
18 Q So you don't know whether amosite was used on cold lines
19 on World War II era warships, correct?
20 A Well, again, it may have in particular applications, but
21 I wouldn't make a generalization that amosite was used on
22 cold lines. I don't see a basis for that.
23 Q I'm asking you if you have knowledge or not whether or
24 not amosite was used on cold lines on World War II era
25 warships. Do you know?

Page 161

41 (Pages 158 to 161)

**Page 162**

1  A  In terms of cold lines, I am aware that asbestos could be
2  used, as well as non-asbestos.
3  Q  I said amosite.
4  A  As well as non-asbestos materials.  I can't speak
5  specifically to amosite.
6  Q  Okay.  Well, let me go on.
7     You know that Mr. Quirin was on a World War II era
8  warship for about three and a half years, correct?
9  A  Yes, the USS Tolovana.
10  Q  And you know that he lived on that ship, that he worked
11  on that ship, he ate on that ship for all those three and
12  a half years, correct?
13  A  Yes, except for the times he may have been off duty, yes.
14  Q  You don't know too many of those times where he was off
15  duty, though, do you, during that three and a half years?
16  A  Well, his description was that they were fairly active in
17  those three years.
18  Q  When you say "active," you mean underway, right?
19  A  Correct.
20  Q  And you know that one of his main jobs was to maintain
21  and repair and replace steam piping aboard that ship,
22  correct?
23  A  That was one of his jobs.  Often in conjunction with
24  equipment work, he would work on piping as well.
25  Q  You do know that there were miles of pipes throughout

**Page 163**

1  that ship, correct?
2  A  Again, I can't speak to the distance, but I am aware that
3  on naval vessels, there could be miles of piping.  He did
4  describe the Tolovana as a 500-foot oiler, so it was a
5  fairly large vessel.  So it seems likely there could be.
6  Q  You know that he used a knife and a hammer and even his
7  hands to tear off the old insulation from steam lines
8  throughout his three and a half years on that ship,
9  correct?
10  A  He did describe a knife and I believe a use of a saw as
11  well.
12  Q  Do you remember him saying he pulled it off with his
13  hands sometimes?
14  A  Yes, he could pull it off with his hands.
15  Q  And you know that those actions performed by Mr. Quirin
16  would create dust in his breathing area, correct?
17  A  Yes.
18  Q  You know that he cut new pipe insulation for use on those
19  same steam lines, correct?
20  A  Yes, at times he would replace it.
21  Q  And you know "at times" was throughout his three and a
22  half years on that ship, correct?
23  A  Yes, it would be during that three-year period.
24  Q  You do know that he mixed mud insulation from a powdered
25  form of asbestos to apply onto those lines; is that

**Page 164**

1  right?
2  A  That's true.  He did that.
3  Q  And you know that those activities caused dust to rise up
4  into his breathing area, correct?
5  A  Yes, that's true.
6  Q  And after that dust would settle, it would be swept up
7  and would rise up again in his breathing area all over
8  again; isn't that right?
9  A  There certainly is the potential for re-entrainment on a
10  vessel like that.
11  Q  As a matter of fact, you do recall his testimony saying
12  that happened, don't you?
13  A  I believe they did some of their own cleanup work as
14  well, yes.
15  Q  And you know that Mr. Quirin reported seeing dust below
16  the main deck during his watches, correct?
17  A  Yes, at times he did.
18  Q  So I suppose what I'm getting at is whether or not all
19  that information you were able to glean from reading his
20  deposition transcripts and talking to him for 40 minutes
21  that one time informed you as to whether or not his
22  exposure to amosite asbestos for three and a half years
23  was causative of his mesothelioma?
24  A  In my opinion, certainly amosite exposure along with
25  chrysotile in the Navy would be a component part of his

**Page 165**

1  cumulative exposure that resulted in mesothelioma.  It
2  would certainly be a substantial contributing factor in
3  his development of mesothelioma in my opinion.  I've
4  certainly indicated that in my diagnostic conclusions in
5  terms of insulation aboard the naval vessel.
6  Q  Well, would you agree with me that Mr. Quirin's exposure
7  to amosite asbestos while he was working in enclosed
8  areas such as the galley or the shops or the laundry room
9  or the engine room, that would be more potent an exposure
10  for causation purposes than if he was exposed to
11  chrysotile asbestos while on the outside decks?
12  A  Well, first of all, I don't agree with the
13  characterization that he would have been exposed in the
14  galley.  He was working mainly with spigots in the
15  galley.  He didn't describe pipe work in the galley.  He
16  didn't describe -- he never did pipe work in the engine
17  room.  So I would disagree with that characterization.
18     But, yes, in the laundry room, he did replace piping
19  that likely would have represented mixed fiber exposures
20  in an interior compartment that would have been greater
21  than outdoors, and that would be true for the pump rooms
22  as well.  He would certainly at times remove insulation
23  from piping and flanges to access equipment, and that
24  would be within interior compartments.  So, yes, those
25  would be sources of exposure.

42 (Pages 162 to 165)

Page 166

1  Q  They would be greater sources of exposure than sources of
2  exposure -- for the purposes of a diagnosis of
3  mesothelioma, they would be more potent and greater
4  sources of exposure than to chrysotile asbestos from
5  gaskets out in the main decks outside; isn't that right?
6  A  I've identified insulation as one component of
7  Mr. Quirin's exposure.  I would not necessarily say they
8  were dominant compared to other sources.  He worked with
9  insulation, but he worked significantly with gaskets and
10  packing.
11      One of his primary work responsibilities was to
12  maintain equipment, pumps and valves, and working with
13  gaskets and packing was integral to that activity.  So
14  those are important exposures along with the insulation.
15      In terms of levels of exposure, Mr. Quirin described
16  uses of chisels, hand wire brushing, scraping that
17  certainly have been documented by Longo and others to
18  cause exposures up to about 24 fibers per cc for hand
19  applications.
20      That number is actually fairly consistent or similar
21  in magnitude to some of the levels described at the high
22  end by Balzer and Cooper for removal of insulation in
23  terms of isolated insulation removal.
24      The packing would be somewhat less, but certainly up
25  to four fibers per cc with removal as a significant

Page 167

1  exposure.
2      So these are all component sources of his exposure.
3  I don't make a list of priority in terms of which one was
4  more important.  I think they are all significant
5  components of Mr. Quirin's cumulative exposure.
6  Q  Well, those levels of gasket and packing exposure that
7  you just talked about, those were found to have occurred
8  in enclosed areas, and I'm talking about the four walls,
9  a floor and a ceiling, right?
10  A  Yes, those would be done in some indoor or protected
11  context.
12  Q  None of them were done outside, right?
13  A  No, those studies weren't done outside.
14  Q  Do you know that Mr. Quirin specifically testified, and I
15  will quote, that "Most of the valves that I worked on
16  were outside on the deck"?  You know that, right?
17  A  Well, that would be true for the winch pumps.  That
18  wouldn't be true for the pump rooms.
19  Q  I'm talking about the valves.  Mr. Quirin specifically
20  testified, and again I will quote, "Most of the pumps I
21  worked on were outside on the deck," close quote.  Do you
22  recall that testimony?
23  A  Well, he certainly did describe 12 winch systems that
24  used pumps and valves.  So that's something he did.  But
25  he also did that work in the pump rooms.

Page 168

1  Q  Can a single fiber of amosite asbestos cause mesothelioma
2  in a human being?
3  A  In my opinion no.  A single fiber of any of the major
4  commercially available asbestos would not be a cause of
5  mesothelioma.  First of all, the body has significant
6  respiratory defenses that would make that extremely
7  unlikely.  Those defenses have to be overcome by very
8  significant exposures.
9      And, secondly, studies, pathologic studies, of
10  individuals in the general population have certainly
11  indicated a body burden of asbestos associated with
12  individuals breathing ambient air, and there's no
13  evidence that those individuals are at increased risk for
14  mesothelioma.
15      So I don't -- I don't feel a single fiber theory is
16  scientifically valid.
17  Q  Okay.  You know that Mr. Quirin couldn't identify the
18  manufacturer of any gasket or packing that he may have
19  used in conjunction with the valve, correct?
20  A  I think that's fair.  He didn't know the brands that he
21  removed.  I don't think he provided testimony about the
22  sheet gaskets that he utilized to replace them.  He did
23  indicate that at times he used manufacturers' gaskets but
24  didn't provide a name.
25  Q  Well, based on your professional expertise, your own

Page 169

1  experience in studies you have done, you've learned that
2  gaskets and packing used in conjunction with valve
3  applications, if they contained asbestos at all, they
4  contained chrysotile asbestos, correct?
5  A  Yes, typically gaskets and packing for hot applications
6  during the period that Mr. Quirin worked would represent
7  a chrysotile application unless it were some sort of
8  chemically resistant application, which could be mixed
9  fiber.
10  Q  Do you know there are some experts, medical
11  professionals, some expert pathologists, who opine that
12  only an amphibole asbestos fiber such as amosite, as
13  Mr. Quirin was exposed to on that ship, can be the cause
14  of mesothelioma, correct?
15  A  Well, I think we've reviewed that.  I've given you my
16  opinion, and I think that's part of the consensus.  I
17  mean, as I said, some may have the opinion that
18  chrysotile cannot cause mesothelioma.  I think that's an
19  outlier in terms of opinions.
20  Q  One second, please, Doctor.
21      Do you know there are expert medical professionals
22  and pathologists who will opine that chrysotile fibers
23  such as might be in gaskets or packing that might have
24  been used in the valves that Mr. Quirin worked on cannot
25  be a cause of mesothelioma, correct?

43 (Pages 166 to 169)

Seattle/Tacoma, Washington

**Page 170**

1　A　Well, there may be those people with that opinion.　But I
2　think one has to characterize what is done with the
3　gaskets and packing.　For example, if you look at the
4　textbook by Selikoff and Lee, they talk about gaskets not
5　being an important cause of disease in the form used in
6　equipment.　But in terms of the method and activity of
7　using it, if it disrupts the material, it's a significant
8　risk factor for disease.　So it takes a consideration of
9　that.
10　　　Again, I think if airborne fibers are being
11　generated on a significant basis, chrysotile fibers would
12　be a risk for disease.　I think most professionals in my
13　field would have that opinion.　I'm not saying everyone
14　does.
15　Q　By the way, Doctor, your report, your notes on Page 5, if
16　you can turn to that, please?
17　A　Okay.
18　Q　Somewhere on that page, I don't have it in front of me,
19　but I know it's on Page 5, your notes cite that
20　Mr. Quirin worked on hundreds of valves.　Do you see
21　that?
22　A　Correct.　That's in the occupational and environmental
23　history subsection.
24　Q　And you wrote that regarding his work on valves while he
25　was on that naval ship, correct?

**Page 171**

1　A　Correct.
2　Q　There's no work on valves subsequent to his time in the
3　Navy, correct?
4　A　Correct.
5　Q　Now, you cite that you have about him working on
6　hundreds of valves, I have got to tell you I deposed
7　Mr. Quirin, and I know that he said he saw hundreds of
8　valves aboard that ship, but can you cite me to a page
9　and line from anywhere in his testimony where he says he
10　worked on hundreds of valves on that ship?
11　A　Well, these are notes I took from reviewing the
12　deposition.　I mean, the deposition is going to speak for
13　itself.　I mean, if you want me on a break to look for
14　it, I might or might not be able to find it.　I mean, I
15　would be glad to look for it.
16　Q　That's okay.　You will defer, as far as correctness as to
17　how many valves he may have worked on, you will defer to
18　the transcript of the deposition itself; am I correct?
19　A　Yes.　But in terms of the totality of it, I mean, one has
20　to be careful about taking one line out of context.　I
21　mean, this was my assessment based on the totality of it.
22　But, yes, the deposition will speak for itself.
23　Q　That was your assessment based on the totality of what,
24　of reading the deposition transcript?
25　A　Yes.　This section of notes is based on my review of

**Page 172**

1　Mr. Quirin's deposition testimony.
2　Q　And somehow in reading that transcript, you came up with
3　the fact that he worked on hundreds of valves; is that
4　what you are saying?
5　A　Yes, I've written it down.　Yes.
6　Q　You don't know how many valves in fact he worked on while
7　he was on that ship; is that correct?
8　A　Well, Mr. Quirin's testimony was not to the resolution of
9　a specific number of valves.
10　Q　Am I correct?
11　A　Yes, so you would be correct in that.
12　Q　And you don't know how many times he may have changed out
13　a gasket or packing from a valve; isn't that correct?
14　A　Not in terms of a specific number, but it was a regular
15　practice that he performed in terms of his machinist
16　duties.
17　Q　Am I correct, Doctor?
18　A　You are correct in terms of a specific number.
19　Q　Okay.　You know that there were machinists and other
20　naval personnel who worked on the valves aboard that ship
21　other than Mr. Quirin, correct?
22　A　That's true.
23　　　　MR. MILOTT:　Doctor, I have nothing
24　further.　Thank you.
25　　　　THE WITNESS:　Thank you.

**Page 173**

1　　　　MR. COOK:　Hello, sir.　This is Eric
2　Cook.　Can you hear me all right?
3　　　　THE WITNESS:　Good afternoon.　Yes,
4　thank you.
5
6　　　　　EXAMINATION
7　BY MR. COOK:
8　Q　Doctor, I represent Union Carbide.　And I have -- I'm
9　going to jump around quite a bit because we have covered
10　some ground already.　So if you need some more context
11　for my questions, please let me know.
12　A　Thank you.
13　Q　You had mentioned at the beginning different folders that
14　you had for a number of different defendants for the
15　case.　Do you have a folder specific for Union Carbide in
16　this case?
17　A　No.
18　Q　Do you have any information that Calidria was
19　incorporated into any of the products that Mr. Quirin
20　worked with or around, sir?
21　A　Some of the discovery documents for the joint compound do
22　discuss suppliers.　And give me one second.　(Peruses
23　documents.)
24　　　In the Georgia-Pacific discovery document, they do
25　refer to one of the suppliers as being Union Carbide,

**Page 174**

1 which I would typically associate with Calidria asbestos.
2 Q  And in that one, does that refer to two other suppliers
3 of asbestos as well for Georgia-Pacific?
4 A  Correct.
5 Q  And with specific regard to the joint compound that was
6 used while Mr. Quirin was present, do you know whether or
7 not Union Carbide Calidria was incorporated into that
8 joint compound as compared to the other two suppliers?
9 A  No, I'm not a supply expert that researches supply lines.
10 Q  Do you have any information on Mr. Quirin's dose from any
11 alleged exposure to Calidria in this case, sir?
12 A  No.  Again, let me just ask for some clarification about
13 what you mean by dose.  Are you talking about fiber cc
14 year?
15 Q  Well, you had mentioned earlier in response to some
16 questions that dose was an important consideration for
17 you, and so do you have any information as to dose,
18 whether it's fibers per cc year or another way of
19 determining dose, sir?
20 A  Well, in my field of occupational and environmental
21 medicine, I rely on the occupational history.  And
22 certainly that history would indicate in terms of this
23 use of chrysotile asbestos that Mr. Quirin would have had
24 regular bystander exposure over a 20-year period between
25 approximately 1957 and 1977 in the joint compound.

**Page 175**

1    Now, in terms of Georgia-Pacific, he indicated that
2 he saw that in the latter part of his work perhaps as a
3 supervisor, sort of the '67 to '77 timeframe that would
4 be relevant.  But that's a qualitative assessment.  It's
5 a duration of exposure that could include approximately a
6 10-year period.
7    It would be significant intensity exposure in terms
8 of mixing, sanding and sweeping joint compound that
9 Mr. Quirin was in proximity to, but I can't speak to the
10 specific fiber type supplier.  It was chrysotile in my
11 opinion.  I can't speak to who the supplier was.
12 Q  All right.  And so if I understand your answer correctly,
13 sir, with specific respect to Calidria chrysotile, you
14 have no information as to Mr. Quirin's alleged dose; is
15 that correct?
16 A  That's true.  I have not done a supply specific
17 assessment.  I certainly did note that UCC was one of the
18 suppliers.  I mean, it certainly informs my opinion that
19 it was a chrysotile exposure.  But it doesn't tell me
20 what dose or how much by supplier.
21 Q  All right.  And in that vein, sir, that presents a
22 possibility that Calidria was incorporated into the joint
23 compound that was used while Mr. Quirin was present, but
24 it doesn't rise to the level to give you enough
25 information to provide an opinion to a reasonable degree

**Page 176**

1 of medical certainty as to Calidria, does it?
2 A  Again, I cannot provide testimony about who the suppliers
3 are to that specific joint compound.  I believe, I'm just
4 thinking about the other joint compound Mr. Quirin saw
5 and cites US Gypsum.  I mean, I haven't researched it or
6 looked at any other interrogatories in this case, but I
7 believe Union Carbide was one of the suppliers for that
8 entity as well.
9    But, again, I'm not a supply expert.  I can't really
10 speak to whether the material Mr. Quirin worked around
11 contained a specific supplier, whether it be Union
12 Carbide or someone else.
13 Q  Okay.  I'm going to move topics on you, sir.  And I've
14 read some of your previous testimony where you testified
15 that the Verma and Crump final draft on potency estimates
16 was rejected by the EPA.  Do you recall that testimony?
17 A  Well, they created an analysis where coefficients
18 established potency differences.  That recommendation was
19 not adopted by the EPA.  I've testified to that.
20 Q  And you would agree that not being adopted by the EPA is
21 different than being rejected by the EPA, correct?
22 A  Well, certainly it was an analysis that was done for the
23 EPA for consideration.  Based on that consideration, it
24 was rejected for adoption.  Now, I guess it's semantics
25 is what you would want to call that.

**Page 177**

1 Q  And is there a particular document that you are referring
2 to that specifically says it was rejected, sir?
3 A  No.  I believe I'm aware of a letter of correspondence, I
4 don't have it with me, so I don't want to cite it
5 specifically, but it certainly speaks to not adopting it.
6 Q  All right.  And is that the letter from Cane with regard
7 to the Bratton proposal of 2008?
8 A  Yes, I believe the letter was authored by Cane.
9 Q  All right.  And it specifically referred to the Bratton
10 proposal, correct?
11 A  Well, I don't have it in front of me, so I don't want to
12 really speak to specifics of it.  But it was a letter by
13 Cane speaking to the use of that selective methodology
14 between the fiber types.
15 Q  Are you familiar with the Bratton 2008 proposal, sir?
16 A  Well, without it in front of me, I don't want to get into
17 specifics.  So, you know, I don't have a working memory
18 of the specifics of it.
19 Q  Okay.  And so you would defer to the contents of the
20 letter as to whether or not it rejected Bratton, 2008, as
21 compared to Verma and Crump, 2003, correct?
22 A  Yeah.  And, I mean, I'm not sure we're even talking about
23 the same letter.  It may be the same author and not the
24 same letter.  So I don't know.
25 Q  Do you know when the letter you are referring to was

**Page 178**

1   authored?

2 **A I don't want to guess. Sitting here, I just don't want**

3 **to be inaccurate about that.**

4 Q Okay. Let me change topics on you again then, sir. Let

5   me ask you briefly just some basic questions about animal

6   studies. What are the limitations of animal injection

7   studies for determining disease causation in humans?

8 **A Well, there can be certainly biologic variability between**

9 **species. So while toxicologic assessments of animals can**

10 **be extremely useful in assessing biologic effects, it**

11 **shouldn't be considered definitive in assessing what**

12 **would happen in terms of human experience.**

13   **So interspecies variation is a very important**

14 **limitation. The other limitations would be dose response**

15 **for some animal experiments. Significant doses are**

16 **provided that may result in a different physiologic**

17 **response than might be experienced in typical human**

18 **experience or inhalation. So those are limitations.**

19 Q In addition, an injection study bypasses the body's

20   defense mechanisms as well, correct?

21 **A It does, and it generates physical injury potentially by**

22 **the application mechanism that may also be a confounder**

23 **and would have to be controlled for.**

24 Q All right. You would agree, sir, that there are

25   substances that cause mesothelioma when injected into

**Page 179**

1   animals but do not cause mesothelioma when humans are

2   exposed to those substances, correct?

3 **A Yes. I mean, there are good examples of different**

4 **injection experiments that just by virtue of injuring the**

5 **tissues cause mesotheliomas that wouldn't be applicable**

6 **to causation of mesothelioma in humans.**

7 Q Sir, Calidria has never caused mesothelioma in an animal

8   inhalation study, has it?

9 **A The studies I'm aware of, and I've cited a number of them**

10 **in the reference reliance list I brought for Calidria,**

11 **which is a NIOSH pure chrysotile, so it's been used in a**

12 **number of animal experiments, have been injection studies**

13 **or there are some studies that have utilized cells in**

14 **culture, including human mesothelial cells in culture.**

15   **I'm not aware of a specific inhalation study. I**

16 **mean, certainly there are inhalation studies of**

17 **chrysotile, but I don't recall them being specific to**

18 **Calidria.**

19 Q All right. You, in reaching your opinions with respect

20   to Calidria, have not reviewed any inhalation studies

21   then?

22 **A No. I mean, I really don't distinguish Calidria from**

23 **other forms of chrysotile. I mean, for example, Coffin**

24 **and Cook studied chrysotile relative to amphiboles and**

25 **found high rates of mesothelioma, but that wasn't**

**Page 180**

1   specific to Calidria. I wouldn't consider it a Calidria

2   experiment, but it does inform my opinion about

3   chrysotile.

4 Q You would agree there are important physical

5   differences -- strike that.

6   You would agree there are important differences in

7   the physical characteristics of Calidria as compared to

8   other forms of chrysotile though, correct?

9 **A Well, again, I'm not a mineralogist to really speak to**

10 **those aspects. In my opinion as a physician in**

11 **occupational medicine, Calidria would be a form of pure**

12 **chrysotile exposure that would have the biologic and**

13 **health effects of chrysotile. It is certified by NIOSH**

14 **as a pure chrysotile, so it would be substantially free**

15 **of contaminants, and I would consider it a pure form of**

16 **chrysotile. But I don't consider it a mineral distinct**

17 **from chrysotile.**

18 Q All right. But going back to my question, though, and I

19   just want to make sure I understand your answer, sir,

20   because you are not a mineralogist, you have not

21   considered any of the physical characteristics that

22   differentiate Calidria chrysotile as compared to other

23   forms of chrysotile?

24 **A In terms of the mineralogic physical aspects, no, with**

25 **the exception that Calidria is a relatively pure**

**Page 181**

1   chrysotile that would distinguish it from some other

2   deposits.

3 Q I'm sorry, sir. I'm flipping through stuff that we have

4   already covered.

5   Sir, you have Kanarek, 2011, listed in your -- the

6   reference list at the end of your notes.

7 **A Kanarek, yes.**

8 Q Yes.

9   And my question for you on that is what flaws or

10   limitations of Kanarek, 2011, did you consider in

11   reaching your opinions in this case?

12 **A Well, it's a review that informs my opinion. It reviews**

13 **numerous articles that are -- the original articles are**

14 **published elsewhere. So I don't use Kanarek**

15 **independently of looking at the original epidemiologic**

16 **studies, but I think it's a useful review of those**

17 **studies. I certainly have relied on it in that context.**

18   **It's not original research in terms of health**

19 **outcomes associated with asbestos exposure, but it does,**

20 **I think, provide a cogent review of many of those**

21 **studies.**

22 Q All right. Are there studies that are omitted from

23   Kanarek that you believe should have been included in his

24   review?

25 **A Well, I don't have it in front of me. I mean, I think**

**Page 182**

1  it's a useful review of the literature. I don't know
2  that it's a comprehensive review of all the literature.
3  But rarely is a review that.
4      So without having it in front of me, it's hard for
5  me to address that specific question. I mean, I think it
6  was a well done review in my opinion in terms of
7  reviewing important studies. That's not to say it
8  reviewed all studies.
9  Q  Okay. I'm going to change topics on you again, sir, and
10  ask you just a couple of state-of-the-art questions.
11      Do you have an opinion as to when it was generally
12  understood in the United States that mesothelioma was a
13  primary malignant tumor of the pleura?
14  A  Well, I think that understanding developed in terms of --
15  well, let me ask for clarification.
16      Are you talking about an asbestos-related
17  mesothelioma?
18  Q  Well, I'm going to actually ask you just first with
19  respect to mesothelioma, regardless of whether or not
20  it's connected to asbestos.
21  A  Mesothelioma was first characterized, to my
22  understanding, in the 1930s, but it wasn't initially
23  appreciated that it could be an asbestos-related
24  phenomenon.
25  Q  All right. And -- but you would agree that there was

**Page 183**

1  debate in the United States as to whether or not
2  mesothelioma was a primary malignant tumor of the pleura
3  prior to the 1960s, correct?
4  A  I would say it was established as a primary pleural
5  malignancy in the 1930s. But, you know, certainly
6  knowledge evolved over time. I mean, it's a rare tumor,
7  and there definitely was discussion of whether that could
8  represent secondary malignancies. It took time to
9  certainly establish it was a primary pleural malignancy.
10  Q  When you say it was established, sir, by that what do you
11  mean?
12  A  That it was a tumor -- a malignant tumor of origin in the
13  mesothelial tissue of the pleura.
14  Q  Okay. And I guess what I'm getting at, though, is when
15  you say established, is that the first report saying that
16  mesothelioma was a primary malignancy of the tumor or --
17  because my question was addressed to when it was
18  generally understood.
19  A  Right. And, again, I mean, you might want to talk to a
20  pathologist about that, that specific question. It
21  certainly is discussed in the medical literature as a
22  primary pleural malignancy independent of a pulmonary
23  malignancy even in the 1940s.
24      If you look at the 1947 case report of malignant
25  mesothelioma, that's discussed as a primary malignant

**Page 184**

1  mesothelioma.
2      Now, there is some discussion in there about whether
3  it could be from some other source, but they rule it out.
4  Q  Okay. So -- and I guess once again my question wasn't
5  about whether there was discussion about it, but when it
6  was generally understood, sir.
7      So with respect to when it was generally understood
8  that mesothelioma was a primary malignant tumor of the
9  pleura, you would defer to a pathologist; is that
10  correct?
11  A  Well, no, I would refer -- defer to a pathologist in
12  terms of a discussion of the pathologic findings. But in
13  terms of a discussion of mesothelioma as a primary
14  pleural tumor, I mean, I cited the New England Journal of
15  Medicine, I would also cite JAMA in 1949 that
16  distinguishes lung cancers from pleural cancers. I think
17  that was established in the 1940s. I mean, that wasn't
18  an area of ongoing debate.
19      Now in discussions, there would always be an
20  assessment about whether or not a tumor of the pleura
21  could have metastasized from some other primary site. I
22  mean, that's part of a differential diagnosis. But in
23  terms of there existing a primary pleural tumor, no, I
24  think that would have been established in the 1940s and
25  really in the 1930s.

**Page 185**

1  Q  All right. And let me just read to you from another
2  article that you cited in your reference list here, sir.
3  And this is from Wagner, 1960, Diffuse Pleural
4  Mesothelioma in Asbestos Exposure in Northwestern Cape
5  Province.
6      Beginning with the discussion in that, it says
7  specifically, and I understand you don't have this in
8  front of you, sir, but I will represent to you this is
9  what it says, "In 1924, Robertson denied the existence of
10  primary malignant tumors of the Pleura and considered
11  them to be secondary in origin. Since then, on the one
12  hand, Willis 1948-1953, and Smart and Henson in 1957 have
13  supported Robertson's views, while on the other hand
14  primary neoplasms of this nature have been described by
15  many authors in recent years."
16      And so Wagner, 1960, what he's indicating there is
17  there was actually a debate as to whether or not
18  mesothelioma was a primary malignant tumor of the pleura
19  through that time period, correct?
20  A  Well, I think it's referencing the discussion that
21  pleural malignancies can commonly be metastatic from
22  other sites. So it's part of the discussion.
23      I mean, I think Wagner's discussion is fair that,
24  you know, by that timeframe, it was pretty well
25  established, but it was still a source of discussion

Page 186

1 among some individuals. And that's because the pleura
2 can be a source of metastases.
3 Q  Sir, do you have an opinion as to when it was generally
4 agreed in the United States that asbestos could cause
5 mesothelioma?
6 A  Again, there's not a bright line date in any of these
7 medical questions. It's evolution of knowledge over
8 time.
9     I would say that first citation I gave you in terms
10 of the New England Journal of Medicine, 1947, would be
11 the first established case where an individual exposed to
12 asbestos cutting insulation board developed a documented
13 pleural mesothelioma.
14     But from that point, there were other cases in
15 series, certainly Vice reported mesothelioma in a valve
16 repair worker in marine settings and reviewed Wedler's
17 finding of 31 individuals with asbestosis of which two
18 developed mesothelioma.
19     And then certainly Cartier in 1952 describing
20 mesothelioma in chrysotile-exposed miners, as well as
21 Lecker describing peritoneal mesothelioma in the 50s
22 really led up to Wagner's paper, which I think more
23 definitively established asbestos as a cause of
24 mesothelioma.
25 Q  I'm going to change topics on you again, sir.

Page 187

1     Do you have an opinion as to the relative
2 contribution of early exposures as compared to subsequent
3 exposures of ten or more years later?
4 A  Well, I think if there are exposures of ten or more years
5 latency, I would consider them all relevant assuming it's
6 an identified exposure from the occupational history
7 that, you know, it would meet the criteria of a
8 significant airborne asbestos exposure that would
9 overcome the body's burden and -- overcome the body's
10 defenses and add to the body's burden of asbestos that
11 would increase risk for mesothelioma.
12     I don't really have a methodology to weigh one
13 exposure over another based on latency as long as it
14 meets that 10-year latency criteria. I know Peto and
15 others have tried to model waiting for earlier exposures,
16 but I think most of the risk really comes from dose, not
17 latency.
18 Q  Okay. And when you refer to Peto, you are referring to
19 Peto's statement that the risk of asbestos is actually
20 determined from the time since first exposure; is that
21 correct?
22 A  Correct.
23 Q  All right. Have you read the more recent articles on
24 that?
25 A  There have been other publications about it.

Page 188

1 Q  Have you reviewed and considered those in reaching your
2 opinions in this case?
3 A  I have reviewed some. I don't know which ones you are
4 considering. But, yeah, there have been several articles
5 about that. I really consider dose within an appropriate
6 latency. I don't rule in or rule out exposures just
7 because there's a certain latency unless it doesn't meet
8 some minimum latency criteria.
9 Q  Let me ask you this question: If the only exposures that
10 Mr. Quirin had were the exposures to asbestos-containing
11 insulation that he identified during his naval service,
12 and then he subsequently developed mesothelioma and was
13 diagnosed on the same date that he was diagnosed in this
14 case, would it be your opinion that those exposures to
15 asbestos-containing thermal insulation were sufficient by
16 themselves to cause his mesothelioma?
17 A  Well, I would indicate that I guess I would treat it as a
18 hypothetical question. It's obviously not Mr. Quirin.
19 Certainly one can be exposed to pipe insulation. It
20 increases risk for mesothelioma and one can develop
21 mesothelioma.
22     An individual that had Mr. Quirin's exposure to pipe
23 insulation would be at increased risk for developing
24 mesothelioma. That individual wouldn't be at as great of
25 risk as Mr. Quirin was by virtue of his other exposures

Page 189

1 to gaskets, packing, drywall, insulation in the telephone
2 land-based setting and others. But it is an exposure
3 that would increase risk for mesothelioma, and such an
4 individual could develop mesothelioma.
5     Obviously in that assessment, I would want to assess
6 their comprehensive occupational and environmental
7 history.
8 Q  All right. Let's say you have a hypothetical person with
9 three and a half years of exposure to amosite-containing
10 thermal insulation. In your opinion is that sufficient
11 to cause pleural mesothelioma?
12 A  Well, I certainly would identify that as an exposure, and
13 it could increase risk for mesothelioma in a particular
14 individual. It might be the only exposure that one
15 identifies.
16     But certainly, again, one would want to take a
17 comprehensive occupational history because mesothelioma
18 is a cumulative dose disease. You have to consider all
19 the sources of exposure.
20 Q  My question is, sir, if the only exposure that was
21 presented was three and a half years of exposure to
22 amosite-containing thermal insulation, would that
23 exposure be sufficient in your opinion to cause pleural
24 mesothelioma?
25 A  It could, yes. I mean, clearly that exposure would

48 (Pages 186 to 189)

**Page 190**

1 increase risk for mesothelioma and such an individual
2 could develop mesothelioma, absolutely. But, again, one
3 wants to consider the comprehensive occupational history.
4 Q Let me switch topics on you again, sir, and let me talk
5 to you just briefly about hazards and risks.
6     Would you agree that there's a distinction between a
7 hazard and a risk?
8 A Yes.
9 Q Would you agree with the definition of a cancer hazard as
10 an agent that is capable of causing cancer under some
11 circumstances?
12 A Yes. I mean, I would say a hazard would occur when there
13 is a known carcinogen with a potential route for
14 exposure. That would result in a hazard should an
15 individual become exposed.
16     Obviously it doesn't define a hazard. It's a
17 potential hazard depending on the circumstances.
18 Q Right. And so you cannot agree with the definition of a
19 cancer hazard as an agent that is capable of causing
20 cancer under some circumstances unless you qualify your
21 answer then?
22 A You would have to qualify it. I mean, just because a
23 material is toxic doesn't mean that it's hazardous.
24 Q Would you agree with the definition of a cancer risk as
25 an estimate of the carcinogenic effect expected from

**Page 191**

1 exposure to a cancer hazard?
2 A Repeat the question. I'm not sure I understood it.
3 Q Of course.
4     Would you agree with the definition of a cancer risk
5 as an estimate of the carcinogenic effect expected from
6 exposure to a cancer hazard?
7 A Well, yes. I mean, risk is the resulting effect of
8 exposure, so I think as a basic principle that's true.
9 And certainly that addresses dose response.
10 Q You would also agree that the distinction between a
11 hazard and a risk is an important one, correct?
12 A Certainly.
13 Q Sir, I think that is all -- oh, I'm sorry. I forgot one
14 area.
15     You had mentioned Balangero, and that's the
16 chrysotile cohort in Italy, correct?
17 A Correct.
18 Q Now, you are familiar with balangeroite?
19 A I am, yes.
20 Q And balangeroite is a contaminant of the chrysotile at
21 the Balangero mine, correct?
22 A It's a mineral that exists in that same strata.
23 Q All right. And actually has been likened to tremolite as
24 a contaminant of chrysotile, correct?
25 A Well, it's been discussed. I think in terms of studies,

**Page 192**

1 there's not been an identified health effect of
2 balangeroite. But that has been discussed in terms of
3 the mineralogy.
4 Q You also mentioned Yano and the chrysotile in China,
5 correct?
6 A Yes.
7 Q And looking at that subsequent studies have demonstrated
8 that there actually is significant tremolite
9 contamination in the chrysotile mines in China, correct?
10 A There's been some discussion of tremolite contamination.
11 I mean, often in these areas of relatively pure
12 chrysotile, there are discussions of the mineralogy,
13 whether there's some level of contamination.
14     I think the conclusion is that the Chungking
15 province has relatively pure chrysotile. That's not to
16 say there aren't some contaminants. I am aware that
17 that's been discussed, although, again, I don't really
18 focus on the mineralogic literature.
19 Q Well, focusing specifically on fiber burden, fiber
20 burdens of individuals in the region that were reportedly
21 exposed to pure chrysotile have actually demonstrated
22 very high levels of tremolite in the lung tissue,
23 correct?
24 A I would want to see the article you are referring to. I
25 don't want to make a blanket statement about that.

**Page 193**

1 Q Okay. And so you have not reviewed any articles
2 indicating an elevated level of tremolite in lung fiber
3 burdens of individuals in the region of the China
4 chrysotile mine in reaching your opinions in this case?
5 A Well, again, I don't have Yano's articles in front of me
6 to speak to that. There may have been some discussion of
7 whether they saw some amphibole fiber. But in terms of
8 it being a major contaminant, I'm not aware of that.
9 So --
10 Q I'm sorry. Were you finished?
11 A Yeah. So, I mean, if you have a specific article, I
12 mean, I would have to -- I would have to look at it. I
13 just can't refer to it as I sit here.
14 Q In your opinion, sir, what level constitutes a major
15 contaminant?
16 A Well, again, I'm working in the dark here a little bit
17 because I'm not sure what article you are referring to,
18 whether it was part of the lung burden, if they saw one
19 isolated tremolite fiber in a lung digestion analysis, or
20 whether we're talking about percentages, you know, within
21 a strata of chrysotile. So I'm not sure what you are
22 referring to.
23 Q Well, I'm asking you -- sir, you specifically said a
24 major contaminant. And so I'm curious in your mind and
25 in your opinion what level of tremolite would constitute

**Page 194**

1  a major contaminant. And you can tell me in any form
2  that you like, whether it's a fiber burden or as
3  indicated from the mine.
4  A  Well, I'm talking about some isolated finding of
5  amphibole within the general context of the exposure. I
6  mean, it's difficult in a place like Chungking because
7  you are talking about chrysotile that doesn't have a lot
8  of biopersistence in the lung. We've talked about that
9  at length earlier today.
10      So it can be very difficult to assess chrysotile in
11  terms of body burden which biases towards finding
12  amphibole. So those are issues in the lung burden
13  studies.
14      In terms of just mineralogic studies, I mean, it can
15  vary. I mean, tremolite in Libby, vermiculite can be
16  well over a percentage of the entire mineral. I mean, I
17  would call that a very significant exposure, a very
18  significant contaminant.
19      If you are talking about contaminants that are, you
20  know, orders of magnitude below one percent, they could
21  represent trace exposures.
22  Q  If the -- if the lung fiber burden indicated tremolite
23  above background, would you consider that a major
24  contaminant?
25  A  Not necessarily, particularly in a chrysotile lung burden

**Page 195**

1  study where it tends to skew the results towards finding
2  amphiboles. I mean, I think such a study would really
3  have to compare it to other referent ranges. And, again,
4  without a study in front of me, it's really hard to speak
5  to it.
6  Q  And in your reference list in this case, you haven't
7  cited any studies addressing that issue, have you?
8  A  No.
9      MR. COOK: All right, sir. I think
10  that's all the questions I have. Thank you very much.
11      THE WITNESS: Thank you.
12      MR. SHOR: Hi, Dr. Brodkin. Can you
13  hear me okay?
14      THE WITNESS: Yes. Good afternoon.
15
16      EXAMINATION
17  BY MR. SHOR:
18  Q  My name is Eric Shor, and I represent Hollingsworth &
19  Vose Company. And I want to turn to your -- the section
20  of your notes entitled Exposure-Related Documents
21  Reviewed and Considered. Can you pull those out?
22  A  (Peruses documents.) Okay.
23  Q  And this is a four-page fax, and I want to see if you can
24  turn to Page 3 of that fax.
25      And at the top of that page, it says,

**Page 196**

1  "Exposure-Related Documents (Cont'd), P. Lorillard Co.
2  Cont'd." And then it says "Industrial hygiene evaluation
3  of H&V Specialties Co." Do you see that?
4  A  Yes.
5  Q  And you say here, "Operator exposure of 3.5 to 11 million
6  particles per cubic foot," right?
7  A  Yes.
8  Q  And you are aware that H&V Specialties was told that the
9  maximum allowable concentration for that facility was 15
10  million particles per cubic foot?
11  A  As I sit here, I really only recall what I have written
12  in the notes, that there was concern about it being above
13  the TLV of 5 million particles per cubic foot. That's
14  not to say there wasn't a discussion of 15. I just don't
15  recall it as I sit here.
16  Q  You don't remember that it said in the document that you
17  reviewed that because asbestos was less than a third of
18  the material that was being used in that plant, they
19  tripled the 5 million and used 15 million particles per
20  cubic foot as the maximum allowable concentration for
21  that specific facility?
22  A  I think there was some discussion that it wasn't pure
23  asbestos, that there was cotton and cellulose and other
24  materials. But, again, I don't have the document in
25  front of me right now.

**Page 197**

1  Q  But in fact you are not aware of any evidence that H&V
2  Specialties was told that their plant exceeded the
3  maximum allowable concentration, right?
4  A  No, I'm not aware of any sort of violation or a document
5  like that, no.
6  Q  And you mention further down that there was a concern
7  that 5 million particles per cubic foot of asbestos dust
8  is too high.
9      You are aware that 5 million particles per cubic
10  foot was the current threshold limit value in 1952,
11  right?
12  A  Yes, that's correct.
13  Q  And when was that changed?
14  A  That changed in 1968 down to 2 million particles per
15  cubic foot. That would be the date of transition.
16  Q  And after you say "concern that 5 million particles per
17  cubic foot asbestos dust is too high," you have a
18  parenthetical that says "lower levels required for
19  illness prevention" and then a bracket, "Dr. Elkins
20  11/3/1952," right?
21  A  Correct.
22  Q  And you are referring when you say that to a memo from
23  Dr. Elkins to someone named Mr. Whalen, right?
24  A  It is a memo from Dr. Elkins that I was referring to when
25  I took these notes.

**Page 198**

1  Q  And it was not a memo from Dr. Elkins to H&V Specialties
2     Company, was it?
3  A  Boy, the document would speak for itself.  I mean, I have
4     no reason to question what you are saying.  I just don't
5     have it in front of me.
6  Q  There's no evidence, for example, that H&V Specialties
7     Company was ever told that officials were concerned that
8     the five million particles per cubic foot level was too
9     high and could cause illness, right?
10 A  I can only speak to the memo, itself.  I can't really
11    speak to the line of communication with H&V.
12 Q  But Dr. Elkins didn't work for H&V, did he?
13 A  You know, I would have to look.  These are notes I took a
14    while back, so I'm not sure who his employer was.  I
15    really can't speak to that.
16 Q  Do you know -- do you know who Dr. Elkins is?
17 A  I don't specifically.  I mean, I haven't researched it.
18 Q  Well, if the memo that you are referring to said "no copy
19    of the report is being sent to us by the employer," would
20    that inform your opinion about whether H&V Specialties
21    was ever informed of this specific memo or its contents?
22 A  I would have no knowledge of the communication line.  I
23    mean, if there's a memo that says they weren't informed,
24    that would speak for itself.
25 Q  So to the extent you have this information in your notes,

**Page 199**

1     you are not using this information to say that, for
2     example, H&V Specialties was aware that exposures in its
3     plant were above a safe level, right?
4  A  Well, I think this evaluation speaks to certainly a
5     health concern based on release of asbestos fibers.  I
6     mean, it informs my opinion that the filter media
7     material is capable of releasing asbestos fibers and at
8     least in this context was capable of releasing them to a
9     level that generated health concerns.
10 Q  But this was not the filter media releasing anything;
11    this was the filter media being manufactured, right?
12 A  That's true, yes.
13 Q  So this is before it was ever put into rolls, right?
14 A  It was the carting, processing of the material.
15 Q  So then this material is carted and processed and put
16    into rolls, right?
17 A  Correct.
18 Q  And then it was shipped to Lorillard in another state,
19    right?
20 A  That's my understanding, yes.
21 Q  And then after that in another state, Lorillard used that
22    material to make cigarette filters, right?
23 A  That is my understanding.
24 Q  And then those cigarette filters were attached to
25    cigarettes?

**Page 200**

1  A  Correct.
2  Q  And then they were put in packs?
3  A  Correct.
4  Q  And then those packs were put into cartons?
5  A  That would be my understanding.
6  Q  And then they were shipped off to different places where
7     people purchased them, right?
8  A  Correct.
9  Q  So what happened at this plant in Massachusetts doesn't
10    tell you whether the filter media, when a Kent cigarette
11    was smoked, released asbestos, does it?
12 A  No, I don't think this evaluation speaks to that.  But I
13    think it speaks to the assessment of workers fabricating
14    that material that they can be exposed to high levels
15    that would generate health concerns.
16 Q  And you say toward the end of these notes, there's a
17    recommendation for CXR, which means chest x-rays, for
18    exposed workers, right?
19 A  Correct.
20 Q  And there's no mention in the documents you reviewed of
21    any safety measures that should be implemented for
22    individuals who smoked Kent cigarettes, is there?
23 A  No, I don't recall seeing that.
24        MR. SHOR:  All right, Dr. Brodkin.
25    That's all I have.  Thank you for your time.

**Page 201**

1        THE WITNESS:  Thank you.
2        MS. RAINES:  All right.  I guess it's
3  my turn.
4     Does anyone need a break?  Doctor?
5        THE WITNESS:  We can take a
6  five-minute break, sure.
7        (Recess from 4:02 to 4:09.)
8        (Exhibit No. 27-28 marked
9        for identification.)
10
11       EXAMINATION
12 BY MR. SCHILLING:
13 Q  Dr. Brodkin, my name is Drew Schilling.  I represent
14    several defendants in this case.
15    Earlier you had mentioned you created folders for
16    various defendants in the asbestos litigation.  And I
17    just want to go over to see if you've created folders for
18    any of my specific clients.  All right?
19    First is Warren Pumps, do you have -- have you
20    collected any information in order to form any kind of
21    opinions regarding products manufactured by Warren Pumps?
22 A  No.  I didn't pull any files regarding Warren Pumps in
23    this case, so I haven't brought any in.  I don't believe
24    it was mentioned in Mr. Quirin's deposition.
25 Q  So at this time -- well, the materials you reviewed in

**Page 202**

1 preparation for your deposition here today did not have
2 anything to do with Warren Pumps specifically, correct?
3 **A No. I did not assess Warren Pumps. Certainly I assessed**
4 **pumps in general, but not anything that Mr. Quirin**
5 **identified specifically as Warren Pumps.**
6 Q The second defendant I want to ask you about that I'm
7 here for is Parker Hannefin. Do you have a folder
8 created for Parker Hannefin?
9 **A No, not in this case.**
10 Q Do you have Parker Hannefin materials from previous
11 cases?
12 **A I might, but I certainly didn't consult them or consider**
13 **them in this case, so I didn't pull them.**
14 Q And so at this time you don't have any specific opinion
15 in regards to Parker Hannefin, itself, in regards to the
16 Quirin case?
17 **A No. I mean, I don't know what hypotheticals I might be**
18 **asked at trial regarding those entities, but they**
19 **wouldn't be independent of my opinions about the**
20 **exposures I've identified.**
21 Q And would this be true for Imo Industries as well?
22 **A Yes.**
23 Q Which would be Delaval as well, correct?
24 **A Correct.**
25 Q And I'm going to guess you don't have any materials in

**Page 203**

1 regard to Molex, Incorporated, correct?
2 **A That's true.**
3 Q And you haven't reviewed any materials specific to Molex,
4 Incorporated, in preparation for your deposition here
5 today, correct?
6 **A Only in terms of Mr. Quirin's deposition, not any other**
7 **documents.**
8 MR. SCHILLING: I said I would be
9 brief, and those are all the questions I have. I
10 appreciate your time.
11 THE WITNESS: Thank you.
12 MS. RAINES: I'm Elizabeth Raines. We
13 met many hours ago.
14 THE WITNESS: Yes.
15
16 EXAMINATION
17 BY MS. RAINES:
18 Q Good afternoon, Dr. Brodkin. I'm here representing
19 Lorillard Tobacco Company. I would like to start with
20 the documents you have brought with you that are
21 contained in two Redwelds I have sitting here on the
22 table.
23 I believe earlier you said these are your Kent
24 micronite materials from the Burns and McGuire cases that
25 inform your opinions; is that right?

**Page 204**

1 **A That's true.**
2 Q And did you actually review the contents of these two
3 Redwelds for the Quirin case to inform your opinions?
4 **A I certainly perused them. I didn't specifically look at**
5 **every single document, but I did peruse them.**
6 Q I would like to go ahead and just identify what is here
7 for our record in this case.
8 As Exhibit 28, we have marked the Redweld, and it
9 says -- oh, I'm sorry. We're on 27. Let's start over.
10 All right. Strike that Exhibit 28 reference.
11 Let's start with 27. And we have the Redweld marked
12 Burns, Charles, and that signifies the Charles Burns
13 case, correct?
14 **A Correct, discovery documents I received in that case.**
15 Q And you served as an expert witness for the plaintiff in
16 that case?
17 **A That's correct, yes.**
18 Q And are there any documents in this Redweld that you
19 collected yourself versus receiving them from a
20 plaintiff's lawyer?
21 **A I would have received those in the context of a**
22 **medical/legal action through a lawyer.**
23 Q All right. And inside this Redweld are five folders, so
24 I just wanted to --
25 (Interruption in proceedings.)

**Page 205**

1 MS. RAINES: Wow. Are you okay on the
2 phone?
3 (No response.)
4
5 MS. RAINES: All right. We'll go on.
6 Q (By Ms. Raines) We have five folders inside the Redweld.
7 The first one has been marked as Exhibit 27A. And on it,
8 it says Kent Micronite/P. Lorillard documents. Correct?
9 **A Yes.**
10 Q And inside that folder is a CD labeled Lorillard
11 documents and then a stack of documents with various
12 Post-it notes on it, correct?
13 **A Yes.**
14 Q These notes that are stuck on the documents in the folder
15 we've now marked as 27A, are those all from the Charles
16 Burns case or are there new notes for the Quirin case?
17 **A No, I have not added any new Post-its in the Quirin case.**
18 **They would have all existed before.**
19 Q And these are -- actually the CD in here is labeled
20 Kananian Plaintiff Trial Exhibits Re Lorillard Tobacco,
21 correct?
22 **A Yes. Mr. Kananian was an individual I evaluated a number**
23 **of years ago. And I believe I incorporated the discovery**
24 **documents I received in that case in the Burns case.**
25 Q So all of that is contained in 27A?

**Page 206**

1  A  Correct.
2  Q  Moving on to 27B, you have a folder labeled Kent
3     Micronite/Hollingsworth & Vose, correct?
4  A  Correct.
5  Q  And in this folder are discovery responses from the
6     Robert Cox case; is that right?
7  A  Yes, another individual I evaluated in the context of
8     Kent micronite.
9  Q  So you served as an expert witness for the plaintiff in
10    the Robert Cox case?
11 A  That's true.
12 Q  And the notes that are attached to the discovery
13    responses from the Cox case that are contained in Exhibit
14    27B, are those previous or do some of those correspond to
15    the Quirin case?
16 A  They are previous. I have not added any Post-its for the
17    Quirin case.
18 Q  Next, 27C, says Kent Micronite Discovery Documents on it,
19    correct?
20 A  Yes.
21 Q  And inside this folder are a number of paper documents
22    and a DVD labeled Fullam, I believe, TEM series Kent
23    articles; is that correct?
24 A  Yes.
25 Q  And then there are a number of paper documents and some

**Page 207**

1     photographs of Kent cigarette packs and advertising,
2     correct?
3  A  Correct.
4  Q  And there are also a few Post-it notes here. Were all
5     those placed by you previously or are any of those new
6     for the Quirin case?
7  A  They were all placed previously.
8  Q  27D is labeled Dr. Longo testimony 8/18/95, Micronite v.
9     Raybestos, correct?
10 A  Yes.
11 Q  And inside this folder it appears are two transcripts of
12    testimony from the Horowitz case; is that right?
13 A  That's my understanding, yes.
14 Q  And, again, there are a number of Post-it notes with
15    handwritten notes on them. Are any of these handwritten
16    notes on the Post-it notes new for the Quirin case or are
17    they all previous to this case?
18 A  No, they would all be previous.
19 Q  And then finally Exhibit 27E is the folder labeled Trial
20    Testimony of Douglas Hallgren, Horowitz versus Raybestos,
21    correct?
22 A  Yes.
23 Q  And, again, this folder also contains a transcript from
24    the Horowitz versus Raybestos case with a number of
25    Post-it notes with handwritten notes on it, true?

**Page 208**

1  A  True.
2  Q  And are any of these Post-it notes new for the Quirin
3     case?
4  A  No.
5  Q  They are all previous to this case?
6  A  They are all previous.
7  Q  All right. That completes Exhibit 27 and 27A through E.
8     Moving on to Exhibit 28, we have a Redweld labeled
9     McGuire, William, correct?
10 A  Yes.
11 Q  And that was from the William McGuire case in Kentucky in
12    which you served as an expert for the plaintiff; is that
13    right?
14 A  Correct.
15 Q  And we have Exhibit 28A, which is a file folder labeled
16    Lorillard Cases Death Certificates, McGuire, William,
17    true?
18 A  True.
19 Q  And did you review this again for the Quirin case?
20 A  No. I perused it but certainly did not add any Post-its.
21    I reviewed the findings from my prior review.
22 Q  Next is Exhibit 28B, which is labeled Trial Testimony of
23    Douglas Hallgren, Cox versus Asbestos Corp, McGuire,
24    William; is that correct?
25 A  (Peruses documents.)

**Page 209**

1  Q  It's hard to see.
2  A  Yes, that's a transcript.
3  Q  The folder only contains the transcript which also has a
4     number of Post-it notes with handwritten notes on it,
5     correct?
6  A  Correct.
7  Q  And are any of those notes new for the Quirin case?
8  A  No.
9  Q  And then finally Exhibit 28C is labeled Owens-Corning
10    Testimony of Kent Micronite/Testimony of Mark Risler,
11    R-I-S-L-E-R, Ph.D. (additional material), and that is
12    abbreviated, McGuire, William.
13 A  Yeah, that's probably --
14 Q  Is that right?
15 A  It's probably Rigler.
16 Q  Oh, Rigler. I know that name.
17 A  Yeah. It's testimony. I believe I probably received
18    this after my deposition in the McGuire case.
19 Q  And so this is testimony you reviewed after your
20    deposition in the McGuire case, but before the trial in
21    the McGuire case; is that right?
22 A  That's my recollection.
23 Q  And did you testify at the trial in the McGuire case?
24 A  No.
25 Q  So you simply reviewed this testimony, and have you ever

1  testified in a case involving the Kent micronite
2  cigarettes that contained asbestos since the McGuire
3  case?
4  A  No, not to my recollection.
5  Q  All right.
6  A  That would be the most recent one.
7  Q  And so in these notes you've put on Post-it notes on
8  Exhibit 28C are from the period of the McGuire case and
9  not for the Quirin case, correct?
10 A  Correct.
11 Q  Now, earlier your comprehensive set of handwritten notes
12 was marked as Exhibit 18.  And that includes the list of
13 various publications on various subjects related to
14 asbestos exposure.  What section of your notes refers
15 specifically to publications that inform your opinions
16 about the Kent cigarette in this case?
17 A  The publications that inform my opinion relevant to Kent
18 would be on the final page.  It's a list of articles that
19 would start with Dodson and Hammar, Inhalation
20 Toxicology, 2006, and end in Millette, MVA 2010.
21 Q  And earlier I believe you testified this would be a
22 cumulative list of reliance documents; is that right?
23 A  That's correct.  As new articles come to my attention or
24 I review them, I periodically do add them to the list.
25 Q  And are there any publications that you've added to this

Page 210

1  list since you gave your expert opinions in the McGuire
2  case?
3  A  Yes.  The bottom two, I did receive these reports in the
4  context of the Quirin case and have added them.
5  Q  And one of those is Rigler and Longo, MAS 2012, correct?
6  A  That's correct.
7  Q  And why was that one added to your list?
8  A  Well, I certainly reviewed it.  It was among the
9  materials sent to me in this case.  And it certainly is
10 an analysis of release of crocidolite fibers during the
11 process of smoking from a smoking machine.
12    So I certainly found it relevant to understanding
13 exposure levels relative to smoking with the
14 asbestos-containing Kent micronite filter.
15 Q  And did that publication change in any way the opinions
16 you expressed about the Kent asbestos-containing filter
17 cigarette from the McGuire case?
18 A  I would say it doesn't change any of my opinions from the
19 McGuire case.  It does provide some additional
20 information.  This analysis looked at fiber cc ranges or
21 intensity of exposure, whereas previous analyses that
22 Longo had done had looked more in terms of structures.
23 And the technique was different.  Rather than using a
24 piston method of smoking, they used a standard smoking
25 machine.  So it's additional information that I included.

Page 211

1  Q  So it is correct to say that your review of this Rigler
2  and Longo MAS 2012 report did not cause you to form any
3  new opinions about the Kent asbestos-containing filter
4  cigarette?
5  A  I think that's true.  I think it refined some of my
6  opinions about levels of exposure just based on use of
7  the standardized smoking machine.
8  Q  Did it cause you to actually try to calculate an exposure
9  level for Mr. Quirin in this case?
10 A  No, although, the report, which I don't know what
11 exhibit -- maybe it would be Exhibit 7, does look at an
12 individual who smoked six Kent cigarettes per day.  So
13 that actually is in the range of Mr. Quirin.
14    So that does inform my opinions as well about the
15 type of cumulative exposure that might result.  It's in
16 the appendix of that report.  I mean, I certainly read
17 and considered it.
18 Q  When you say "the appendix," are you referring to Table 2
19 in the MAS report that's been marked as part of Exhibit 7
20 in this case?
21 A  Actually, what I'm referring to is dose of crocidolite
22 structures calculation for Kent micronite cigarettes for
23 six smoked per day for seven days.  So there is that
24 analysis that I certainly looked at and considered.
25 Q  That were smoked on a smoking machine, correct?

Page 212

1  A  Correct, yes.
2  Q  And these were 60-plus-year-old Kent cigarettes that were
3  smoked on a smoking machine, right?
4  A  Yes, they would have been vintage from the '52 to '56
5  timeframe.
6  Q  And you don't know how those Kent cigarettes that Longo
7  tested which resulted in this report, you don't know how
8  those were stored for all those 60 plus years, correct?
9  A  I can't speak to that.  My only knowledge of it would be
10 the description in the report and the methods they used.
11 But, no, I wouldn't have personal information about that.
12 Q  And you can't speak to the validity or the reliability of
13 the testing that is reflected in this July, 2012, report
14 by Rigler and Longo, correct?
15 A  I would say I certainly would rely on the material from
16 the scientists in terms of measuring the exposure levels
17 and the methodology.  I mean, I'm not a smoking machine
18 expert.  I don't have expertise in that technical aspect
19 of it.  So I certainly rely on their expertise and
20 measurements.  They certainly describe it in the report.
21 Q  So this isn't actually a test that is representative of a
22 person smoking a fresh Kent cigarette between 1952 and
23 1956 when there was asbestos in the filter, true?
24 A  The smoking machine was smoking a cigarette from that era
25 with the asbestos-containing chrysotile filter.  It was

Page 213

**Page 214**

1 treated in the standard method for smoking machines such
2 as described in the report. But, yes, it would be
3 representative of that cigarette.
4 Q But you are not a material scientist, correct?
5 A Correct. I'm relying on the material scientist's
6 analysis in terms of understanding the exposure levels.
7 Q But you can't say whether the materials tested, the Kent
8 filter cigarettes that were tested, were actually
9 representative of those at the time from a material
10 science perspective?
11 A Again, I rely on Rigler and Longo for that.
12 Q Right. And you are not an expert in testing cigarettes
13 for particle or fiber release, correct?
14 A Correct. I don't do that as part of my practice.
15 Q And you've never designed a cigarette filter, right?
16 A No.
17 Q And you've never designed any type of filter at all;
18 isn't that right?
19 A That would be true.
20 Q Okay. While we're talking about testing documents that
21 you reviewed, there's also the MVA scientific consultants
22 expert report dated September 30th, 2010, and you've
23 added that to your reliance list, correct?
24 A Correct.
25 Q And so how does this report inform your opinions in the

**Page 215**

1 Quirin case?
2 A The Millette report speaks to a TEM or transmission
3 electron microscopic analysis of the Kent micronite
4 cigarette. It confirms release of crocidolite fibers in
5 four of the filters tested. So certainly that informs my
6 opinion about release of fibers from the filter.
7     It also indicates some technical limitations from
8 the scanning electron microscope versus the transmission
9 electron microscope in terms of their analysis. So I've
10 noted that.
11 Q And, again, here we're analyzing 50- to 60-year-old Kent
12 cigarettes, correct?
13 A Yes, vintage 1952 to 1956.
14 Q And, again, you don't know how those were stored or how
15 any materials in the cigarette filter may have degraded
16 before they were tested by MVA, correct?
17 A Again, I rely on the reports in terms of their
18 representativeness. I don't have independent knowledge
19 of it.
20 Q And actually in the MVA testing, they found that some of
21 their Kent cigarette samples showed no release of
22 crocidolite, true?
23 A They did, and certainly the scanning electron microscopy
24 did not appear to show it. But what Dr. Millette notes
25 is a likely limitation of SEM versus TEM.

**Page 216**

1 Q And so the results there in the MVA test were four
2 samples they say released some crocidolite fibers, but
3 four other samples did not show release of crocidolite
4 fibers, correct?
5 A They have noted the ones that showed release and those
6 that didn't, and they speak to some of the limitations of
7 the methodologies.
8 Q And in fact there was a broad range of results in terms
9 of the number of fibers detected in the MVA testing,
10 correct?
11 A There was variation, yes.
12         (Discussion off the record.)
13
14 Q (By Ms. Raines) Are there any other materials besides
15 the Redwelds from the Burns and McGuire case, the Exhibit
16 7 with the two expert witness studies and your reliance
17 list that's in your handwritten notes, is there anything
18 else besides that you are relying on for your
19 opinions in this case?
20 A Just the ones specific to Mr. Quirin in terms of the
21 occupational and environmental history.
22 Q In terms of his smoking history?
23 A Exactly.
24 Q Okay. Earlier you said you looked at plant exposures
25 regarding Kent micronite cigarettes. Why did you do that

**Page 217**

1 when Mr. Quirin was not a plant worker?
2 A You are referring to the West Groton plant, the earlier
3 questions?
4 Q Yes.
5 A Well, it certainly is material that I reviewed earlier
6 and had taken notes from. Again, it's a different
7 application. It's an occupational setting where the
8 media is being -- the filters are fabricated. It's
9 not to say that would be analogous to smoking the
10 cigarette. But from a health standpoint, in occupational
11 medicine one wants to understand the occupational
12 exposures as well as the environmental exposures. So it
13 is relevant that you understand the workers making the
14 materials as well.
15 Q All right. But Mr. Quirin wasn't one of those workers,
16 so that's not relevant to his exposure here, correct?
17 A I would say the exposures during carting of the media to
18 create the filters is certainly not synonymous with
19 smoking the Kent micronite filter. I don't use the
20 report in that way.
21 Q All right. And you looked at materials from the Burns
22 case, but you are not doing that to make a comparison
23 between Mr. Quirin and Mr. Burns, correct?
24 A That's true. In fact, I've not reviewed the medical
25 details of Mr. Burns for this case.

Page 218

```
 1   Q   And the same question for McGuire, you are not reviewing
 2       materials for McGuire because you are going to make some
 3       sort of comparison between Mr. McGuire and Mr. Quirin in
 4       this case, correct?
 5   A   That's true.
 6   Q   And you are not going to give any opinions that any other
 7       individual who smoked Kent cigarettes is somehow similar
 8       to Mr. Quirin, correct?
 9   A   Well, I think one has to assess each individual in terms
10       of the evidence.  I mean, certainly I would rely on the
11       literature I've cited and that we've gone over in terms
12       of my understanding of the exposures related to Kent
13       micronite and the effect of smoking Kent micronites on
14       lung burden.  And I would rely on those studies.  But
15       certainly I would consider Mr. Quirin as a specific
16       individual in terms of his smoking history.
17   Q   I believe you previously testified that you earned about
18       $800,000 in 2011 and $400,000 of that was for
19       medical/legal work; is that correct?
20   A   That sounds about right for 2011 -- well, 2011, $850,000,
21       somewhere in that range.  That's my recollection.
22   Q   All right.  Would that make your medical/legal work
23       income for 2011 $425,000?
24   A   Yes, it would be about 50 percent of my activity in 2011.
25       It's probably a little more this year.
```

Page 219

```
 1   Q   And what is your estimate for your income this year in
 2       terms of medical/legal work?
 3   A   The amount would be roughly the same.  I would say
 4       $850,000.  But probably about 60 percent of my activities
 5       would involve that rather than 50.
 6   Q   Okay.  So more along the lines of, you know, $500,000
 7       plus earned in 2012 for medical/legal work?
 8   A   Yeah, I mean, I haven't figured out an exact number, but
 9       I think 60 percent of $850,000 would be roughly the
10       range.
11   Q   Okay.  Have your opinions regarding relative potency of
12       different fiber types in causing mesothelioma changed
13       since your October 2011 deposition in the McGuire case?
14   A   No.
15   Q   Okay.  And have your opinions regarding TLV threshold or
16       asbestos exposure level required to cause mesothelioma
17       changed since you were deposed in the McGuire case?
18   A   No.
19   Q   And have your opinions regarding ambient air levels, that
20       they are trivial exposures changed since you were deposed
21       in the McGuire case?
22   A   No, they haven't changed, and certainly I would not
23       attribute asbestos-related disease to ambient levels of
24       asbestos exposure.
25   Q   And have your opinions regarding state-of-the-art
```

Page 220

```
 1       knowledge of asbestos and mesothelioma changed since you
 2       were deposed in the McGuire case?
 3   A   No.
 4   Q   Have your opinions regarding possible causes of
 5       mesothelioma changed since you were deposed in the
 6       McGuire case?
 7   A   No.
 8   Q   And have your opinions that ship and shipyard workers'
 9       risk of asbestos-related disease is significant changed
10       substantially since you were deposed in the McGuire case?
11   A   No, and I think I certainly have provided those opinions
12       today as well.
13   Q   Have your opinions regarding the Kent filter composition
14       when it had asbestos in it, manufacturing specifics and
15       the patent information changed since you were deposed in
16       the McGuire case?
17   A   I would say in broad overview, those opinions haven't
18       changed.  I would note the Rigler and Longo MAS 2012
19       study that we talked about.  I believe they cited that
20       crocidolite was about 9.8 percent of the filter.  They
21       had not reported that on previous studies, so that's some
22       new information.
23           It doesn't substantively change any of my opinions,
24       but to the extent there's some new information in that
25       report, I've considered it.
```

Page 221

```
 1   Q   All right.  But the Rigler and Longo report and the
 2       Millette report that we talked about earlier are both
 3       expert reports and experiments prepared for litigation,
 4       correct?
 5   A   That would be my -- well, certainly I received them in
 6       the context of this litigation.  I mean, I guess I can't
 7       speak overall as to what the context would be unless
 8       they've indicated it in their reports.  Those would speak
 9       for themselves.  But I received it in the context of
10       litigation.
11   Q   Well, and I will hand you Exhibit 7, which has your
12       copies of the Rigler/Longo and of the Millette reports,
13       and you can tell me if you see anything in there
14       indicating these are peer-reviewed published studies?
15   A   It would be my conclusion that they are not peer
16       reviewed.  I mean, these are material science reports.
17       There's no indication here that they are in a
18       peer-reviewed publication.  They are reports.
19           The MVA report is -- well, at least there's a cover
20       letter to the law firm of Waters, Kraus & Paul, so it was
21       submitted in the medical/legal context.  I don't know if
22       it was originally written in that.  But in terms of the
23       MAS report, they call it an expert report, so I would
24       assume it's in some medical/legal context likely.
25   Q   Are you aware of any peer-reviewed published
```

Carl A. Brodkin, MD MPH FACOEM
December 17, 2012

**Page 222**

1  epidemiological studies of Kent micronite
2  asbestos-containing filter smokers?
3  **A  I'm not aware of a study of smokers. I'm aware of the**
4  **worker studies I've already spoken about. I'm aware of**
5  **assessments of lung burden in individual smokers, Kent**
6  **micronite smokers, asbestos-containing Kent micronite**
7  **filters who developed mesothelioma. But I'm not aware of**
8  **a study to date that has systematically looked at smokers**
9  **during that era. I'm just not aware of that.**
10  Q  So your reliance list that we talked about earlier does
11  not contain a single peer-reviewed published article that
12  reports on an epidemiological study of Kent
13  asbestos-containing micronite filter smokers, correct?
14  **A  I would say there isn't a population epidemiologic study**
15  **of Kent micronite smokers that I'm aware of that's ever**
16  **been done. I'm just not aware of that.**
17  Q  And would you agree with me that there's a hierarchy of
18  reliability for medical and scientific evidence?
19  **A  Yes.**
20  Q  And probably at the top would be your clinical studies
21  and then your lab studies and then epidemiological
22  studies and then case reports, and then at the bottom
23  would be studies and reports in the legal context,
24  correct?
25  **A  Well, I'm not sure I would characterize it that way. I**

**Page 223**

1  **think within epidemiology there is a hierarchy of**
2  **evidence that would go from case reports to case series**
3  **to population-based studies and design perspective**
4  **studies.**
5  **In terms of other reports, they may inform opinions**
6  **about exposure that really are independent of health**
7  **effects. I mean, those are a different type of report**
8  **and certainly could be material science reports that may**
9  **be in the context of peer-reviewed literature or not.**
10  **But I would consider those and toxicological reports**
11  **are an important complement to human studies, but I**
12  **don't -- I mean, I would just consider them**
13  **complementary, not a substitute for human epidemiologic**
14  **studies, but certainly one that is a group of studies**
15  **that should be considered in terms of causation.**
16  Q  But you would place a peer-reviewed published study above
17  a study done in the context of litigation and not peer
18  reviewed and published, you would place the peer-reviewed
19  published study as more reliable, correct?
20  **A  Well, I think the peer-reviewed process establishes**
21  **reliability and validity. So in that sense, yes.**
22  Q  Right. It would be more reliable and valid if it's peer
23  reviewed and published than if it was just published for
24  litigation?
25  **A  Well, I wouldn't say it would be necessarily more**

**Page 224**

1  **reliable. I would say its reliability and validity would**
2  **have gone through a peer-reviewed process and been**
3  **established. That's not true for a report -- a study**
4  **that hasn't gone through that process.**
5  Q  Have your opinions about the testing of the Kent
6  asbestos-containing filter in the 1950s changed since you
7  were deposed in the McGuire case?
8  **A  No, I've not received any additional information that**
9  **would change my opinions regarding any of the Armour, the**
10  **Fullam or Revere studies. No, those would be the same.**
11  Q  And have you reviewed those studies, the company testing,
12  Fullam, Revere, Armour Research Foundation, for the
13  Quirin case?
14  **A  Well, I perused them and certainly looked at my notes and**
15  **brought them in in this case. So to that extent, yes.**
16  Q  And you didn't form any new opinions as a result of that
17  review?
18  **A  Correct.**
19  Q  Have your opinions about Longo's 1990s testing of both
20  published and unpublished results and the methodology
21  changed since your deposition in the McGuire case?
22  **A  No.**
23  Q  And have your opinions about company knowledge of
24  asbestos hazards in the 1950s changed since you were
25  deposed in the McGuire case?

**Page 225**

1  **A  No.**
2  Q  And you have not formed an opinion in which you quantify
3  fiber release from Kent cigarettes for this case,
4  correct?
5  **A  Just to clarify, in terms of a calculation of a fiber cc**
6  **year, no, I have not done that for any entity in this**
7  **case. It's not part of my practice.**
8  Q  And I wanted to make sure that fit into your earlier
9  testimony about the other products.
10  **A  Right. My assessment is all from the occupational and**
11  **environmental history. It's a qualitative assessment of**
12  **duration and certainly understanding the intensity of the**
13  **exposure through the various studies I have cited, but I**
14  **haven't calculated the fiber cc year.**
15  Q  I'm just checking my notes to make sure I'm not
16  repetitive.
17  You've testified in a few previous asbestos cases
18  involving alleged Kent cigarette usage including
19  Kamanian, McGuire, Cox, Burns and others, correct?
20  **A  Those are the major ones I can recall sitting here.**
21  Q  And in each of those cases, you were under oath to tell
22  the truth just like you are today, true?
23  **A  Correct.**
24  Q  And do you reaffirm your testimony in each of those
25  previous asbestos cases involving alleged Kent cigarette

1 use?

2 A  Yes, I would.

3 Q  Okay.  And you previously testified extensively about
4 your qualifications and areas of expertise including
5 areas where you say you are not an expert.  That has not
6 changed since your previous testimony, correct?

7 A  True.

8 Q  Have you ever reviewed any opinions of any of the other
9 experts who have been designated by the plaintiff to
10 testify in this case?

11 A  In terms of an actual assessment of Mr. Quirin?

12 Q  Yes.

13 A  Well, I can't really speak to the Longo 2012 report if
14 that was done for the Quirin case or not.  If it was,
15 then I have.  But I reviewed it whether it was
16 independent of Mr. Quirin or not.  And I'm not aware of
17 any other report that would be specific to the Quirin
18 case.

19 Q  Have you had any conversations or meetings with any of
20 the other expert witnesses that the Quirins have
21 designated to testify for them in this case?

22 A  I haven't had any meetings with any other experts in this
23 case.

24 Q  Have you had any meetings or conversations with any of
25 Mr. Quirin's treating physicians?

Page 226

1 A  No.

2 Q  Let's talk about Mr. Quirin's smoking history
3 specifically.  Now, Mr. Quirin smoked brands other than
4 Kent, correct?

5 A  That's true.

6 Q  And his deposition testimony indicates that although he
7 says he smoked Kent while he was in the Navy, he also
8 smoked other brands when he was on leave in foreign
9 ports, correct?

10 A  Yes.

11 Q  Because he says Kent wasn't available in foreign ports,
12 right?

13 A  Right.  He purchased the Kent micronites from the ship
14 store.  If he wasn't aboard ship or they weren't
15 available, he would get other cigarettes.

16 Q  Did that impact your opinions in this case in any way?

17 A  I would say not in terms of the general duration of
18 exposure.  Mr. Quirin indicated that shortly after he
19 boarded the Tolovana, he started smoking the Kent
20 micronites that were available in the ship store.  And
21 then at some point after he left in '57, he transitioned
22 to another cigarette.  In my opinion, that defines a
23 period between mid 1954 and mid 1956 that he was likely
24 exposed to the Kent micronite.

25     Now, could there have been some days he didn't smoke

Page 227

1 it?  Yes.  But as I testified earlier, this was an active
2 sailing vessel.  For the most part, Mr. Quirin was at sea
3 with pretty limited time away from the ship.  So the
4 majority of it certainly would be Kent micronite.  It's
5 not to say that every day was Kent micronite.

6 Q  And how much did Mr. Quirin say he smoked per day while
7 in the Navy?

8 A  My assessment of that was approximately a third of a pack
9 per day.  It could range from five to seven cigarettes
10 per day.

11 Q  And how does that amount of smoking per day that
12 Mr. Quirin has claimed affect your opinions in this case?

13 A  In my opinion, it certainly defines a period of
14 approximately two-thirds of a pack year specific to Kent
15 micronite cigarettes.  It is a significant cumulative
16 dose.  I have discussed that in the diagnosis and
17 assessment section of my notes, and that would be on Page
18 4 of that subsection in terms of a third of a pack per
19 day for two years.

20     And certainly based on the published Longo study of
21 1995, one can look at the estimated range of crocidolite
22 structures for a third of a pack per day, and they do
23 represent exposures in the millions of crocidolite
24 structures.  So in my view, that would be a significant
25 exposure to crocidolite.

Page 228

1 Q  But you are not saying that was Mr. Quirin's dose of
2 crocidolite from smoking Kent cigarettes as he's claimed
3 he did, correct?

4 A  Well, I don't think I can give a specific dose.  And as I
5 said, I haven't calculated a specific dose in this case.
6 I think what these numbers tell me based on Dr. Longo's
7 assessment, and I've also cited his 2012 numbers, is that
8 there is an intensity of exposure in the 2012 analysis in
9 the 4 to 68 fiber per cc range in the mainstream smoke
10 that would represent part of his usual daily or almost
11 daily exposure over a two-year period.

12     And certainly I would identify that as an exposure,
13 a component part of the exposure, in the context of
14 others.

15 Q  And how did you come up with two years of exposure?

16 A  Well, two years really relates to Mr. Quirin's testimony,
17 his recollection, that he began smoking Kent micronites
18 shortly after joining the Tolovana, that that was the
19 cigarette he purchased from the ship's store.  That
20 really -- and if you look at the naval personnel records,
21 that dates very specifically to May of 1954.

22     So in the general period of mid 1954, he started
23 smoking Kent micronites.  And although he stopped smoking
24 them sometime after 1957, the relevant period really is
25 to mid 1956 in terms of their asbestos content.  So

Page 229

58 (Pages 226 to 229)

Page 230

1   that's where I get the two years, mid 1954 to mid 1956.
2 Q  And Mr. Quirin didn't know for sure about the date when
3   he started.  He thought it was a few months after he came
4   aboard the Tolovana, correct?
5 A  Well, Mr. Quirin, and he indicated this to me in my
6   interview, is not great at recalling specific dates.  I
7   mean, he just doesn't have a memory for that.
8     What he did have a memory for, though, is he started
9   smoking those cigarettes shortly after joining the
10   vessel, the Tolovana, and he was pretty consistent about
11   that in his deposition testimony.  I asked him about
12   that, and I think he was consistent about that when I
13   talked to him as well.
14     So I think that date is really pretty specific.
15   It's not to the day or month, but I think it's pretty
16   specific to mid 1954 for starting.
17 Q  I just want to be sure I'm clear on the opinions you are
18   planning to give at trial.  Are you going to give an
19   opinion about the amount of asbestos exposure that you
20   think Mr. Quirin had from allegedly smoking Kent
21   cigarettes from sometime in 1954 to 1956?
22 A  I certainly would be comfortable providing the
23   information that I provided in my notes at trial.  I
24   mean, I don't think there's going to be additional
25   information.  I guess the one piece of additional

Page 231

1   information would be the 2012 Longo.  That analysis
2   indicated a somewhat lower dose than the 1995 analysis.
3     So I would -- I would opine that there's some range
4   depending on the methodology used, the type of smoking
5   machine.  So I would provide that opinion that there's
6   not one specific exposure, but I would be comfortable
7   talking about those ranges in the two analyses that I
8   considered.
9 Q  Just the fact that that was reported or that you are
10   saying that's the dose?
11 A  Well, I'm not going to say that Mr. Quirin was exposed to
12   this specific dose.  I would indicate and I certainly
13   would cite that 4 to 68 fibers per cc in the mainstream
14   smoke as an intense exposure on a daily basis over that
15   two-year period, and that analyses of cumulative smoking
16   have indicated millions of crocidolite structures for an
17   individual with that range of smoking, but not a specific
18   level.
19 Q  So are you going to pick some of these ranges or numbers
20   as between Longo in the 90s, Longo in 2012 and Millette
21   in 2010?
22 A  I think it would be fairer to pick the 2012 lower range
23   and the 1995 higher range as a range that's been observed
24   and calculated that I've considered.
25 Q  Why is that?  I'm just --

Page 232

1 A  Well, it basically offers estimates of cumulative
2   exposure or body burden of structures for that designated
3   level of smoking.  I mean, I have considered that in
4   terms of assessing whether it was a significant exposure.
5 Q  Okay.  So looking at Longo's revised Table 2 that we
6   talked about earlier, and I will give that back to you,
7   that's Labeled Crocidolite Fibers in Eight Puffs Average,
8   correct?
9 A  Yes.  Table 2 is labeled Actual Number of Crocidolite
10   Fibers in Kent Cigarettes Smoked.
11   All right.  Now --
12 A  Oh, you are looking at the table at the end.
13 Q  Yes.  I'm sorry.  Table 2.  Because that's where the
14   numbers are that we've been discussing, correct?
15 A  Yeah, this one is called Table 2 as well.  But, yes, I've
16   looked at that as well.
17 Q  There's a Table 2 and then a revised table?
18 A  There seems to be an Appended Table 2 that breaks it into
19   specific cigarettes.
20 Q  Yes.  And so there we have crocidolite fibers in puffs,
21   which we've got 15,400 plus 8,120 plus 1,120, plus
22   19,040, plus 5,880.  And I don't know if you added that
23   up there in your notes, but I would represent to you that
24   total is 49,560.
25     So if we want to figure out how many fibers per

Page 233

1   cigarette, would we divide by five?
2 A  That would give you the average, yeah.
3 Q  Okay.  And I will represent to you that when you divide
4   49,560 by 5, you get 9,912 fibers in cigarettes -- fiber
5   per cigarette.
6 A  That looks like probably it would be pretty close to the
7   average, yes.
8 Q  And then if we take 9,912 fibers per cigarette times
9   seven cigarettes a day, a high number for Mr. Quirin's
10   smoking, that equals 69,384 fibers per day; does that
11   sound right?
12 A  Yeah, I haven't done the math, but I have no reason to
13   think it isn't correct.
14 Q  So back in the 1950s, if you look at TLVs and what was
15   known about asbestos exposure, is 69,384 fibers per day
16   significant?
17 A  Well, I don't think one can easily transpose this to
18   TLVs.  I mean, TLVs are a regulatory level for
19   work-related exposures.  It's sort of apples and oranges
20   in terms of exposure.  I mean, these are intense
21   exposures that happen during inhalation of cigarette
22   smoke.  So I don't think I would make a comparison to
23   TLVs.
24 Q  But 69,384 fibers per day is not millions, correct?
25 A  No.  On a per-day basis, that's true.

Carl A. Brodkin, MD MPH FACOEM
December 17, 2012

1 Q It's not even close to millions. So when you talked
2 about millions of fibers earlier, what time period were
3 you speaking of?
4 A Well, for instance, Longo does an analysis for six
5 cigarettes smoked per day here below Table 2, and he
6 takes the average of fibers per cc and then does 35 cc's
7 per puff times 8 puffs times 6 cigarettes and gets 59,000
8 crocidolite fibers per day. I'm not so sure that was
9 different than the number you got. It was pretty
10 similar.
11 Q Uh-huh.
12 A So that's the daily rate. You know, one certainly can
13 calculate that over a two-year period as well.
14 Q So to get to millions, you would have to go not just
15 days, but weeks?
16 A You would have to go to weeks. By certainly a month, you
17 would be -- well, by three weeks you would be in the
18 million range.
19 Q And that's assuming there was any fiber release from the
20 Kent cigarettes that Mr. Quirin smoked, correct?
21 A Well, it would be based on the evidence that there is
22 release here. I mean, otherwise one wouldn't make that
23 conclusion. But these are the observations.
24 Q And there actually are some test results that you've
25 reviewed for this case that show no measurable release of

Page 234

1 asbestos-containing filter in the 1950s, what caused his
2 mesothelioma?
3 A Well, I guess I would view that as a hypothetical. An
4 individual who had Mr. Quirin's occupational history of
5 asbestos exposure but did not smoke the Kent --
6 asbestos-containing Kent micronite cigarettes would also
7 have had a significant cumulative exposure to asbestos
8 that would place that individual at increased risk for
9 mesothelioma and certainly could be causally associated
10 with it.
11    Obviously an individual that had that exposure but
12 had additional exposures such as Kent micronite or others
13 hypothetically would be at further increased risk than
14 that individual.
15 Q And if no fibers were released when Mr. Quirin smoked
16 Kent cigarettes with an asbestos-containing filter in the
17 1950s, these cigarettes would not contribute to cause his
18 mesothelioma, right?
19 A Again, I will treat that as a hypothetical because the
20 evidence I reviewed would allow me to conclude otherwise.
21 But in the hypothetical that there was no release of
22 asbestos fibers, then it would not contribute to
23 mesothelioma, it would not be a source of exposure.
24 Q Do you have an opinion on why Longo keeps getting results
25 with fewer and fewer fibers released as the Kent

Page 236

1 asbestos fibers from Kent cigarettes when they had
2 asbestos in them, correct?
3 A There is variation in the testing. So although Longo has
4 reported a release in every cigarette, I don't know that
5 one can say that for every study that has ever been done.
6    But certainly in the 1950s studies, which you asked
7 me about earlier, there was consistent demonstration of
8 release in those fibers, too. So I think overall there
9 is consistent evidence of fiber release.
10 Q But there are also some reports where there was no
11 release or traces or three fibers in the case of Armour
12 Research Foundation, correct?
13 A Right. Well, Armour -- I mean, the Armour one has to
14 kind of assess in the context it was done. I mean, they
15 were having difficulty with fiber overload with exhaled
16 cigarette smoke -- or inhaled cigarette smoke. They
17 designed a study to look at residual fibers during
18 exhalation, which is going to greatly underestimate the
19 fibers, and they did see several fibers even on
20 exhalation.
21 Q And you would stand by your previous testimony about the
22 Armour Research Foundation studies and the other Kent
23 cigarette studies that were done in the 1950s, correct?
24 A Yes. My opinions haven't changed about them.
25 Q If Mr. Quirin did not smoke Kent cigarettes with the

Page 235

1 cigarettes he is testing age?
2 A Well, he discusses in the 2012 report the reasons for the
3 variation between the various testing. He describes the
4 difference as, first of all, using different methods and
5 going from the piston method of inhaling to a standard
6 ISO smoking machine. And then there are differences in
7 the humidification of the cigarettes. I believe in the
8 1995 testing, he used a 90 percent humidification. The
9 ISO method he used in 2012 required 60 percent
10 humidification. That may account for the difference in
11 fiber release. So there are those variables that he
12 discusses.
13 Q But you are not personally familiar with the various ISO
14 standards that apply to moisture content, storage of
15 cigarettes, testing of cigarettes, any of those issues,
16 correct?
17 A No, I certainly have relied on Dr. Longo and Dr. Rigler's
18 discussion.
19 Q You are relying on what Longo and Rigler and Millette
20 have stated in their reports, not on your own knowledge
21 and study of filtration, filter materials or cigarette
22 filters and testing of cigarettes, correct?
23 A Correct.
24 Q In fact, you can't say one way or the other whether any
25 of these cigarettes that Longo has been testing are truly

Page 237

60 (Pages 234 to 237)

Page 238

1 representative of Kent cigarettes with the
2 asbestos-containing micronite filter that were sold in
3 the 1950s, true?
4 A I have no conclusions based on independent knowledge.
5 Again, I do rely on the material science reports for
6 that.
7 Q So if Longo or Rigler or anyone else is incorrect that
8 those Kent cigarettes that have been tested are
9 representative of what Mr. Quirin or anyone else claims
10 they smoked in the 1950s, then those weren't
11 representative, correct?
12 A Well, certainly Millette and Longo's report discuss the
13 process by which they assess the cigarettes and why they
14 feel they are representative.
15 I mean, in the hypothetical that they were not, then
16 they wouldn't accurately reflect the nature of those
17 cigarettes and potentially the exposures.
18 Q And then you wouldn't rely on those results to the extent
19 you do today if that were true, correct?
20 A If I had evidence that they weren't representative, that
21 would be true. But based on my review of the studies,
22 they certainly address it and conclude that they likely
23 are representative of the types of exposures that were
24 experienced by individuals such as Mr. Quirin.
25 Q But if you had verification from a reliable source that

Page 239

1 the Kent cigarettes tested by Longo and Millette are --
2 or were not representative of Kent cigarettes sold to
3 consumers in the 1950s, then you would not rely on those
4 test results, correct?
5 A In the hypothetical that they were not representative, I
6 wouldn't rely on them.
7 Q Okay. And you have no method of isolating any particular
8 exposure that Mr. Quirin may have had to asbestos in the
9 context of disease causation, correct?
10 A Let me ask for some clarification on that question.
11 Are you talking about Kent micronites or the sort of
12 extent of the other components of his exposure?
13 Q You can't take one alleged exposure and say that one
14 caused his disease, correct?
15 A Absolutely not. Mesothelioma is a dose response disease.
16 It's the aggregate dose that increases risk and causes
17 disease.
18 Q So is it your opinion that Mr. Quirin's alleged Kent
19 cigarette smoking in and of itself would not have been
20 sufficient to cause his mesothelioma?
21 A I can't say that one way or the other. I don't think
22 medical science has a way of addressing that question.
23 Mr. Quirin's exposure to asbestos smoking the Kent
24 micronite filters between 1954 and 1956 in my opinion is
25 a significant exposure. I've identified it as a

Page 240

1 component part of his exposure. That exposure is not as
2 great as the cumulative exposure he had including all
3 occupational exposures.
4 So the exposure to Kent micronite did increase his
5 mesothelioma, but it's the aggregate of his exposure in
6 the environmental as well as the occupational setting
7 that resulted in his total risk and caused his
8 mesothelioma.
9 So I have no way of parsing out a single component,
10 whether it be Kent micronite or some other component.
11 Q You would agree that the smoking history you take is only
12 as good as the information provided to you, correct?
13 A Yes. Certainly one relies on the history to assess
14 cumulative smoking.
15 Q Do you have any other opinions you expect to give
16 specifically concerning Kent filter cigarettes or
17 Lorillard in this case that you haven't given in a
18 previous case or we haven't discussed today?
19 A I would say not. My opinions are certainly provided in
20 my notes, and I would reference those in aggregate. But
21 as I said, I've not developed new opinions, and I think
22 we've talked about the opinions I would express. That
23 being said, I don't know what hypotheticals I will be
24 asked. Certainly to the extent my knowledge, training
25 and experience allows, I would address those.

Page 241

1 Q So the only significance of your handwritten notes about
2 the Lorillard documents is to show that you did review
3 them again for purposes of your opinions in this case?
4 A Well, yes. While I'm certainly familiar with them, I did
5 review them to refresh my memory and basically, you know,
6 consider all the evidence I've looked at. So certainly
7 they are part of the evidence I considered.
8 Q During the course of your review of Mr. Quirin's
9 testimony or your interview with him, did you learn that
10 his smoking was limited on the ship because it was a
11 fueler, an oiler?
12 A Yes, they had designated smoking areas. Their smoking
13 was limited.
14 Q And did he share the reason for that or did you learn the
15 reason for that?
16 A I didn't discuss it with him in the interview, but he did
17 discuss it in the deposition that because it was a fuel
18 vessel, an oiler, he had to smoke in an area that wasn't
19 necessarily the most pleasant area to hang out.
20 Q You noted in here that his smoking was limited. Did you
21 note anything else about why it was limited or the rules
22 on the ship that limited his smoking?
23 A No, I have no other additional information about that.
24 Q Did Mr. Quirin tell you that there were time periods when
25 he wasn't permitted to smoke at all on the ship?

1 **A** Boy, the deposition would speak for itself about that. I
2 don't have a specific recollection of that. It's not to
3 say there wouldn't be.
4     I mean, I'm sure under certain watches, you wouldn't
5 be allowed to smoke obviously. But in terms of not
6 smoking period as a policy, I don't recall that.
7 **Q** He didn't tell you anything about that during your
8 interview with him?
9 **A** No.
10 **Q** Do you plan to do any further work in this case before
11 the trial?
12 **A** I feel comfortable with the materials I've been provided
13 and considered in making my opinions, so I don't
14 anticipate reviewing additional materials. I haven't
15 requested it. To the extent I am provided additional
16 materials, I certainly would consider them. If they were
17 to change any of my opinions regarding the exposure or
18 health-related opinions, I would submit separate addenda.
19 But I don't anticipate that as I sit here.
20     MS. RAINES: Okay. Those are all the
21 questions I have. Thank you for your time.
22     THE WITNESS: Thank you.
23     MR. PFAHL: Off the record.
24 ///
25 ///

Page 242

1 **A** Yes.
2 **Q** And then we reviewed an article that was a biopersistence
3 study by Dr. Bernstein and also had one of the -- well,
4 both of the articles had a Georgia-Pacific employee
5 involved as well. Do you remember that?
6 **A** Yes.
7 **Q** With respect to the biopersistence paper that we
8 discussed, you recall that they were looking at the
9 biological response in the rats' lungs to exposure to
10 pure chrysotile in one group and then joint compound dust
11 that also included chrysotile in another group?
12 **A** Yes, the reconstructed joint compound.
13 **Q** Joint compound dust.
14     And they had found at the two termination points,
15 the two study points, that there was an order of
16 magnitude fewer chrysotile fibers in the combined
17 exposure group as compared to the pure chrysotile
18 exposure group.
19     Do you recall that?
20 **A** Yes, we discussed that.
21 **Q** Yeah, I'm just trying to reorient ourselves so that my
22 follow-up questions make some sense.
23 **A** No, I recall that.
24 **Q** All right. And you recall that an observation they had
25     was that there was an increased macrophage response in

Page 244

1     FURTHER EXAMINATION
2 BY MR. MILOTT:
3 **Q** Dr. Brodkin?
4 **A** Good afternoon.
5 **Q** Can you hear me okay, Doctor?
6 **A** Yes, thank you.
7 **Q** Doctor, once an individual is diagnosed with
8 mesothelioma, subsequent exposures to asbestos are
9 irrelevant to that disease progression; isn't that
10 correct?
11 **A** I would agree with that. I mean, once a mesothelioma has
12 developed, it really will depend on the biology of that
13 tumor to a much greater extent than any ongoing exposure.
14 I think that would be a de minimus effect once a
15 mesothelioma has developed.
16     MR. MILOTT: Thanks, Doctor. Nothing
17 further.
18     THE WITNESS: Thank you.
19
20     FURTHER EXAMINATION
21 BY MR. PFAHL:
22 **Q** Dr. Brodkin, just a few follow-up questions for you.
23     And in order to reorient ourselves, we had talked
24 about the Brorby article, which was the joint compound
25 reconstitution article. Do you recall that?

Page 243

1 the combined exposure group as opposed to the pure
2 chrysotile group?
3 **A** Yes.
4 **Q** And that they found an increase in acidic environment due
5 to that increased macrophage response in the combined
6 exposure group as opposed to the pure chrysotile exposure
7 group.
8     Do you recall that?
9 **A** That was discussed in the paper, yes.
10 **Q** All right. Would you expect there to be the same type of
11 biological response in the human lung where you have
12 human lung exposed to the combined exposure versus just
13 pure chrysotile?
14 **A** Boy, that's a difficult question. I mean, even though we
15 reviewed this in the findings, I haven't had a chance to
16 read the article comprehensively. I would be very
17 reluctant based on one toxicologic study to make a
18 generalization that that's what happens in humans just
19 because in one rat experiment they did observe that.
20     I think you would really have to observe that much
21 more comprehensively probably in different rodents,
22 different species, before you made some global conclusion
23 about that.
24     I mean, obviously mechanistically one discusses
25 that, but I don't think one knows that based on one

Page 245

**Carl A. Brodkin, MD MPH FACOEM**
**December 17, 2012**

**Page 246**

1  study.

2  And then, of course, the biologic implication one

3  doesn't know either. Just because chrysotile is

4  metabolized or kinetically reduced in number, it seems to

5  be mechanistically an as an increase in inflammatory

6  response that can also cause injury, so what's the

7  significance of that, and that we don't know in humans

8  either.

9  Q  Is there any reason why you think the human lung would

10  react differently in terms of the macrophage response

11  where you have joint compound dust and chrysotile being

12  introduced into the lung which would be a greater

13  particle burden than if you just had pure chrysotile

14  fibers?

15  A  Well, I guess the question is, you know, is this

16  observation something that can be carried out into

17  something that can be shown to be a definitive biologic

18  response generally?

19  And the -- you know, I think this study is, you

20  know, a hypothesis generating study. I mean, they've

21  made this observation. From that, you would go to

22  different species and try to replicate it and then

23  perhaps consider some type of pathologic study where you

24  looked at joint compound versus other exposures and see

25  if there was a difference, although, it would be a

**Page 247**

1  difficult study to design in humans.

2  But I think it's premature after one study to say

3  this is what happens to humans. I just don't think you

4  would do that on the basis of one animal experiment.

5  Q  While it's just one study, does it raise in your mind an

6  interesting question or hypothesis as to how the lung

7  does react to a sanded product versus just a pure

8  chrysotile exposure?

9  A  I think it is an interesting finding, and that's why I

10  say it's hypothesis generating. I mean, it makes you

11  want to sort of do other studies and see if that's a true

12  phenomenon. Maybe think of some different controls that

13  would really address some of the other issues about

14  whether this is truly chrysotile clearance or some other

15  phenomenon on the basis of the particulates.

16  And then to do a study to see if that clearance is

17  at the cost of increased inflammation that would have

18  additional injury. Those are all things that could be

19  done in follow-up.

20  So yes, I mean, I think they are interesting

21  questions raised that are hypothesis generating.

22  MR. PFAHL: Thank you, Doctor. I

23  appreciate your time.

24  THE WITNESS: Thank you.

25  (Signature waived.)

**Page 248**

1  (Deposition concluded at

2  5:29 p.m.)

**Page 249**

1  STATE OF WASHINGTON ) I, Barbara Castrow, CCR, RPR,
   ) ss CCR #2395, a certified court
2  County of King     ) reporter in the State of
   Washington, do hereby certify:

3

4

   That the foregoing deposition of CARL A. BRODKIN,
5  MD MPH FACOEM, was taken before me and completed on
   December 17, 2012, and thereafter was transcribed under my
6  direction; that the deposition is a full, true and complete
   transcript of the testimony of said witness, including all
7  questions, answers, objections, motions and exceptions;

   That the witness, before examination, was by me
8  duly sworn to testify the truth, the whole truth, and
   nothing but the truth, and that the witness waived the right
9  of signature;

10

   That I am not a relative, employee, attorney or
11  counsel of any party to this action or relative or employee
   of any such attorney or counsel and that I am not
12  financially interested in the said action or the outcome
   thereof;

13

   That I am herewith securely sealing the said
14  deposition and promptly delivering the same to
   Attorney Scott B. Pfahl.

15

   IN WITNESS WHEREOF, I have hereunto set my hand
16  and affixed my official seal this 21st day of December,
   2012.

17

18

19

   Barbara Castrow, CCR, RPR
20  Certified Court Reporter No. 2395
   (Certification expires 11/24/12.)

21

22

23

24

25

# EXHIBIT 2

2013 WL 214378
Only the Westlaw citation is currently available.
United States District Court,
D. Utah,
Central Division.

Linda SMITH, as Personal Representative
on behalf of the Legal Heirs of
Ronnie Smith, Deceased, Plaintiff,
v.
FORD MOTOR COMPANY, et al., Defendants.

No. 2:08–cv–630. | Jan. 18, 2013.

**Attorneys and Law Firms**

Bronson D. Bills, Jones Bills PC, South Jordan, UT, Gilbert L. Purcell, James P. Nevin, Jennifer L. Alesio, Lloyd F. Leroy, Richard M. Grant, Brayton Purcell LLP, Novato, CA, Michael P. Thomas, Paul J. Simonson, Brayton Purcell, Robert G. Gilchrist, Eisenberg Gilchrist & Cutt, Salt Lake City, UT, for Plaintiff.

Christopher J. Martinez, Dan R. Larsen, Dorsey & Whitney, Adam C. Buck, Snell & Wilmer, Rachel G. Terry, Fabian & Clendenin, Salt Lake City, UT, Warren E. Platt, Snell & Wilmer, Costa Mesa, CA, Brien F. McMahon, Perkins Coie, San Francisco, CA, Tonn K. Petersen, Perkins Coie LLP, Boise, ID, for Defendants.

**Opinion**

**MEMORANDUM DECISION AND ORDER**

DEE BENSON, District Judge.

*\*1* This matter is before the court on defendant Ford Motor Company's Daubert Motion to Exclude Expert Testimony of Samuel Hammar, M.D. (Dkt. No. 96.) The court heard oral argument on the motion on November 13, 2012. Having considered the parties' arguments, memoranda, and the relevant law, the court enters the following Memorandum Decision and Order.

**BACKGROUND**

Ronnie and Linda Smith, husband and wife, filed this asbestos personal injury action on July 15, 2008, in the Third District Court for the State of Utah. Ronnie Smith passed away on November 3, 2009, and the case is now being prosecuted by Linda Smith as plaintiff's representative on behalf of Ronnie Smith's heirs. The case was removed to this court on August 20, 2008.

In this action, plaintiff Linda Smith contends that Ronnie Smith was injured as a result of exposure to asbestos products which contributed to his development of mesothelioma. Plaintiff is suing numerous parties, including Ford Motor Company, which allegedly manufactured asbestos-containing products which exposed plaintiff to unknown doses of asbestos for unknown durations.

In his deposition, plaintiff Ronnie Smith stated he was exposed to asbestos-containing Ford brake parts while working as a part-time service station attendant at a full-service gas station in Cedar City, Utah, from August 1966 to May of 1968, a period of approximately 19 months. Although plaintiff offered that "he didn't know for sure" with respect to the number of times he changed brake pads on Ford vehicles, plaintiff asserts that during his 19 months of employment as a service station attendant, he may have changed brake pads on Ford vehicles on as many as seven occasions—and on one non-work related occasion in 1963 when he changed brake pads on his personal Ford automobile. According to Mr. Smith, the process of changing brake pads consisted of lifting the vehicles with a hydraulic-hoist and removing the vehicle's wheels with an air wrench. Thereafter, plaintiff would blow an accumulation of a black or gray dust-like substance away from the brake pad location with an air hose. Plaintiff claims the air hose caused the dust to enter the air which he then inhaled. After plaintiff removed the old brake pads and cleared the dust from the work zone, he replaced the brake pads, thereby completing the process. Plaintiff asserts that on the occasions he performed this process on Ford brand vehicles, the brake pads he was changing contained asbestos; and consequently, the dust he inhaled through the process of changing the brake pads exposed him to asbestos and caused his injuries.

**DISCUSSION**

Dr. Hammar's opinion is based on a theory of causation that has variously been described as the "every exposure" or "every breath" theory, which holds that each and every exposure to asbestos by a human being who is later afflicted

with mesothelioma, contributed to the formation of the disease.

Defendant asserts that this theory is without scientific foundation, that it is mere speculation designed for litigation, and that it is inadmissible pursuant to Rule 702 of the Federal Rules of Evidence and the standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993).

 **\*2** Having now reviewed the parties' briefing and the extensive number of exhibits, which includes prior court opinions, law review articles, and the declarations of numerous science and medical experts, including Dr. Hammar, the court agrees with the defendant's position. Dr. Hammar's opinion is, as a matter of law, unsupported by sufficient or reliable scientific research, data, investigations or studies, and is inadmissible under Rule 702.

Furthermore, even if it were deemed admissible under Rule 702, the court would exclude Dr. Hammar's testimony pursuant to Rule 403 of the Federal Rules of Evidence, because the probative value of such unsupported speculation by Dr. Hammar is substantially outweighed by the danger of unfair prejudice, as well as being confusing, and presenting a danger of misleading the jury. In reaching this conclusion, the court agrees with the growing number of published opinions from other courts that have reached a similar result: that the every exposure theory as offered as a basis for legal liability is inadmissible speculation that is devoid of responsible scientific support. When carefully examined, it becomes clear that Dr. Hammar's proffered testimony is precisely the kind of testimony the Supreme Court in *General Electric Co. v. Joiner,* 118 S.Ct. 136 (1997), observed as being nothing more than the "ipse dixit of the expert." *Id.* at 519.

The arguments in support of the court's holding are ably expressed in the opening and reply briefs of the defendant, and those briefs are adopted by the court, as well as is the expert opinion of Dr. Mark Roberts, which the court finds to be a well-reasoned examination of the standard *Daubert* factors most closely associated with the relevant medical scientific community. (See Def.'s Mem. in Supp. of Daubert Mot. to Exclude Expert Test. of Samuel Hammar, M.D., Def's Reply Mem. in Supp. of Daubert Mot. to Exclude Expert Test. of Samuel Hammar, M.D., Def.'s Mem. in Supp. of Daubert Mot. to Exclude Expert Test. of Samuel Hammar, M.D., Ex. 2, Mark A. Roberts M.D. Ph.D., Aff.) Consistent with those arguments, the court's reasons for rejecting Dr. Hammar's opinion include the following:

**1. The every exposure theory is not based on sufficient facts or data.**

The every exposure theory does not hold up under careful examination. It is questionable whether it can even properly be called a theory, inasmuch as a theory is commonly described as a coherent collection of general propositions used to describe a conclusion, and while there are some general propositions used by Dr. Hammar, they fall far short of supporting the legal liability he attempts to reach with them. Rule 702 and *Daubert* recognize above all else that to be useful to a jury an expert's opinion must be based on sufficient facts and data. The every exposure theory is based on the opposite: a lack of facts and data. When Dr. Hammar states that he cannot rule out any asbestos exposure as a possible cause of an individual's mesothelioma he is confirming the fact that there are insufficient facts and data to establish what minimum dosage levels of asbestos are required to cause cancer in a human being. The fact is the medical community at present does not know the answer to the all-important question regarding legal causation, how much is too much?

 **\*3** Dr. Hammar seeks to base his causation opinion not on the thin reed that he cannot rule any exposure out, but on the opposite: he rules all exposures "in," boldly stating that Mr. Smith's mesothelioma "was caused by his total and cumulative exposure to asbestos, *with all* exposures and all products playing a contributing role." (Hammar Decl. at 17, ¶ 17.) This asks too much from too little evidence as far as the law is concerned. It seeks to avoid not only the rules of evidence but more importantly the burden of proof. It is somewhat like a homicide detective who discovers a murdered man from a large family. Based on his and other detectives' training and experience the detective knows that family members are often the killer in such cases. When asked if there are any suspects the detective says he cannot rule out any of the murdered man's relatives. This would be reasonable, but it would not allow the detective to attribute legal liability to every family member on the basis of such a theory. That is, in effect, what Dr. Hammar and plaintiff are trying to do here, without *any* underlying data as to the amount of chrysotile asbestos fibers found in Ford brakes that are needed to cause cancer in a human being.

Dr. Hammar wants to be allowed to tell a jury that all of the plaintiff's *possible* exposures to asbestos during his entire life were contributing causes of the plaintiff's cancer, and, therefore, sufficient to support a finding of legal liability

as to the manufacturer of each asbestos containing product, without regard to dosage or how long ago the exposure occurred. Just because we cannot rule anything out does not mean we can rule everything in.

## 2. Legal liability must rest on proof of specific causation.

Dr. Hammar's every exposure theory is supported by certain general conclusions that are not in dispute. These are: (1) asbestos fibers, both amphibole and chrysotile, are carcinogenic, (2) the majority (+/–80%) of mesothelioma cancers are caused by asbestos exposure, (3) prolonged and large exposures to asbestos in certain types of occupations and industries (e.g., mines, shipyards) satisfy the legal requirement of "substantial contribution" to allow a jury to determine legal causation in such large-dosage cases, and (4) there is no known minimum dose of asbestos that is required to cause cancer in a human being. Indeed, the vast majority of Dr. Hammar's declaration dwells on these matters about which the parties have no dispute.

What is missing from Dr. Hammar's proposed testimony is the necessary research and data to show that Mr. Smith's six alleged exposures to asbestos based on six brake jobs in the 1960s constitutes proof of sufficient exposure to cause Mr. Smith's cancer on its own (which plaintiff has never contended) or that such exposure amounted to more than an insignificant or de minimus factor in the development of the disease that afflicted Mr. Smith forty years after those exposures.

**\*4** Dr. Hammar cites to no studies, reports, examinations, or data of any kind to show that the alleged dust that Mr. Smith allegedly breathed in during those six brake jobs was sufficient to be a contributing cause, substantial or otherwise, to the development of Mr. Smith's cancer. He points to no research or findings that even suggest that the amount of chrysotile fibers that one would expect to find in the alleged brake dust associated with those incidents would cause cancer, let alone how many of such fibers would still be carcinogenic after the brakes had been used long enough to need to be replaced. Dr. Hammar cites to no such studies because there are none.

Dr. Hammar's testimony does virtually nothing to help the trier of fact decide the allimportant question of specific causation. His opinions are based solely on his belief that he should not rule out any exposure as a contributing cause. Accordingly, with regard to the most basic purpose of Rule

702—that the expert's opinion should be helpful to the jury—Dr. Hammar's testimony fails.

Beyond the almost complete lack of facts or data to support specific causation, Dr. Hammar's testimony also appears on its face to be inconsistent. He tells us on page 4 of his declaration that "I do not believe every asbestos fiber an individual breathes into their lungs contributes to the development of mesothelioma," and on page 5 that "it is not possible to specifically identify an individual fiber from the individual's occupational, non-occupational, or bystander exposure that caused the cellular events that led to the development of mesothelioma," yet concludes his opinion on page 17 with the bold declaration that "[i]n my opinion, the information referenced in my report is sufficient for me, as a practicing pathologist to come to the specific causation determination to a reasonable degree of medical certainty that each of defendant's product [sic] was a contributing cause in the development of Mr. Smith's mesothelioma and death." Hammar Decl. at 4–5, 17

## 3. Dr. Hammar's and Plaintiff's references and citations are, for the most part, irrelevant.

In his declaration, Dr. Hammar cites to numerous scholarly studies and articles in support of his testimony. Upon even a cursory review, virtually all of these sources are either irrelevant or of little assistance to the court in providing support for the admissibility of Dr. Hammar's opinions. For the most part they only reinforce the general undisputed principles discussed above.

The same is true for the majority of plaintiff's memorandum in support of Dr. Hammar's testimony. All of the separate bullet-points from pages 6 to 14 relate to large scale exposures of asbestos in mills and plants and other work sites that have nothing in common with this case.

## 4. The scientific literature and studies that exist do not support Dr. Hammar's views.

Separate and apart from the lack of any reliable scientific methodology or data that supports Dr. Hammar's opinion, the research that has been done contradicts his point of view. Chief among these are the tests that have been conducted to determine if there is any greater incidence of mesothelioma cancers among auto mechanics than in the general population. All of these studies have shown no statistically significant difference.

**\*5** Plaintiff discounts these studies as worthless because they were funded by asbestos manufacturers, but has not shown them to be flawed or fraudulent. And perhaps more to the point, neither plaintiff nor his expert reference any studies to the contrary.

**5. Numerous courts have examined the every exposure theory and found it lacking under *Daubert* and Rule 702.** Numerous courts have examined and rejected expert testimony attempting to assert causation without assessing the dose and held the every "exposure theory" lacking under Daubert and Rule 702. These include:

*Moeller v. Garlock Sealing Technologies, LLC,* 660 F.3d 950, 952 (6th Cir.2011)

*Lindstrom v. A–C Prod. Liab. Trust,* 424 F.3d 488 (6th Cir.2005)

*Wills v. Amerada Hess Corp.,* 379 F.3d 32, 40, 53 (2d Cir.2004)

*Borg–Warner Corp. v. Flores,* 232 S.W.3d 765, 774 (Tex.2007)

*Georgia–Pac. Corp. v. Stephens,* 239 S.W.3d 304, 321 (Tex.App .2007)

*Smith v. Kelly–Moore Paint Co., Inc.,* 307 S.W.3d 829, 839 (Tex.App.2010)

*Butler v. Union Carbide Corp.,* 310 Ga.App. 21, 712 S.E.2d 537 (2011)

*Betz v. Pneumo Abex, LLC,* 44 A.3d 27, 58 (Pa.2012)

*In re Toxic Substances Cases,* A.D. 03–319, 2006 WL 2404008 (Pa.Com.Pl. Aug. 17, 2006)

This court agrees with the general assessment of these various state and federal courts that the every exposure theory does not qualify as admissible expert testimony. The *Butler* court summed up expert testimony regarding the every exposure theory accurately by stating that an expert's "any exposure theory is, at most, scientifically-grounded speculation: an untested and potentially untestable hypothesis." *Butler v. Union Carbide Corp.,* 310 Ga.App. 21, 43, 712 S.E.2d 537, 552 (2011), cert. denied (Oct. 17, 2011)

*CONCLUSION*

For the foregoing reasons, Ford Motor Company's Daubert Motion to Exclude Expert Testimony of Samuel Hammar, M.D. is GRANTED.

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 3

1
2
3
4
5
6
7
8 **SUPERIOR COURT OF THE STATE OF WASHINGTON**
**KING COUNTY**
9

10 FREE,

11            Plaintiff,              CAUSE NO. 07-2-04091-9 SEA

12      vs.                  **RULING ON MOTION IN LIMINE**
**UNDER *FRYE V. UNITED STATES***
13 AMETEK et al,

14            Defendants.

15
16
17
18 Signed this ___ day of _____, 2008.
19
20
21                Judge Suzanne M. Barnett
22
23
24 ┌─────────────────────────┐
25 │ **Exhibit F** │
26 │ **to Union Carbide** │
27 │ **Corporation's** │
28 │ **<u>Frye</u> Motion** │
29 └─────────────────────────┘

**RULING ON MOTION IN LIMINE UNDER *FRYE***

*ORIGINAL*

*Free v. Ametek*, et al., 07-2-04091-9 SEA
February 28, 2008

This is the court's ruling on motions *in limine* brought under the case of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). The issue before the court is the admissibility of testimony by certain of plaintiff's designated expert witnesses regarding the proximate cause/s of plaintiff's mesothelioma. Specifically, plaintiff's experts seek to testify that once a product is identified and exposure is established, any level of exposure greater than ambient levels or greater than 0.1 fibers per cubic centimeter of air per work-year is a substantial factor, undifferentiated and incapable of differentiation, in proximately causing plaintiff's disease.

In this case, defendant Caterpillar, Inc. ("Caterpillar") made two motions to limit or preclude testimony by plaintiff's designated experts. The first motion *in limine* seeks to preclude Dr. Carl Brodkin from testifying that every exposure to asbestos, above ambient levels, is a substantial factor in causing plaintiff's asbestos-related disease, which in Mr. Free's case is malignant mesothelioma. Caterpillar's second motion *in limine* seeks to preclude Dr. Samuel Hammar from testifying that plaintiff's asbestos exposure from any defendant's products was a substantial factor in the development of his mesothelioma. *unless* plaintiff can establish that his exposure to that defendant's product/s was greater than 0.1 fibers per cubic centimeter year ("fbrs/cc yr")[1]. Caterpillar also moved *in limine* to exclude testimony of plaintiff's experts on other grounds. The court does not deal with those specific grounds in this ruling. This ruling is an analysis under the *Frye* case only.

Defendant Cameron International Corporation[2] moved *in limine* for exclusion of testimony by Dr. Brodkin relating to marine engineering, specifically the design and function of Cameron's GND-8 engines; whether the GND-8 engines were designed for use with other systems, including exhaust systems; what Cameron knew or should have known about the installation of its engines in a particular context, specifically the methods of exhaust or the nature of exhaust systems that would or would not be attached to the engines; the varieties and methods of insulation used by the U.S. Coast Guard in 1959-60; the state of the art of burn protection measures for crew members; and whether a warning on the Cameron engine would have been useful. Cameron's attempt to limit Dr. Brodkin's testimony on these issues implicates a *Frye* analysis only to the extent Dr. Brodkin asserts that these areas are within the specialized knowledge, skill, training, and experience of an occupational medicine physician.

The court heard two and a half days of testimony and argument on the *Frye* motions. Plaintiff's challenged experts, Drs. Hammar and Brodkin, testified, as did defendants' experts, Dr. David Garabrandt, Captain Richard Silloway, USN (ret.), and Dr. Suresh

---

[1] "fbrs/cc yr" refers to the number of fibers present in ~~660~~ *one* cubic centimeter of air over a period of 8 hours per work day of exposure, for 250 work days per year.
[2] Cameron International Corporation is the successor in interest to Cooper-Bessemer, the manufacturer of the GND-8 engine at issue. For simplicity, the defendant will be referred to as "Cameron".

Moolgavkar. Caterpillar called Dr. Garabrandt, an epidemiologist who is board certified in, *inter alia*, occupational medicine, and Dr. Moolgavkar who is qualified as, *inter alia*, a biostatistician. Captain Silloway, called by Cameron, is a marine engineering expert.

### *Frye* standard

The *Frye* court probed the interstice between the "experimental and [the] demonstrable stages" of science as it relates to the admissibility of expert testimony in a court of law. The rule of *Frye*, correctly stated by counsel in this case, is that an expert's testimony on or deductions (notably, not "inductions") from science in this "twilight zone" must be based upon a principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs."[3]

Those few but dense words from the *Frye* court have spawned a generation (or two) of jurisprudence on the issue of expert scientific testimony.

Rule 702 of the Washington Rules of Evidence establishes that expert opinion testimony is admissible if an expert, qualified by "knowledge, skill, experience, training, or education" can offer "scientific, technical, or other specialized knowledge" that will "assist the trier of fact to understand the evidence or to determine a fact in issue". Notwithstanding a witness's abilities, however, Washington courts have adhered to the *Frye* test for admissibility of opinions in both civil and criminal cases.

### Dr. Samuel Hammar

Dr. Hammar is a preeminent pathologist concentrating in pulmonary pathology. He has extensive relevant training in his field and many years of clinical experience with patients presenting with asbestos-related diseases. Dr. Hammar testified that he has seen over 6,000 patients with asbestos-related diseases. He serves on an international mesothelioma review panel. He has a special interest in, and has studied, the pathology of cancers in particular. Dr. Hammar is qualified by both training and experience to testify as an expert in pulmonary pathology and asbestos-related disease.

Dr. Hammar testified, and defendants did not challenge, that mesothelioma is a "dose-response" disease, that is, that there is a positive correlation between increased concentration of exposure and risk of development of the disease. The parties also do not dispute that mesothelioma is a disease with a protracted latency, in a wide range of ten to forty years.[4] Dr. Hammar further testified that it is cumulative exposure, over the work life of the patient, that accounts for the development of mesothelioma. Once a patient develops mesothelioma it is impossible to determine which specific exposure, either by dose, type, or time, caused the disease.

Dr. Hammar did not purport to have any expertise in determining intensity of exposure in any particular setting. He did concede that some exposures are less intense than

---

[3] 293 F. at 1014.
[4] The actual range is not relevant to the issues in this case or in the *Frye* motions.

others. He further testified that chrysotile asbestos fibers have a very short half life (perhaps 90 – 180 days) and clear the lungs over time; whereas other types of asbestos fibers have a much longer, by orders of magnitude, half-life. Nonetheless, inasmuch as asbestos molecules carry no labels or tags, by the time a pathologist is studying tumor cells, there is no way to know what type of fiber or what amount of fiber initiated the cellular changes that lead to mesothelioma.

The aspects of Dr. Hammar's testimony challenged by defendants in this case are his conclusions that *1)* because mesothelioma is a dose-response disease, and because of its latency, it is undifferentiated cumulative exposures that cause the disease; and *2)* every exposure to asbestos can and should be considered a substantial factor contributing to the development of mesothelioma.

During his testimony, Dr. Hammar conceded that an exposure would have to be at a level of at least 0.1 fbrs/cc yr to be considered a contributing factor. Dr. Hammar also conceded that his opinion is a hypothesis, not a scientific conclusion. As support for his opinion, Dr. Hammar relied on various studies and regulatory analyses. The regulatory standards are not probative of scientific analysis or acceptance in the scientific community. The epidemiological studies and meta-analyses do not analyze cases of exposures at very low levels.

The assumption of some epidemiologists and practitioners in the field of asbestos-related diseases is that the risk of occurrence at low levels of exposure follows a straight line below the level of available data. This downward extrapolation of a straight line correlation between exposure and risk of development of mesothelioma is, however, not proved by empirical data. In fact, according to defendants' biostatistician, Dr. Garabrandt, just the opposite is true. Referring to the meta-analysis performed by Hodgson and Darnton,[5] he and they conclude that a straight-line correlation is not accurate for the data that are available, let alone for extrapolation to data that are not collected.[6]

Conventional wisdom is that there is no safe level of exposure to asbestos. A more accurate statement of conventional wisdom, however, would be that there is no *known* safe level of exposure, just as there is no known threshold level for causation of asbestos-related disease. Dr. Hammar's hypothesis, therefore, while persuasive in lay, "common sense" terms, is not supported by replicable, scientific methodology. While it may be *assumed* to be accurate and sufficient for purposes of connecting asbestos exposure to mesothelioma in general, the assumption that every exposure to asbestos over a life's work history, even every exposure greater than 0.1 fbrs/cc yr, is a

---

[5] J. Hodgson, A. Darnton, "The Quantitative Risks of Mesothelioma and Lung Cancer in Relation to Asbestos Exposure," 2000. At page 577, the authors note that the data are graphed as linear, but on a log scale. An actual plotting of the data points would result in a curve, not an applied straight-line.
[6] "Direct statistical confirmation of a threshold from human data is virtually impossible." "[W]e do not believe there is a good case for assuming any threshold for mesothelioma risk." Hodgson & Darnton at p.583. No threshold for risk precludes a conclusion that the same data predict a threshold for causation.

substantial factor contributing to development of an asbestos-related disease, is not a scientifically proved proposition that is generally accepted in the field of epidemiology, pulmonary pathology, or any other field relevant to this case.

There is no *known* threshold; there is no *known* safe level of exposure. That does not mean none exists; it simply means modern science has not and cannot, with current scientific expertise or relying on existing studies, determine what that level of exposure is. Dr. Hammar may not testify that any exposure at the level of 0.1 fbrs/cc yr or ~~greater~~ less is a substantial contributing factor to the development of mesothelioma.

Dr. Carl Brodkin

Dr. Brodkin is an occupational medicine physician; that is, a physician who specializes in the assessment of exposure-related diseases. His *curriculum vitae* reveal extensive knowledge, training, and experience in the field of occupational and environmental medicine. He is qualified to testify as an expert in occupational medicine.

Dr. Brodkin testified that it is generally accepted practice in the field of occupational medicine to take a careful and detailed occupational history. The conducting of the history is emphasized in training occupational and environmental medicine physicians and in their practice. He also testified that, based upon such an occupational history and certain studies evaluating the level of exposure in selected occupations, an occupational medicine physician can and does estimate the level of exposure of any particular patient. The exquisite occupational history prepared by an occupational medicine practitioner may be a generally accepted scientific practice in that field, but an occupational history of a patient cannot establish causation with regard to exposure to any specific fiber type from any specific fiber source.

At the *Frye* hearing, Dr. Brodkin repeated the opinion, now accepted in medicine and borne out by epidemiological studies of risk, that mesothelioma appears to be a dose-response disease. The epidemiological studies deal with statistical risks based on estimates of cumulative exposure over the life of the patient. As segregation of specific causes is not currently scientifically possible, physicians look upon mesothelioma as resulting from cumulative exposure.

Dr. Brodkin opined that, therefore, every biologically significant exposure to asbestos, that is, every exposure above ambient levels[7] within the latency period for mesothelioma is a proximate cause of the disease. Because medical science has only been able to determine that mesothelioma is related to cumulative exposure, Dr. Brodkin concludes that each component of that cumulative exposure is a necessary and substantial factor in development of the disease.

---

[7] Dr. Brodkin defined the public's "fresh" air as "background." He defined "ambient" levels as those that might be present in a workplace, whether or not the patient is working directly with asbestos products.

Scientific studies do clearly show that risk of developing the disease increases with increased exposure. Determination of risk in an epidemiological study is not, however, an assessment of causation in a particular case. Downward extrapolation from the studies that establish levels of risk at doses at or above 10 fbrs/cc yr is not a sound scientific methodology and is not generally accepted in the field of epidemiology or occupational medicine.

To support his opinion that every biologically significant exposure is a substantial factor contributing to or causing development of disease, Dr. Brodkin analogized a series of exposures to the chapters of a book – each chapter contributes to the whole. Alternatively, he used the bucket analogy. He opined that it doesn't matter if you add water to a bucket by the teaspoonful or by the gallon, the water in the bucket is all the same and when the bucket is full it doesn't matter how it got that way. He makes no allowance for insignificant chapters in a book, pages inserted in error by the publisher, or excess materials between the covers, such as flysheets or title pages. Further, with his bucket, he makes no allowance for the temporal effects of evaporation or condensation or the possibility of contamination or spillage.

Dr. Brodkin's analogies are not good science and they do not make good law.

Dr. Brodkin will not be permitted to testify that every biologically significant exposure to asbestos above ambient levels is an undifferentiated proximate cause of mesothelioma. We do not know, and modern science cannot tell us what a biologically significant exposure is. We cannot tell which fiber or group of fibers from which sources at what time in the life of a patient overwhelmed that patient's individual bodily defenses.

<u>Dr. Brody</u>

Dr. Brody did not testify at the *Frye* hearing, but his deposition in this case was tendered to the record. To the extent Dr. Brody would opine that "every fiber" or every undifferentiated exposure to asbestos, regardless of type, level, or time of exposure is a substantial factor in causing mesothelioma, that testimony is excluded.

<u>Conclusion</u>

In arguing the *Frye* motions in this case, plaintiff suggested that a *Frye* analysis was inapposite. Citing *Lockwood*[8], *Mavroudis*[9], and *Hue*[10], plaintiff argued that the science offered by his experts is not novel, but is rather accepted and part of the legal record in this state. In fact, none of the cases upon which plaintiff relies is the result of a *Frye* inquiry. Further, none of those cases reaches the point central to this case.

---

[8] *Lockwood v. AC & S, Inc.*, et al., 109 Wash.2d 235 (1987).
[9] *Mavroudis v. Pittsburgh-Corning Corp.*, et al., 86 Wash. App. 22 (Div. I, 1997).
[10] *Hue v. Farmboy Spray Co., Inc.*, et al., 127 Wash.2d 67 (1995).

*Lockwood,* a 1987 Supreme Court case, establishes the threshold for product identification and factors to consider in determining whether exposure is sufficient to tender the causation question to a jury. In 1997, in *Mavroudis,* Division I of the Court of Appeals altered the standard for determination of proximate cause of asbestos-related disease. In light of the apparent statistical relationship between cumulative exposure and risk of development of disease, the *Mavroudis* court determined that the "substantial factor" test should replace the "but-for" test.[11]

Plaintiffs also argued the *Hue* case, analogizing the "cloud of poison" dispersed in that case to cumulative exposures to asbestos. *Hue* is a cumulative exposure case against wheat farmers whose chemical crop dust caused harm to the downwind neighbors' plants. The *Hue* court found that it was impossible to segregate which particular chemicals in the cocktail caused the damage, as each contributed to the cloud of poison set loose by the crop duster.

*Mavroudis* acknowledged the *Hue* authority. The Court of Appeals specifically stated that

> while the substantial factor test may be unclear with regard to an *insubstantial* cause that combines with other causes to produce an injury, we need not reach that issue in this case.

86 Wash. App. at 30-31 *(emphasis in original).* The court noted that the Supreme Court, after *Hue,* might require a different instruction than the one approved in *Mavroudis,* but the Supreme Court has not spoken on the issue. It is that mystery, therefore, of what is substantial and what is insubstantial that raises the *Frye* issue in this case[12].

Plaintiff's reliance on these reported cases is insufficient. To overcome the unknown in this asbestos case, an analogy to crop dusting is not persuasive. In *Hue* the parties were unable to determine which chemical caused the damage. There was a series of chemical applications, but it was not the repetition that rendered causation undifferentiated, it was the chemical composition of each offending cloud.

In asbestos, a plaintiff is not exposed to all defendants' products simultaneously and *seriatim.* Each exposure varies by type, level, and extent. Science cannot trace the pathology of the asbestos-related disease back to "fiber X". Nor can it say at what point in the latency of the disease that fiber or group of fibers triggered cellular change in an

---

[11] *Mavroudis* addressed specifically the propriety of a substantial factor jury instruction. The instruction at issue introduced the substantial factor principle. It is important not to lose sight of the instruction at issue. The challenged jury instruction required the jury to determine that any individual cause "operating alone would have been sufficient." 86 Wash. App. at 30, n.5.

[12] *Mavroudis* cites the analogy made in W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on Torts,* § 41 (5th ed. 1984) regarding the substantial factor test of proximate cause. The substantial factor test is designed to exclude liability for insubstantial factors *("throwing a match into a forest fire").* 86 Wash.App. at 32.

individual. We do not know, for example, whether, after a hiatus or a period of low-dose exposure to a fiber with a shorter half-life, the body might heal itself, only to succumb at the next exposure.

We do not know, and science cannot tell us.

<u>Cameron</u>

Cameron filed a motion to exclude testimony by Dr. Brodkin relating to marine engineering issues. Dr. Brodkin testified that, as part of a thorough occupational history, it is generally accepted practice in the field of occupational medicine to inquire as to warnings posted for, or safety precautions taken by, the patient. To the extent Dr. Brodkin seeks to testify to this inquiry, such testimony is within his field of expertise.

The remainder of Cameron's motion is more properly characterized as a motion to exclude under ER 702. Having heard the testimony and argument, however, the court will make the following ruling.

Dr. Brodkin will not be permitted to testify as to engine design, construction, or employment. He will not be permitted to testify as to exhaust temperature levels, exhaust systems that were or were not or might have been or might not have been attached to the Cameron engines at issue in this case. He will not be permitted to testify as to what Cameron knew or should have known. He may not testify as to whether, in what way, or with what recommendations or precautions, Cameron should have affixed any warnings to its engines.

# EXHIBIT 4

2006 WL 2404008
Only the Westlaw citation is currently available.
Court of Common Pleas of
Pennsylvania, Allegheny County,
First Judicial District, Civil Trial Division.

In re: TOXIC SUBSTANCE CASES
Incorporated by reference: A. John Vogelsberger
and Freda M. Vogelsberger, his wife Plaintiffs,
v.
Owens-Illinois, Inc., et al., Defendants.
Tammie L. Cline, Administratrix of the
Estate of Michael Cline, Deceased, and
Tammie L. Cline, in her own right, Plaintiff,
v.
Pneumo Abex LLC, et al., Defendants.
Charles Simikian, Plaintiff,
v.
Pneumo Abex LLC, et al., Defendants.
Clinton M. Bahnemann and Susan
K. Bahnemann, his wife, Plaintiffs,
v.
Allied Signal, Inc., et al. Defendants.

No. A.D. 03-319.    |    No. GD
02-018135, 05-010028, 05-004662,
04-010451.    |    Aug. 17, 2006.

Opinion

**OPINION FOLLOWING FRYE HEARING**

COLVILLE, J.

**PROCEDURAL HISTORY**

 *1  In the Spring of 2005, DaimlerChrysler and Volkswagen of America filed a Global Motion for Frye Hearing requesting that this court [1] entertain arguments challenging the general acceptance of the methodologies that defendants anticipated would be asserted in support of plaintiff's experts' causation opinions against friction product manufacturers in all pending cases. Several additional friction product manufacturer defendants joined in this Motion. The challenged methodologies were those that defendants asserted were regularly and historically employed by

plaintiff's experts against friction product manufacturers in past asbestos cases. [2] These methodologies purportedly supported the opinions offered by plaintiff's experts asserting that exposure to friction products was a medical cause of asbestos-related disease in specific plaintiffs.

Because I was not satisfied that I could properly conduct a Frye challenge and analysis as to "all pending cases," I directed the lawyers from the three local law firms representing plaintiffs in asbestos cases and all lawyers representing any friction product manufacturer defendant in asbestos cases in Allegheny County, to designate "a handful of representative cases" within which specific Frye challenges might be properly raised, and resolved. [3] Once those cases were identified, this court directed plaintiffs' counsel to file expert reports related only to medical causation theories that would be relied upon by each plaintiff at trial. The expert reports were expected to identify the opinions, and the basis for the opinions anticipated to be offered by plaintiff's experts at trial, including, in particular, the opinions and methodology supporting the plaintiff's theory that exposure to friction products was a proximate cause of the plaintiff's asbestos-related disease.

In response to this direction, plaintiffs filed non-case-specific expert reports [4] offered by Dr. Maddox and Dr. Laman. In their expert reports, both Dr. Maddox and Dr. Laman offer the opinion that each plaintiff's exposure to each of the defendant's friction products was a proximate cause in the development of the plaintiff's asbestos-related disease. Ultimately, these opinions are grounded upon the proposition asserted by Drs. Maddox and Laman, that every single exposure to every asbestos product is a proximate cause of a subsequently diagnosed asbestos-related disease. Reliance upon this proposition ultimately, and necessarily, supports Dr. Maddox and Dr. Laman's opinions, (offered to a reasonable degree of medical certainty), that each of the plaintiff's exposures to each friction product was a substantial contributing factor, i.e. proximate cause, of the plaintiff's subsequently diagnosed asbestos-related disease.

**THE FRYE CHALLENGE**

Defendants challenged the general acceptance of any methodology that would support the medical causation opinions offered by Drs. Maddox and Laman in numerous respects. In the judgment of this court, however, the only

question that need be resolved for purposes of this appeal is whether Drs. Maddox and Laman's ultimate opinion-that every exposure constitutes a proximate cause of a subsequently diagnosed asbestos-related disease-is based upon generally accepted methodologies in the relevant scientific field. In my opinion, based upon the evidence of record, it is not.

### NOVELTY

**\*2** On August 17, 2005, this court entertained argument regarding the novelty of the opinions expressed by Drs. Maddox and Laman in their expert reports. Following that hearing, I concluded that the opinions offered by Drs. Maddox and Laman were, in fact, novel and that a Frye hearing was warranted.

### THE HEARING

I conducted a Frye Hearing in the four identified cases on October 17, 18, and 21 of 2005. Subsequent testimony was concluded, outside of my presence, but submitted by transcript for review, by the end of 2005. In addition, the parties agreed to submit the prior testimony of numerous witnesses from other court proceedings and many scientific papers, industrial/commercial/trade documents, governmental publications, and other papers, documents, and publications referenced and relied upon by the witnesses in support of their respective positions. In short, the testimony and scientific literature, submitted to and reviewed by this court, is voluminous.

It is appropriate to note that the legal, medical, and scientific issues raised and implicated by this *Frye* challenge have been exhaustively and capably briefed by the litigants, and are a part of this record. Any effort by me to provide greater clarity to the status of the law, medicine, or scientific consensus or disagreement on the issues involved would be in vain. As such, while this opinion is offered as a modest attempt to assist the appellate court in a meaningful review of the proceedings before this court, and also to convey to the litigants the primary and fundamental considerations of this court in arriving at its conclusion, any attempt to exhaustively describe this court's considerations would be imprudent, if not impossible.

In resolving this *Frye* challenge I have considered the testimony of the witnesses, voluminous scientific literature, and numerous legal authorities proffered in support of the plaintiffs' and the defendants' respective positions. In the end, my decision ultimately rests upon whether the plaintiffs experts' opinions were based upon methodologies utilizing discrete and specific scientific principles logically applied in a manner that can be affirmatively articulated, referenced, reviewed, and tested, and empirically verified or whether the testimony was based upon the "best estimate," the "gut instinct," or the "educated guess" of the experts. Thorough review of the transcripts and the various authorities relied upon by the plaintiffs' experts persuades me that the plaintiffs' experts' foundational opinions are based upon the latter rather than the former. [5]

### FRYE STANDARD APPLIED

Specifically, I precluded Drs. Maddox and Laman from testifying that each and every exposure to asbestos is a substantial contributing factor in the development of asbestos related disease and that the specific plaintiff's disease in this case was caused by exposure to a specific defendant's friction product. I did so because I discern no generally accepted methodology within the relevant scientific field to support those opinions. *Grady v. Frito-Lay, Inc. 839 A.2d 1038 (Pa.2003),Trach v. Fellin,* 817 A.2d 1102 (Pa.Super.2003).

### THE FOCUS ON METHODOLOGY [6]

**\*3** It is important to recognize two fundamental terms as defined by the Superior Court. The first term, methodology, is "[1] a method of research in which a problem is identified, [2] relevant data are gathered, [3] a hypothesis is formulated from these data, and [4] the hypothesis is empirically tested." *Trach,* 817 A.2d at 1113. "Empirical" is defined as "provable or verifiable by experience or experiment." *Id.* (citations omitted). A vital characteristic of the scientific method, as the Superior Court determined, consists of the "ability to test or verify a scientific experiment by a parallel experiment or other standard of comparison (control) and to replicate the experiment to expose or reduce error."

> One of the primary reasons
> we embraced the Frye test ...
> was its assurance that judges
> would be guided by scientists

when assessing the reliability of a scientific method. Given the ever-increasing complexity of scientific advances, this assurance is at least as compelling today as it was in 1977, when we decided that case. We believe now, as we did then, that requiring judges to pay deference to the conclusions of those who are in the best position to evaluate the merits of scientific theory and technique when ruling on the admissibility of scientific proof, as the Frye rule requires, is the better way of insuring that only reliable expert scientific evidence is admitted at trial.

*Grady v. Frito-Lay, Inc. 839 A.2d 1038 (Pa.2003)* (citations omitted)

### THE UBIQUITY OF ASBESTOS [7]

Asbestos is everywhere. Everyone is exposed to asbestos. Everyone has asbestos in his or her lungs. Individuals without specific occupational exposure to asbestos can be expected to have hundreds of thousands of asbestos fibers in their lungs. Asbestos is in the air. It comes from a multitude of products which are incorporated everywhere into modern life. Asbestos occurs naturally in the ground and is naturally released from rock outcroppings. Humans would be exposed to asbestos even if it had never been incorporated into industrial products.

This exposure, to which every human being is subjected, is often, and alternatively, referred to as "background exposure" or "ambient exposure". For instance, experts suggest that the average ambient exposure in Pittsburgh is approximately .0001 fibers per milliliter of air. Consistent with this exposure, one would expect to find, on average, one fiber of asbestos in every 10 liters of air on every street corner in Pittsburgh. No one, including the plaintiff's experts, proffers an opinion that this level of exposure creates an increased risk of the development of any asbestos-related disease. Accordingly, this background or ambient exposure is simply not sufficient to allow experts to causally attribute asbestos-related disease to it. Everyone, including

the plaintiff's experts, agrees that something greater is required. The argument in this *Frye* challenge, in part, revolves around the question of how much greater quantity of exposure is necessary to permit the causal attribution of an asbestos-related disease to a particular asbestos exposure.

### GENERAL AND SPECIFIC CAUSATION

**\*4** The ultimate question to be resolved is whether the opinions offered by Drs. Maddox and Laman are supported by generally accepted methodologies within the relevant scientific fields. The specific opinion, whose supporting methodology is being questioned, is that the asbestos related disease suffered by the specific plaintiff[s] in this case was proximately caused by exposure to a specific friction product manufactured by a specific defendant. This opinion ultimately rests upon the proposition and opinion that each and every exposure to the defendant's friction products constituted a proximate cause of the specific plaintiff's subsequently diagnosed asbestos-related disease.

In order to meet their burden plaintiffs must offer evidence, (presumably in the form of expert medical testimony), from which a jury can reasonably find or infer that *the specific plaintiff involved in this case* was, *in fact,* proximately caused to develop an asbestos-related disease as a result of the plaintiff's inhalation of fibers shed from a specific friction product of the defendant.

Of course, there is no direct, (i.e observational), evidence of this, and no direct evidence can be plausibly expected. Such evidence is simply not practically available because of restrictions on human capacities for observation and knowledge. It is, as a practical fact, impossible to follow a single fiber shed from a specific defendant's product into the airway of a specific plaintiff, and watch it interact with the biological structures of the human body, and thereby cause a disease. Accordingly, the plaintiffs must rely upon expert medical opinion testimony to develop evidence from which a jury can reasonably infer that *the plaintiff in this case* was, *in fact,* caused to be injured by a specific defendant's product. [8]

Drs. Maddox and Laman begin by stating their opinion on the question of general causation-that all asbestos fibers can potentially cause disease. [9] This opinion, standing alone, is not sufficient evidence from which a jury can reasonably find or infer proof of specific causation, i.e. that the plaintiff in this case was, in fact, caused to develop asbestos-related

disease as a result of exposure to a specific defendant's friction product.

**CASE REPORTS**

Plaintiff's counsel has repeatedly assured this court that they do not proffer the opinions of Drs. Maddox and Laman as supported by case reports alone, but argue that other generally accepted methodologies support their experts' opinions. Notwithstanding this assurance, plaintiff's counsel has also repeatedly suggested that reliance upon case reports of brake/auto repairmen suffering from asbestos related disease is one "arrow in the quiver" of their expert's generally accepted methodology. In this respect a word or two regarding case reports is warranted.

Case reports are nothing more than reports by other physicians and professionals confirming the development of a disease in an individual patient with additional information about that patient. For instance: "John Doe, male, 6ft 7 in., 78lbs, smoker, coffee drinker, astronaut, and Socialist is diagnosed with lung cancer." constitutes, an admittedly sketchy, case report. Case reports can be valuable because as they grow in number, physicians can begin to develop hypotheses regarding the correlations and associations between the disease and other known factors. If many people who develop lung cancer are smokers, a hypothesis that smoking causes lung cancer may be generated. But the development of this hypothesis alone is not a generally accepted methodology that would support the opinion that smoking actually causes cancer-or, more importantly, that smoking caused a specific plaintiff's cancer, until the hypothesis is tested and validated through the scientific method that requires repeatable, testable verification. Utilizing an unverified hypothesis to support a causal attribution opinion is not generally accepted methodology.

 **\*5** The reason case reports (even multiple case reports) cannot, alone, support a causal attribution opinion is because they only report associations-not causal correlations. Sometimes an association exists because there is a causal correlation. Sometimes associations exist because there is a coincidence, and nothing more. If, for instance, we learned that several case reports, like that of our "John Doe" above, were being reported we might conjecture that any of a number of habits, conditions, and beliefs: being male, very thin, a smoker, a coffee drinker, an astronaut, and a Socialist cause

lung cancer-and while our conjecture would be supported by several associations-we would be wrong in most instances.

Of course, other diagnostic criteria might assist us-for instance, we could rule out "being a Socialist" as a cause because of an absence of a biologically viable mechanism to support the hypothesis that "being a Socialist" causes lung cancer. Of course, we would continue to conjecture that the other attributes were causal, and we would be wrong. Additional study may identify anomalies in the statistical data, such as inadequate representation of a specific group, requiring the removal of another attribute-say "being an astronaut". Additional case reports balancing out early aberrational results may demonstrate that "being male" and "being very thin" really are not associated after all.

In the end, after review of countless case reports we would be left with the situation, as it appears to actually be today-there are significant associations between coffee drinking and lung cancer, and between smoking and lung cancer. If we relied solely upon the case reports we would quite likely conjecture that both smoking and coffee drinking cause lung cancer-and we would be wrong. We would be wrong because only one is a causal correlation-smoking causes lung cancer. In spite of all the case reports that suggest a connection between coffee drinking and lung cancer, the connection is only a coincidental association-coffee drinking does not cause lung cancer. [10] We would have been wrong not because science failed us, but because we failed science. We would have been wrong because we failed to utilize the scientific method to distinguish a coincidental association from a causal correlation. Importantly, for our purposes in this *Frye* challenge, our failure to use the scientific method renders our errant causal attribution opinion inconsistent with generally accepted methodology within the relevant scientific field. For this reason, our errant opinion, and underlying methodology, would not have (and should not have) survived a *Frye* challenge.

The scientific method's requirement of empirical verification saves us from the peril of confusing "coincidental association" with "causal correlation". Case reports alone, or in conjunction with other methodology short of empirical verification, do not meaningfully support the plaintiff's expert's opinions.

**DOSE RESPONSE CURVE**

**\*6** Next, Drs. Maddox and Laman state their reliance upon the generally accepted consensus, (if not fact), that all asbestos-related diseases are, at least in some respects, (i.e. at high levels of exposure, or "high dose" exposures [11]) subject to a dose-response curve. That is to say that (at high dose exposures), greater amounts of asbestos fibers inhaled into the lungs or other biological structures and retained there, in some manner, correlates to a greater probability of developing an asbestos-related disease. Given the applicability of a dose response curve, one can reasonably assume, all other things being equal, that the greater asbestos exposure and retention an individual experiences, the greater the likelihood of his or her developing a disease. The question that is not addressed anywhere by Drs. Maddox and Laman is how they properly arrive at the conclusion that a dose response curve is applicable to the specific plaintiff before the court.

### KNOWN DOSE REPONSE CURVES APPLICABLE TO HIGH DOSE EXPOSURE SHOULD NOT BE APPLIED TO LOW DOSE EXPOSURES WITHOUT THE SUPPORT OF GENERALLY ACCEPTED METHODOLOGIES.

Drs. Maddox and Laman do not rely, in any respect, upon any actual quantity or quality of exposure suffered by any specific plaintiff, but rather, conclude that if the evidence supports a single exposure, then causation can be opined and asserted. [12] Accordingly, Drs. Maddox and Laman are required to assert that an asbestos-related disease dose response curve applies even where there is a vanishingly small exposure. I have been unable to find, and I do not believe that Drs. Maddox or Laman, or any other witness or authority offered on behalf of the plaintiffs has offered any generally accepted methodology to support this proposition.

Asbestos exposure dose response rates have been studied and are the subject of a considerable volume of medical literature in the cases of high-dose exposures. In some trades, [13] much is known about the quantity and quality of asbestos fibers in the air during traditional work practices. Mathematical calculations can plausibly, if not ably, support reasonable assumptions about the amount of fibers inhaled by workers engaging in such traditional work practices. These values can then be correlated against the known incidence of a particular asbestos related disease within such worker populations. With appropriate adjustments for statistical and empirical error one can then, in turn, generate a reasonably reliable dose response

curve. Such dose response curves have been generated for high dose exposures. I accept that dose response curves for high dose exposure do demonstrate an increased likelihood of disease with an increased dose of asbestos exposure. Dose response curves, based upon generally accepted scientific methodology, for "low dose" exposures, however, simply do not exist. [14]

Accordingly, in order to apply known dose response curves for high dose exposures to low dose exposures Maddox and Laman must "extrapolate down" from the premise that "exposure to large amounts of asbestos can cause disease" to the conclusion that "exposure to small amounts of asbestos can cause disease."

**\*7** The plaintiffs assert that Drs. Maddox and Laman are properly extrapolating from known facts and generally accepted scientific principles (i.e. known dose response curves for high dose asbestos exposure). Beginning with this generally accepted scientific principle, i.e. high dose exposure to asbestos may cause disease (and if high enough may be reasonably inferred to be the cause of a specific plaintiff's subsequently diagnosed asbestos related disease), Drs. Maddox and Laman attempt to "extrapolate down" reasoning that if high dose exposure is bad for you, then surely low dose exposure (indeed, no matter how low) must still be bad for you. In this regard, Drs. Maddox and Laman's argument and analysis encounters a simple logical error.

While it may be a valid assertion that: if high dose asbestos exposure is bad for you, then low dose asbestos exposure may *potentially* be bad for you; it is not a valid assertion that because high dose exposure to asbestos is bad for you, then low dose exposure to asbestos is, *in fact,* bad for you, or that a specific plaintiff's exposure at an unknown low dose exposure level, in fact, contributed to that plaintiff's asbestos-related disease.

The fallacy of the "extrapolation down" argument is plainly illustrated by common sense and common experience. Large amounts of alcohol can intoxicate, larger amounts can kill; a very small amount, however, can do neither. Large amounts of nitroglycerine or arsenic can injure, larger amounts can kill; small amounts, however, are medicinal. Great volumes of water may be harmful, greater volumes or an extended absence of water can be lethal; moderate amounts of water, however, are healthful. In short, the poison is in the dose. [15]

Plaintiffs cite *Trach v. Fellin,* 817 A.2d 1102 (Pa. Super 2003) to support the extrapolation analysis employed by Drs. Maddox and Laman. But *Trach* did not involve "extrapolation down;" rather it utilized "extrapolation up," or perhaps more precisely: "extrapolation away from the chemical norm."

*Trach* allowed a physician to opine that, where it was a generally accepted principle that exposure to known heightened dosages of Bendectin could cause certain birth defects, exposure to grossly higher levels of Bendectin could be reasonably anticipated to cause other adverse effects. *Trach* tells us what we understand common-sensibly, that when science knows that a certain deviation from a body's chemical norm causes harm, then a greater deviation from a body's chemical norm can be reasonably expected to cause increased harm (i.e. "extrapolation up"). What *Trach* does not say is that where it is known that a certain deviation from a body's chemical norm causes harm, a lesser deviation from a body's chemical norm can be similarly presumed to cause harm (i.e. "extrapolation down").

Employing an exaggerated example, while admittedly absurd, nonetheless, illustrates the point. If it is accepted by medical science that forcing an individual to drink 100 cups of water within an hour will have adverse effects upon his or her physical well-being, it is not unreasonable to offer medical opinion that forcing a person to drink 200 cups of water within one hour, will likewise cause ill effects; and moreover, may be predictably expected to cause even greater ill effects upon his or her well-being. However, it is not reasonable to "extrapolate down" from the known scientific fact that forcing a person to drink 100 cups of water within one hour can cause ill effects to the conclusion that forcing a person to drink 3 cups of water within an hour will cause ill effects upon his or her well-being. [16] The reasons for this conclusion are obvious, the human body may be able to tolerate or in some manner accommodate a small deviation from its chemical or biological norm, but greater deviations it cannot.

 **\*8** Moreover, there may be limitations to the appropriate and responsible utilization of "extrapolation up" by experts in Pennsylvania courts. In *Vinitski v. Adler,* 2005 W.L. 984497 (Pa.Super 2005), a memorandum decision, the Superior Court discussed the limitations of extrapolation under *Trach* stating:

> According to appellants such extrapolation [up] is allowed under Trach v. Fellin 817 A.2d 1102 (Pa.Super.2003) This is however a misreading of our opinion.

The current appeal is a far cry from *Trach.* Here, Dr. Breggin wishes to start at the principle that Valium causes short-term and acute dementia and arrive, somehow, at the conclusion that long-term Valium use causes permanent frontal lobe brain damage. Yet, this is not logical; one cannot view the temporary effects a drug has on the brain and then leap to the conclusion that these temporary effects become permanent and, indeed much worse, with repeated exposures. This is not extrapolation, it is merely a biased guess.

Thus, we agree with the trial judge: Dr. Breggin's methodologies do not proceed scientifically to his stated conclusion. As such, Frye prohibits his testimony as an expert.

*Vinitski,* 2005 WL 984497 (Pa.Super.), at page 3. [17]

As such, the rationale employed in *Vinitski* recognizes the limitations to extrapolation even where the extrapolation involves extrapolation away from the normal body conditions as opposed to "extrapolating downward" toward more normal body conditions.

Generally accepted scientific methodology may well establish that certain "high dose" asbestos exposure causes, or contributes to, a specific hypothetical plaintiff's disease, but the plaintiffs have not proffered any generally accepted methodology to support the contention that a single exposure or an otherwise vanishingly small exposure has, in fact, in any case, ever caused or contributed to any specific individual's disease, or even less so, that in this case such a small exposure did, in fact, contribute to this specific plaintiff's disease.

## A SAFE LEVEL OF EXPOSURE?

Plaintiffs counsel has repeatedly argued and solicited testimony and admissions that "there is no safe level of exposure to asbestos ." This assertion, while in one manner of speaking not necessarily inaccurate, implicitly suggests a placement of the burden of proof with the wrong party and tends to misdirect the fundamental inquiry.

First, the plaintiffs are required to demonstrate that generally accepted methodology within the relevant scientific field supports their proffered expert opinions that low dose asbestos exposure causes disease generally and in the specific plaintiff before the court. The defendants do not maintain a

burden of proving the contrary or that "there is a safe level of asbestos exposure".

Second, when considered in context, all expert witnesses who have agreed with the statement that "there is no safe level of asbestos exposure" have done so to the extent that they agree that there is no *known* safe level of exposure. This is an important distinction. There may, or there may not, be an actual safe level of asbestos exposure. The critical point for my purpose is that, at present, whether there is (or is not) a safe level of asbestos exposure is currently unknown utilizing generally accepted scientific methodology.

 **\*9**  So, while it may be accurate that there is no competent evidence in this record that supports the position that medical science has confirmed, or can support a reasonable inference that, there exists a safe "low dose" level of exposure to asbestos;[18] it is likewise accurate that there is no competent evidence in this record that supports the contention that medical science is able to confirm, or otherwise support a reasonable inference, that each and every exposure to asbestos contributes to a subsequently diagnosed asbestos-related disease. Finally, there is no competent evidence in this record that supports the conclusion that the quality and quantity of the exposure[s] that a jury might reasonably find or infer that the plaintiff[s] in this case experienced while performing occupational duties with and around friction products, caused or in any way contributed to the development or progression of this plaintiff's asbestos-related disease.[19]

Parenthetically, some members of the Superior Court have offered guidance (albeit in dicta) on the question of whether a vanishingly small exposure may be reasonably found to be a substantial contributing factor to a plaintiff's illness. In an evenly split *en banc* decision, the Superior Court's Opinion in Support of Affirmance in *Summers v. Certainteed Corporation, et al.,* 886 A.2d 240, stated:

> Just because a hired expert makes a legal conclusion does not mean that a trial judge has to adopt it, if it is not supported by the record and is devoid of common sense. For example, Dr. Gelfand used the prhrase, "each and every exposure to asbestos has been a substantial contributing factor to the abnormalities noted." However, suppose an expert said, "that if one took a bucket of water and dumped it in the ocean, that was a 'substantial contributing factor' to the size of the ocean. Dr. Gelfand's statement saying every breath is a "substantial contributing factor" is not accurate. If someone walks past a mechanic changing brakes, he or she is exposed to asbestos. If that person worked for thirty years at an asbestos factory making lagging, it can hardly be said that the one whiff of the asbestos from the brakes is a "substantial" factor in causing disease.

*Summers,* Opinion in Support of Affirmance, 886 A.2d at 244.

Generally accepted scientific methodology is not able to demonstrate what effect low dose exposures have upon the body. While there plainly exists anecdotal suspicion that each and every exposure to asbestos fibers *might,* potentially, possibly, contribute to an asbestos-related disease; such anecdotal suspicions are, in my judgment, a far cry from the quantum and quality of evidence necessary to present expert opinion testimony to juries in Pennsylvania.

### PROOF OF "INCREASED RISK" DOES NOT ESTABLISH CAUSATION

It is black-letter law in Pennsylvania that causation in a product liability case requires actual causation and injury, not simply the increase of risk of injury to the plaintiff. In E*ckenrod v. GAF Corp.,* 544 A.2d 50 (Pa.Super 1988), the Superior Court stated: "In order for liability to attach in a product liability action, Plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier.... Summary Judgment is proper when the Plaintiff has failed to establish that the Defendants' products were the cause of Plaintiff's injury." *Eckenrod,* at 52.

 **\*10**  In order to be admissible, an expert's opinion, attributing an illness to a specific cause, must be made with the requisite degree of certainty, as stated in *McMahon v. Young,* 276 A.2d 534 (Pa.1971):

> (T)he expert has to testify, not that the condition of claimant might have, or even probably did, come from the accident, but in his professional opinion the result in question came from the cause alleged. A less direct expression of opinion falls below the required standard of proof, and does not constitute legally competent evidence. (citing cases).

> The issue is not merely one of semantics. There is a logical reason for the rule. The opinion of a medical expert is evidence. If the fact finder chooses to believe it, he can find as a fact what the expert gave as an

opinion. For a fact finder to award damages for a particular condition to a Plaintiff, it must find as a fact that that condition was legally caused by the Defendant's conduct. Here, the only evidence offered was it was 'probably' caused, and that is not good enough. Perhaps in the world of medicine nothing is absolutely certain. Nevertheless, doctors must make decisions in their own profession every day based on their own expert opinions. Physicians must understand that it is the intent of our law that if the Plaintiff's medical expert cannot form an opinion with sufficient certainty so as to make a medical judgment, there is nothing on the record with which a jury can make a decision with sufficient certainty so as to make a legal judgment.

*McMahon,* 276 A.2d at 535, citing *Menarde v. Philadelphia Trans. Company,* 103 A.2d 681 (Pa.1954).

In *Checchio v. Frankford Hospital-Torresdale Division,* 717 A.2d 1058(Pa.Super.1998) (implicitly overruled on other grounds), the Superior Court addressed the general acceptance of the methodologies proffered to support expert opinions causally attributing a two-year-old's cognitive deficits to negligent medical treatment rendered in response to respiratory distress immediately following the child's birth. The *Checchio* court stated:

> The crux of [Plaintiff's] argument and the logical construct on which their case is grounded begins with the major premise that a lack of oxygen and blood flow to the brain can cause neurologic damage. Daniel suffers neurologic damage, the argument proceeds therefore the damage must have been caused by oxygen deprivation. The corollary to this conclusion is that 'the damage may manifest itself in a severe mental retardation, developmental delay, and autistic like behavior exhibited by Daniel Checchio.'

*Checchio,* 717 A.2d at 1060.*Checchio* goes on to state:

> [Plaintiffs] argue that these opinions are sufficient to satisfy *Frye* because '[i]t is a well established fact in the medical community that a lack of oxygen to the brain will eventually cause hypoxia and if severe and prolonged enough it will result in acidosis and eventual death of the brain tissue.' ... While this may well be true, it does not explain whether the specific condition from which Daniel suffers is the result of brain tissue death or some other cause, ...

**\*11** Nor, again, even accepting the validity of [Plaintiff's] major premise, does it serve to connect the autistic tendencies with the brain injury. There is no testimony, and no evidence of any other sort, to the effect that such tendencies always occur in conjunction with hypoxic brain damage, or indeed with mental retardation. Appellants themselves assert somewhat tentatively that the neurologic dysfunction allegedly caused by the putative hypoxia may cause the condition exhibited by Daniel ...; they paraphrase their own experts, who are actually more positive in their assessment, as asserting that 'a lack of oxygen can cause brain damage' (emphasis added). No authority, statistical or otherwise is offered on these points.

*Checchio,* 717 A.2d at 1061 (emphasis in original). As in *Checchio,* so it is in this case that, the Plaintiff's experts do not offer support or methodology other than their subjective belief that each and every breath of asbestos causes or substantially contributes to the disease process suffered by the Plaintiff.

While it is true that Drs. Maddox and Laman do not materially equivocate with regard to the certainty of their professional opinion, they offer not a shred of independent corroboration of their opinion that each and every fiber causes or contributes to a Plaintiff's disease process. To the extent that it is suggested that these wholly unsupported assertions might be more fairly interpreted as simply a statement that each and every inhalation of asbestos fibers *increase the risk* or *probability* of the Plaintiff suffering from asbestos-related disease or every inhalation might *possibly* cause or contribute to the Plaintiff's disease, such opinions proffered in support of the causation prong of the Plaintiff's claim are simply not admissible under the principles of *Menarde,* and *McMahon.*

### THE EXISTENCE OF THE DISEASE COUPLED WITH EXPOSURE HISTORY ALONE SHOULD NOT BE PERMITTED TO ESTABLISH CASUATION WITHOUT GENERALLY ACCEPTED METHODOLOGIES TO SUPPORT THE ATTRIBUTION.

Plaintiffs, at times, seem to implicitly assert that the mere existence of the asbestos-related disease [20] coupled with the allegation (or proof) of exposure to the defendant's product can support a finding of causation. This argument is without

merit. Demonstration of the lack of merit is dependent upon the disease process involved.

In the case of mesothelioma, while I recognize that there exists a consensus in the scientific community that mesothelioma *may* be caused by asbestos exposure levels far less than those necessary to cause asbestosis or pleural fibrosis, [21] both Drs. Maddox and Laman (as well as all of the defendants' witnesses) recognize that the probability of development of mesothelioma is particular to the individual. They recognize that many individuals with the same level of exposure (whether below, at, or above normal background levels [22]) will not develop mesothelioma. Not surprisingly, some people exposed to the same level of asbestos will develop asbestos-caused mesothelioma, while others will not; and others may not develop asbestos-caused mesothelioma at even much greater levels of exposure.

**\*12** All of the witnesses, including Drs. Maddox and Laman acknowledge that a certain percentage of mesotheliomas are idiopathic. The phrase "idiopathic" is intended to describe diseases that develop without a known, or attributable, cause. Presumptively, an idiopathic mesothelioma can develop, whatever its cause, in an individual with no asbestos exposure, normal background level asbestos exposure, or greatly heightened asbestos exposure. Estimates of the incidence of idiopathic mesothelioma range from 6% to 20 % of all reported mesotheliomas. [23] Presumably, because of the possibility of an idiopathic mesothelioma, which can occur even in the absence of asbestos exposure, both Drs. Maddox and Laman reserve their attribution of mesothelioma to asbestos exposure only where there is evidence that the plaintiff has experienced an increased exposure to asbestos over the normal background levels. [24]

But Drs. Maddox and Laman still never satisfactorily answer the question of how they can distinguish an idiopathic mesothelioma that would have occurred in a given plaintiff regardless of his lifetime asbestos exposure (whether non-existent, average or high) from a purportedly "asbestos-caused mesothelioma" in an individual with, at best, modestly increased lifetime asbestos exposure. [25] Moreover, even where it is conceded that a mesothelioma was caused by asbestos exposure generally, neither Maddox nor Laman ever addresses how it is that they can determine that it was exposure to a specific defendant's friction product that caused a plaintiff's mesothelioma and not some other asbestos exposure that independently caused the mesothelioma.

Where the plaintiff suffers from asbestosis or some form of pleural fibrosis, the experts generally acknowledge that these disease processes are caused by exposure to asbestos generally. What remains contested is whether or not the exposure to a specific friction product was the cause of (or contributor to) these asbestos-caused diseases. Because, as discussed earlier, certain unknown factors related to "low dose" exposures exist within the realm of known medical science, including whether "low dose" exposures contribute at all to asbestosis or pleural fibrosis and, if so, to what degree and under what conditions, Drs. Maddox and Laman do not offer an opinion based upon generally accepted methodologies that the plaintiff's low dose exposures to a specific defendant's friction products was a substantial contributing factor to his or her asbestos-related disease.

### PLAINTIFFS DO NOT RELY UPON BIOLOGICAL FINDINGS TO SUPPORT THEIR CLAIMS AGAINST ANY PARTICULAR DEFENDANT

Numerous studies have been conducted that determine the amount of fibers that have been retained within different biological structures of individuals with known asbestos-related exposure and/or disease. Accordingly, reliable information is available to the relevant scientific communities regarding the quantity and quality of fibers retained in biological structures of individuals exposed to asbestos who subsequently develop asbestos related disease. In some instances, where statistically significant high fiber loads are recognized, a medical consensus (or at least generally accepted methodologies) exist to support an opinion causally attributing an individual's asbestos-related disease to asbestos exposure. [26] There are no "fiber load" findings relied upon by the plaintiffs experts in this case.

### PLAINTIFFS DO NOT RELY UPON QUANTITATIVE EVIDENCE OF OCCUPATIONAL HIGH DOSE EXPOSURE TO SUPPORT THEIR CLAIMS AGAINST ANY PARTICULAR DEFENDANT

**\*13** Neither Dr. Maddox, nor Dr. Laman attempts to meaningfully quantify the actual or even approximate amount of plaintiff's occupational, or other, asbestos exposure in this case. Nor do they attempt to meaningfully quantify the exposure directly attributable to a specific defendant's friction

product. Moreover, nowhere do they attempt to delineate a threshold exposure, or even a potential range for a threshold exposure, (i.e. over which they would attribute a specific exposure and under which they would not attribute a specific exposure as a cause of an asbestos related disease), other than to simply indicate that if there was a single exposure to a defendant's asbestos containing product, then the plaintiff's disease can be causally attributed to that exposure. Drs. Maddox and Laman do not, however, offer any methodology other than those addressed above to support that conclusion.

## A DIFFERENT RESULT MAY BE WARRANTED WHERE PLAINTIFFS EXPERTS' OPINIONS ARE BASED UPON GENERALLY ACCEPTED METHODOLOGIES UTILIZING BIOLOGICAL FINDINGS OR OTHER QUANTITATIVE EVIDENCE OF ACTUAL HIGH DOSE EXPOSURE.

Armed with quantitative information from biological samples reflecting statistically significant higher fiber loads within the plaintiff's biological structures, or quantitative evidence of statistically significant actual high dose asbestos exposure the scientific community can, in some instances, utilize generally accepted methodologies to causally attribute an asbestos-related disease to a known quantity of high dose asbestos exposure. From this data, the relevant scientific communities have developed some understanding and appreciation for the fact that given a certain quantity and quality of exposure to a particular asbestos-containing product, a fair inference can be drawn that that product contributed to an asbestos-related disease. Precisely what quality and quantity of exposure is necessary is the subject of honest debate within the relevant scientific communities.

Where the debate falls silent, however, is in the area of low-dose exposures or where, as here, there exists no quantitative evidence of either actual occupational exposure or biological samples from which causal attribution can be reasonably inferred. Frankly, because such low-dose exposures do not, as strongly, correlate to asbestos-related disease, there is less, and in some instances, no information available to scientific inquirers regarding whether low-level asbestos exposure, in fact, contributes to an asbestos related disease.

Accordingly, while Drs. Maddox and Laman's opinions regarding medical causation of asbestos-related diseases in large-dose scenarios are supported by the medical literature (and, in fact, are perhaps a consensus opinion among medical experts), what is neither equally the subject of a medical consensus, nor even supportable by generally accepted methodology is the opinion that low-dose asbestos exposures are causative of asbestos-related diseases generally, let alone in this specific plaintiff. There is no medical authority or generally accepted methodology that would support the conclusion that low-dose exposures cause asbestos-related disease generally, let alone the rather extraordinary assertions by Drs. Maddox and Laman that "each and every exposure" substantially contributed to this specific plaintiff's disease process. It is in this regard, that this court ultimately concludes, that Dr. Maddox's and Dr. Laman's methodology is fundamentally flawed and not generally accepted by the relevant scientific community.

## THIS RULING IS BASED UPON INADEQUACIES IN THE PLAINTIFF'S EXPERTS' METHODOLOGIES, NOT UPON THE PROFFERED MERIT OF DEFENDANTS' EPIDEMIOLOGICAL STUDIES, OR OTHER EXPLANATIONS FOR WHY "FRICTION PRODUCTS ARE DIFFERENT."

 **\*14** Much of the *Frye* hearing addressed the defendants' argument that there exist numerous plausible explanations for why exposure to friction products (i.e. brakes and clutches generally) does not, in fact, contribute to the development of asbestos-related disease. These arguments centered upon the assertions that 1) fibers shed from friction products are chemically altered during use so as to render them biologically inactive and harmless, 2) that those fibers that are not so altered are too small to contribute to the disease process, and 3) that traditional work place asbestos exposures for individuals who work with friction products, (i.e. brake/auto mechanics) are not adequate levels of exposure to meaningfully contribute to asbestos-related disease. Moreover, the defendants rely upon proffered epidemiological studies to statistically support their contention that occupational exposure to friction products does not substantially contribute to asbestos-related disease.

While this evidence is academically interesting and satisfies a certain degree of curiosity as to why friction products might appear to cause (or not cause) disease differently than other asbestos-related products, this evidence does not, in my judgment materially support the defendants' Frye challenge. Specifically, I do not hold that the expert opinions explaining "why friction products are different" or the epidemiological evidence offered by the defendants in this case, in any

manner, "trumps" the plaintiff's evidence,[27] or that the Plaintiffs are required to proffer epidemiological evidence in support of their medical causation opinion.

The defendants assert that where an opinion (such as Drs. Maddox and Laman's) relies fundamentally upon case reports and extrapolation from known facts, it can be properly argued that the opinion is no longer generally accepted by the relevant scientific community where, as a function of the advance of scientific knowledge, stronger, more conclusive, evidence is now available in the form of epidemiological studies.[28] Frankly, the attempt to focus upon the defendants' epidemiological evidence and other explanations for "why friction products are different" is simply improper.[29] The focus of this court should be, and has been, upon what methodologies were utilized by Drs. Maddox and Laman, and whether those methodologies support the conclusions proffered by Drs. Maddox and Laman and whether those methodologies are, in fact, generally accepted within the relevant scientific fields.

### *SMALLS* AND *ANDALARO*

Of particular concern to me is that my ruling on this Frye challenge may appear, facially, to be at odds with the ruling of the Superior Court in *Smalls v. Pittsburgh Coming, et al.* 2004 PA Super 31, 843 A.2d 410 (Pa.Super.2004). Because of this concern, I set forth the relevant language of *Smalls* in its entirety:

> Next, Appellant asserts that the trial court erred in allowing Dr. Richard Katz, Appellees' expert, to testify as follows: "Each and every breath of asbestos fibers is [a] significant and substantial contributing factor to the asbestos related disease that Mr. Smalls has." N.T. Trial, 12/4/01, at 32. Appellant argues that the opinion was inadmissible because it had no basis in fact nor general acceptance in the scientific community. We disagree.
>
>  **\*15** Again, we observe that the admission or exclusion of evidence is within the discretion of the trial court, and it will not be reversed absent a manifest abuse of that discretion. *Eichman, supra.* As we previously have held that this type of opinion evidence is not only admissible, it is sufficient to demonstrate a *prima facie* case of liability against an asbestos manufacturer if believed by the fact finder, see *Junge v. Garlock Inc.,* 427 Pa.Super 592, 629 A.2d 1027 (1993), the trial court's decision to admit the

statement was not tantamount to an abuse of discretion. Moreover, we observe that Dr. Katz is certified by the American Board of Medical Specialties in pulmonary disease, and his experience and expertise is sufficient to testify about the relationship between breathing asbestos and the development of asbestos-related diseases.

*Smalls,* 843 A.2d at 414. I have considered *Smalls,* and I have earnestly attempted to comply with any mandates that may be set forth within it.

Initially it should be noted that it does not appear from the Superior Court's decision in the *Smalls* case that the trial court actually conducted a *Frye* hearing. Accordingly, the trial court may have simply concluded that the proffered expert testimony was not novel, and a *Frye* hearing not necessary. Moreover, although the Superior Court does not disapprove of the trial court's failure to sustain a *Frye* objection to the testimony by plaintiff's expert that: "Each and every breath of asbestos fibers is [a] significant and substantial contributing factor to the asbestos-related disease that [plaintiff] has." The Superior Court provides no analysis of why such an expert opinion is, in fact, generally accepted in the relevant scientific community, and cites no facts of record that could plausibly support such a conclusion.

To the extent the Superior Court provides an analysis, it does so in the following paragraph where it indicates that a trial court's decision to exclude evidence is within the trial court's discretion, and that opinion evidence of the type offered in *Smalls* has been held to be admissible and sufficient to demonstrate a *prima facia* case of liability. The Superior Court cites *Junge v. Garlock, Inc.* in support of this final proposition, but fails to note that the *Junge* case did not involve a Frye challenge.

Accordingly, while the specific language set forth in *Smalls* is heavily relied upon by the plaintiffs; and it is true that that language, standing alone, could conceivably support the assertion that the Superior Court has explicitly taken judicial notice that there is general acceptance in the scientific community that: "Each and every breath of asbestos fibers is [a] significant and substantial contributing factor to the asbestos-related disease that the [plaintiff] has," this court simply cannot bring itself to conclude that that was the intent of the Superior Court in *Smalls.*

 **\*16** First, and most significantly, the focus of a Frye challenge in Pennsylvania is not on the general acceptance of the *opinion* proffered, but rather on the general acceptance

of the *methodology* underlying the opinion. No consideration of the methodology supporting the proffered opinion in *Smalls* was ever undertaken. If the *Smalls* holding was intended as suggested by the plaintiffs (i.e. a declaration that Pennsylvania courts have recognized that the opinion: "Each and every breath of asbestos fibers is [a] significant and substantial contributing factor to the asbestos-related disease that the [plaintiff] has" enjoys general acceptance within the relevant scientific field) then the Superior Court's analysis in *Smalls* would have improperly focused on the irrelevant question of whether there existed general acceptance of the *opinion* of the expert and not on the proper inquiry of whether there is general acceptance of the *methodology* underlying that opinion. I do not conclude that the *Smalls* court intended to so focus its analysis and ruling.

Second, if interpreted as suggested by plaintiffs, *Smalls* would constitute a judicial decree potentially usurping the collective expertise of the medical/scientific community regardless of the actual general acceptance (or lack thereof), within the relevant scientific field, of whatever methodologies, (whether sound or wholly preposterous) that may have been proffered in support of the expert's opinion in *Smalls,* without a moment's substantive consideration. I plainly cannot conclude that this was the intent of the *Smalls* Court.

Rather, I interpret *Smalls* to simply indicate that where a trial court, within its discretion, does not determine that proffered expert testimony is novel, and then concludes that such testimony is admissible, the Superior Court will not disturb such a ruling, because such a ruling does not constitute a manifest abuse of the trial court's discretion.

Additionally, plaintiffs assert that the Superior Court's decision in *Andaloro v. Armstrong World Industries, Inc.* 799 A.2d 71 89 (Pa.Super.2002) similarly supports the position that Pennsylvania courts have accepted that "each and every breath of asbestos fibers is a significant and substantial contributing factor to the asbestos-related disease [that a plaintiff has developed]" and that, in fact, no further proof of causation of injury is required than to demonstrate inhalation of asbestos fibers by an individual with an asbestos related disease. However, the *Andaloro* opinion expressly concludes that the defendant "failed to preserve for appellate review its claim that the causation theory advanced by plaintiff's experts was not generally accepted in the scientific community." Because the defendant did not preserve its *Frye* objection, the Superior Court's language related to the "Frye" issue in *Andaloro* is dicta and not binding on this court. However,

because *Andaloro* directly addresses, (albeit in dicta), an issue presented to, and preserved before this court, I have set forth the relevant language from *Andaloro* below:

**\*17** [Defendant's] assertion is derived from the premise that quantification of the levels of asbestos exposure a plaintiff suffered is a prerequisite to a determination of causation and hence, liability. [Defendant] provides no authority for such a premise, nor are we aware of any. In point of fact, Pennsylvania law provides that causation of asbestos-related injuries is shown upon proof that the plaintiff inhaled *some* fibers from the products of the defendant manufacture ...

> Our case law includes no requirement that a plaintiff in an asbestos case prove through [expert testimony] *how many asbestos fibers are contained in the dust emissions from a particular asbestos-containing product.*

Similarly, the plaintiff need not demonstrate the specific links of fibers contained in the manufacturers product, the length of fibers he inhaled, or the overall concentration of fibers in the air ... Because these elements are not legally necessary to a determination of causation, an expert's inability to testify about them does not render his testimony incompetent on the issues of causation and liability.

*Andaloro,* 799 A.2d at 85-86 (emphasis in original) citing *Junge v. Garlock,* 629 A.2d 1027, 1029 (Pa.Super.1993).

The *Andaloro* decision might appear upon immediate review to hold that causation in an asbestos case is fully proven upon proof that the Plaintiff inhaled some fibers from the Defendants' product. However, a more reasoned interpretation of the language in *Andaloro* supports the conclusion that *Andaloro* merely recognizes the physical fact that in order for asbestos fibers to cause disease processes within the human body, they must first be inhaled. *Andaloro* does not, in any material manner, and certainly in no explicit respect, appear to challenge the generally applicable legal principle requiring proof of actual injury in a product liability case. Clearly, the more fundamental focus of the *Andaloro* court was that a Plaintiff need not prove the specific quantity of fibers inhaled, or the specific character or quality (including specifically the fiber length) of the fibers inhaled, but rather simply must establish that sufficient fibers were inhaled to have caused the Plaintiff's injuries. But again proof of actual injury remains a requirement.

Further guidance regarding the applicability of the *Smalls* and *Andaloro* cases is found in the Superior Court's decision in *Rafter v. Raymark, Industries,* 632 A.2d 897 (Pa.Super 1993): where the court stated as follows:

> Appellant argues that [the court's jury instructions] led the jury to believe that if they found that appellees inhaled asbestos, then [the jury] must also conclude that asbestos was a substantial cause of [the Plaintiffs'] lung and throat cancer. We disagree.... In the instant action, the trial court never stated that inhalation of asbestos was sufficient but, rather, stated that it was necessary to establish that asbestos exposure was a substantial factor in causing [Plaintiffs'] injuries. Moreover, the trial court's instruction clearly provided that appellees were required to show that they have been injured by asbestos exposure, and that this exposure was a substantial contributing factor to their injuries.... After reviewing the instruction in its entirety, we find no abuse

of discretion or error of law regarding the trial court's charge on causation.

**\*18** *Rafter,* 632 A.2d at 901-902 (citations omitted).

As demonstrated by the Court's analysis in *Rafter,* it is appropriate to conclude that the Superior Court does not approve of the notion that the mere inhalation of fibers is presumptively sufficient to establish causation in an asbestos case. Rather, proof of causation of the actual injury is necessary.

### CONCLUSION

For the reasons set forth above, I entered the Order of February 27, 2006, precluding the plaintiff's experts from offering opinion testimony causally attributing the plaintiff's asbestos related disease to exposure to any specific defendant's friction products.

Footnotes

1   Resolution of this Motion was assigned to me by Order of Court of the Administrative Judge of the Civil Division of Allegheny County.

2   It is not my intent that the phrase "friction product manufacturer" be interpreted as a strict term of limitation, but, generally speaking, I intend by use of the phrase to identify brake and clutch manufacturers.

3   The cases identified by counsel were: *Simikian v. [Asbestos Defendants],* GD 05-004662; *Bahneman v. [Asbestos Defendants]* GD 04-010451; *Cline v. [Asbestos Defendants],* GD05-010028; and *Vogelsberger v. [Asbestos Defendants]* GD 02-18135. Each has been incorporated by reference at Administrative Docket No. A.D. 03-000319.

4   By "non-case-specific" expert reports, I intend to describe expert reports specifically filed in each case, but which did not rely upon specific factual circumstances involved in the case. For instance, in each instance, neither Dr. Maddox nor Dr. Laman relied upon specific data regarding the quality or quantity of the specific plaintiff's alleged exposure to any of the specific defendant's product, or to friction products generally; but rather the reports essentially theorized that if the evidence offered at trial established any work around or exposure to friction products then a finding of proximate causation may be supported for the reasons proffered in the expert reports. These reports are substantially identical to reports prepared by Drs. Maddox and Laman previously filed on behalf of numerous asbestos plaintiffs.

5   I do not mean to unfairly disparage the honestly held beliefs of Drs. Maddox and Laman. I maintain no doubt that the doctors' opinions are rooted in each doctor's abundant knowledge of the best evidence currently available to science regarding asbestos exposure generally. Indeed, I will be among those least surprised if, some day, generally accepted scientific methodology validates some or all of Drs. Maddox and Laman's opinions in this case. Their opinions enjoy a certain commonsensical appeal, and are not, in any specific respect, disproved by medical science. This, however, is not the standard for admissibility of expert opinion in Pennsylvania. In the end, the doctors' opinions are nothing more than their current "best guesses," unverified by generally accepted methodology. This kind of expert opinion is simply not admissible in Pennsylvania courts.

6   I borrow greatly from, and am indebted to, the excellent analysis set forth in Judge Allen's trial court opinion in the case of *Vinitski v. Adler,* 69 Pa. D & C 4th 78. (Pa.Com.Pl., Phila., 2004), affirmed by memorandum opinion 2005 WL 984497 (Pa.Super.2005).

7   The facts set forth in this section are not materially contested by the parties.

8   I specifically acknowledge and recognize as binding, the ruling of the Superior Court in *Trach v. Fellin,* 817 A.2d 1102 (Pa. Super 2003), that epidemiological studies are not necessary to demonstrate that exposure to an agent was the medical cause of a disease. Still, *Trach* does not alter the fundamental principle that proof of actual causation remains required.

9    I do not take issue with this predicate opinion regarding general causation, for purposes of this *Frye* ruling.

10    Coffee drinking coffee strongly correlates with smoking; which, in turn, strongly associates coffee drinking with lung cancer.

11    My use of the phrase "high dose" is not intended to imply or suggest any particular quantitative value of dosage but rather to simply distinguish between the "low dose" of a single exposure, or otherwise vanishingly small exposure that is opined to be a proximate cause of a specific plaintiff's disease by Drs. Maddox and Laman and certain known higher dose exposures that can, and have been, adequately associated with asbestos related disease based upon generally accepted scientific methodologies.

12    In fairness, Maddox and Laman, at times, seem to suggest that, given any *reasonable* length of employment as an auto/brake repairman, a specific plaintiff's actual exposure should be adequate to allow Maddox and Laman to opine the applicability of a dose response curve. Nowhere, however, do they even remotely attempt to quantify the actual exposure that they believe would be required, or support how they arrive at a quantitative value for a specific plaintiff's exposure. As such, when subjected to even modest scientific rigor their low dose causation "methodology" is either not stated or fails, unless they can support the contention that each and every exposure contributes to the disease process.

13    In particular, the scientific literature establishes some understanding of applicable dose response curves for exposures typically experienced by high exposure trades including asbestos miners, asbestos insulators, and ship workers, among others.

14    Parenthetically, it has been asserted that dose response curves for low dose exposure do not exist, in part, because of an absence of reliable information regarding actual inhalation and retention of asbestos fibers in low exposure settings and, in part, because of a statistically modest, (or non-existent) increase of the occurrence of asbestos related disease at low exposure levels. Whatever the reason for their non-existence, *why* they do not exist is not determinative of my ruling. *The fact that they do not exist,* and thus, cannot be relied upon by Drs. Maddox and Laman is the important point.

15    I do not intend to assert that asbestos is, in fact, ever medicinal or benign in any quantity, but only that the "extrapolation down" assertion and argument relied upon by Maddox and Laman can not logically establish, or give rise to a reasonable inference, to the contrary.

16    I recognize that this example does not constitute an exact parallel to the position of the plaintiff's experts, but it illustrates the point effectively enough.

17    In citing *Vinitski,* a memorandum decision, I am cognizant of *Internal Operating Procedure of the Superior Court,* Rule 444B, implementing Pa.R.A.P. 3501-3517, and Superior Court *Notice to the Bar,* 598 A.2d 1324. My citation is not intended to rely upon *Vinitski* as precedential authority but rather only to illustrate (consistent with *Melendez v. Pennsylvania Assigned Claims Plan,* 557 A.2d 767 (1989) holding that because "the authority relied upon in [the cited memorandum decision] applie[d] to the instant case, ... the trial court's conclusion was correct,") that my proffered interpretation of *Trach* is reasonable. If it is determined that I have improperly relied upon *Vinitski* in this respect, I note that my ruling is only buttressed, and not exclusively based upon, that reliance and, thus, if improper the reliance may be deemed harmless. *Major v. Major,* 518 A.2d 1267 (1986).

18    Of course, I recognize, and accept, that generally accepted scientific methodology supports the opinion that sufficiently "high dose" (comparatively speaking) exposures of asbestos are known to be dangerous. Additionally, I understand, and accept, that there is no competent evidence in this record that supports the position that medical science has confirmed, or can support a reasonable inference that, there does exist a safe "low dose" level of exposure to asbestos. Accordingly, I am aware that there may, in fact, be no safe level of exposure. I, and everyone else, simply do not know.

19    This is not to say that I know that the plaintiff's occupational exposure to the defendant's friction products (if proven) did not, in fact, contribute to plaintiff's disease-it very well may have. But, based upon this record, (subject to the limitations of scientific knowledge, as it is) that is about as much as I, or anyone, can say on the subject-"it *may* have." "It may have" is not a sufficient basis for a jury to find, (or to reasonably infer), that it *did.* To allow a jury to find, (or infer), that "it *did*" where the evidence supports, at best, the conclusion, or inference, that "it *may* have" simply invites the jury to guess; and that, the jury may not do.

20    I intend to reference specifically mesothelioma, asbestosis, and forms of pleural fibrosis.

21    There appears to be a consensus that mesothelioma can also be caused by other known factors, such as high levels of radiation exposure, that are not implicated in these cases.

22    Asbestos is naturally occurring in the environment, and thus we all unavoidably experience a (particularly insignificant, but) certain level of asbestos exposure.

23    I have considered the suggestion that because Maddox and Laman are competent to report that medical consensus has established that between 80% and 94% of all mesotheliomas are caused by exposure to asbestos that they should, therefore, be permitted to offer the opinion, and the jury should be capable of finding, that it is more likely (in fact 80%-94% more likely than not) that this plaintiff's mesothelioma was caused by asbestos exposure. If I were to permit Drs. Maddox and Laman to offer such an opinion, I would be allowing a new method of proof of causation of injury in Pennsylvania. I suspect that such a method is not endorsed because it confuses proof of actual injury to a specific plaintiff with proof of an increased risk of harm not necessarily applicable to any specific plaintiff. In practice it would allow for absurd results. For instance: to permit such a theory to be presented to a jury would

be tantamount to permitting a state trooper to offer an opinion that speeding caused a specific one-car accident based solely upon his knowledge that 80% of all other one-car accidents on Pennsylvania highways are caused by speeding. To permit such testimony to be presented to a jury as expert testimony in support of a theory of causation would invite sheer speculation to replace reason and logic in support of a medical causation finding.

24   Interestingly their opinion in this regard does not appear to take into account their recognition that "normal" background levels are different in different parts of this country, and around the world, as a function of local geography, geology, and industrial development.

25   Allowing that plaintiff[s] in this case are "individual[s] with, at best, modestly increased lifetime asbestos exposure" gives the plaintiff's experts the benefit of the doubt, as they rely on no actual data regarding the plaintiff[s] actual lifetime exposure, but merely allow that if there was any exposure to the defendant's product, then causation can be found.

26   While I need not, and do not, reach the issue squarely, there exists a secondary question as to whether causal attribution to exposure to a specific product may be made based solely upon biological "fiber load" findings, particularly where there is sufficient evidence of other asbestos exposure, and there exists no meaningful generally accepted methodology to determine the actual, or likely, fiber source detected in pathological samples.

27   Additionally, it should be noted that I am cognizant of the concerns raised by members of the Supreme Court in *Blum v. Mergenthal* regarding the manufacturing of scientific consensus by corporate interests. It has been insinuated at various times during these *Frye* proceedings that the epidemiological evidence proffered by the defendants is this type of manufactured cannon fodder. While I can discern no such ulterior or improper motives on behalf of the researchers who conducted the studies that constitute the substantive basis for the epidemiological evidence presented by the defendants in this *Frye* hearing, it remains important to note that I do not ultimately rely upon the epidemiological evidence to support my ruling. As such, the legitimate concern of the Supreme Court regarding such manufactured evidence, while perhaps proper in some cases, would be misplaced in this case

28   I reject this assertion based upon my interpretation of the spirit of *Trach'*s clear directive that plaintiffs are not required to advance epidemiological evidence to prove causation. If I am mistaken in this regard, guidance from the appellate courts regarding the appropriate, required, or allowable consideration of epidemiological evidence countering the plaintiff's proffered methodologies within the context of a *Frye* challenge would be welcomed.

29   I note that in the face of ever-increasing scientific knowledge, the appellate courts of Pennsylvania may, someday, choose to revisit the question of whether epidemiological evidence is necessary to establish causation in toxic tort cases. Until that day, however, this court will not entertain the argument that a Plaintiff must advance epidemiological evidence to prove causation.

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

2007 WL 712049 (Pa.Com.Pl.) (Trial Order)
Court of Common Pleas of Pennsylvania.
Indiana County

Katherine M. BASILE, Executrix of the Estate of Fred Dalbo, Sr., deceased
and Viola Imogene Coen Dalbo, his wife, in Her own right, Plaintiffs,
v.
AMERICAN HONDA MOTOR COMPANY, INC. Et. al., Defendants.

No. 11484 CD 2005.
February 22, 2007.

**Opinion and Order of Court**

Gregory A. Olson, Judge.

Before the Court is Caterpillar Inc.'s Motion to Exclude Plaintiffs' expert testimony that relies upon novel scientific evidence, commonly referred to as a *Frye* motion. For those reasons set forth in the Opinion below, Caterpillar's motion is granted in part.

**FACTUAL AND PROCEDURAL HISTORY**

This is a toxic tort case. Plaintiff claims her Decedent, Fred Dalbo, Sr., died of mesothelioma he contracted as a result of exposure to asbestos fibers. Plaintiff has sued a number of defendants on the theory that Decedent's work-related exposure to asbestos fibers shed by one or more of defendants' products was a legal cause of Decedents' death.

In the course of pretrial discovery, Plaintiffs identified as potential expert witnesses two doctors, Christopher Faber and John C. Maddox.1 Each of these experts, by methodologies of case study and downward dose-effect extrapolation, opines that because asbestos exposure and consequent mesothelioma are cumulative processes, any asbestos exposure from any Defendant's product, whatever its nature and regardless of quantity or quality of exposure, is a legal cause of Decedent's mesothelioma.

By Order entered August 15, 2006, the Court per Pa. R.C.P. No. 207.1 directed that all *Frye* motions must comply with the Rule and set a filing and service deadline of January 15, 2007, with hearing on all *Frye* motions to occur on February 2, 2007, at 8:30 a.m.

Caterpillar, Inc., is one of the defendants in this litigation. By a timely filed *Frye* motion, it challenged the Faber/Maddox opinions as infirm because Caterpillar contended they rested on methodologies not generally accepted in the relevant scientific community. No other timely *Frye* Motions were filed.

On February 2, 2007, all parties appeared before the Court to address the Caterpillar motion. Plaintiff limited her presentation to argument that the doctors [1] challenged methodologies and opinions were not novel and thus not subject to a *Frye* challenge. At the close of Plaintiff's presentation, Plaintiff's counsel, contending Plaintiff had not realized the proceeding was to be an evidentiary hearing rather than an argument, requested time to supplement the record. Caterpillar objected. The Court, subject to objection, invited either party to proffer a record supplement on or before February 12, 2007. On February 12, Plaintiff proffered a supplemental record.

## DISCUSSION

At the outset, the Court observes the relief it grants Caterpillar is narrowly drawn. Caterpillar seeks total pretrial exclusion of all Maddox opinions; the Court does not grant that prayer for relief. The exact Maddox opinion that Caterpillar challenges reads: "Based on the exposure history, all asbestos exposure substantially contributed and caused this lethal malignant pleural mesothelioma." The term "history," as used in this Opinion, is ambiguous. It may refer to the overall work-exposure history, without regard to individual exposures, or it may refer to the record of specific exposures developed in this case. Because the Plaintiff at hearing could not clarify this ambiguity, the Court's opinion is confined to a possible opinion that any asbestos exposure in a work-exposure history regardless of its nature or extent, is a competent legal cause of the disease process.

Under *Frye,* novel scientific evidence is admissible if the methodology that underlies the evidence has general acceptance in the relevant scientific community. Commonwealth v. Blasioli, 713 A. 2d. 1117, 1119 (Pa. 1998). The "general acceptance" test is limited to methodology, not conclusions. Where *Frye* is properly at issue, the proponent of the evidence bears the burden of proving that the methodology an expert used is generally accepted by scientists in the relevant field as a method for arriving at the conclusion the expert will testify to at trial. Grady v. Frito-Lay, Inc., 839 A. 2d 1038 (Pa. 2003).

Plaintiff argues no *Frye* issue exists with respect to the Maddox opinion because it is not novel. To support her position, Plaintiff points to several cases where on review our appellate courts upheld trial court introductions of opinions similar to those Dr. Maddox now proffers. See, e.g., Smalls v. Pittsburgh Corning, et. al., 843 A. 2d 410 (Pa. Super. 2004); Andalero v. Armstrong World Industries, Inc., 799 A. 2d 71 (Pa. Super. 2002); Cauthorn v. Owens Corning Fiberglas Corp., 840 A. 2d 1028 (Pa. Super. 2004).

For several reasons, the Court finds these cases inapplicable to the *Frye* determination now before it.

First, none of these cases involve *Frye* challenges. A *Frye* challenge is distinct from other expert-driven challenges, such as qualifications per Pa. R.E. 702. Grady, 839 A.2d at 1045.

Second, none of these cases involved challenges to methodologies, which is the heart of a *Frye* challenge. For *Frye* purposes, "methodology" refers to the scientific method, a method of research in which a problem is identified, relevant data are gathered, a hypothesis is formulated from these data, and the hypothesis is empirically tested. Trach v. Fellin, 81 7 A. 2d 1102 (Pa. Super. 2003).

And third, by offering these cases, Plaintiff advances a definition of "novel" which is at odds with that term as used in *Frye.* "Novel" and "new" are not synonyms in this area of the law. Astrology and lie detector tests, for example, can be novel, within the meaning of *Frye,* even though these methods have been around for many years and cannot qualify as "new." Commonwealth v. Dengler, 843 A. 2d 1241 (Pa. Super. 2004), *affirmed* 586 Pa. 54, 890 A. 2d 372 (2005).

All Plaintiff's cases show is that opinions similar to Dr. Maddox's have been around for some time. The cases cited do not support a finding that the methodology Dr. Maddox used in this case is generally accepted in the relevant scientific community. Although Trach involves the dose-response of linking toxic exposure to harmful effects, this case does not address the downward extrapolation methodology Dr. Maddox appears to offer here. The Court thus finds the methodologies advanced in the case *sub judice* are novel within the meaning of *Frye.*

The Court now considers what happened, and did not happen, at the *Frye* hearing in this case.

Plaintiff presented no evidence on the issue of general acceptance. Normally, because Plaintiff has the burden of proof on this matter, a ruling in favor of Caterpillar would automatically follow. Plaintiff asked the Court to accept her supplemental record because counsel said they were confused about the purpose of the February 2 court proceeding.

The Court does not understand counsel's confusion. August 15, 2006, Order unambiguously refers to the February 2 *Frye* proceeding as a hearing. Plaintiff and defense counsel understood this date was preset to allow all parties to schedule attendance for any pretrial *Frye* dispositions.

Nonetheless, rather than grant Caterpillar's motion out of hand because of the inadequate record, the Court over objection permitted Plaintiff to proffer a post-hearing submission. In response to that invitation, Plaintiff now offers hundreds of pages of text, including deposition transcripts, affidavits, reports, and test results from various sources.

At the outset, the Court disapproves of Plaintiff's approach to making a *Frye* record. She easily could have prepared these submissions for the February 2 hearing. Had Plaintiff done so, Caterpillar then would have had an opportunity to raise objections, particularly with respect to deposition transcripts. Instead, the Court is left to guess what portions of Plaintiff's proffer would be proper for it to consider.

In this situation, the Court easily could sustain Caterpillar's objection and reject the entire proffered record. But that is not necessary here, because the Court finds the record offered does not support a finding of general acceptance.

Dr. Maddox's challenged opinion, and its supporting assumptions, can be summarized as follows: 1) there is no "safe" minimum level of asbestos exposure, 2) asbestos exposure is a recognized cause of mesothelioma, and 3) the etiology of mesothelioma results from the cumulative process of asbestos exposure (or, the greater the overall exposure, the greater the probability mesothelioma will develop in a particular case); therefore 4) any exposure to a product shedding asbestos fibers must be deemed a legal cause of an individual's mesothelioma.

This chain of ideas is not methodology at all, but an effort at logical analysis. As logic, the effort fails. The three premises Dr. Maddox advances - asbestos is an unsafe product, asbestos exposure is a recognized cause of mesothelioma, and the greater the asbestos exposure, the greater the risk of contracting mesothelioma - do not support a leap to the conclusion that any asbestos exposure must be deemed a legal cause of the resulting harm, especially as Pennsylvania defines the term "legal cause."

Under Pennsylvania law, legal cause, also known as substantial contributing factor, requires proof of direct causation. In the context of this case, Plaintiff must prove decedent's exposure to Caterpillar's asbestos-shedding processes was a direct cause of his mesothelioma. If exposure to Caterpillar products, along with other legally-sufficient exposures, contributed to the single, indivisible harm of mesothelioma, then all causal actors shall be treated as joint and several tortfeasors. *Martin v. Owens-Corning Fiberglass,* 528 A.2d 947 (Pa. 1987); § 433 A, Restatement (Second) of Torts.

The need for proof of direct process is underscored by the leading case of *Eckenrod v. GAF Corp.* 544 A.2d 50 (Pa.Super. 1998). In this case, which sets a widely used summary judgment standard in asbestos litigation, our Superior Court recognized that it is virtually impossible in asbestos litigation to establish a sole causal link between the victim's exposure to asbestos fibers shed by a particular defendant's product and a resultant disease process. Therefore, that court held: "Whether a plaintiff could successfully get to a jury or defeat a motion for summary judgment by showing circumstantial evidence depends upon the frequency of the use of the product and the regularity of Plaintiff's employment in proximity thereto." *Eckenrod,* 544 A.2d at 53.

The Eckenrod frequency/proximity standard does not negate the requirement of direct causation; rather, it permits a finding of direct causation by inference. The Maddox opinion, to the extent it offers up a legal conclusion, does not comport with *Eckenrod* or *Martin.* Further, to the extent it offers a medical conclusion, it inescapably advances the "single fiber" theory, or a very close variant.

The "single fiber" theory holds that exposure to a single asbestos fiber can cause mesothelioma and other disease processes. Calling it a "cumulative exposure" theory does not alter its operative effect. For example, in the context of this case, Dr. Maddox opines that, because asbestos exposure is inherently dangerous, asbestos exposure causes mesothelioma, and the disease process is cumulative (that is, the greater the exposures, the greater the risk) if Plaintiff's decedent had been exposed to twenty different

asbestos-shedding products, and Caterpillar were one of those products, the Caterpillar exposure would be a legal cause of the Plaintiff's decedent's mesothelioma, even if that exposure consisted of a single asbestos fiber.

As the Court previously has noted, Dr. Maddox's non-scientific assumptions do not logically lead to a single-fiber hyposis, nor does the theory square up with *Eckenrod's* legal proof requirements. So the question remains: is the "single-fiber" opinion supported by a methodologically that is generally accepted in the relevant scientific community?

The record in this case offers no methodology to support a "single fiber" opinion, much less general acceptance of any such methodology. In particular, Plaintiff's record does not meet her burden of proving that either extrapolation-downward dose-response or case studies are generally accepted methodologies in the relevant scientific community to project harm from "extremely low" or "low" doses of toxic exposure.

The Court having found Plaintiff's methodology is novel, and Plaintiff having failed to meet her burden of general acceptance,

The Court's Order follows.

### *ORDER OF COURT*

AND NOW, February 22, 2007, it is ORDERED, that Defendant's *Frye* Motion to Exclude Testimony of Dr. John C. Maddox is granted in part. By this Order, Dr. Maddox is precluded from offering an opinion that, regardless of specific exposure history, all asbestos exposures substantially contributed and caused the Plaintiff's Decedent's mesothelioma.

BY THE COURT;

——————————————————

Gregory A. Olson, Judge

Footnotes

1     Plaintiff has since withdrawn Dr. Faber from her witness list)

**End of Document**      © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 6

2013 WL 2477077
Only the Westlaw citation is currently available.
United States District Court,
C.D. California.

David SCLAFANI, et al.
v.
AIR AND LIQUID SYSTEMS CORP., et al.

Nos. 2:12–cv–3013–SVW–PJW, 2:12–
cv–3037–SVW–PJW. | May 9, 2013.

### Attorneys and Law Firms

Benno B. Ashrafi, Josiah W. Parker, Leonard Sandoval, Weitz and Luxenberg PC, Los Angeles, CA, for David Sclafani, et al.

Glen R. Powell, John F. Hughes, Richard R. Ames, Gordon and Rees LLP, San Francisco, CA, Brad D. Bleichner, Rod J. Cappy, Selman Breitman LLP, Los Angeles, CA, Bradley William Gunning, Daniel Scott Hurwitz, Geoffrey M. Davis, Stephen Pavel Farkas, K and L Gates LLP, Los Angeles, CA, Michele C. Barnes, K and L Gates LLP, San Francisco, CA, Susan W. Gilefsky, Celeste M. Brecht, Farah Sohaili Nicol, William J. Sayers, McKenna Long and Aldridge LLP, Los Angeles, CA, Kevin D. Jamison, Previn A. Wick, Pond North LLP, Los Angeles, CA, Charles S. Park, Edward R. Hugo, Karleen Frances Murphy, Shaghig D. Agopian, Thomas Jeffrey Moses, Brydon Hugo and Parker, San Francisco, CA, Elan N. Stone, Lewis Brisbois Bisgaard and Smith LLP, Los Angeles, CA, Nina Ilene Webb, Vorys Sater Seymour and Pease LLP, Columbus, OH, G. Jeff Coons, Gordon and Rees LLP, San Francisco, CA, T. Stephen Corcoran, Gordon and Rees LLP, Los Angeles, CA, Bobbie R. Bailey, Henry D. Rome, Lisa K. Rauch, Howard Rome Martin and Ridley LLP, Redwood City, CA, Arpi Galfayan, Carla Lynn Crochet, Jeremy David Milbrodt, Prindle Amaro Goetz Hillyard Barnes and Reinholtz LLP, Long Beach, CA, for Air and Liquid Systems Corp., et al.

### Opinion

### Proceedings: IN CHAMBERS ORDER Re DEFENDANTS' MOTIONS IN LIMINE Case No. 2:12–cv–3013–SVW–PJW: [170][172][179][180][181][182][183][184][221] Case No. 2:12–cv–3037–SVW–PJW: [116][117][118][119][120][121][122][132][133]

STEPHEN V. WILSON, District Judge.

*1 Paul M. Cruz, Deputy Clerk.

### *Defendants' Motion in Limine Number 1* (Dckt.179) [1]

Defendants' Motion in Limine Number 1 seeks to limit the admission of "any evidence regarding past medical expenses of David Sclafani through documents, expert testimony, or otherwise, to only those amounts *actually paid* by or on" Sclafani's behalf. Most of Sclafani's medical costs have been covered by the Veteran's Administration. Under California law, a tortuously injured plaintiff whose medical bills are paid by another—such as the plaintiff's health insurer—cannot recover damages for those *past* medical expenses "for the simple reason that the injured plaintiff did not suffer any economic loss in that amount." *Howell v. Hamilton Meats & Provisions, Inc.,* 52 Cal.4th 541, 548, 129 Cal.Rptr.3d 325, 257 P.3d 1130 (2011). Therefore, Sclafani will only be permitted to recover past medical expenses he *actually* paid; any other medical expenses cannot be recovered from Defendants. Plaintiffs do not oppose this portion of Defendants' Motion in Limine Number 1; therefore, to the extent they seek reimbursement for Sclafani's past medical expenses, Plaintiffs will be limited to introducing evidence of amounts actually paid by Sclafani.

Defendants' Motion in Limine Number 1 also seeks to exclude the opinions of Plaintiffs' economist Dr. David Fractor as speculative an unfounded. At trial, Fractor will opine that Plaintiff would lose future earnings of $68,463 and lost "household services" of $180,233.

"Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996). Here, Dr. Fractor's $68,463 figure was calculated by *assuming* that Sclafani would work to the end of his life and earn the New Hampshire minimum wage of $7.25 an hour. However, prior to his mesothelioma diagnosis, Sclafani was selfemployed, and his business was generating no income. Moreover, Plaintiffs have provided no indication that Sclafani—who is at least 70 years old —intended on taking up a full-time, minimum wage job. Fractor's calculations are, by definition, speculative—they are not based either on Sclafani's work history, nor his stated intentions to return to work. Thus, Dr. Fractor will not be permitted to testify as to Sclafani's lost future earnings.

WestlawNext' © 2013 Thomson Reuters. No claim to original U.S. Government Works.

However, Dr. Fractor will be permitted to testify as to the lost "household services." Defendants argue that Dr. Fractor failed to account for the fact that, since Sclafani has become sick, his wife has taken over the household responsibilities from Sclafani. This argument was specifically rejected by the California Court of Appeals in *McKinney v. California Portland Cement Co.,* 96 Cal.App.4th 1214, 1228, 117 Cal.Rptr.2d 849 (2002). Defendants present no other objection to Dr. Fractor's methodology as to Plaintiffs' "household services" claim; therefore, Dr. Fractor will be permitted to testify on this point at trial.

**\*2** Thus, Defendants' Motion in Limine Number 1 is GRANTED IN PART, AND DENIED IN PART.

### Defendants' Motion in Limine Number 2 (Dckt.179–1)

Defendants' Motion in Limine Number 2 is a motion by defendant Foster Wheeler that seeks to exclude any testimony "purporting to identify a Foster Wheel product solely by testimony that its name appeared [on a product], and any testimony relying on such identification" as either inadmissible hearsay or on the basis of the best evidence rule.[2] As this Court determined in ruling on Buffalo's motion for summary judgment, the Ninth Circuit has held that labels affixed to a medium "are most appropriately characterized as circumstantial evidence of origin, rather than as an 'assertion' within the meaning of the hearsay rule." *Los Angeles News Serv. v. CBS Broad., Inc.,* 305 F.3d 924, 935 *opinion amended and superseded,* 313 F.3d 1093 (9th Cir.2002) (finding that an identifying "CBS" slate appearing on the opening frames of a videotape is not hearsay and 'is more akin to a postmark or timestamp' such that it is an "indicia of origin" that did not implicate the hearsay rule); *see also United States v. Snow,* 517 F.2d 441, 443 (9th Cir.1975) (holding that a piece of tape affixed to a briefcase with the name "Bill Snow" printed on it was *not* hearsay, but rather circumstantial evidence that the briefcase belonged to Bill Snow).

However, as this Court observed in its separate order of May 9, 2013, Sclafani's testimony that he saw the words "Foster Wheeler" is subject to the best evidence rule. The Court will defer ruling on Foster Wheeler's motion to exclude this portion of Sclafani's testimony on the basis of the best evidence rule until the pretrial conference set for May 13, 2013.

### Defendants' Motion in Limine Number 3 (Dckt.179–2)

Defendants' Motion in Limine Number 3 is a motion by defendant Foster Wheeler that seeks to exclude the testimony of Plaintiffs' expert Captain Francis Burger altogether. Foster Wheeler argues that Captain Burger's expert report fails to indicate that he reviewed "any materials regarding Foster Wheeler in preparation for this case." However, in his expert report, Captain Burger states that he reviewed, among other things, the discovery responses of "Naval Defendants"— including Foster Wheeler—and deposition transcripts of the Naval Defendants' "Person Most Qualified," and the ship records for the Naval vessels that Sclafani worked on, which noted, among other things, that there were Foster Wheeler boilers aboard the USS Morton. *See* Burger Rept. at 11–12.

In the alternative, Foster Wheeler asks this Court to limit Captain Burger's testimony to the opinions disclosed in his expert report, and to exclude any opinions that lack a factual basis. Foster Wheeler argues that many the opinions Captain Burger offered in his declaration in support of Plaintiffs' motion for summary judgment were either not disclosed in Captain Burger's expert report or lack a factual basis. Specifically, Foster Wheeler attacks Captain Burger's opinions 1) that Foster Wheeler boilers were often supplied with asbestos-containing parts already installed; 2) that Foster Wheeler supplied spare parts, including gaskets, for use in and with its boilers; 3) that during Sclafani's service aboard the USS Morton, Foster Wheeler's boilers onboard the Morton "would more likely than not have been insulated with asbestos containing insulation and utilized asbestos containing refractory material, gaskets, and packing;" and 4) that it was more likely than not that Sclafani would have removed and replaced asbestos-containing insulation, refractory material, gaskets, or packing supplied by Foster Wheeler.

**\*3** Plaintiffs have failed to file an opposition to Defendants' Motion in Limine Number 3. Without greater guidance from Plaintiffs, the Court cannot discern whether Captain Burger included each of these opinions in his initial expert report, nor whether his opinions were formed the factual bases for each opinion. Thus, Plaintiffs shall have until Monday, May 13, 2013 at 10:00 a.m. to respond to Defendants' Motion in Limine Number 3, and to identify where in Captain Burger's report he disclosed these four opinions, and his factual basis for so opining.

### Defendants' Motion in Limine Number 4 (Dckt.179–3)

Defendants' Motion in Limine Number 4 seeks to preclude Plaintiffs from introducing "all evidence post-dating

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Sclafani's last alleged exposure to asbestos" as irrelevant and as barred by Federal Rule of Evidence 407. Defendants have failed to identify which items of evidence they are seeking to exclude, and thus will defer ruling on this motion until specific items of evidence are identified. However, the Court notes that, to the extent that Plaintiffs seek to introduce evidence of remedial measures taken by Defendants after Sclafani's alleged exposure to asbestos (i.e., post–1963), such evidence will be excluded under Rule 407. *See also* Pls.' Mot. in Limine No. 3.

### Defendants' Motion in Limine Number 5 (Dckt.179–4)

Defendants' Motion in Limine Number 5 seeks to preclude Plaintiffs' expert Dr. Barry Horn from testifying regarding the cost or value of Sclafani's medical treatment. Defendants' argue that 1) any such opinion was not included in Dr. Horn's Rule 26 report; and 2) if he attempts to amend his previous report, he has failed to review Sclafani's medical records. Plaintiffs concede that Dr. Horn has *not* reviewed Sclafani's medical records; therefore, Dr. Horn has no factual basis from which he could opine as to the cost or value of Sclafani's medical treatment.

Therefore, Defendants' Motion in Limine Number 5 is GRANTED.

### Defendants' Motion in Limine Number 7 (Dckt.179–5) [3]

Defendants' Motion in Limine Number 7 is a motion by defendant Foster Wheeler that seeks to preclude Plaintiffs from making any argument that Foster Wheeler is liable for asbestos-containing packing and gaskets that it did not supply or distribute. As this Court previously found, Plaintiffs' claims against Foster Wheeler is premised on their argument that Sclafani was exposed either to the original asbestos-containing parts in the Foster Wheeler boilers, or Foster Wheeler-supplied spares during Sclafani's service on the Morton. Plaintiffs' argument at trial will be limited to these theories of liability. [4]

### Defendants' Motion in Limine Number 8 (Dckt.179–6)

Defendants' Motion in Limine Number 8 seeks to bifurcate the liability and damages phases of the trial. The Court will phase the trial in the matter discussed with the parties; thus, the motion is DENIED as MOOT.

### Defendants' Motion in Limine Number 9 (Dckt.116)

**\*4** Defendants' Motion in Limine Number 9 seeks to preclude Plaintiffs from offering expert testimony and documents regarding the "historical development of medical and scientific information the purported dangers of asbestos exposure." Defendants do not identify which specific items of evidence they seek to exclude; as such, the Court will defer ruling on this motion until trial.

### Defendants' Motion in Limine Number 10 (Dckt.132)

Defendants' Motion in Limine Number 10 seeks to preclude Plaintiffs from eliciting opinions from their experts that "every" exposure to asbestos is a substantial factor in causing mesothelioma. Specifically, Defendants object to the opinion of Dr. Arnold Brody, who intends to opine that "[o]nce a person develops an asbestos-related cancer, it is not possible to exclude any of the person's abovebackground exposures to asbestos from the causal chain. Each and every exposure to asbestos that an individual with mesothelioma experienced in excess of a background level contributes to the development of the disease."

The question of causation in asbestos-related litigation is an exceedingly difficult one. "At the most fundamental level, there is scientific uncertainty regarding the biological mechanisms by which inhalation of certain microscopic fibers of asbestos leads to lung cancer and mesothelioma." *Rutherford v. Owens–Illinois, Inc.,* 16 Cal.4th 953, 974, 67 Cal.Rptr.2d 16, 941 P.2d 1203 (1997). The California Supreme Court addressed this difficulty by articulating a two-part causation test: first, the plaintiff must "establish some threshold *exposure* to the defendant's defective asbestos-containing products [.]" *Rutherford,* 16 Cal.4th at 982, 67 Cal.Rptr.2d 16, 941 P.2d 1203 (footnote omitted). Second, a plaintiff must establish to a "reasonable medical probability that a particular exposure or series of exposures was a 'legal cause' of his injury, i.e., a *substantial factor* in bringing about the injury." *Id.* This latter inquiry requires a plaintiff to show that his or her exposure to a particular defendant's asbestos-containing product, "in reasonable medical probability," was a substantial factor in contributing to the "aggregate *dose* of asbestos the plaintiff or decedent inhaled or ingested." *Id.* at 976–77, 67 Cal.Rptr.2d 16, 941 P.2d 1203.

Dr. Brody's opinion—that "each and every exposure ... contributes to the development of" mesothelioma—is, in fact, the legal conclusion that, under *Rutherford,* a jury must reach. While an opinion is "not objectionable just because it embraces an ultimate issue," *see* Fed.R.Evid. 704, the Court

finds that this opinion should be excluded for two other reasons.

First, as a legal issue, accepting Dr. Brody's opinion as true would render the "substantial factor" prong of the causation test meaningless. If "each and every exposure" is a *substantial factor* in leading to the development of mesothelioma, then all a plaintiff would have to do is prove 1) that he had mesothelioma; and 2) that he was exposed to asbestos at some time. Similar opinions have been rejected on precisely this basis. *Lindstrom v. A–C Prod. Liab. Trust,* 424 F.3d 488, 492–3 (6th Cir.2005) (upholding the district court's exclusion of an "each and every exposure" opinion and holding that " '[m]inimal exposure' to a defendant's product is insufficient[,]" as "[a] holding to the contrary would permit imposition of liability on the manufacturer of any product with which a worker had the briefest of encounters on a single occasion."); *see also Holcomb v. Georgia Pac., LLC,* 289 P.3d 188, 197 (Nev.2012) (Noting that courts that adopt "the three-factor test of frequency, regularity, and proximity" in determining "substantial factor" regularly "reject the 'any' exposure argument.").

 **\*5** Secondly, Plaintiffs have failed to carry their burden of demonstrating this opinion is relevant and reliable, as required by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). "Under *Daubert,* the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 982 (9th Cir.2011). In making this determination, district courts are to consider, among other things, "(1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community." *Elsayed Mukhtar v. California State Univ., Hayward,* 299 F.3d 1053, 1064 (9th Cir.2002) *amended sub nom. Mukhtar v. California State Univ., Hayward,* 319 F.3d 1073 (9th Cir.2003) (citing *Daubert,* 509 U.S. at 593–94.).

Plaintiffs have failed to demonstrate that Dr. Brody's opinion is the product of reliable techniques. It is unclear how Dr. Brody came to his "every exposure" opinion; although he refers to several studies (none of which was provided to the Court by Plaintiffs), each study concludes only that "no

amount of exposure to asbestos above the background levels present in ambient air has been established as too low to induce mesothelioma." Most troubling is Dr. Brody's own testimony—when cross-examined in another action about his "each and every exposure" opinion, Dr. Brody conceded that 1) there was no data to establish that all exposures contribute to mesothelioma; 2) his theory could not be tested; 3) his theory had not been published in any peer-review literature; and 4) had not been "put together as a scientific principle and tested." *See* Decl. of Crane's Counsel Bradley W. Gunning ¶ 8, Ex. G. These admissions demonstrate that, in forming his theory, Dr. Brody has not, and indeed cannot, met at least two of the four criteria *Daubert* sets forth in assessing a theory's reliability. Thus, the Court GRANTS Defendants' Motion in Limine Number 10.

### Defendants' Motion in Limine Number 11 (Dckt.121)

Defendants' Motion in Limine Number 11 seeks to preclude Plaintiffs from introducing evidence or making argument that any Defendant manufactured or supplied asbestos-containing products not at issue in this case—for example, Defendants' marketing materials, product catalogues, patents, technical drawings and purchasing specifications regarding products *not* identified by Sclafani or witnesses as the source of Sclafani's asbestos exposure. Plaintiffs argue that this evidence is relevant to establish that Defendants should have known of the dangers of asbestos, an element of their negligence and strict liability claims.

 **\*6** Defendants have failed to identify which items of evidence they are seeking to exclude; thus, the Court will defer ruling on this motion until Plaintiffs seek to introduce specific items of evidence.

### Defendants' Motion in Limine Number 12 (Dckt.133)

Defendants' Motion in Limine Number 12 relates to studies conducted by Material Analytical Services ("MAS"). The MAS studies purported to measure the amount of airborne asbestos fibers created by the removal and wire-scraping of packing and gaskets from valves. Defendants claim that the techniques and methodologies are at odds with the generally accepted scientific methods for making such measurements, and should therefore be excluded under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. Defendants present substantial evidence that the techniques used in the MAS study are at odds with the Occupational Safety and Health Administration's methods for measuring

exposure, and therefore are *not* the product of "reliable principles and methods," a prerequisite of the introduction of expert testimony under Rule 702. Moreover, several courts have excluded this study on these grounds. Plaintiffs' have submitted no opposition to the motion; [5] therefore, Defendants' Motion in Limine Number 12 is GRANTED.

### Defendants' Motion in Limine Number 13 (Dckt.117)

Defendants' Motion in Limine Number 13 seeks to preclude Plaintiffs from introducing evidence of a test performed at a Shell Oil Company plant in which a "Durabla" [6] gasket was removed with a power grinder (Defendants do not indicate what the gasket was removed from). Plaintiffs intend to use this study under to cross-examine Defendants' expert witnesses' opinions that the removal of gaskets "emits practically no asbestos dust." Defendants appear to object to the introduction of this study on hearsay grounds: although statements contained in a "treatise, periodical, or pamphlet" may be introduced to cross-examine an expert witness under the learned treatise exception to the hearsay rule, *see* Fed.R.Evid. 803(18), Plaintiffs must establish that the treatise is "a reliable authority." They have failed to do so here: the study does not describe the methodology used; it was not published in a journal; and the person who performed the test is not available for cross-examination. Thus, Defendants' Motion in Limine Number 13 is GRANTED.

### Defendants' Motion in Limine Number 14 (Dckt.118)

Defendants Motion in Limine Number 14 seeks to exclude "any evidence, reference, or argument relating to the Southern Power and Industry Trade Journal." Plaintiffs have agreed to the granting of this motion; therefore, Defendants' Motion in Limine Number 14 is GRANTED.

### Defendants' Motion in Limine Number 15 (Dckt.122)

Defendants' Motion in Limine Number 15 seeks to preclude Plaintiffs from introducing documents "relating to trade organizations of which Defendant were never members," such as the National Safety Council. Plaintiffs intend on introducing the identified documents as learned treatises to cross-examine Defendants' experts, specifically as to the issue of what was *knowable* about the dangers of asbestos. Such evidence is plainly relevant to an element of (at least) Plaintiffs' strict liability and negligence failure to warn claims. *See* CACI 1222 (listing the elements of negligent failure to warn, including "that Defendant knew or *reasonably should have known that the product was*

*dangerous* or was likely to be dangerous when used or misused in a reasonably foreseeable manner") (emphasis added); *see also* CACI 1205 (listing the elements of strict liability failure to warn, including that the product "had potential risks that were known or *knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture, distribution, or sale* " ) (emphasis added).

 **\*7** Defendants' further argue that Plaintiffs cannot authenticate these documents; however, these reports can likely be authenticated either by the testimony of a witness with knowledge (namely, Defendants' experts), *see* Fed.R.Evid. 901(b)(1), or as a self-authenticating newspaper or periodical. *See* Fed.R.Evid. 902(6). Thus, Defendants' Motion in Limine Number 15 is DENIED.

### Defendants' Motion in Limine Number 16 (Dckt.120)

Defendants Motion in Limine Number 16 seeks to exclude "evidence or argument regarding their alleged liability for other manufacturer's products." More specifically, Defendants seek to exclude evidence of exposure to asbestos-products that were not designed, manufactured, supplied or otherwise placed into the stream of commerce by Defendants. [7] Plaintiffs have agreed to the granting of this motion; therefore, Defendants' Motion in Limine Number 16 is GRANTED.

### Defendants' Motion in Limine Number 17 (Dckt.119)

Defendants' Motion in Limine Number 17 seeks to preclude Plaintiffs' expert Captain Francis Burger from opining that equipment manufacturers (such as Defendants) were "required by Navy specifications to warn of the dangers of death and personal injury from asbestos released from the foreseeable work practices involved in installing, repairing, and removing such equipment," because this opinion lacks foundation. This motion also seeks to preclude Captain Burger from opinion that the Navy selected replacement gaskets based on information in the equipment manufacturers' "drawings and technical manuals" and that the Navy "utilized the original equipment manufacturers for replacement parts."

The Court remains unclear how these opinions are relevant to the instant action, and will thus defer ruling on this motion in limine until the May 13, 2013 pretrial conference.

### Defendants' Motion in Limine Number 18 (Dckt.180)

Defendants' Motion in Limine Number 18 is a motion by defendant Buffalo Pumps that seeks to preclude Plaintiffs' expert Captain Francis Burger from offering opinions at trial that were not included in his Rule 26 report. Specifically, Buffalo Pumps argues that Captain Burger's Rule 26 report did not include an opinion about "spare" gaskets, only "replacement" gaskets.

As this Court previously found, Buffalo Pumps did not manufacture the asbestos-containing packing and gaskets at issue in this action; instead, Buffalo Pumps' potential liability was premised on Plaintiffs' theory that Buffalo Pumps supplied these products. There were three potential avenues through which Buffalo Pumps may have supplied the packing and gaskets: either encased in the original pumps aboard the Rogers or the Morton; as "spares" that Buffalo Pumps supplied with the originally installed parts; and as "replacement" parts. This Court found that, as a matter of law, Sclafani could not have been exposed to asbestos from the original packing or gaskets, and that Buffalo Pumps did not supply "replacements," but that a triable issue remained as to whether Sclafani worked with Buffalo Pumps-supplied *spares.*

 **\*8** Integral to the Court's finding was Captain Burger's opinion that "Buffalo provided asbestos-containing spare packing and gaskets for originals [,]" and that the Navy would "use manufacturer-supplied spare parts as replacements for original parts prior to dipping into the general supply stock." *See* Burger Decl. in Opp. to Buffalo Pumps' MSJ ¶ 21. Buffalo Pumps now contends that this opinion was not previously disclosed in Captain Burger's Rule 26 report, and is based on Captain Burger's review of materials not previously disclosed, and that the opinion should be excluded as prejudicial. [8]

In his Rule 26 report, Captain Burger discusses "replacement" parts, but does not discuss "spares" provided by Buffalo Pumps. *See* Capt. Burger's Expert Report at pp. 18, 19 (noting that "the industry utilized the original equipment manufacturers [such as Buffalo Pumps] for *replacement* parts, including asbestos gaskets and packing"). Plaintiffs argue that the word "replacement" is the same as "spare," and thus Burger's opinion was adequately disclosed.

The Court has serious reservations about Plaintiffs' argument. [9] However, it appears that this failure was not prejudicial; during Captain Burger's deposition, Buffalo Pumps' counsel appeared to distinguish between "spare

gaskets" and "subsequent replacement parts." It appears from this portion of the deposition that Buffalo Pumps was aware that Captain Burger intended to opine as to the provision of "spares," and thus the alleged failure to disclose was not prejudicial. Therefore, Defendants' Motion in Limine Number 18 is DENIED.

### *Defendants' Motion in Limine Number 19* (Dckt.181)

Defendants' Motion in Limine Number 19 is a motion by defendant Buffalo that seeks to preclude Sclafani from testifying that he saw the name "Buffalo Pumps" or "Buffalo" on the materials he worked with during his time aboard the USS Morton, as either inadmissible hearsay or subject to the best evidence rule. As this Court determined in ruling on Buffalo's motion for summary judgment, the Ninth Circuit has held that labels affixed to a medium "are most appropriately characterized as circumstantial evidence of origin, rather than as an 'assertion' within the meaning of the hearsay rule ." *Los Angeles News Serv. v. CBS Broad., Inc.,* 305 F.3d 924, 935 *opinion amended and superseded,* 313 F.3d 1093 (9th Cir.2002) (finding that an identifying "CBS" slate appearing on the opening frames of a videotape is not hearsay and 'is more akin to a postmark or timestamp' such that it is an "indicia of origin" that did not implicate the hearsay rule); *see also United States v. Snow,* 517 F.2d 441, 443 (9th Cir.1975) (holding that a piece of tape affixed to a briefcase with the name "Bill Snow" printed on it was *not* hearsay, but rather circumstantial evidence that the briefcase belonged to Bill Snow).

However, as this Court observed in its separate order of May 9, 2013, the words "Buffalo" and "Buffalo Pumps" are subject to the best evidence rule. The Court will defer ruling on Buffalo's motion on this basis until the pretrial conference set for May 13, 2013.

 **\*9** Buffalo also seeks to preclude Sclafani from opining that Buffalo Pumps was the "source or origin" of the "spare" parts Sclafani worked with. Buffalo is correct that Sclafani is unqualified to give such an opinion: he was not involved in the Naval supply chain, and has no knowledge of where the packing and gaskets he worked with came from. Thus, Sclafani will not be permitted to opine that the packing and gaskets he worked with were supplied by Buffalo.

Thus, Defendants' Motion in Limine Number 19 GRANTED in part.

### Defendants' Motion in Limine Number 20 (Dckt.184)

Defendants' Motion in Limine Number 20 is a motion by Defendant Buffalo Pumps that seeks to preclude the introduction of any evidence or argument of Sclafani's exposure to any asbestos-containing gaskets or packing allegedly supplied by Buffalo aboard the USS Rogers because that issue was "finally and fully adjudicated" when this Court granted in part Buffalo Pumps' motion for summary judgment. [10] Plaintiff does not oppose the motion; therefore, Defendants' Motion in Limine Number 20 is GRANTED.

### Defendants' Motion in Limine Number 21 (Dckt.183)

Defendants' Motion in Limine Number 21 is a motion by defendant Buffalo Pumps that seeks to preclude the introduction of any evidence or argument of Sclafani's exposure to any asbestos-containing gaskets or packing during his time aboard the USS Morton that were either originally-installed in the Buffalo Pumps-supplied pumps, or were supplied as "replacement" parts to those pumps, because these issues were "finally and fully adjudicated" when this Court granted in part Buffalo Pumps' motion for summary judgment. [11] Plaintiff does not oppose the motion; therefore, Defendants' Motion in Limine Number 21 is GRANTED.

### Defendants' Motion in Limine Number 22 (Dckt.182)

Defendants' Motion in Limine Number 22 is a motion by Defendant Buffalo Pumps that seeks to preclude the introduction of a declaration signed by Sclafani that was submitted in opposition to Buffalo Pumps' motion for summary judgment as hearsay, pursuant to Federal Rules of Evidence 801 and 802. Plaintiff does not oppose the motion; therefore, Defendants' Motion in Limine Number 22 is GRANTED.

### Defendants' Motion in Limine Number 23 (Dckt.170)

Defendants' Motion in Limine Number 23 is a motion by defendant Goodyear that seeks to preclude Plaintiffs from

introducing evidence or making argument that Goodyear manufactured asbestos-containing products *other* than the ones to which Sclafani alleges he was exposed. This motion is the same as Defendants' Motion in Limine number 11, which sought to exclude evidence all evidence of *any* defendant "manufactured or supplied asbestos-containing products not at issue in this case." Here, as there, Goodyear has failed to identify which items of evidence it seeks to exclude; thus, the Court will reserve ruling on this motion until Plaintiffs seek to introduce specific items of evidence.

### Defendants' Motion in Limine Number 24 (Dckt.172)

 **\*10** Defendants' Motion in Limine Number 24 is a motion by defendant Goodyear that seeks to preclude Plaintiffs, their counsel, and their expert witnesses from "making any reference to asbestos exposure from new Goodyear gasket material after 1969," and from making any reference to "any Goodyear-related documents, manuals, or any other written materials relating to any gasket product manufactured by Goodyear after 1969." Plaintiffs do not oppose the motion; therefore, Defendants' Motion in Limine Number 24 is GRANTED.

### Defendants' Motion in Limine Number 25 (Dckt.221)

Defendants' Motion in Limine Number 25 is a motion to preclude Plaintiffs from using any graphic and illustrative material not timely disclosed. Defendants do not identify what, if any material, they are seeking to exclude; thus, the Court defers ruling on this motion until such material is identified. If Plaintiffs attempt to use graphs, pictures, or other illustrations at trial that were not disclosed at least eleven (11) days before trial (or before May 3, 2013), this Court will prohibit Plaintiffs from using these materials under Local Rule 16–3. ("If not already disclosed ... the parties shall disclose copies of all graphic or illustrative material to be shown the trier of facts as illustrating the testimony of a witness at least eleven (11) days before trial.").

Footnotes

1    All docket numbers refer to case number 2:12–cv–3013–SVW–PJW, except for the motions in limine numbers 9 through 17, which were filed under case number 2:12–cv–3037–SVW–PJW.

2    Foster Wheeler also seeks to strike portions of Sclafani's deposition that were elicited "through impermissible leading questions." At the pretrial conference, Plaintiffs indicated that Sclafani would not be testifying himself; instead, his testimony will be offered by reading his deposition into the record. Plaintiffs' counsel is currently identifying which portions of Sclafani's deposition they seek to introduce; and Foster Wheeler (among others) will respond by identifying, and objecting to, specific items of testimony. The Court will defer on ruling on this objection until this process is complete.

    Foster Wheeler also argues that Sclafani's identification of Foster Wheeler gaskets and packing during his deposition lacked foundation and was based on speculation. Specifically, they point out that, while at certain points in his deposition Sclafani recalled seeing the name "Foster Wheeler" on boilers, gaskets, and packing, at other points he could not remember seeing any such logos or writing. These arguments obviously go to Sclafani's credibility, an issue reserved for the jury.

3    Defendants did not file a Motion in Limine Number 6.

4    Foster Wheeler's motion was likely made to preempt Plaintiffs from arguing that Foster Wheeler is liable because it "was foreseeable [to Foster Wheeler that] workers would be exposed to and harmed by the asbestos in replacement parts and products used in conjunction with their pumps and valves." *O'Neil v. Crane Co.,* 53 Cal.4th 335, 342, 135 Cal.Rptr.3d 288, 266 P.3d 987 (2012). However, in *Crane,* the California Supreme Court explicitly rejected this theory of liability, holding that a plaintiff in an asbestos-related personal injury suit must show that the defendant being sued was somehow involved in the manufacturing, distribution, or retail chain of the asbestos product to which a plaintiff was exposed. *Id.* at 362–63, 135 Cal.Rptr.3d 288, 266 P.3d 987.

5    Under Local Rule 7–12, the failure to file any required document "may be deemed consent to the granting or denial of the motion."

6    Durabla was another gasket manufacturer who included asbestos in their gaskets.

7    Defendants' motion was likely made to preempt Plaintiffs from arguing that Foster Wheeler is liable because it "was foreseeable [to Defendants that] workers would be exposed to and harmed by the asbestos in replacement parts and products used in conjunction with their pumps and valves." *O'Neil v. Crane Co.,* 53 Cal.4th 335, 342, 135 Cal.Rptr.3d 288, 266 P.3d 987 (2012). However, in *Crane,* the California Supreme Court explicitly rejected this theory of liability, holding that a plaintiff in an asbestos-related personal injury suit must show that the defendant being sued was somehow involved in the manufacturing, distribution, or retail chain of the asbestos product to which a plaintiff was exposed. *Id.* at 362–63, 135 Cal.Rptr.3d 288, 266 P.3d 987.

8    Buffalo Pumps raised other objections to this portion of Captain Burger's declaration in their motion for summary judgment, objections which this Court overruled.

9    As this Court previously found, "spares" were provided by pump manufacturers, like Buffalo Pumps, when they sold the original pumps. "Replacements" were additional gaskets and packing purchased by the Navy separately-and it was undisputed that Buffalo Pumps never sold separate "replacements."

10    As this Court previously found, Plaintiffs had identified three potential sources of asbestoscontaining gaskets and packing that Buffalo Pumps might have supplied for use aboard the USS Morton during Sclafani's service aboard the ship: 1) the originally installed gaskets and packing; 2) the "replacement" gaskets and packing; and 3) the "spare" gaskets and packing. This Court concluded that no triable issue remained as to the first two sources of asbestos-containing gaskets; but that one remained as to whether Sclafani was exposed to "spare" gaskets and packing distributed by Buffalo Pumps.

11    As this Court previously found, Sclafani was *not* exposed to Buffalo-supplied asbestos-containing parts aboard the Rogers, as Sclafani did not board the Rogers until approximately eighteen years after it was commissioned.

---

**End of Document**                                        © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 7

Anderson v. Ford Motor Co., --- F.Supp.2d ---- (2013)

2013 WL 3179497
Only the Westlaw citation is currently available.
United States District Court,
D. Utah,
Central Division.

Arva ANDERSON, Plaintiff,
v.
FORD MOTOR COMPANY, et al., Defendants.

No. 2:06–CV–741 TS.   |   June 24, 2013.

## Synopsis

**Background:** Plaintiff filed state court action alleging that his mesothelioma was caused by his exposure to asbestos. After removal, transfer by Panel on Multidistrict Litigation, and substitution of executor of plaintiff's estate, defendants moved to exclude proposed specific causation testimony.

**[Holding:]** The District Court, Ted Stewart, J., held that proposed testimony was not sufficiently reliable to warrant its admission.

Motion granted.

## Attorneys and Law Firms

G. Patterson Keahey Law Offices of G. Patterson Keahey Birmingham, AL, Gary M. Dimuzio, Law Offices of Gary Dimuzio, Houston, TX, for Plaintiff.

Scott A. Dubois, Wrona Law Firm, Park City, UT, Dennis H. Markusson, Markusson Green & Jarvis, Mary Price Birk, Ronald L. Hellbusch, Baker & Hostetler, Denver, CO, Casey K. McGarvey, Edizone LLC, Alpine, UT, Clinton A. McAdams, Joseph J. Joyce, Ryan J. Schriever, J. Joyce & Associates, South Jordan, UT, Tonn K. Petersen, Perkins Coie LLP, Boise, ID, Kamie F. Brown, Gregory S. Roberts, Rick L. Rose, Ray Quinney & Nebeker, Stewart O. Peay, Tracy H. Fowler, Todd M. Shaughnessy, Snell & Wilmer, Timothy C. Houpt, Jones Waldo Holbrook & McDonough, Melinda A. Morgan, Vantus Law Group, Patricia W. Christensen, Parr Brown Gee & Loveless, Katherine E. Venti, John P. Ball, Jr, Parsons Behle & Latimer, Jonathan L. Hawkins, Morgan Minnock Rice & James, Barbara K. Berrett, Berrett & Hanna LC, Rebecca L. Hill, Scot A.

Boyd, Christensen & Jensen PC, Mark J. Williams, Price Parkinson & Kerr PLLC, Mark D. Taylor, Lewis Hansen Waldo Pleshe Flanders LLC, Peter W. Billings, Rachel G. Terry, Christian D. Austin, Fabian & Clendenin, Allan L. Larson, Jill L. Dunyon, Kenneth L. Reich, Snow Christensen & Martineau, Dennis C. Ferguson, Timothy J. Bywater, Mark R. Anderson, Williams & Hunt, H. Scott Jacobson, Jr., Strong & Hanni, Dan R. Larsen, Dorsey & Whitney, Karthik Nadesan, Nadesan Beck PC, Salt Lake City, UT, for Defendants.

**Opinion**

MEMORANDUM DECISION AND ORDER
GRANTING DEFENDANTS' MOTION TO
EXCLUDE THE PROPOSED SPECIFIC CAUSATION
TESTIMONY FROM PLAINTIFF'S EXPERTS

TED STEWART, District Judge.

**\*1** This matter is before the Court on Defendant Crane Co.'s Renewed Motion to Exclude the Proposed Specific Causation Testimony from Plaintiff's Experts. Defendants York International Corporation, Honeywell, Inc., Goulds Pumps, Flowserve Corporation, and Sepco Corporation (collectively "Defendants") have all joined in Crane Co.'s Renewed Motion. For the reasons discussed below, the Court will grant Defendants' Motion.

### I. BACKGROUND

This matter was initially filed in state court by Joseph Alexander Anderson, Jr., and was removed to this Court on September 1, 2006. Plaintiff's complaint alleged that Mr. Anderson had been diagnosed with asbestos-caused Mesothelioma. Mr. Anderson died of Mesothelioma on June 7, 2008, and his wife and the executor of his estate, Arva Anderson, was substituted as Plaintiff. On October 20, 2006, the United States of America Judicial Panel on Multidistrict Litigation issued Conditional Transfer Order 269,[1] which transferred Plaintiff's case to the United States District Court for the Eastern District of Pennsylvania (the "Pennsylvania Court").

On September 26, 2012, without giving any reasoning for its determination, the Pennsylvania Court issued an order denying Defendant Crane Co.'s Motion to Exclude as moot.[2] On the same day, the Pennsylvania Court issued a Suggestion

of Remand, suggesting that the case be remanded to this Court because all discovery had been completed and the case was ready for trial. [3] On October 12, 2012, a Clerk's Order of Conditional Remand was signed, remanding the case back to this Court for trial and severing all claims for punitive or exemplary damages. [4] Soon thereafter, on December 3, 2012, Defendant Crane Co. filed its Renewed Motion to Exclude the Proposed Specific Causation Testimony from Plaintiff's Experts.

Plaintiff hired two experts to testify regarding the cause of Mr. Anderson's Mesothelioma. Drs. Barry Horn and Steven Dikman have each submitted expert reports and have been deposed by Defendants in regard to those reports. Before making their reports, both experts reviewed Mr. Anderson's medical records and work history as supplied by Plaintiff's counsel. However, neither expert personally spoke with or examined Mr. Anderson.

Dr. Dikman passed away on November 8, 2012, and Defendants have withdrawn their arguments as to his personal testimony. However, Defendants have not withdrawn their arguments as to the substance of Dr. Dikman's proposed testimony, and continue to seek an order that no expert should be allowed to offer "every exposure" testimony or give specific causation testimony regarding any of Defendants' products. As the substance of Dr. Dikman's report is at issue in the present Motion, it will be considered despite his death.

### A. DR. HORN'S REPORT

Dr. Horn's report consists of a detailed summary of the medical information provided to him, a recitation of Mr. Anderson's work history, and a brief opinion. Dr. Horn opines that "[a]ll of Mr. Anderson's asbestos exposure should be considered a contributing factor in the development of his malignancy. In summary, Mr. Anderson has been diagnosed as having malignant mesothelioma caused by prior occupational and paraoccupational exposure to asbestos." [5] He further opines that "[t]here is only one known cause of malignant mesothelioma in man, and that [is] prior asbestos exposure or exposure to a similar substance called zeolite.... [M]any studies have clearly demonstrated that workers exposed to asbestos are at risk for this otherwise rare malignancy." [6] Dr. Horn later submitted a supplemental report in which he declares that "[t]he mesothelioma was caused by prior exposure to asbestos as outlined in my prior report." [7]

**\*2** When questioned in his deposition about the basis for his opinions, Dr. Horn affirmed that he "didn't consult anything specific for this case." [8] Furthermore, when asked specifically if he had any opinions related to Defendant Crane Co.'s products, Dr. Horn testified "[n]o, I have no specific opinions. I have no information regarding this man's exposure to Crane Co. Products." [9] Neither Dr. Horn's report nor deposition contains any information regarding Mr. Anderson's exposure to the products of any specific Defendant.

When questioned about whether he needed to know the dose of asbestos dust Mr. Anderson was exposed to in formulating his opinion, Dr. Horn testified "No. If the exposure is above background, then it increased his risk. Now, if there are some exposures that are much higher than other exposures, then the higher exposures would contribute a greater risk than lower exposures. But any exposure above background would increase his risk." [10] He further explained that

> [a]ll chemical carcinogens manifest a dose-dependent relationship. There's, I don't believe there's any dispute anywhere in the literature regarding that issue. The more of a chemical carcinogen you are exposed to, the greater your risk for the development of cancer. This is clearly also true for asbestos; that is, the more asbestos you inhale and retain in your lungs, the greater your risk for developing an asbestos-related disease, and that includes mesothelioma. [11]

### B. DR. DIKMAN'S REPORT

Dr. Dikman's report consists of a brief summary of Mr. Anderson's work and medical history followed by a one paragraph opinion. Dr. Dikman opines as follows:

> Asbestos exposure is well documented to cause malignant mesothelioma. The finding of hyalinized pleural plaquing in the surgical tissue specimen from Mr. Anderson indicates asbestos related pleural disease and confirms that his asbestos exposure was substantial. The radiographic and

clinical findings, including the intraoperative appearance, and the microscopic and immunopathologic studies established the diagnosis of malignant mesothelioma. It is my opinion, with a reasonable degree of medical certainty, that Mr. Anderson's malignant pleural mesothelioma was caused by his asbestos exposure. [12]

When asked whether his opinion on causation required a consideration of the frequency of exposures, Dr. Dikman stated that "[i]n some cases, yes, generally I would say yes but in specifically in Mr. Anderson we have high hyalinized pleural plaquing which documents that he had substantial exposure in the past which would cover both frequency and duration." [13] Dr. Dikman later clarified that he didn't have specific information on Mr. Anderson's exposure to asbestos, stating that he didn't "have specific information as to those types of frequency, duration, and things of that sort." [14]

Additionally, Dr. Dikman testified as follows:

Q. Did you think that every exposure contributes to the development of this disease?

**\*3** A. I would think there is no way of separating every specific exposure, but I would say that, yes, that the aggregate of the exposures did contribute to his disease.

Q. Let me ask you: Do you believe that every exposure contributes to his disease?

A. I would say, yes, and then I have no way of separating one exposure from the other. We know this individual, as many individuals, has had substantial exposure to asbestos and they have an asbestos-caused mesothelioma.

Q. Do you believe that every exposure to asbestos contributes equally to the development of the disease?

A. I don't know.

MR. KIELY: Objection.

Q. Do you believe that the frequency of exposures affects its contribution to the development of disease?

A. We don't know. We don't know the specific threshold of what is needed to develop mesothelioma. There is no established threshold. And the types and amounts of

exposure and duration and frequency is very variable, and it's at all different levels. So there is really no specific duration or amount that's really known to be necessary to cause mesothelioma. [15]

Finally, Dr. Dikman testified that the general population is exposed to asbestos in the ambient air. [16] Dr. Dikman clarified that "the measurements in the air samples in the general population, and air samples have been used to see the incidence in a background population from nonexposed individuals, and this has never been shown to have a significant increase in the risk for mesothelioma in these background populations." [17]

## II. RULE 702 AND *DAUBERT*

Defendants do not argue that Plaintiff's experts are not qualified to testify as experts in this matter. Instead, Defendants seek to exclude any specific causation testimony that the asbestos which caused Mr. Anderson's disease came from their products. Specifically, Defendants argue that the experts should be precluded from offering testimony that "every exposure" to asbestos is a factual cause of the development of mesothelioma. Defendants argue that such testimony should be excluded because (1) it is not based on sound scientific principles and should be excluded under *Daubert* and Fed.R.Evid. 702; and (2) jurisdictions applying a substantial factor causation test should not permit this type of opinion evidence. As the Court finds that the proposed testimony does not meet the requirements of Rule 702 and *Daubert,* there is no need to consider whether the testimony is appropriate under the substantial factor causation test.

Fed.R.Evid. 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

**\*4** (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals Inc.* [18] and *Kumho Tire Co., Ltd. v. Carmichael,* [19] the Supreme Court interpreted the requirements of Rule 702. "*Daubert* requires a trial judge to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." [20] "In applying Rule 702, the trial court has the responsibility of acting as a gatekeeper." [21]

**[1]** "Scientific knowledge ... 'implies a grounding in the methods and procedures of science' which must be based on actual knowledge and not 'subjective belief or unsupported speculation." [22] "In other words, 'an inference or assertion must be derived by the scientific method ... [and] must be supported by ... good grounds, based on what is known." [23] " 'Under the regime of *Daubert* ... a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." [24]

**[2]** "The Supreme Court has provided some guidance for the task of determining scientific validity." [25] "This inquiry is 'a flexible one,' not governed by a 'definitive checklist or test.' " [26] Some factors to consider are whether the expert's theory or technique: (1) can be (and has been) tested; (2) has been subjected to peer review and publication; (3) has a known or potential rate of error with standards controlling the technique's operation; and (4) enjoys widespread acceptance in the relevant scientific community. [27]

### III. DISCUSSION

Plaintiff's experts admit that they do not have any specific information regarding Mr. Anderson's exposure to any of Defendants' products. [28] They do not appear to think such information is necessary, as their testimony that every exposure Mr. Anderson had to an asbestos fiber contributed to the causation of his disease would imply specific causation regardless of the dose of the exposure or the type of fiber to which Mr. Anderson was exposed. Under this analysis, all Plaintiff must do at trial is show that Mr. Anderson was exposed to some minimal amount of asbestos from the product of a Defendant at some point in his life, and that

Defendant could be found liable for his mesothelioma. This would be true regardless of whether or not Mr. Anderson was also exposed to significant amounts of highly carcinogenic fibers from one or more of the other Defendants.

Defendants argue that the testimony of Plaintiff's experts is conjecture that is not based on sound scientific principles or evidence. Therefore, Defendants urge the Court to exercise its gatekeeping powers to exclude this evidence under Rule 702 and *Daubert.* The chief dispute is whether the testimony is based on sufficient facts or data, and whether the testimony is the product of reliable principles and methods.

**\*5** Recently, in *Smith v. Ford Motor Company,* Judge Dee Benson of this Court thoroughly considered whether Rule 702 and *Daubert* permit expert testimony that "every exposure" to asbestos is a contributing cause to a person's mesothelioma. [29] The Court finds Judge Benson's opinion to be persuasive and well-reasoned. [30] In *Smith,* the plaintiff's expert sought to offer "every exposure" testimony to show that Mr. Smith's mesothelioma was caused by his cumulative exposure to asbestos, with each exposure playing a contributing role, including any exposure he may have had when he changed automobile break pads on several occasions. [31] However, the expert did not have any underlying data on the quantity of fibers found in brakes necessary to cause cancer in a human being. [32]

After thoroughly considering the arguments before it, the Court found the expert opinion to be, "as a matter of law, unsupported by sufficient or reliable scientific research, data, investigations or studies, and is inadmissible under Rule 702." [33] The Court found that "the every exposure theory as offered as a basis for legal liability is inadmissible speculation that is devoid of responsible scientific support." [34]

### A. UNDERLYING FACTS AND DATA

Plaintiff's experts are unable to point to any studies showing that "any exposure" to asbestos above the background level of asbestos in the ambient air is causal of mesothelioma. Instead, Plaintiff's experts base their opinion on the fact that scientists have been unable to determine a safe level for exposure to asbestos. Such studies are difficult to perform as mesothelioma often develops as long as between ten and forty years after exposure to asbestos, [35] and scientists have not yet found a way to determine which exposure or fiber(s) caused the mesothelioma. As Dr. Dikman testified, "We don't know.

We don't know the specific threshold of what is needed to develop mesothelioma. There is no established threshold.... So there is really no specific duration or amount that's really known to be necessary to cause mesothelioma." [36]

As noted earlier, not only do Plaintiff's experts lack data on the level of exposure to asbestos necessary to cause mesothelioma, they have no information on Mr. Anderson's exposure to Defendants' products, or even the type of asbestos fibers that Defendants' products may contain. All of the experts' data comes from medical reports which demonstrate that, at some point, Mr. Anderson was exposed to asbestos and that the "asbestos exposure was substantial ." [37] The experts have no information on whether that substantial exposure had any relation to the remaining Defendants before the Court.

[3] As this Court recently stated in *Smith,* "Rule 702 and *Daubert* recognize above all else that to be useful to a jury an expert's opinion must be based on sufficient facts and data. The every exposure theory is based on the opposite: a lack of facts and data." [38] Plaintiffs experts do not base their opinions on scientific evidence that every exposure to asbestos causes mesothelioma. Instead, their testimony is based on their lack of information sufficient to show the level of exposure which does not create a risk of mesothelioma. This is not reliable enough evidence for the Court to allow it in under the standards of *Daubert* and Rule 702. "Just because we cannot rule anything out does not mean we can rule everything in." [39]

## B. PRINCIPLES AND METHODS
*6 [4] "It is well established that a plaintiff in a toxic tort case must prove that he or she was exposed to and injured by a harmful substance manufactured by the defendant." [40] Normally, a plaintiff will rely on its expert to "demonstrate 'the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover.' " [41] Here, however, Plaintiff's experts simply assert that any level of exposure is hazardous to human beings and forego any examination of Mr. Anderson's actual level of exposure.

In support of his proposed testimony that every exposure to asbestos is casual of mesothelioma, Dr. Horn states that mesothelioma is dose-responsive to asbestos exposure. [42] In addition, Dr. Dikman testified that although there is some

background level of asbestos to which the general population is exposed, this exposure has not been shown to pose a significant risk of mesothelioma. [43] The experts simply do not have the scientific information to allow them to testify in further detail regarding a dosage that does pose a significant risk of mesothelioma.

Considering the *Daubert* factors for examining a scientific theory, the theory proposed by Plaintiff's experts is troubling. Due to the significant lag between exposure to asbestos and a diagnosis of mesothelioma, the theory cannot be easily tested. Plaintiff's experts testified that they have no way of knowing which fibers or which exposure caused the mesothelioma. Similarly, there is no known error rate for this theory. Although Plaintiff has pointed to instances in which people with very little known exposure to asbestos contracted mesothelioma, it is not known if the odds of people with so little exposure contracting mesothelioma is one out of a million or one out of a hundred.

Plaintiff has supplemented the record with numerous scholarly articles and scientific studies in support of the claim that asbestos causes mesothelioma and that there is no known safe exposure to asbestos. However, Plaintiff's experts have pointed to no studies showing that the type of exposure Mr. Anderson had to Defendants' products is likely to cause mesothelioma. Viewed in its most favorable light, the literature shows that any exposure to asbestos *could* cause mesothelioma, but no one knows how likely that is.

Plaintiff has also supplied the Court with the reports and testimony of a core group of experts in similar cases where the experts testified that every exposure to asbestos caused a person's mesothelioma. However, the Court must base its opinion on the facts and testimony presented in this case, rather than on the testimony of experts in other cases. Although the testimony of these experts does indicate that the theory has some acceptance in the scientific community, the Court notes that a growing number of courts have determined that the theory is not proper under *Daubert* and Rule 702, expressing the opinion that the " 'any exposure theory is, at most, scientifically-grounded speculation: an untested and potentially untestable hypothesis.' " [44]

*7 For the reasons stated above, the Court finds that the every exposure theory of causation does not meet the standards set by Rule 702 and *Daubert* and must be excluded. Therefore, Defendants' Motion will be granted.

## IV. CONCLUSION

It is therefore

ORDERED that Defendants' Renewed Motion to Exclude the Proposed Specific Causation Testimony from Plaintiff's Experts (Docket No. 270) is GRANTED.

Footnotes

1    *See* Docket No. 143.
2    Docket No. 270–8.
3    Docket No. 254.
4    *Id.*
5    Docket No. 270–1 Ex. A, at 12.
6    *Id.* at 10.
7    Docket No. 285–7 Ex. D, at 4.
8    Docket No. 270–2 Ex. 2, at 19.
9    Docket No. 270–3, at 87.
10   Docket No. 270–2 Ex. 2, at 27.
11   *Id.* at 17.
12   Docket No. 285–7 Ex. B, at 2.
13   Docket No. 270–2 Ex. 1, at 13–14.
14   *Id.* at 18–19.
15   *Id.* at 46–48.
16   *Id.* at 126.
17   *Id.* at 128.
18   509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
19   526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).
20   *Atl. Richfield Co. v. Farm Credit Bank of Wichita,* 226 F.3d 1138, 1163 (10th Cir.2000) (quoting *Daubert,* 509 U.S. at 589).
21   *In re Breast Implant Litig.,* 11 F.Supp.2d 1217, 1222 (D.Colo.1998).
22   *Mitchell v. Gencorp Inc.,* 165 F.3d 778, 780 (10th Cir.1999) (quoting *Daubert,* 509 U.S. at 590).
23   *Id.* (quoting *Daubert,* 509 U.S. at 590).
24   *Id.* at 783 (quoting *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996)).
25   *In re Breast Implant Litig.,* 11 F.Supp.2d at 1223.
26   *Atl. Richfield,* 226 F.3d 1163 (quoting *Daubert,* 509 U.S. at 593).
27   *Id.*
28   Docket No. 270–3, at 87; Docket No. 270–2 Ex. 1, at 18–19.
29   2013 WL 214378 (D.Utah Jan.18, 2013).
30   This Court had previously considered whether to allow testimony similar to the testimony proposed here when presented with the question in the context of a motion in limine in *Larson v. Bondex International, Inc.* 2011 U.S. Dist. LEXIS 79830 (D.Utah July 21, 2011). Without the aid of the extensive briefing provided by the parties to the present case, the Court allowed the testimony. *Id.* at *4.
31   *Id.* at *1.
32   *Id.* at *3.
33   *Id.* at *2.
34   *Id.*
35   Docket No. 285–1, at 25.
36   Docket No. 270–2 Ex. 1, at 48.
37   Docket No. 285–7 Ex. B, at 2.
38   2013 WL 214378, at *2.
39   *Id.* at *3.

---

40    *Mitchell,* 165 F.3d at 781 (citing *Wright v. Willamette Indus., Inc.,* 91 F.3d 1105, 1106 (8th Cir.1996); *Wintz By & Through Wintz v. Northrop Corp.,* 110 F.3d 508, 515 (7th Cir.1997); *Allen v. Pa. Eng'g Corp.,* 102 F.3d 194, 199 (5th Cir.1996)).

41    *Id.* (quoting *Wright,* 91 F.3d at 1106).

42    Docket No. 270–2 Ex. 2, at 17.

43    *Id.* Ex. 1, at 128.

44    *Smith,* 2013 WL 214378, at *5 (quoting *Butler v. Union Carbide Corp.,* 310 Ga.App. 21, 712 S.E.2d 537, 552 (Ga.Ct.App.2011)).

---

**End of Document**                                            © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 8

2012 WL 1570129
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois.

SEGLE

v.

STEGMILLER.

No. 10 C 4618.    |    May 3, 2012.

**Attorneys and Law Firms**

Gigi Ann Gilbert, Law Offices of Gigi Gilbert, Chicago, IL, for Segle.

Brandon J. Gibson, Carla Madeleine Kupe-Arion, City of Chicago, Jonathan Clark Green, Chicago Corporation Counsel, Chicago, IL, for Stegmiller.

**Opinion**

**STATEMENT**

HARRY D. LEINENWEBER, Judge.

**I. Background**

 **\*1**  Plaintiff has moved to bar testimony from Defendants' expert Dr. Paul Akers. Dr. Akers is, according to Defendants, an experienced maxillofacial surgeon and diplomat to the American Board of Oral & Maxillofacial Surgery. Although a copy of his resume, publications, and previous testimony has not been provided to the Court, Defendants aver (and Plaintiff does not dispute) that that information has been provided to Plaintiff. In any event, Plaintiff challenges the adequacy of Akers' report, not his qualifications.

The substantive portion of Dr. Akers' expert opinion is a one-page letter. In it, Dr. Akers states that "it is my medical opinion, that within a reasonable degree of certainty that [Plaintiff's] broken jaw may have occurred while [Defendants subdued] Mr. Sigle and forc[ed] him to the ground while he was resisting arrest. The fracture may have occurred when Mr. Sigle hit the floor in the hallway." Essentially, Dr. Akers concludes that the defendants' account is "very plausible" in light of the injuries as described in the medical records, but that the relative lack of facial bruising or lacerations is, in his experience as a maxillofacial surgeon, inconsistent with

being hit or kicked multiple times in the face. Accordingly, Dr. Akers concluded that Mr. Sigle's version of events was inconsistent with the medical evidence that he reviewed.

**II. Legal standard**

Rule 26 requires a party to disclose "a complete statement of all opinions [an expert witness]will express and the basis and reasons for them." Rule 26(a)(2)(B)(i). Whether such testimony is admissible is governed by Federal Rule of Evidence 702, and the line of cases originating with *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007). Courts undertake a three-step analysis to determine whether such testimony is relevant and reliable, not "unscientific speculation offered by a genuine scientist." *Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996). First, the witness must be qualified as an expert based on his knowledge, skill, experience, training, or education. Fed.R.Evid. 702. Second, his reasoning or methodology must be scientifically reliable. *Ervin,* 492 F.3d at 904. Courts consider a variety of factors in determining whether an opinion is reliable, including whether the theory has been tested or published, and whether it is generally accepted in the scientific community; however, the inquiry is flexible and relevant factors vary by the kind of expertise at issue. *See Smith v. Ford Motor Co.,* 215 F.3d 713, 719–20 (7th Cir.2000). Finally, the testimony must assist the trier of fact to understand certain evidence or determine a fact at issue in the case. *Ervin,* 492 F.3d at 904.

**III. Discussion**

Plaintiff objects that the expert report does not satisfy Rule 26 in that it is unsigned and insufficiently sets forth the basis for Akers' conclusions. There is no dispute that the report is unsigned, but Plaintiff has identified no prejudice that he suffered by that error. It was harmless. The Court accordingly permits Defendants to produce a corrected copy of the expert report which includes a proper signature.

 **\*2**  As to the substance of the report, the Court notes that the substantive portion of Dr. Akers' report is hardly overwhelming in its detail. Nonetheless, Dr. Akers notes that he has reviewed the medical records from two relevant hospitals, transcripts of IPRA investigations, and the parties' depositions. Although he sets forth Defendants' account at

greater length than Plaintiff's, Dr. Akers notes the conflicting stories and states that in his medical experience, Defendants' account of what transpired is a plausible explanation for Plaintiff's injuries, whereas Plaintiff's account is not. *Cf. Mosby v. Silberschmidt,* No. 08–cv–677, 2010 WL 4536999, at *2 (W.D.Wis. Nov.2, 2010) (noting that where the expert explained what documents he reviewed and applied his experience as a practicing dentist to that information, the brevity of the expert report did not render it inadmissible. The fact that Dr. Akers did not examine Plaintiff before offering his opinion does not render that opinion unreliable or otherwise impermissible. *See Walker v. Soo Line R. Co.,* 208 F.3d 581, 591 (7th Cir.2000). Accordingly, the Court does not agree that Dr. Akers' opinion is unreliable in that it fails to provide a basis for his conclusions, or merely parrots Defendants' story.

The shortness of the opinion is doubtless attributable at least in part to its simplicity: Akers' opinion is essentially that any significant blunt trauma to the face can result in a broken jaw, and that both parties have proffered a theory of what that trauma was in this case. Based on Dr. Akers' medical experience, the absence of noted significant facial lacerations or bruising makes Plaintiff's account of the incident inconsistent with the medical evidence. Plaintiff objects that Akers is not qualified as an expert in how jaws are fractured, but he doesn't have to be. Nowhere in his report does he state that he knows what caused the fracture—he merely opines that Defendants' account is consistent with a force that could have broken Plaintiff's jaw (and unlike Plaintiff's version, is evidently not undermined by other medical evidence). It is well understood that blunt trauma can result in a jaw fracture, and that punches and kicks to the face generally produce cuts and bruises—almost to the point of not requiring expert testimony. They certainly do not require any more expertise than Dr. Akers has.

It is a closer question, however, whether Dr. Akers' opinions will be helpful to the jury. If it were true, as Plaintiff's briefing implies, that Akers gave no more than his general conclusion that Defendants' account could have produced Plaintiff's broken jaw, this Court would be inclined to exclude that opinion as too general to be helpful. *Cf. Myers v. Illinois Central R. Co.,* 629 F.3d 639, 644 (7th Cir.2010) (conducting a reliable differential etiology involves ruling possible causes

of a condition in or out). Unlike in *Myers,* and despite Plaintiff's careful avoidance of this point, Dr. Akers did rule something out—Plaintiff's explanation of how he was injured. *See White v. City of Chicago,* No. 07 C 2539, 2011 WL 679905, at * 11 (N.D.Ill. Feb.16, 2011) (A doctor may testify that his professional experience is inconsistent with a plaintiff's account of injuries). To the extent that his medical experience allows him to rule out Plaintiff's explanation, as set forth in Plaintiff's own deposition, he has adequately stated the basis for his conclusion and the testimony could help the jury resolve the contested issue of fact. *Cf. Banister v. Burton,* 636 F.3d 828, 832 (7th Cir.2011) (treating physician gave descriptive testimony and then applied his basic medical knowledge to that information in opining that a plaintiff's injuries would not have stopped him from moving in certain ways.).

**\*3** It is not, however, particularly hard for a layperson to grasp that a fractured jaw can be caused by blunt trauma, or that a significant beating to the face would be expected to result in bleeding, swelling, or lacerations. *See Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 871 (7th Cir.2001) (to be helpful to the jury, an expert must testify to something that is not obvious to a layman). Nonetheless, because the individual experiences of prospective jurors may vary considerably, the Court does not conclude that the proffered opinion is so obvious that brief expert testimony would be impermissible under the circumstances. Given that there is no dispute that Dr. Akers is qualified, and that this Court has found his opinions to be sufficiently reliable and helpful to the jury, Plaintiff's motion to bar is denied.

The Court notes, however, that Defendants will be held to the thinness of the report. For example, it contains no statement that there is anything unique to Plaintiff's jaw fracture that is especially consistent with Defendants' story. Defendants will not be permitted later to offer opinions not disclosed in the report.

### IV. Conclusion

For the foregoing reasons, the Court denies Plaintiff's ocean to bar the testimony of Defense expert Dr. Akers.

---

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 9

2011 WL 3207363
Only the Westlaw citation is currently available.
United States District Court,
S.D. Ohio,
Western Division.

Susan CLEMENTS–JEFFREY, et al., Plaintiffs,
v.
CITY OF SPRINGFIELD, OHIO, et al., Defendants.

No. 3:09–cv–84. | July 27, 2011.

**Attorneys and Law Firms**

John Spenceley Marshall, Columbus, OH, for Plaintiffs.

Jerome Mark Strozdas, City of Springfield Law Director, Springfield, OH, William Charles Curley, James Quinn Dorgan, III, Weston Hurd, LLP, Columbus, OH, Charles Joseph Faruki, Faruki, Ireland & Cox, PLL, Dayton, OH, Jules L. Kabat, Marc A. Fenster, Nathan D. Meyer, Raquel Vallejo, Russ, August and Kabat, Los Angeles, CA, for Defendants.

**Opinion**

**DECISION AND ENTRY SUSTAINING PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE TESTIMONY OF DR. ARTHUR J. JIPSON (DOC. # 93)**

WALTER HERBERT RICE, District Judge.

**\*1** Plaintiffs have moved the Court for an Order prohibiting Defendants from introducing, at trial, the testimony of Defendants' expert witness, Dr. Arthur J. Jipson, an Associate Professor of Sociology and Director of the Criminal Justice Studies Program at the University of Dayton. For the reasons stated below, the Court sustains Plaintiffs' motion (Doc. # 93).[1]

**I. Dr. Jipson's Proposed Testimony**

Defendants offer Dr. Jipson as a "contextual expert," who can help to explain the problems of laptop computer theft, the need for theft recovery tools, and how those tools operate. He also intends to offer his expert opinion that Plaintiffs had no reasonable expectation of privacy in communications via the Internet.

Dr. Jipson offers five conclusions in his expert report:

1. It is not reasonable to believe that electronic communication is private online.

2. Only the original owner of a computer can have meaningful knowledge of security protection it contains. Any subsequent user of a laptop cannot assume automatic protection of any kind.

3. Computer, laptop, and electronic equipment theft is a serious social and criminological problem for organizations, businesses and individuals that requires reasonable remote and location-specific security solutions.

4. When a company activates system operation software capture for security reasons, the representatives of the company/ employees cannot predict the nature of the material that will be accessed.

5. Security and theft protection tools are necessary and proper tools to combat computer theft.

Ex. 1 to Jipson Decl. attached to Absolute Defs.' Mot. for Summ. J.

**II. Federal Rule of Evidence 702**

Plaintiffs maintain that Dr. Jipson's testimony does not satisfy the standards for expert witness testimony under Federal Rule of Evidence 702. That Rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme

Court held that the trial judge must perform a "gatekeeping" function with respect to expert witness testimony. *Id.* at 596. The court must ensure that expert witness testimony "is not only relevant, but reliable." *Id.* at 589.

With respect to relevance, the question is whether the expert testimony being proffered "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id. at 591 (quoting United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). With respect to the question of reliability, where the expert's testimony is based on something other than scientific knowledge, the court is given "broad latitude" in determining whether the proffered testimony is sufficiently reliable. *See Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141–42, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

### III. Qualifications

 **\*2**  The Court turns first to the question of Dr. Jipson's qualifications. The parties disagree on whether Dr. Jipson is qualified, by virtue of his "knowledge, skill, experience, training, or education," to offer expert witness testimony on the topics of Internet privacy, laptop computer theft, and theft recovery tools. *See* Fed.R.Evid. 702.

Defendants note that Dr. Jipson has taught classes in sociology and criminology at the university level for almost 20 years. He teaches classes on cyber crime and Internet deviance. Internet crime and privacy issues have been a consistent area of interest for him. He teaches a course on Internet and Popular Culture, which includes a section on Internet privacy. He has also written numerous articles that touch on these topics. Plaintiffs note, however, that none of these articles deals exclusively with the subject of his opinions in this case, and that he has never testified as an expert witness on this topic. Jipson Dep. at 10–12, 33–34, 48, 56–58, 62.

The Court need not decide whether Dr. Jipson possesses the requisite qualifications to offer the proposed expert witness testimony. Assuming *arguendo* that he is qualified, his testimony is nevertheless inadmissible for other reasons.

### IV. Whether Plaintiffs Had a Reasonable Expectation of Privacy Is a Question of Law and, Given that Dr. Jipson's Opinion Is Contrary to Law, His Opinion on this Subject is Not Relevant to the Issues in this Case.

Based on his knowledge, education, and experience, Dr. Jipson first offers his expert opinion that no one, including Plaintiffs, has a reasonable expectation of privacy in Internet communications. As will be noted in the Decision and Entry ruling on Defendants' motions for summary judgment, this is a threshold issue in this case, and a necessary prerequisite for each of Plaintiffs' claims. *See United States v. Jones,* 75 F. App'x 398, 400 (6th Cir.2003) (noting that a reasonable expectation of privacy is "tantamount to 'standing' in other contexts").

The question of whether Plaintiffs had a reasonable expectation of privacy in their Internet communications, however, is a question of law to be decided by the Court. *See id.; United States v. Welliver,* 976 F.2d 1148, 1151 (8th Cir.1992). This renders Dr. Jipson's "opinion" on this topic absolutely irrelevant. What makes his "opinion" even more troublesome is that it is contrary to case law.

Numerous courts have recognized that individuals have an objectively reasonable expectation of privacy in their personal computers. *See United States v. Heckenkamp,* 482 F.3d 1142, 1146 (9th Cir.2007) (holding that the defendant "had a legitimate, objectively reasonable expectation of privacy in his personal computer"); *United States v. Lifshitz,* 369 F.3d 173, 190 (2d Cir.2004) ("Individuals generally possess a reasonable expectation of privacy in their home computers."); *Guest v. Leis,* 255 F.3d 325, 333 (6th Cir.2001) ("Home owners would of course have a reasonable expectation of privacy in their homes and in their belongings-including computers-inside the home.").

 **\*3**  Personal computers that are password-protected are subject to even greater privacy protection. *See United States v. Aaron,* 33 F. App'x 180 (6th Cir.2002) (in assessing the scope of a privacy interest, the court should examine "whether the relevant files were password-protected or whether the defendant otherwise manifested an intention to restrict third-party access."); *United States v. Lucas,* 640 F.3d 168 (6th Cir.2011) (holding that the district court did not err in holding that the search of a laptop computer that was not password-protected was akin to the search of a closed, unlocked container); *United States v. Buckner,* 473 F.3d 551, 554 n. 2 (4th Cir.2007) (district court's finding that defendant had a reasonable expectation of privacy in password-protected files was not clearly erroneous).

As to electronic communications sent over the Internet, the Sixth Circuit has recently held that "a subscriber enjoys

a reasonable expectation of privacy in the contents of emails 'that are stored with, or sent or received through, a commercial [Internet service provider].' " *United States v. Warshak,* 631 F.3d 266, 288 (6th Cir.2010), reh'g and reh'g en banc denied (2011) (quoting *Warshak v. United States,* 490 F.3d 455, 473 (6th Cir.2007)). The court found that "the very fact that information is being passed through a communications network is a paramount Fourth Amendment consideration." *Id.* at 285. It also stated that "the Fourth Amendment must keep pace with the inexorable march of technological progress, or its guarantees will wither and perish." *Id.* The Sixth Circuit noted that Fourth Amendment protects traditional forms of communications such as telephone calls and letters, and found that "it would defy common sense to afford emails lesser Fourth Amendment protection." *Id.* at 286.

The court in *Warshak* also held that even though email had to pass through an Internet service provider ("ISP"), and even though that provider may have contractually reserved the right to access the subscriber's email in certain circumstances, neither the ability of the ISP to gain that access, nor its contractual right to do so, extinguished the user's reasonable expectation of privacy. *Id.* at 286–87.

In a similar vein, the Supreme Court recently assumed, without deciding, that a city employee had a reasonable expectation of privacy in text messages sent and received on a pager provided by his employer. *See City of Ontario v. Quon,* —— U.S. ——, ——, 130 S.Ct. 2619, 2630, 177 L.Ed.2d 216 (2010).

These holdings can logically be extended to cover instant messages and webcam communications, the types of electronic communications at issue in this case. Applicable statutes also shed light on whether an individual has an objectively reasonable expectation of privacy in electronic communications. The Stored Communications Act ("SCA"), 18 U.S.C. § 1701 *et seq.,* at issue in *Warshak* and *Quon* and the subject of one of Plaintiffs' claims in this case, specifically prohibits the intentional, unauthorized access of stored communications such as email. The Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511, also the subject of one of Plaintiffs' claims in this case, specifically prohibits the intentional, unauthorized interception, disclosure, and use of wire, oral, and electronic communications.

**\*4** Based on these statutes and on the above-cited case law, the Court concludes that Dr. Jipson's expert "opinion," that no one has an objectively reasonable expectation of privacy in password-protected Internet communications, is contrary to law, and thus not relevant to the issues in this litigation.

The Court finds it curious that despite Dr. Jipson's broadly stated expert opinion-that there is no reasonable expectation of privacy in communications via the Internet–Defendants did not argue this in their motions for summary judgment. Rather, they argued only that Plaintiffs lacked an objectively reasonable expectation of privacy because they knew or should have known that the laptop computer being used by Clements–Jeffrey was stolen.[2] The Court also finds it curious that, in formulating his opinion, Dr. Jipson did not consider this fact at all. Nor did he take the statutory prohibitions set forth in the ECPA and the SCA into account. Jipson Dep. at 81–82, 85–86, 135–36. As Plaintiffs note, Dr. Jipson completely ignored these "core issues."

In any event, the question of whether Plaintiffs had an objectively reasonable expectation of privacy in their Internet communications is a question of law to be determined by the Court. This renders Dr. Jipson's opinion on this topic completely irrelevant, even more so in light of the fact that it is contrary to case law. For these reasons, the Court finds that his opinion on this topic is inadmissible.[3]

**V. Even Though the Remainder of Dr. Jipson's Proposed Expert Witness Testimony May Assist the Jury In Understanding Some of the Evidence, It Is Excludable Under Federal Rule of Evidence 403.**
Dr. Jipson also intends to offer expert witness testimony concerning the pervasive problem of laptop computer theft and the need for theft recovery tools. In addition, he intends to explain to the jury that theft recovery tools are often present on laptop computers, and when those theft recovery tools are activated, it is difficult to predict the nature of the material that will be accessed.[4] Defendants argue that because these topics are beyond the actual knowledge and expertise of jurors, Dr. Jipson's testimony will assist the jury in its understanding of the relevant subject matter.

In addition to rendering an expert "opinion" on a topic, an expert witness may also be permitted to provide background information on a particular topic if it will assist the jury in understanding a particular issue. 4 Jack Weinstein & Margaret Berger, *Weinstein on Evidence* § 702.02[2] (2d

Clements-Jeffrey v. City of Springfield, Ohio, Not Reported in F.Supp.2d (2011)
85 Fed. R. Evid. Serv. 1281

ed.2006); *United States v. Mulder,* 272 F.3d 91, 102 (2d Cir.2001) ("The government is free to offer expert testimony both as background for an offense and to assist in proving one or more elements of the offense.").

Even though expert witness testimony may be relevant and may assist the jury in understanding the issues, it is nevertheless subject to the balancing test set forth in Federal Rule of Evidence 403. Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

 **\*5** Plaintiffs maintain that whatever little probative value the remainder of Dr. Jipson's testimony may have, it is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The Court agrees. In assessing the probative value of certain testimony, a court may consider what other evidentiary alternatives are available. If alternatives are readily available that have the same or greater probative value, but a lower danger of unfair prejudice or confusion of the issues, the court may exclude testimony on that basis. *See Old Chief v. United States,* 519 U.S. 172, 183–85, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997).

In this case, the Court presumes that Defendant police officers Geoffrey Ashworth and Neil Lopez, and Absolute Software's theft recovery officer Kyle Magnus will called to testify at trial. They will likely testify about the high number of laptop computers that are reported stolen, and about how theft recovery tools may be used to assist law enforcement officials in tracing stolen laptops.

Dr. Jipson testified that he was generally familiar with the operation of various theft recovery tools, including Absolute Software's "LoJack for Laptops," the theft recovery system that was used in this case. Jipson Dep. at 46. However, in the Court's view, Magnus and other Absolute Software employees are in a much better position to describe to a jury how the LoJack system works. They are also in a much better position to explain the various remote access tools used to trace the stolen laptop. In the Court's view, the testimony of these witnesses has significantly greater probative value than that of Dr. Jipson. The Court therefore concludes that the probative value of the remainder of Dr. Jipson's testimony is very slight.

Moreover, Magnus and other Absolute employees will undoubtedly testify about the prevalence of laptop computer theft, theft recovery tools in general, and about LoJack for Laptops in particular. They will also undoubtedly testify about how difficult it is to predict the nature of material that will be accessed when using certain theft recovery tools. Therefore, Dr. Jipson's testimony on these same topics would amount to "needless presentation of cumulative evidence."

In light of the opinions expressed in Dr. Jipson's expert report, there are also significant risks in allowing him to present "expert" testimony concerning these issues. Dr. Jipson believes that no one has any objectively reasonable expectation of privacy in Internet communications, an opinion the Court has found to be contrary to law, and thus inadmissible at trial. Given the likelihood that his belief would creep into his testimony on these other topics, there is a danger that the jury might be misled or confused.

Dr. Jipson is also of the opinion that theft recovery tools, presumably like those used in this case, are "necessary and proper" for combatting the problem of computer theft. Yet, in formulating his opinions, he admits that he completely failed to consider the statutory prohibitions set forth in the ECPA and SCA. This significantly increases the risk that the jury will be misled by his testimony. If the jury determines that Plaintiffs neither knew nor should have known that the laptop computer was stolen, the jury will then be called upon to determine whether the Absolute Defendants' efforts to recover the stolen laptop violated the ECPA or SCA, or otherwise invaded Plaintiffs' protected privacy interests. Dr. Jipson's opinions completely ignore these core issues.

 **\*6** Plaintiffs argue that a jury might give Dr. Jipson's "expert" witness testimony undue weight. They further argue that the admission of his testimony might invite jury nullification. Expert witness testimony that Plaintiffs' beliefs in privacy were unwarranted and that law enforcement should be given significant leeway in recovering stolen laptops could invite the jury to find that the ends justified the means, regardless of whether Defendants' tactics violated the law or invaded Plaintiffs' privacy rights. In the Court's view, Plaintiffs' concerns are not unfounded.

The Court concludes that the slight probative value of Dr. Jipson's testimony on the remainder of the issues is substantially outweighed by the danger of confusion of the issues and misleading the jury. Quite simply, other witnesses are better equipped to provide the same "background"

information to the jury, and can do so without the risks discussed above. Therefore, although relevant, Dr. Jipson's testimony on these topics is inadmissible under Federal Rule of Evidence 403.

## VI. Conclusion

For the reasons set forth above, the Court SUSTAINS Plaintiffs' Motion in Limine to Exclude Testimony of Dr. Arthur J. Jipson (Doc. # 93).

**Parallel Citations**

85 Fed. R. Evid. Serv. 1281

Footnotes

1    Defendants argue that Plaintiffs' motion is not yet ripe because the Court has not yet ruled on Defendants' motions for summary judgment. A separate Decision and Entry ruling on those motions, however, will be issued within a few days, and counsel have already been orally advised as to the Court's ruling therein.

2    As discussed in the Decision and Entry ruling on those motions for summary judgment, the question of whether Plaintiffs knew or should have known that the laptop was stolen is a factual dispute that must be resolved by a jury.

3    Having found that Dr. Jipson's testimony on this topic is irrelevant, the Court need not address the question of whether it is reliable.

4    To the extent that Defendants seek to introduce this particular testimony to support their claim that Plaintiffs had no reasonable expectation of privacy in their Internet communications, it is irrelevant for the reasons previously discussed.

**End of Document** © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 10

2010 WL 3893601
Only the Westlaw citation is currently available.
United States District Court,
D. Minnesota.

Mark ANDERSON and Killer Whale Holdings, LLC,
a Minnesota limited liability company, Plaintiffs,
v.
DAIRY FARMERS OF AMERICA,
INC., a foreign corporation, Defendant.

Civil No. 08–4726 (JRT/FLN). | Sept. 30, 2010.

**Attorneys and Law Firms**

Thomas B. Hatch and Thomas C. Mahlum, Robins Kaplan
Miller & Ciresi LLP, Minneapolis, MN, for plaintiffs.

Anthony M. Mansfield and Amandeep S. Sidhu, McDermott
Will & Emery, LLP, Washington, DC; Bryan M. Webster and
Joel G. Chefitz, McDermott Will & Emery, LLP, Chicago,
IL; and Thomas A. Gilligan, Jr. and Nicholas J. O'Connell,
Murnane Brandt, PA, Saint Paul, MN, for defendant.

**Opinion**

**MEMORANDUM OPINION AND ORDER**

JOHN R. TUNHEIM, District Judge.

*\*1* Plaintiffs Mark Anderson and Killer Whale Holdings,
LLC (collectively, "plaintiffs") brought this action against
defendant Dairy Farmers of America, Inc. ("DFA"), alleging
that DFA violated Section 9 of the Commodity Exchange
Act ("CEA") by manipulating prices for cheese and Class III
milk futures on the Chicago Mercantile Exchange ("CME").
DFA filed a motion for summary judgment, arguing that
plaintiffs have not pleaded or adduced evidence showing that
artificial prices for cheese or Class III milk futures existed
or that DFA intended to cause artificial prices. Plaintiffs
and DFA also filed motions to exclude expert opinions. For
the reasons set forth below, the Court denies DFA's motion
for summary judgment, grants plaintiffs' motion to exclude
James Jordan's expert opinion on mitigation of damages,
denies without prejudice DFA's motion to exclude the expert
testimony of Wayne Brown, and denies without prejudice
plaintiffs' motion to exclude the expert testimony of Robert
Mackay.

**BACKGROUND** [1]

Mark Anderson is a commodities trader who began trading
on the CME in late 2001 through his personal account and
also through Killer Whale Holdings, LLC, which was formed
in 2003. (Anderson Decl. ¶ 11, Docket No. 75.) Plaintiffs
traded a variety of commodities on the CME, including Class
III milk futures. (*Id.*) DFA is a dairy marketing cooperative
owned by 18,000 dairy farmers in 48 states. (Anderson
Decl. Ex. C at 2, Docket No. 95.) "DFA markets the milk
produced by its members, manufactures dairy products, food
components and ingredients, and formulates and packages
shelf-stable dairy products." (*Id.*) DFA trades on the CME.
(*Id.* at 3.)

**I. CLASS III MILK FUTURES TRADING AND THE
CHEESE SPOT CALL ON THE CME**

Traders meet on the CME Spot Call to trade various futures
contracts, including Class III milk futures and cheddar cheese.
(Anderson Decl. ¶ 12, Docket No. 75; Harty Decl. ¶ 4, Docket
No. 52.) Class III milk futures are traded daily on the CME
in units of 200,000 pounds, or 2,000 hundredweight of milk.
(Anderson Decl. Ex. C at 2, Docket No. 75.) A Class III
milk futures contract is cash-settled against the United States
Department of Agriculture Class III milk price. (*Id.*) Class III
milk is the milk that is used to make cheese, and the Class
III milk prices are calculated by reference to, *inter alia,* the
price of cheddar cheese. (*Id.* ¶ 12 & Ex. C at 2.) In other
words, cheese prices are a component of the formula that
determines the price of Class III fluid milk and Class III milk
futures contracts. (*Id.* Ex. C. at 2; Garrod Decl. Ex. A at 22–
28, Docket No. 77.)

Cheddar cheese is also offered on the CME Cheese Spot
Call in the form of 500–pound barrels and 40–pound blocks,
and is traded in 40,000–44,000 pound quantities known as
"loads" or "carloads." (Anderson Decl. Ex. C at 2, Docket No.
75; Garrod Decl. Ex. B, Docket No. 77.) The CME cheese
spot market is a "thin market"—that is, it handles a very
small proportion of all United States bulk cheddar cheese
transactions—but the CME cheese spot market effectively
sets the market price for most cheese and milk sales across
the country. (Garrod Decl. Ex. A. at 9, 22–28, Docket No.
77; *see also* Anderson Decl. Ex. C at 3, Docket No. 75 ("The
volume of cheddar cheese traded on the CME Cheese Spot
Call comprises less than two percent of the annual U.S. supply
of cheddar cheese.").) Unlike futures contracts, such as the

Class III milk futures contracts traded on the CME, "where delivery of the underlying cash product is optional," delivery of cheese traded on the CME Cheese Spot Call occurs within a few business days of the execution of the sale. (Harty Decl. ¶ 4, Docket No. 52.)

## II. DFA'S TRADING ACTIVITIES ON THE CME FROM MAY 21, 2004, TO JUNE 22, 2004

**\*2** Plaintiffs allege that DFA's trading activities from May 21, 2004, through June 22, 2004, (the "relevant time period") violated Section 9 of the CEA, which prohibits the manipulation of prices for commodities in interstate commerce. (See Am. Compl. ¶ 18, Docket No. 83.)

In May 2004, plaintiffs—acting on the belief that cheddar cheese prices and Class III milk futures prices would fall —acquired a substantial short position in Class III milk futures contracts that would settle in June, July, and August 2004. (Anderson Decl. ¶¶ 14–16, Docket No. 75.) Although block cheddar cheese prices were $2 .20 per pound in the middle of April 2004, those prices declined slowly, settling at $2.15 through May 11, 2004. (Garrod Decl. Ex. C at DFAI0095589–629 to–634, Docket No. 77.) On May 12, the block cheddar cheese price dropped to $2.00, where it remained for six days. (Id. at DFAI0095589–634 to 38.) On May 21, the CME block cheddar cheese price dropped an additional 20 cents to $1.80. (Id . at DFAI0095589 to 638.) Between May 21, 2004, and June 22, 2004, the CME block cheddar cheese price remained at $1.80. (Am. Compl. ¶ 22, Docket No. 83.)

In December 2008, the Commodities Futures Trading Commission ("CFTC"), in a proceeding relating to DFA's spring 2004 trading activities on the CME, found:

> Beginning on April 14, 2004, as sellers offered cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese. From May 21 to June 23, 2004, DFA ... purchased and took delivery of a total of 323 loads (approximately 40,000 pounds per load) of cheddar cheese blocks at $1.80 per pound on the CME Cheese Spot Call. During this period, DFA was the sole purchaser of cheddar cheese blocks on the CME.

(Anderson Decl. Ex. C at 3, Docket No. 75.)

Notably, in the months leading up to May 2004, DFA had purchased a number of long speculative June, July, and August 2004 Class III milk futures contracts on the CME. (Wilson CFTC Dep. Tr. 47–52, Aug. 3, 2006, Garrod Decl. Ex. D, Docket No. 77.) Plaintiffs allege that DFA held long Class III milk futures contracts in excess of the CME limit of 1500 contracts. See CME Rule 5202.E ("No person shall own or control more than: 1500 contracts long or short in any contract month."). Specifically, plaintiffs claim that as of May 21, 2004, DFA and its affiliates held 6,172 June contracts, 4,656 July contracts, and 4,227 August contracts. (Anderson Decl. Ex. C at 3, Docket No. 75.) Because dairy product prices, including cheddar cheese prices, continued to decline, "DFA's Class III milk futures position reflected an unrealized loss." (Id.)

Plaintiffs allege that DFA had no need for the cheddar cheese it purchased during the relevant time period. Plaintiffs allege that DFA's purchase of cheddar cheese blocks was an attempt to sustain cheddar cheese and Class III milk futures prices while DFA liquidated its long June, July, and August Class III milk futures contracts. (See Garrod Decl. Ex. F, Docket No. 77; see also Am. Compl. ¶ 22, Docket No. 83.) Plaintiffs allege that DFA's cheddar cheese purchases in fact supported the cheddar cheese and Class III milk futures prices, which eroded plaintiffs' short June, July, and August 2004 Class III milk futures contracts. (Id. ¶¶ 27–28.) Plaintiffs claim that they suffered a combined $6 million loss as a result of DFA's trading activities on the CME Cheese Spot Call during the relevant time period. (Id. ¶ 29.) In a letter to the CFTC, DFA stated:

> **\*3** It appears that from sometime in May 2004 forward, DFA's primary reason for purchasing block cheese on the CME was to defend the price at $1.80 to protect the value of DFA's existing inventories of physical cheese and its Class III milk futures contract positions. Another effect of supporting the price of cheese was support for the Class III milk price, which directly impacted milk payments to DFA's dairy farmer members. [2]

(Garrod Decl. Ex. 1 at 10–11, Docket No. 124.)

On November 2, 2009, DFA brought a motion for summary judgment arguing that plaintiffs have not established that artificial prices existed for cheese or Class III milk or that DFA intended to cause artificial prices for cheese or Class III milk. DFA also brought a motion to exclude plaintiffs' expert, Wayne Brown. Plaintiffs filed motions to exclude DFA expert Robert Mackay and to exclude DFA expert James Jordan's opinion on mitigation of damages. The Court first addresses DFA's motion for summary judgment, and then turns to the parties' motions to exclude.

## I. MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

### B. CEA Manipulation Claim

Section 9(a)(2) of the CEA makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2). The CEA does not define the term "manipulate," but federal courts and the CFTC have held that manipulation is "an intentional exaction of a price determined by forces other than supply and demand. *Frey v. CFTC,* 931 F.2d 1171, 1175 (7th Cir.1991); *see also Volkart Bros ., Inc. v. Freeman,* 311 F.2d 52, 58 (5th Cir.1962) ("Manipulation is[ ] any and every operation or transaction or practice ... calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets.... Any and every operation, transaction (or) device, employed to produce these abnormalities of price relationship in futures markets, is manipulation." (third alteration in original) (internal quotation marks omitted)). To establish a market manipulation claim under Section 9(a) of the CEA, the plaintiff must show "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant

specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commodities Litig.,* 587 F.Supp.2d 513, 530 (S.D.N.Y.2008); *accord Hershey v. Energy Transfer Partners, L.P.,* 610 F.3d 239, 247 (5th Cir.2010).

**\*4** While DFA concedes plaintiffs' factual allegations for the purposes of the motion for summary judgment, including the allegation that DFA intended to influence the price of cheese and Class III milk futures, DFA contends that "[p]laintiffs ... do not allege, nor do they have evidence to show, that DFA intended to or actually created an artificial price for cheese or milk futures. Without proof of artificial price, there can be no manipulation under the CEA." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 9, Docket No. 103.)

### 1. Artificial Price and Intent to Cause an Artificial Price

As alluded to by DFA, the issue before the Court is whether plaintiffs have pleaded or adduced evidence that an artificial price for cheese and Class III milk futures existed.[3] An artificial price is a "price which does not reflect basic forces of supply and demand." *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1163 (8th Cir.1971); *see also United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 223 (1940) ("[M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to ... market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone."). To determine whether a price is artificial,

> One must look to the aggregate forces of supply and demand and search for those factors which ... are not a legitimate part of the economic pricing of the commodity.... [W]hen a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial. Thus, the focus should not be as much on the ultimate price, as on the nature of the factors causing it.

*In re Ind. Farm Bureau Coop. Ass'n,* [1982–1984 Transfer Binder] Comm. Fut. Law. Rep. (CCH) ¶ 21,796, at 27,288 n. 2; *accord CFTC v. Enron Corp.,* Civ. No. H–03–909, 2004 WL 594752, at *6 (S.D. Tex Mar. 10, 2004). DFA asserts that "[i]n order to be manipulative, one must commit fraud, engage in sham or otherwise fictitious transactions or cornering activity, or trade in a manner that disrupts orderly trading processes or violates applicable trading rules." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 20, Docket No. 103.) DFA contends that evidence of its intent to influence price, without establishing fraud, misrepresentation, or violation of trading rules, is insufficient

to establish a CEA manipulation claim and that DFA's cheese purchases were a legitimate part of supply and demand. The Court disagrees and declines to adopt or apply DFA's proposed standard.

Courts and the CFTC "generally agree that manipulation defies easy description. As a result, manipulation cases tend to be characterized by fact-specific, case-by-case analysis." *In re Soybean Futures Litig.,* 892 F.Supp. 1025, 1044 (N.D.Ill.1995). The test for manipulation "must largely be a practical one.... The aim must be therefore to discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand." *Cargill,* 452 F.2d at 1163.

 **\*5** A number of manipulation cases under the CEA involve fraud, deceit, misrepresentation, or some violation of exchange rules by the defendant. *See, e.g., United States v. Reliant Energy Servs., Inc.,* 420 F.Supp.2d 1043, 1058 (N.D.Cal.2006). Those cases, however, do not support a conclusion that a plaintiff **must** show a defendant engaged in fraudulent activity or violated applicable trading rules to establish manipulation. Other cases addressing manipulation under the CEA demonstrate that a plaintiff need not show fraudulent conduct, a misrepresentation, or some violation of trading rules to establish manipulation. *See, e.g., In re Amaranth,* 587 F.Supp.2d at 535 ("[T]he combination of a wrongful intent (or more accurately, the lack of a legitimate economic motive) and a legitimate transaction would constitute manipulation."); *In re Henner,* 30 Agric. Dec. 1151, 1198 (U.S.D .A.1971).

The Court finds that to establish that an artificial price existed for the purposes of a CEA manipulation claim, a plaintiff need not establish fraud, misrepresentation, or a violation of exchange rules on the part of the defendant. *See Reliant,* 420 F.Supp.2d at 1058–59. While "fraud and deceit are not legitimate market forces," *see id.* at 1058, "[t]he methods and techniques of manipulation are limited only by the ingenuity of man." *Cargill,* 452 F.2d at 1163. *Cf. General Foods Corp. v. Brannan,* 170 F.2d 220, 224 (7th Cir.1948) ("[T]he common criteria **usual** in manipulation or corner cases are deceit, trickery through spreading of false rumors, concealment of position, the violation of express anti-manipulation controls, or other forms of fraud." (emphasis added)). Thus, the appropriate inquiry is whether the specific facts of a case to support a finding that the commodity price was determined by forces other than legitimate forces of

supply and demand and whether a defendant intended to cause that artificial price.

Federal courts and the CFTC have provided useful guidance in how to determine whether the facts of a case support a CEA manipulation claim. *Cf. In re Ind. Farm Bureau,* Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,281 (stating that the task of defining manipulation or attempted manipulation "has fallen to case-by-case judicial development"). For example, in *In re Amaranth,* the district court rejected the defendants' contention that a legitimate transaction, regardless of the intent of the defendants, cannot violate the CEA. *See In re Amaranth,* 587 F.Supp.2d at 533–34. The court held: "Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate. Thus, a **legitimate transaction combined with an improper motive** is commodities manipulation." *Id.* at 534 (emphasis added). The Court emphasizes that such a formulation is not the only manner in which to determine, on a case-by-case basis, whether an artificial price exists or whether a defendant caused an artificial price. *In re Amaranth,* however, illustrates one way that a court may review the sufficiency of a CEA manipulation claim.

### 2. *United States v. Radley*

 **\*6** The Court is not persuaded that DFA's cited cases support its proposed rule. In particular, DFA relies on *United States v. Radley,* in which the district court addressed the sufficiency of a criminal indictment that charged a defendant with, *inter alia,* manipulation under the CEA. 659 F.Supp.2d 803, 806–09 (S.D.Tex.2009). The district court dismissed all counts charging defendant with manipulation or attempted manipulation because the CEA statute was constitutionally vague and, "[a]lthough the government has alleged that defendants caused and intended to cause an increase in price, it has not adequately alleged that the increased price was artificial." *Id.* at 816. The district court reasoned:

> Since defendants have not been accused of making false or misleading statements, the effect of their actions on the market was part of the legitimate forces of supply and demand.... Acting in a manner that shifts the price of a commodity in a favorable direction is the business of profitmaking enterprises, and if it is done without fraud or

misrepresentation, it does not clearly violate the CEA.

*Id.* at 816. The district court further noted that "there is no universally accepted measure or test of price artificiality," and "[t]his uncertainty is the very thing that the constitutional vagueness doctrine is meant to protect against." *Id.*

*Radley* is not persuasive in the Court's analysis for two reasons. First, *Radley* is a criminal case and the district court in *Radley* did not attempt to define or limit what constitutes manipulation under the CEA, as suggested by DFA. Rather, *Radley* determined that Section 9 of the CEA was void for vagueness as a criminal statute because "a person of ordinary intelligence would not be able to determine that [the facts of the case as alleged in a criminal indictment] constitute price manipulation under the CEA." *Id.* at 812–13. *Radley's* analysis relating to the constitutional requirement of definiteness in a criminal statute is not helpful to the Court in these circumstances.

Second, *Radley's* and DFA's focus on a party's self-interested or profit-making motives misses the mark. (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 11, Docket No. 103. ("[B]uying more of a commodity than needed to fill customer orders, with the intent of raising transaction prices, does not remove the purchases from the legitimate supply and demand for the commodity.").) Certainly, self-interest and profit-making motives do not remove a parties' conduct from the realm of legitimate forces of supply and demand. *See, e.g., In re Ind. Farm Bureau,* Comm. Fut. L. Rep. (CCH) ¶ 21,796. Classifying a motive as self-interested or profit-making, however, also does not render a party's conduct appropriate.

The Court finds it uncontroversial that an entity may act in its own self-interest or act with the intent to make a profit while trading in commodities and not run afoul of applicable trading rules or statutes. On the other hand, entities that act fraudulently or disseminate false reports also, presumably, are acting in their self-interest and for the purpose of making a profit, although fraud and deceit are not legitimate forces of supply and demand. In other words, generalizing an entity's motive as self-interested or profit-making does not remove the entity's conduct from the ambit of the CEA. Instead, the inquiry must be whether the facts of a case support a finding that defendant specifically intended to subvert legitimate forces of supply and demand.

**\*7** To prove that DFA intended to cause artificial prices on the CME Cheese Spot Call and on the Class III milk futures market, "it must be proven that [DFA] acted ... with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Ind. Farm Bureau,* Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,283. "Since proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused." *Id.*

The CME Cheese Spot Call is a thinly traded market, which during the relevant time period opened for only fifteen minutes a day and comprised only 2% of the sales of cheese in the United States. Yet, the price at which cheese traded on the CME Cheese Spot Call effectively set the price for cheese purchases nationwide. From May 21 to June 23, 2004, DFA purchased 323 loads of cheddar cheese blocks at $1.80 per pound. DFA was the sole purchaser of cheese on the CME Spot Call during that period. Plaintiffs allege that DFA's cheese purchases prevented cheese prices from dipping below $1.80 and that DFA was able to liquidate its long Class III milk futures contracts at a profit during the relevant time period. In addition, the price of cheese plummeted after DFA ceased purchasing cheese, indicating that DFA's purchases of cheese—allegedly without commercial need for the cheese —prevented the "determination of [cheese] prices by free competition alone." *See Socony–Vacuum Oil Co.,* 310 U.S. 150, 223 (1940); *see also Enron,* 2004 WL 594752, at \*6 ("The CFTC alleges in its complaint that '[o]n July 19, 2001, artificial prices existed in the HH Spot Market, and in the NYMEX Henry Hub Futures as well.' The CFTC describes the time, market, and circumstances surrounding the 'price artificiality,' alleging that Shively engaged in a fifteen minute 'buying spree,' raising prices, and eventually unwound Enron's position in the market with a resultant price decline. The CFTC also points out that this activity caused prices in the NYMEX Henry Hub Futures Market to become artificial. The CFTC has alleged enough to survive a motion to dismiss." (citations omitted)). Viewing the facts in a light most favorable to plaintiffs, a reasonable trier of fact could find in plaintiffs' favor on their CEA manipulation claim.

Of course, the Court does not conclude as a matter of law that DFA's purchases of cheese on the CME Cheese Spot Call caused artificial prices for cheese or Class III milk futures or that DFA intended to cause an artificial price for cheese or Class III milk futures. Rather, the Court concludes only that based on the facts pleaded by plaintiffs and on the record,

there is a genuine dispute of fact as to whether the price of cheese and Class III milk reflected factors other than legitimate market forces of supply and demand and whether DFA intended to cause artificial prices. *See In re Soybean Futures,* 892 F.Supp. at 1058 (stating that "[a]s a general matter, ... questions of intent are inappropriate for resolution on summary judgment" but in some circumstances, dismissal may be appropriate if "the plaintiff presents no indication of motive and intent supportive of his position").

### 3. Legitimate Supply and Demand

**\*8** DFA argues that its purchases of cheese were part of legitimate supply and demand as a matter of law, and as a result, DFA asserts that no artificial prices for cheese or class III milk existed. In particular, DFA argues that federal courts and the CFTC have "held that market participants may legally purchase more of a commodity than needed to fill customer orders or at apparently higher than necessary prices." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 10, Docket No. 103.)

The CFTC, however, has held that "[w]henever a buyer on the Exchange intentionally pays more than he has to **for the purpose of causing the quoted price to be higher than it would otherwise have been** ..., the resultant price is an artificial price not determined by the free forces of supply and demand on the exchange." *In re Henner,* 30 Agric. Dec. at 1198 (emphasis added); *accord Enron,* 2004 WL 594752, at \*6. Plaintiffs have alleged and adduced evidence that DFA purchased cheese on the Cheese Spot Call to prop up Class III milk futures prices to enable DFA to liquidate its long Class III milk futures position at a profit, and plaintiffs allege that those actions did not constitute legitimate forces of supply and demand. *See In re Amaranth,* 587 F.Supp.2d at 534 ("[A] legitimate transaction combined with an improper motive is commodities manipulation."). DFA "treats as undisputed the factual allegations from Plaintiffs' Amended Complaint," (Def.'s Mem. in Supp. of Mot. for Summ. J. at 4 n. 4, Docket No. 103), and states that its motion is premised on a dispute over the appropriate legal standard, not on a dispute regarding the material facts, (Reply Mem. at 18, Docket No. 138). For the reasons discussed above, plaintiffs' factual allegations and the record show that there is a genuine dispute of fact as to plaintiffs' CEA manipulation claims, and summary judgment is not warranted.

## III. MOTIONS TO EXCLUDE EXPERT OPINIONS

### A. Standard of Review

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Fed. R. Evidence 702. Under Rule 702, proposed expert testimony must satisfy three prerequisites to be admitted. *See Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir.2001). First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* Second, the proposed witness must be qualified. *Id.* "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *Id.* (internal quotation marks omitted). The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U .S. 579, 597–98 (1993). But an expert's opinion should be excluded as unreliable under the third prong only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929–30 (8th Cir.2001) (internal quotation marks omitted).

### B. Plaintiffs' Motion to Exclude DFA Expert James Jordan's Opinion on Mitigation of Damages

**\*9** Plaintiffs ask the Court to preclude DFA's lost-profits expert, James V. Jordan, from offering at trial his opinion relating to mitigation of damages. (Mot. to Exclude Test. of James V. Jordan, Docket No. 111; Mem. in Supp. of Mot. to Exclude at 1, Docket No. 112.) Plaintiffs argue that Jordan's expert opinion is contrary to law on the duty to mitigate and that Jordan's opinion is based on his "personal opinion." (Mem. in Supp. of Mot. to Exclude at 1, Docket No. 112.)

Plaintiffs assert that they incurred the majority of their damages on June 8 and June 9, 2004, when Class III milk futures reached levels that produced margin calls plaintiffs could not meet. Plaintiffs contend that as a result of DFA's manipulative scheme, which supported Class III milk futures prices, they suffered $4,343,613 in out-of-pocket losses. Similarly, Jordan estimated plaintiffs' "no mitigation" losses to be $4,339,436. (Jordan Expert Report ¶ 21, Garrod Decl. Ex. 1, Docket No. 120.) Jordan opines, however, that plaintiffs had a duty to mitigate, that plaintiffs failed to do so and, as a consequence, if plaintiffs succeed on the merits of their manipulation claim, plaintiffs may only claim less than $300,000 in damages. (*Id.* ¶ 31.) Plaintiffs seek to preclude Jordan from testifying that plaintiffs had a duty to mitigate damages prior to June 3, 2004, although plaintiffs concede

that Jordan may testify about his opinion on lost profits. (Mem. in Supp. of Mot. to Exclude at 4, Docket No. 112.) For the reasons discussed below, the Court grants plaintiffs' motion as to Jordan's opinion on mitigation of damages as contrary to law.

## 1. Jordan's Expert Opinion

DFA retained Jordan as its lost-profits and damages expert. Jordan's expert opinion and testimony state that plaintiffs' "gross out-of-pocket losses of over \$4 million were the result of large, risky short positions in milk futures, which [plaintiffs] maintained in the face of increasing price volatility (i.e., increasing risk), and persistent indications that [their] market view was wrong." (Jordan Expert Report ¶ 22, Garrod Decl. Ex. 1, Docket No. 120.) Jordan opines that "regardless of the alleged market effects of DFA, ... [plaintiffs] should have mitigated [their] losses by reducing or eliminating the [short] positions as market volatility increased and as market prices continually moved contrary to [their] market view." (*Id.*)

Jordan concludes that plaintiffs accumulated significant losses between May 28 (when they could have exited the market with \$500,000 in profit) and June 9 (when plaintiffs were forced to liquidate their Class III milk futures at a loss of millions of dollars). (*Id.* at 8 & Ex. 1B.) Jordan concludes that given the market information of which plaintiffs were aware, "exiting the market by approximately June 3 is a reasonable mitigation assumption," and Jordan therefore calculated plaintiffs' gross out-of-pocket damages at no more than \$501,327. (*Id.* ¶ 31.)

**\*10** Jordan notes that between May 14 and May 25, plaintiffs increased their short Class III milk futures position from 631 contracts to the maximum of 1575 contracts. (*Id.* ¶ 23.) Jordan states that plaintiffs' short position as of May 25 "exposed [them] to a substantial risk of loss." (*Id.* ¶ 24.) Jordan notes that plaintiffs reduced their short position to 1100 contracts through June 3 and to 900 contracts on June 8, before margin calls forced plaintiffs to liquidate their short Class III milk futures contracts. (*Id.* ¶ 25.) Jordan concludes that "[t]he risk of [plaintiffs'] large short positions would have been obvious to [plaintiffs] from the large profit/loss swings [they] was experiencing during [the relevant] period." (*Id.* ¶ 26.)

Jordan states that there were two circumstances that should have contributed to plaintiffs' awareness of the risks inherent in holding large short positions in Class III Milk futures

contracts. First, Jordan contends that there was significant milk market volatility in May and June that could be seen by simply observing the market. (*Id.* ¶¶ 25–27.) Second, Jordan concludes that there were "signs" making it "[e]qually obvious to [plaintiffs] by May 25 ... that market prices were beginning to behave contrary to [their] market view." (*Id.* ¶ 28.) Jordan contends that prior to June 4, "[plaintiffs] could have recognized the riskiness of [their] large short positions and the increased market volatility and elected to reduce or eliminate [their] exposure to the risk of large losses.... [Plaintiffs] took undue risk by not reducing or eliminating his exposure to losses in early June." (*Id.* ¶ 29.) In short, Jordan opines that the market signals indicating to plaintiffs that they "had been wrong in [his] assessment of the market," were the same signals that plaintiffs saw from May 21, 2004, to June 9, 2004, when plaintiffs finally liquidated their short positions. (*Id.* ¶ 30.)

At his deposition, Jordan elaborated on the background principles he applied in reaching his expert opinion. As to his understanding of the "concept of mitigation," Jordan stated, "if a person or institution is at—is in a position where they could be harmed, ... they should take reasonable steps to prevent that harm, prevent or reduce their harm, regardless of the cause of their harm." (Jordan Dep. Tr. 125:23—126:4, Oct. 22, 2009, Garrod Decl. Ex. 2, Docket No. 120.) Jordan did not testify that he thought plaintiffs should have known that DFA was manipulating the market at that time, but instead confirmed "that [plaintiffs] had a duty to avoid harm before [they] even knew that the market was being manipulated." (*Id.* 126:5–16.) In reaching his opinion, Jordan testified:

> I'm applying a reasonableness standard, and it is based upon whether the individual had information that would have allowed him to conclude that he was in a highly risky position and could readily sustain very large losses in the future.
>
> **\*11** And so at that point, the individual has sufficient information to draw a conclusion that I'm really exposed here, this is extremely risky, and that that meets the standards of mitigation analysis, I believe, that you—you ask yourself at what point would reasonable behavior by the individual indicate mitigation.

(*Id.* 131:5–16.) Jordan testified that June 3, 2004, was "a reasonable date at which [plaintiffs] had enough information to have taken reasonable steps to reduce the potential for loss." (*Id.* at 127:1–4.)

**2. Contrary to Law**

Jordan's mitigation opinion is contrary to law and therefore would not be helpful to a finder of fact in deciding the issues in the case. "As a general rule, a party defrauded cannot, **after discovery of the fraud,** increase his damages by continuing to expend money on the property retained and recover for such expenditures." *Clements Auto Co. v. The Serv. Bureau Corp.,* 298 F.Supp. 115, 136 (D.Minn.1969) (emphasis added; internal quotation marks omitted). The duty to mitigate, however, does not arise before an individual has knowledge of the wrongdoing. *See, e.g., Connelly v. Hyundai Motor Co.,* 351 F.3d 535, 542 (1st Cir.2003) ("[T]here is no duty to mitigate damages **prior to sustaining an injury[.]**" (emphasis added)); *Nilson–Newey & Co. v. Ballou,* 839 F.2d 1171, 1175 (6th Cir.1988) (holding that the duty to mitigate damages "arises only after the defendant's tortious conduct, not before it"); *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 651 F.2d 615, 620 (9th Cir.1981) ( "Plaintiffs' damages in a 10b–5 case are limited by what they would have realized had they acted to preserve their assets or rights when they first learned of the fraud or had reason to know of it."); *Harris v. Am. Inv. Co.,* 378 F.Supp. 894, 900 (E.D.Mo.1974) ("[A] plaintiff has a duty to mitigate his damages **upon discovery of the fraud.**" (emphasis added)).

The parties agree that "[commodity] future customers have a general obligation to mitigate damages." *Samson Refining Co. v. Drexel Burnham Lambert, Inc.,* No. 82–R448, Comm. Fut. L. Rep. (CCH) ¶ 24,596, 1990 CFTC LEXIS 90 (Feb. 16, 1990). However, "complainant's duty to complain about unauthorized trading **does not arise until it learns of the wrongdoing.**" *Id.* at 117 (emphasis added). "[A] customer should not be allowed to recover damages for losses occurring after the customer learns of the truth, can reasonably foresee that further damages are likely and does not act reasonably to limit his damages." *Id.* at 115–16 (internal quotation marks omitted); *see also Darrah v. First Am. Inv. Servs. Co.,* No. 05–R042, 2006 CFTC LEXIS 59, at 103 n. 23 (June 28, 2006) ("The duty to mitigate doesn't arise until complainant becomes aware of the underlying wrongdoing.").

Jordan states: "[plaintiffs] had a duty to avoid harm before [they] even knew that the market was being manipulated." (Jordan Dep. Tr. 126:5–16, Oct. 22, 2009, Garrod Decl. Ex. 2, Docket No. 120 .) In effect, Jordan opines that a commodities trader must take constant precautions against fraud in light of the fact that someone, somewhere,

may be perpetrating a fraudulent trading scheme. Such a standard is not supported in the law.

**\*12** Further, a standard that requires an individual to mitigate damages when he "should have known" of the wrongdoing—as proposed by DFA—is impractical. As the Seventh Circuit stated:

> The best solution is for people not to harm others intentionally, not for potential victims to take elaborate precautions against such depradations. If the victims' failure to take precautions were a defense, they would incur costs to take more precautions (and these costs are a form of loss victims would feel in every case, even if the tort does not occur), while would[-]be tortfeasors would commit additional torts because they would not fear the need to pay up in cases where the victims do not protect themselves. Common law torts have balked at such an outcome in ordinary tort cases, and securities law has followed the same path.

*DeRance, Inc. v. PaineWebber Inc.,* 872 F.2d 1312, 1323 (7th Cir.1989). Thus, proof that a victim "should have known" of the wrongdoing does not trigger a duty to mitigate, although if the victim **knew** of the wrongdoing and did nothing or "consciously disregarded information" that would have informed him of the wrongdoing, he may not complain. *Id.* at 1324.

In sum, Jordan's mitigation opinion is directly contrary to the law, and the opinion is therefore not helpful to a fact-finder at trial. The Court thus precludes Jordan from testifying at trial regarding Anderson's duty to mitigate.

**C. Anderson's Motion to Exclude Expert Testimony of Robert Mackay and DFA's Motion to Exclude Expert Testimony of Wayne Brown**

Anderson moves to exclude certain portions of DFA expert Robert McKay's opinion relating to (1) the legal definition of manipulation; (2) causation; and (3) intent under the Commodities Exchange Act. (Mot. to Exclude Test. of Robert J. McKay at 1, Docket No. 127.) DFA retained McKay to provide an expert opinion on whether DFA caused artificial

prices on the Spot Cheese and Class III milk futures markets and to refute the expert opinion of Anderson's expert, Wayne Brown. (MacKay Expert Op. ¶ 13, Garrod Decl. Ex. 1, Docket No. 129.) MacKay concludes, *inter alia*, that DFA did not manipulate either the CME spot cheese market or the Class III milk futures market between May 21, 2004, to June 23, 2004. (*Id.*)

DFA moves to preclude plaintiffs' expert, Wayne Brown, from offering at trial expert testimony regarding whether DFA manipulated the CME Cheese Spot Call and Class III milk futures markets and regarding plaintiffs' damages. (Mem. in Supp. of Mot. to Exclude Ops. of Wayne R. Brown at 1, Docket No. 117.) Brown offers two opinions. First, Brown concludes "that DFA manipulated the price of cheese and milk futures when it defended the price of cheese as quoted on the CME from May 21 through June 23, 2004 with cheese purchases in order to unwind its investment in milk futures." (Brown Expert Report ¶ 12, Mansfield Decl. Ex. 1, Docket No. 118.) Brown opines that "[b]ecause of the relationship between cheese and milk futures, DFA manipulated the price of milk futures." (*Id.*) Brown states that "DFA had 1) the ability to influence prices; 2) the specific intent to create an artificial price; 3) the artificial price existed[;] and 4) causation existed." (*Id.*) Second, Brown concludes that given plaintiffs' out-of-pocket losses and lost profits—which were the result of DFA's manipulative activities on the CME Cheese Spot Call—"the most reasonable damages amount is $11,769,253." (*Id.* ¶ 13.)

**\*13** Plaintiffs and DFA prematurely brought their respective motions to exclude. Both parties filed their motions prior to the Court's ruling on DFA's motion for summary judgment, which addresses the appropriate standard for reviewing a

CEA manipulation claim. As a consequence, the parties largely repeat the arguments made at summary judgment. The Court therefore dismisses without prejudice plaintiffs' motion to exclude the expert testimony of Robert Mackay and DFA's motion to exclude the expert testimony of Wayne Brown. The parties may, prior to trial, submit motions to exclude portions of those experts' testimony in light of the Court's ruling on the motion for summary judgment.

This case will be placed on the Court's next available trial calendar.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Dairy Farmers of America, Inc.'s Motion for Summary Judgment [Docket No. 102] is **DENIED.**

2. Plaintiffs Mark Anderson and Killer Whale Holdings, LLC's Motion to Exclude the Testimony of James V. Jordan [Docket No. 110] is **GRANTED.**

3. Defendant Dairy Farmers of America, Inc.'s Motion to Exclude Opinions of Wayne R. Brown [Docket No. 115] is **DENIED without prejudice.**

4. Plaintiffs Mark Anderson and Killer Whale Holdings, LLC's Motion to Exclude the Testimony of Robert J. Mackay [Docket No. 127] is **DENIED without prejudice.**

Footnotes

1    For the purposes of the motion for summary judgment, DFA states that it treats as undisputed Anderson's factual allegations pleaded in the Amended Complaint. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 4 n. 4, Docket No. 103.)

2    DFA prefaced this statement to the CFTC by stating that it was assuming certain facts for the purposes of the letter, but "[b]ecause the Division and DFA are continuing to gather and confirm certain information ... the Division should not consider the following assumed facts to be factual assertions by DFA. Furthermore, if additional or different material facts come to light, DFA will revise its analysis if necessary." (Garrod Decl. Ex. 1 at 2, Docket No. 124.)

3    DFA argues that its purchases of cheese were a part of legitimate forces of supply and demand, and that an "intent to influence price" does not equate to an "intent to cause an artificial price." In the Court's view, DFA's arguments address a single issue relating to Anderson's establishment of a CEA manipulation claim: whether plaintiffs must show that DFA committed fraud, engaged in sham or fictitious transactions or cornering activity, traded in a manner that disrupted orderly trading processes, or violated applicable trading rules. Accordingly, although the two elements are distinct and must be separately proven, in these circumstances, the Court addresses the question of whether artificial prices existed together with the element of "intent to cause an artificial price." *Cf. In re Soybean*

*Futures Litig.,* 892 F.Supp. 1025, 1057 (N.D.Ill.1995) ("[T]here is no universally accepted measure or test of price artificiality, and ... this element can be closely interrelated with the other three elements of a manipulation claim[.]").

---

**End of Document**                                   © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 11

Nunez v. BNSF Ry. Co., Not Reported in F.Supp.2d (2012)

88 Fed. R. Evid. Serv. 1321

2012 WL 2874059
Only the Westlaw citation is currently available.
United States District Court,
C.D. Illinois.

Tanya NUNEZ, Administrator of Estate
of Cynthia L. Madden, deceased, Plaintiff
v.
BNSF Railway Company, Defendant.

No. 09–4037.     |     July 13, 2012.

**Attorneys and Law Firms**

Ryan Scott McCracken, Richard L. Steagall, Nicoara &
Steagall, Ralph D. Davis, Peoria, IL, for Plaintiff.

Stephen J. Heine, Robert M. Bennett, Shari Lynn Berry, Heyl
Royster Voelker & Allen, Peoria, IL, for Defendant.

**Opinion**

### ORDER

JOHN A. GORMAN, United States Magistrate Judge.

 **\*1** The parties have consented to have this case heard to
judgment by a United States Magistrate Judge pursuant to 28
U.S.C. § 636(c), and the District Judge has referred the case to
me. Now before the court are the Defendant's motions to bar
Plaintiff's two expert witnesses, James Sottile (# 58) and Paul
Bodnar (# 56). The motions are fully briefed. As explained
below, both motions are **GRANTED.**

### BACKGROUND

On the night of May 28, 2007, Cynthia Madden appeared to
be having car trouble. Her car stalled several times, the last
time at the point on Cleveland Road where it intersects with
railroad tracks in Colona, Illinois. As Ms. Madden tried to re-
start her car, two motorists in the area saw the crossing gates
came down and the warning lights begin to flash. One of them
heard a train horn blowing. Both of them observed that Ms.
Madden did not immediately get out of her car. It was not until
the train was visible to those at the crossing that Ms. Madden
fled her car. She was too late. The train hit her car, which in
turn struck her. She did not survive.

The train was a BNSF train. The engineer and conductor on
board both recall that the train's headlights were on and that
horn was sounded for more than 20 seconds before it entered
the intersection. Both stated that the train, as it approached
the intersection, was traveling under the allowable speed of
30 m.p.h. The conductor recalls seeing the closed gates and
flashing lights at the intersection. They agree that, as Ms.
Madden's car came into view, the train was immediately
thrown into emergency mode, but it was not possible to stop
the train in time.

The Cleveland Road crossing is protected by what is referred
to as an "active warning system," meaning that as a train
approaches the crossing, warning lights start flashing, gates
automatically lower, and pedestrian bells ring. This system is
triggered by circuits placed in the tracks that sense a train's
approach. When a train is sensed, the system performs a rapid
calculation, based on the train's speed and the distance to the
intersection, that triggers the active warning system.

This warning system produces data (such as the train's
speed and activation of the active warning system) that is
transmitted to an event recorder. [1] There are two parts to
this event recorder: the HXP–3, which operates the warning
system and produces the data, and the HCR, which records
the data and allows it to be downloaded to a computer and
printed. When the event recorder is installed, there are various
"options" that must be selected. In addition, the installer
may select "daylight savings time" as an option. In the
system at the Cleveland Road crossing, that option had not
been selected, meaning that the recorded data did not reflect
daylight savings time.

There is a second event recorder as well, this one found in the
locomotive itself. This event recorder continuously records
data specific to operation of the locomotive, including such
data as speed, direction, and time. The specific locomotive on
this train was BNSF 4708, which was manufactured in 1997.

 **\*2** About 2 hours after the accident, BNSF personnel
downloaded the event recorder at the crossing. The
morning after the accident, BNSF personnel downloaded
the locomotive's event recorder. Plaintiff was provided with
a copy of these downloads. In addition, BNSF tested the
lights, horn and brakes on the locomotive. The original test
results were no longer available by the time this litigation
began. Federal regulations only require that the test results
themselves be kept until the next test is conducted, but "in
no case for less than one year from the date of the test." 49

Nunez v. BNSF Ry. Co., Not Reported in F.Supp.2d (2012)

88 Fed. R. Evid. Serv. 1321

C.F.R. § 234.273. The Plaintiff was provided with a summary of the tests that BNSF conducted. This summary showed that no problems were found on the test conducted immediately after the accident.

Several days after the accident, Ms. Madden's children went to the scene to retrieve her personal belongings. While they were there, they heard a train horn and, using a cell phone and two wrist watches, they timed the arrival of the train at the crossing. One of the children testified that the arrival of the train at the crossing was 13–14 seconds and that the "lights came on two or three seconds before the train went through."

It was not until October 28, 2011, that Plaintiff retained 2 expert witnesses, Paul Bodnar and James Sottile. One or both of these experts, along with counsel for the parties and a BNSF representative, visited the Cleveland Road crossing site in November. In addition to viewing the physical layout of the scene of the accident, BNSF opened the "bungalow" that contains the HCR portion of the event recorder for the tracks. Contained within that "bungalow" was a document reflecting the most recent 2011 test of the warning system. The expert obtained a photograph of that document.

The two experts authored a joint report containing five opinions. Paul Bodnar's sole opinion is that BNSF was negligent because the train did not sound its horn prior to entering the intersection. James Sottile expresses four opinions: (1) that the times on the data downloaded from the recorder are inaccurate; (2) that the active warning system gave only 13–14 seconds of warning, less than the 20 seconds required by 40 CFR § 234.225; (3) that the crossing signal system appliance test records provided by BNSF do not meet federal requirements [49 C.F.R. 234.273]; and (4) because the signal event recorder data fails to comply with federal regulations, the records are insufficient to determine the speed, horn and active warning systems at the time of the accident. Their joint Report was served on the Defendant, which has now moved to bar their testimony in full. A hearing on the motions was held on June 12, 2012.

## PROCEDURAL HISTORY

In order to fully comprehend the motions attacking the expert's Report, it is necessary to review the procedural and discovery history in this case. This lawsuit was filed on May 22, 2009. The Rule 16 scheduling conference was held on September 23, 2009. The parties' plan was approved.

That plan called for Plaintiff to disclose expert witnesses by January 15, 2011, for Defendant to disclose expert witnesses by April 16, 2011, and for all discovery, fact and expert, to close on May 20, 2011. The Court was not involved in the case again until the Plaintiff moved for an extension of the schedule. Following a conference on February 17, 2011, the schedule was extended. The new schedule closed all discovery—fact and expert—on December 16, 2011.

 **\*3** On November 9, 2011, Plaintiff made the request (or, as Defendant characterized it, the demand) that Plaintiff's expert be allowed to conduct an inspection of the accident scene. Defense counsel agreed, but only with Plaintiff's counsel's representation that the expert's report would be provided before Thanksgiving and the deposition taken before Christmas.

On November 17, 2011, a month before the conclusion of all discovery, the chambers of the undersigned was contacted by counsel for BNSF, who orally requested a hearing. At that time, the parties' attorneys were present at the scene with Plaintiff's expert and a representative from BNSF. The expert had asked BNSF to open the "bungalow" in which the HCR event recorder is stored, a request to which BNSF objected as beyond what had been agreed to. A hearing was held, and the Court directed that the bungalow be opened for inspection and photography by the expert.

At 6:43 p.m. on December 16, 2011, the final day of discovery, Plaintiff served her experts' Report. On December 19, 2011, Defendant filed a motion to bar Plaintiff's experts on the grounds of untimeliness. On December 21, 2011, Defendant filed a supplement to that motion, stating that the expert had served a "revised" report on December 19 at 8:58 p.m. In response, Plaintiff attempted to justify its late production of the expert's report by pointing to what she characterized as BNSF's own delays in producing documents, its refusals to produce documents, and deficiencies in the documents that BNSF had produced. For good measure, Plaintiff included substantive arguments about the merits of the case.

In an Order entered on January 24, 2012, the Court entirely rejected Plaintiff's arguments, pointing out first that any disputes about the sufficiency of document production should have been brought to the Court's attention during discovery; by waiting until after discovery closed, any problems were waived. The Court found "puzzling" Plaintiff's lack of diligence in alerting the Court to any such deficiencies, because Plaintiff's explanation for taking no depositions of

BNSF personnel during the course of discovery was her counsel's belief that the case could be proved with only documents and experts.

After serious consideration being given to barring the experts for failure to timely disclose them and their Report, the Court decided that, in the interests of justice, the motion to bar should be denied. Instead, a new schedule was implemented, which allowed BNSF 7 days to review its production of documents to ensure that it had been complete, and allowed Plaintiff's experts 7 days thereafter to revise their Report if BNSF produced any additional documents. The Order cautioned, in bold, capital letters, that "NO EXTENSIONS OF THESE DEADLINES will be allowed without a detailed and substantial showing of good faith and due diligence."

BNSF produced no additional documents. Despite the strong cautionary language of the Order, on February 2 Plaintiff filed a motion to compel discovery. In that letter, counsel stated that he had been unavailable to work on this case until after January 30 [2]. On January 31, he reviewed the discovery he had previously requested and served a supplemental request for what he believed was missing. BNSF counsel responded that no additional documents would be provided. Hence, the motion to compel.

**\*4** As was pointed out in Defendant's response to this motion, Plaintiff's argument was based on two misconceptions. The first was that a defendant must, in its Rule 26(a) disclosures and supplements, provide documents that support the *plaintiff's* claim. That is not what the Rule requires. It requires a party to disclose information that will support "its" claims or defenses. Then, the opposing party uses those disclosures to formulate its subsequent written and oral discovery.

The other misconception was that the Court's January 24 Order required BNSF to forgo any objections it had previously made and simply produce everything that Plaintiff had requested. The Order required BNSF to produce documents it "should have" produced during discovery. If objections were made and Plaintiff did not timely file motions with respect to those objections, then BNSF was not obligated to withdraw those objections to be in compliance with the Order. Plaintiff's motion was denied.

The January Order also set February 24 as the deadline for Defendant to depose Plaintiff's experts. BNSF took the depositions of the Plaintiff's experts in a timely fashion.

Defendant's deadline to disclose its expert was March 9, 2012. The expert and his report were timely produced, but Plaintiff did not take his deposition.

## EXPERT WITNESSES GENERALLY

The admissibility of expert testimony is governed by Federal Rules of Evidence 702 and 703, as well as the Supreme Court's opinion in *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993); *Lewis v. CITGO Petroleum Corp.,* 561 F.3d 698, 705 (7th Cir.2009).

Expert opinion testimony is admissible, so long as it conforms to Fed.R.Evid.702, which provides:

A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise, if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Under Fed.R.Evid. 703, an expert may base his opinion on facts that are in the record or on facts that are presented to him or on facts that he personally observes. Under this Rule, expert testimony must be rejected if it lacks an adequate basis in fact. *Cella v. U.S.,* 998 F.2d 418 (7th Cir.1993). Evaluation of the "soundness of the factual underpinnings" are crucial to the Court's gatekeeping function. *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir.2000). An expert may not simply ignore evidence that does not support his opinion. See, e.g., *Barber v. United Airlines Inc.,* 17 Fed. Appx.433 (7th Cir.2001).

Under *Daubert,* the district court acts as a gatekeeper to ensure that expert testimony is both relevant and sufficiently reliable. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)); see also *Mihailovich v. Laatsch,* 359 F.3d 892, 918 (7th Cir.2004) and *Bielskis v. Louisville Ladder,* Inc., 663 F.3d 887, 893 (7th Cir.2011).

**\*5** Whether to admit expert testimony rests within the discretion of the district court. See, e.g., *Gen. Elec. Co. v. Joiner,* 522 U.S. 136,(1997). Indeed, a district court has "wide latitude in performing its gate keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis,* 663 F.3d at 894. The inquiry under Rule 702 is "flexible." *Id.* "The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett,* 487 F.3d 482, 489 (7th Cir.2007) (quoting *Kumho Tire v. Carmichael,* 526 U .S. 137, 152 (1999) *Kumho Tire Co.,* 526 U.S. at 152). The court's role is that of "gatekeeper" with respect to expert testimony. *Kumho Tire,* 526 U.S. at 147.

District courts employ a three-part analysis before admitting expert testimony: the expert must be found qualified to provide an opinion on the particular subject; the expert's methodology must be found reliable; and there must be a relevant connection between the methodology and the opinion proffered. *Daubert.* at 509 U.S. at 589–92. In other words, the expert must be qualified and the opinions must be both relevant and reliable. *Id.* at 589.

The opinion must assist the trier of fact is some material way. See, *Dhillon v. Crown Controls Corp.,* 269 F.3d 865, 871 (7th Cir.2001). Where an expert has "unjustifiably extrapolated from an accepted premise to an unfounded conclusion," the gap between the facts and the opinion is simply too great to be helpful or admissible. *G.E. v. Joiner,* 522 U.S. 136, 146 (1997).

Defendant does challenge the qualifications of Sotille and Bodnar to offer the expert opinion testimony at issue. For purposes of this Order, however, it is assumed that the two witnesses are qualified generally to testify about railroad safety and regulations. For the most part [3] Defendant's arguments as to the expert witness's qualifications either go to the substance or the weight of the opinions. The former is dealt with below; the latter is an issue for a trier of fact. The issue before the Court is the methodology used by and/or the substance of the opinions tendered by these witnesses.

**BODNAR'S OPINION**

Bodnar was tendered as an expert in train operating practices regarding the horn and in interpretation of the locomotive event recorder data. His specific opinions concern the horn on the locomotive. In his report, he draws 3 conclusions: (1) the BNSF employee who downloaded the locomotive event recorder did not request the proper parameters for the download, rendering the download incorrect, incomplete and impossible to interpret; (2) the locomotive horn was removed for testing; and (3) the locomotive horn did not sound for the required 15 seconds before it reached the intersection.

Bodnar's first opinion is based on the fact that the locomotive data download included no data showing activation of the horn, although the event recorder installed on this locomotive was capable of recording such data. Bodnar asserts that, because federal regulations require recording this information, the failure to record such data indicates four possibilities: (1) the entries were deleted; or (2) the horn was never activated by the engineer; or (3) the horn failed mechanically; or (4) the event recorder failed to record activation of the horn by the engineer.

**\*6** The regulation cited by Bodnar is inapplicable. This locomotive was manufactured in 1997. The regulation he cited applies to locomotives placed in service after October 1, 2009, a regulation that obviously has no applicability to a locomotive involved in an accident that occurred in 2007. The pertinent regulation does not require recording or retention of data relating to the horn on the particular locomotive involved in this case. 49 C.F.R. § 229.135. Bodnar's underlying assumption that the failure to record this data is a serious deficiency is without merit.

When Bodnar was confronted with the proper regulation during his deposition, he challenged whether it was a "current" regulation and said he would have to check with his partner to confirm that it was. Even if it was the current regulation, however, Bodnar opined that if BNSF had upgraded its recorder so that horn data *can* be recorded, it *should* be recorded. (Bodnar Deposition p. 67–8). This is contrary to law. See, *Waymire v. Norfolk and Western Ry. Co.,* 218 F.3d 773, 776 (7th Cir.2000)(railroad not liable in FELA negligence action for unsafe speed and inadequate warning devices if railroad's conduct was consistent with regulations).

In addition to the lack of legal support for the proposition that the horn data was deficient, Bodnar suggests four other possibilities (besides the lack of any obligation to record the data) that would explain why no horn data showed up.

None of these four possibilities is viable, given the undisputed factual evidence in the record.

Bodnar admitted in his deposition that the first possibility—entries for the horn had been deleted—was wholly unsupported by any evidence (p.94), and no such evidence has been brought to the Court's attention. In addition, by its very definition, an event recorder must be tamper proof, so deletion of data would not appear to be a possibility anyway. This possibility is nothing more than pure speculation.

Bodnar insisted at his deposition that the lack of recorded data is evidence to support his second possibility—that the horn was never activated at all. This flies in the face of undisputed testimony from three witnesses—one of them completely independent of BNSF. Bodnar discounts witness testimony as unreliable, but this is not a situation of conflicting witness testimony; there is no contrary witness testimony. As BNSF points out, Bodnar's opinion on this point is like saying that if a tree falls in the forest but there is no video recording of it, the tree never fell even if witnesses observed it. An expert may not simply ignore evidence that does not support his opinion.

The third possibility posited by Bodnar-that the horn failed mechanically—is also belied by the evidence. The data download and the test result summaries reviewed by Bodnar during his deposition all show that the horn was tested as a matter of routine before the accident and again after the incident. No deficiency in the horn was found at any time. Bodnar cited no evidence at all to support this as a viable possibility-other than the lack of horn data on the download, and Plaintiff cites none in the response to this motion.

 **\*7** The fourth possibility stated by Bodnar was that the event recorder failed to record activation of the horn by the engineer. To the extent that this implies some malfunction in the event recorder, no evidence is cited in the Report or in Plaintiff's response to this motion that would support such an implication and it is contrary to the test records produced by BNSF. It could also be read as simply reflecting the reality that activation of the horn was not recorded because there was no requirement to do so. If read in that manner, the statement attributes no wrongful conduct to BNSF. Neither interpretation of this "possibility" is helpful in the least. It could be read as simply reflecting the reality that activation of the horn was not recorded because there was no requirement that it be recorded. If read in that manner, the statement attributes no wrongful conduct to BNSF. Neither interpretation of this "possibility" is helpful in the least.

Not one of the four possibilities posited by Bodar supports his opinion that the data download from the event recorder on the locomotive was deficient because it did not record activation of the horn. This opinion is not only contrary to evidence but also without factual support, and it is legally unsupportable. It is therefore not admissible.

Bodnar's second opinion is that, contrary to good practices in the industry, the horn in the locomotive had been removed for testing, suggesting some sort of cover-up. When challenged by BNSF to support that assertion, he acknowledged that the documents he was shown during his deposition showed that the horn was still mounted on the locomotive when the testing was conducted. He testified, however, that he thought he had seen some other document showing removal of the horn and that he would identify it after his deposition if he located it. (p.112–13). It is not disputed: no such document has been produced. This opinion is not based on any evidence and is therefore inadmissible.

Bodar's third opinion—that the locomotive horn did not sound for the required 15 seconds before it reached the intersection—is based on certain "calculations" that he performed once he became convinced that the train was traveling at 26 miles per hour. He calculated that 10 seconds elapsed from the time the locomotive was put into emergency mode (which was when the engineer saw Ms. Madden's car on the tracks) to the time of the collision. From that statement, he concludes that the horn was not sounded during those 10 seconds and it is not possible to tell if the horn was sounded during the preceding 5 seconds of the required 15 second interval during which the horn was required to sound. There is no explanation, either in his report or in his deposition, for how he reached the conclusion that the horn was silent during those final 10 seconds. To the extent this conclusion is based on the fact that the sounding of the horn was not recorded, it is without merit as discussed above. If there is some other basis for the conclusion, it has nowhere been stated and, as noted earlier, is contrary to witness testimony. The leap of logic required to reach the conclusion is simply too great. This opinion is inadmissible.

 **\*8** One other problem is raised by Defendant, and that is the fact that Bodnar had his partner review his work, but Bodnar failed to disclose that fact until during his deposition. While this is a serious shortcoming—an expert must disclose all bases for his opinions, Fed.R.Civ.P. 26(a)(2)(B)(i)-in this situation it proves relatively harmless, since Bodnar's

opinions are, in any event, inadmissible. Nonetheless, this shortcoming would in the ordinary course of litigation arguably be subject to Rule 37 sanctions. As noted above and as noted in previous orders, if Plaintiff intended to prove this case using only experts and documents, the failure to use care in timely and completely complying with the Rules is simply inexplicable.

Bodnar's opinion is not based on objective or scientific evidence but rather on Bodnar's purported knowledge of various safety rules that apply to railroads such as BNSF. His knowledge of the applicable rules demonstrated shortcomings, and he attempted to apply those rules without factual support and with disregard to objective facts. His opinion that "the horn wasn't sounded in time for Ms. Madden to have that window of opportunity to step away"-which encompasses each of the three separate opinions discussed above-fails to meet the most basic standards of the Rules of Evidence and *Daubert*. The motion to bar Bodnar from testifying is therefore granted.

## SOTTILE'S OPINIONS

James Sottile's area of expertise is signals and train control. His portion of the Report offered 4 opinions relating to what the signal event recorder data download showed about the train's movement and the signal operations on the date in question.

His first "opinion" is that the wayside event recorder did not record in daylight savings time. This is not an opinion at all; it is an undisputed fact. BNSF does not assert that the recorder did record in daylight savings time.

Sottile's point in making this observation is that he cannot be certain of the timing of various events due to the failure to record in daylight savings time. He refused in his deposition to acknowledge that the time stamp on the signal event recorder downloaded data can simply be adjusted by one hour to obtain the correct time for the events recorded. He insisted that making this adjustment would be an "assumption," and he refused to make that assumption (p.124).

It is not an "assumption" to make this adjustment. If everyone agrees that the time stamps are in central time, not in central daylight time, then no assumption is required to determine the actual time that events occurred. It simply defies common sense to refuse to acknowledge this. His opinion on this matter

is unreasonable and entirely unhelpful. It therefore fails to meet Rule 702's requirement that the opinion assist the jury; in fact, allowing this testimony would likely confuse the jury. It is, moreover, not relevant to any issue of negligence or causation. Because it is neither relevant nor helpful, this "opinion" is not admissible.

**\*9** Sottile's second opinion is that the active warning system gave only 13–14 seconds of warning, less than the 20 seconds required by 40 CFR 234.225. This opinion is not based on any tests conducted by Sottile or on any data provided by BNSF. It is instead based on timing tests conducted by the decedent's children.

The children's test was conducted using their cell phones' stop watch function and their wristwatches to time a different train on a different day with no knowledge of the train's speed. They began timing when they heard the train, to see how long it was before the train entered the intersection. Plaintiff argues that timing devices such as cell phones and watches are accurate devices and that this test was certainly valid information on which the expert could rely.

BNSF does not challenge the accuracy of the timing devices. It challenges instead the ability of a lay person to use these devices to record accurately a time that begins with the lay person's hearing the horn of the train. When to start and stop the device would be key. As BNSF points out, when something is "heard" is "a completely subjective and highly available point in time." Did they start timing when they heard the train engine? heard the whistle? or, as the active warning system operates, when the train reached a certain point on the track? Where was the train when they stopped timing? Sottile testified (p.128) that if he had been the accident investigator and had the information about the children's timing, he would have used that information to order further testing. He did not testify that he would have based any conclusive opinion on their timing.

Moreover, when he was challenged by the documentary evidence at his deposition, Sottile agreed [4] that there were 30 seconds of active warning time prior to the accident. (p.88–90). This does not just undercut the opinion he stated in the Report; it contradicts it.

Sottile also references that one of Madden's children recalled that someone said something at the coroner's inquest about the train's speed being 50–60 mph. There is no such evidence in the record. The Court assumes that if evidence of such

speed was presented at the inquest, Plaintiff would have presented it to the Court, and this case would be a very different case. As it is, Sottile testified in his deposition that the locomotive event recorder showed that the train was traveling at 28 mph when it was placed into emergency mode by the crew (p. 142–143). He acknowledged that the data from the train dispatcher showed that the speed of the train "in the neighborhood" of 30 mph. (p. 55). All the documentary and testimonial evidence shows that the train's speed was 30 m.p.h. or less. For Sottile to have relied in any way on this type of secondhand information under these circumstances was simply unprofessional. No opinion testimony based on this comment will be allowed.

This Opinion is unsupported by the facts, is based on unreliable, unscientific and (and most-likely inadmissible) evidence, and was essentially abandoned by Sottile during his deposition. Sottile's opinion regarding the length of warning time provided by the active warning system at the intersection prior to the collision is not the product of reliable methods. It is neither legally nor scientifically sufficient to meet the standards of *Daubert,* and it is therefore barred.

 **\*10**  Sottile's third opinion is that the test records for the crossing signal system "do not meet the federal requirements outlined in 49 C.F.R. § 234.273." This Regulation provides that results of inspections and tests are to be recorded in a particular way, signed by the employee, and "retained until the next record for that test is filed but in no case for less than one year from the date of the test." *Id.*

Sottile did not have access to the actual tests that were conducted on the locomotive in question because more than one year had passed and subsequent tests had been performed. This litigation was initiated more than one year after the accident. To the extent his "opinion" is critical of BNSF's failure to retain the actual test and inspection documents, his opinion is disregarded. BNSF was not required to and did not keep the actual test results. The summary of the tests and inspections from the time of the accident showed no problems or malfunctions of any part of the warning system.

Sottile also had access to the 2011 tests and inspections, which he criticized for lack of a signature and a missing decimal point on a battery test. These "deficiencies" were not reflective of malfunction of the event recorder or the warning system. Sottile himself testified in his deposition that if he had done an inspection and found the 2011 records, the deficiencies might have been criticized, but there would have

been no warning issued to the railroad as there would be for serious problems.

Sottile does not dispute that this opinion has nothing whatsoever to do with the cause of the accident in question, but claims in his deposition that the deficiencies show "a culture, a pattern." (p.129–32). While there may be some situations in which deficient records would tend to show a culture or pattern of carelessness, a clerical error and a missing signature do not even come close to that level. These "deficiencies" are of no consequence in determining any issue in this action. Fed.R.Evid. 401(b). Sottile's opinion on this question is not relevant and is therefore barred.

Finally, Sottile opines that the signal event recorder data is insufficient to determine the speed, horn and active warning systems at the time of the accident, because (1) the data log is in "txt" format and can be manipulated because it was not encrypted; and (2) the data log time stamp does not reflect daylight savings time. The second question raises the same non-issue as it did above. Standard time and daylight savings time can be synchronized without the need for any assumption whatsoever, and failure to make that synchronization is simply ridiculous. No more need be said on that issue.

With respect to his criticism that the data log might have been manipulated because of its format, this is pure speculation. The data log does not contain the information Sottile expected to see, so he guessed at a couple of possible reasons. When confronted, he stated that he had no evidence of any manipulation (p.135) and no reason at all to criticize the technician who downloaded the data. (p.139–140). He admitted that he had not seen certain documents before his deposition and that the reason he did not see the expected information was that the train remained in the intersection ("on the island") until after the download of data was completed. Because the event recorder is "event driven" and no "event" occurred from the time the train stopped until the download, no more data was recorded.

 **\*11**  Once again, Sottile's opinion was based on incomplete information. Once he was shown additional documents, he back-pedaled and changed his opinion. He cannot be allowed to testify to an opinion that he has abandoned.

**CONCLUSION**

For the reasons stated herein, the Motions to Bar [# 56][# 58] are GRANTED in their entirety. The testimony of Mr. Bodnar and Mr. Sottile is barred.

**Parallel Citations**

88 Fed. R. Evid. Serv. 1321

Footnotes

1    An "event recorder" is a device that "(1) records train speed, hot box detection, throttle position, brake application, brake operations, and any other function the Secretary of Transportation considers necessary to record to assist in monitoring the safety of train operation, such as time and signal indication; and (2) is designed to resist tampering." 49 U.S.C. § 20137.

2    His lack of availability was due to his annual out-of-the country ski trip, related travel, and subsequent activity on other cases. The Order denying his motion found that this did not constitute "due diligence" that would support an extension of the deadlines in any event.

3    Actually, there is some merit to the argument that Bodnar lacked the qualifications to offer his testimony about the horn data. He did not know what type of event recorder was being downloaded or what software was used to do so, and he relied on an undisclosed "partner" to double check his work. He also applied an inapposite federal regulation. But because his opinion is based solely on one row of missing data on that download (and not on a complete reading of the entire download), that serious lack in his qualifications really does seem to go more to the weight or lack thereof of his opinion than to his qualifications. Because his opinions themselves are so far below the requisite *Daubert* standard, I do not find it necessary to reach a definitive decision on this matter.

4    Actually, what Sottile said was that the 30 seconds of warning came one hour before the accident, because he refused to make the adjustment for daylight savings time. As discussed above, that is absurd and is ignored.

**End of Document**    © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 12

2011 WL 2633842
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

UNITED STATES of America, Plaintiff,
v.
David VANCE, Defendant.

No. 07 CR 0351.    |    July 5, 2011.

Opinion

### MEMORANDUM OPINION AND ORDER

JOAN B. GOTTSCHALL, District Judge.

 **\*1**  The United States of America (the "government") has moved *in limine* to bar the testimony of Larry M. Dehus, the defense's proposed expert witness. For the reasons set forth below, the motion is granted.

### I. BACKGROUND

David Vance is charged with committing two armed bank robberies. Vance's attorneys hired Dehus to evaluate certain discovery materials "with respect to crime scene processing procedures, proper evidence handling, sampling and testing procedures, and the degree to which all potential evidence had been evaluated." (United States' Mot. *In Limine* to Bar Defense Expert Testimony Ex. A, ECF No. 213.) These discovery materials included reports completed by the Chicago Police Department and the Illinois State Police Laboratory, photos and sketches of the crime scene, witness statements, security camera videos, and "other various materials." (*Id.*) Dehus formed the following opinions about the procedures for evidence collection and analysis followed in the investigation of the bank robberies in which Vance is alleged to have been involved:

A) The crime scenes are processed by two different agencies. This appeared to result in a lack of coordination in the collection and submission of the evidence coming from multiple sources. Based upon the lack of coordination, labeling and continuity, it is not possible to determine if the chain of custody has been compromised for many of the evidence items.

B) Latex Gloves—This examiner observed numerous problems with respect to the collection, documentation, sampling, and handling of these gloves. These current concerns are as follows:

1. The latex gloves were improperly collected in that as many as ten gloves were placed together in a single package as opposed to being properly packaged separately.

2. The lack of due care in the collection and handling of the glove evidence is evidenced by the discrepancy in the actual number of gloves being submitted. In one exhibit, The Chicago Police Department said there were 12 latex gloves and the Illinois State Police Lab reported that there were 13. In a second exhibit, a discrepancy report states that 9 latex gloves were reported as submitted, but 10 were actually received by the Illinois State Forensic Police Lab.

3. This examiner did not find documentation in either photographs or sketches to show the exact location where each of these gloves were found and collected. Photographs should have been taken of all of the gloves as found and then photographic documentation [sic] to show their collection and preservation.

4. The gloves were submitted with various types of trace evidence materials that were described but never evaluated.

5. The sampling of the gloves for DNA testing was improper. Most of the gloves were sampled using the same swab to sample the interior and exterior of gloves together. The exterior and interior of the gloves should always be sampled separately for obvious reasons.

 **\*2**  C) There is no indication that all of the clothing of Tramaine [sic] Gibson had been tested with respect to gunshot evidence or other trace evidence.

D) There is no indication that the clothing of the two security guards had been tested with respect to gunshot evidence or other trace evidence.

E) A bullet was reported to have been recovered from Dorothy Sanders on June 4, 2007, at Advocate Christ Hospital. There was no indication as to the time that it was recovered or the [sic] proper record keeping regarding a chain of evidence. Notations indicate that Det. M.L. Frasier got the bullet from Gerri Wetzel in the

Pathology Department at Advocate Christ Hospital on that date.

F) A large number of evidence items had been recovered from the 1991 Olds Delta 88 and this list includes: swabs from the steering wheel, swabs from the armrest, vacuuming samples from the interior, floor mats, contents of rear ashtray, torn material from a right rear fender. There is no indication that trace evidence from any of these items had been evaluated.

G) The proper accounting of evidence items is important to insure its [sic] integrity. An Illinois State Police Lab discrepancy notification concerning latent print lifts filed 8–28–10, more than three years after the evidence was collected, demonstrates extremely poor accountability for the evidence.

It is the opinion of this examiner that the evidence collection procedures, documentation, and processing of the evidence do not comply with standard forensic science procedures. This has resulted in evidence being lost, contaminated, and not completely evaluated.

(*Id.*) The above constitutes substantially all of the Dehus' report, which is laid out in a three-page letter dated March 24, 2011. Dehus does not explain how he reached these conclusions, other than to note that "[t]he above is a summary of my findings that were noted with respect to crime scene processing, evidence collection, evidence submission, and evidence evaluation after a review of voluminous materials in this matter." (*Id.*) According to Vance, Dehus will "testify about proper methodology and procedures for the collection, documentation and processing of evidence and will conclude that in the David Vance case, the collection procedures, documentation, and processing of evidence did not comply with standard forensic science procedures." (*Id.*)

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admission of expert testimony. Rule 702 provides:

> If scientific, technical, or otherwise specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training,

or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

**\*3** Fed.R.Evid. 702. Thus, expert testimony is not admissible unless it is relevant and reliable. *Daubert v. Merrell Dow Pharms ., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007). Expert witnesses must have the "knowledge, skill, experience, training, or education" to qualify as an expert; the methodology underlying the expert's testimony must be reliable; and the expert's testimony must help the trier of fact understand the evidence or determine a fact at issue. *Myers v. Ill. Cent. R.R. Co.,* 629 F.3d 639, 644 (7th Cir.2010); *Ervin,* 492 F.3d at 904; Fed.R.Evid. 702; *see Smith v. Ford Motor Co.,* 215 F.3d 713, 721 (7th Cir.2000) ("[I]n order for an expert's testimony to qualify as 'relevant' under Rule 702 it must assist the jury in determining *any* fact at issue in the case."). In determining whether the expert's methodology is reliable, the court may consider "(1) whether the theory has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether it has been generally accepted within the relevant scientific community." *Happel v. Walmart Stores, Inc.,* 602 F.3d 820, 824 (7th Cir.2010) (*citing Daubert,* 509 U.S. at 593–94.).

Also relevant to the government's motion is Federal Rule of Evidence 403 and a portion of Federal Rule of Criminal Procedure 16. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. In addition, Rule 16 [1] "says that if (at defense request) the prosecution discloses details of expected expert testimony, then the defense must do so too, revealing 'the witness's opinions, the bases and reasons for those opinions, and the witness's qualification [s]'." *United States*

*v. Rettenberger,* 344 F.3d 702, 706 (7th Cir.2003). "The rule requires 'a summary of the expected testimony, not a list of topics.' " *Id.* (quoting *United States v. Duvall,* 272 F.3d 825, 828 (7th Cir.2001)). "The level of detail of this summary depends on the complexity of the expert testimony." *United States v. Caputo,* 382 F.Supp.2d 1045, 1049 (N.D.Ill.2005) (citing *United States v. Jackson,* 51 F.3d 646, 651 (7th Cir.1995)). Accordingly, expert witness testimony involving "technical or scientific evidence[ ] may require greater disclosure [than testimony based on experience], including written and oral reports, tests, investigations, and any other information that may be recognized as a legitimate basis for an opinion under [Federal Rule of Evidence 703]." *Jackson,* 51 F.3d at 621. In addition, the Advisory Committee notes explain that this rule is "intended to minimize surprise that often results from unexpected expert testimony, reduce the need for continuances, and to provide the opponent with a fair opportunity to test the merit of the expert's testimony through focused cross-examination." Fed.R.Crim.P. 16 advisory committee's notes.

### III. ANALYSIS

**A. Dehus' Disclosure Does Not Establish that He Has the Qualifications to Testify as an Expert.**

**\*4** Vance's disclosure—which consists of the report described above, a letter from Vance's attorney summarizing Dehus' findings, and Dehus' curriculum vitae—does not adequately describe Dehus' qualifications as required by Federal Rule of Criminal Procedure 16(b)(1)(C). As a result, Vance has not established that Dehus has the "knowledge, skill, experience, training, or education," Fed.R.Evid. 702, to qualify as an expert witness on "crime scene processing procedures, proper evidence handling, sampling and testing procedures, and the degree to which all potential evidence had been evaluated." (United States' Mot. *In Limine* to Bar Defense Expert Testimony Ex. A, ECF No. 213.) According to Dehus' curriculum vitae, Dehus earned his bachelor's degree in biology (with minors in chemistry and psychology) from Otterbein College in 1965, earned his master's degree in "biology-biochemistry" at Wright State University in 1974; has been trained in forensic microscopy, forensic serology, accident reconstruction, microscopy of hairs, forensic geology, DNA analysis, the cause and origin of fires and explosions, and "BAC DataMaster" (which appears to have something to do with field sobriety testing); worked as a criminalist in a crime lab for three years, then as a technical supervisor in a crime lab for seven years; taught

courses on criminalistics, forensic sciences, and criminal justice; and is a member of two professional organizations for forensic scientists, and has served as a consultant for 28 years (24 years of which he spent testing criminal evidence for defense attorneys and prosecutors). (United States' Mot. *In Limine* to Bar Defense Expert Testimony Ex. B, ECF No. 213.) In addition, Dehus published an article entitled "The Collection and Analysis of Physical Evidence from Sexual Assault Victims" in 1980. (*Id.*)

It is clear that some of Dehus' experience is too dated to qualify him to opine on current procedures for evidence collection and analysis. More often, Dehus does not indicate when he obtained certain experience, leaving the court unable to determine whether and how Dehus has stayed current with the procedures for evidence collection and analysis. In addition, Dehus does not define "forensic microscopy", "forensic serology", "microscopy of hairs", "forensic geology", or what he means by "DNA analysis," let alone how training in these areas qualifies him to opine as he does about proper procedures for maintaining a chain of custody, collecting and analyzing ballistics evidence, or collecting DNA evidence or gunshot residue from physical evidence such as latex gloves, the interior of a car, or clothing. Although Dehus indicates that he worked in a crime lab at some point, he does not indicate the skills he obtained from that position or whether he had specific experience collecting and analyzing ballistics evidence, DNA evidence or gunshot residue, or maintaining a chain of custody.

The paucity of information conveyed about Dehus' pertinent qualifications is surprising given that Dehus claims to have testified over 1500 times as an expert witness, including in federal court. In sum, because Vance's disclosures do not adequately describe Dehus' qualifications as required by Federal Rule of Criminal Procedure 16(b)(1)(C), the court cannot discern whether Dehus has the depth or recency of experience that would qualify him to testify as an expert on proper procedures for the collection and analysis of evidence. While the government's motion to exclude Dehus' expert testimony could be granted on this basis alone, the court will address other deficiencies for the sake of completeness.

**B. Dehus' Disclosure Does Not Establish that his Methodology Is Reliable.**

**\*5** In addition, the court cannot conclude that Dehus' methodology is reliable since Dehus did not adequately describe the bases and reasons for his opinions as required by Federal Rule of Criminal Procedure 16(b)(1)(C). As an initial

matter, Dehus reveals only some of the materials he relied on in forming his opinions-reports completed by the Chicago Police Department and the Illinois State Police Laboratory, photos and sketches of the crime scene, witness statements, and security camera videos. (United States' Mot. *In Limine* to Bar Defense Expert Testimony Ex. A, ECF No. 213.) His statement that he also relied on "other various materials" is not helpful. (*Id.*). Indeed, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact ...." *Smith,* 215 F.3d at 718. However, the jury cannot determine whether the factual underpinnings of Dehus' opinions are sound if Dehus does not disclose all of the materials on which he relied in forming his opinions. Moreover, the government cannot properly prepare for cross-examination or procure rebuttal evidence without proper notice of the materials on which Dehus is basing his opinions.

In addition, Dehus does not reveal what methods he used to reach his conclusions or what manuals or other reference materials, if any, he relied upon, other than his noting that he reviewed voluminous materials. (*Id.*) The court is left to wonder whether he simply read certain materials and weighed the evidence, which would be improper. *See Noller v. London & Lancashire Indem. Co. of Am.,* 103 F.2d 622, 623 (7th Cir.1939) ("The jurors are the sole and exclusive judges of the facts, of the credibility of the witnesses, and of the weight of the evidence.") Vance argues that Dehus' opinions are based on his experience, but nowhere was this indicated in Dehus' report, nor does Dehus hint at the nature of the experience on which he relied. While it is true that "[a]n expert's testimony is not unreliable simply because it is founded on his experience rather than data," *Metavante Corp. v. Emigrant Savings Bank,* 619 F.3d 748, 761 & n. 8 (7th Cir.2010) ("Criminal cases, for instance, are replete with examples of experts, such as police officers or informants, qualified by experience."), as explained above, Dehus has not established that he has the requisite experience to qualify as an expert on the proper procedures for evidence collection and analysis. Had Dehus shown that he possesses the relevant qualifications, perhaps he could have assisted the jury by testifying about what is currently accepted as proper procedure for evidence collection and analysis. However, since Dehus has not shown that he has the relevant expertise, the court cannot conclude that Dehus' testimony would do anything other than invade the province of the jury. Indeed, allowing Dehus to testify based on nothing more than his review of certain discovery materials could give the jury the impression that he did something more than simply review the materials, which the jury can do itself. *See United States v. Hall,* 93 F.3d 1337, 1343 (7th Cir.1996) ("Unless the expertise adds something, the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403.")

**\*6** Accordingly, even if Dehus' summary had adequately described his qualifications and opinions, his report and testimony would have been excluded for failure to adequately describe the bases and reasons for his opinions.

**C. Dehus Has Not Established that his Proposed Testimony Would Help the Jury Understand the Evidence or Determine a Fact in Issue.**

"In determining whether expert testimony will be helpful to the jury in a particular case, the court is required to evaluate 'the state of knowledge presently existing about the subject of the proposed testimony' in light of its 'appraisal of the facts of the case.' " *United States v. Brown,* 7 F.3d 648, 651–52 (7th Cir.1993) (quoting *United States v. DeSoto,* 885 F.2d 354, 359 n. 3 (7th Cir.1989)). "Expert testimony is not admissible under Rule 702 if it will not assist the jury in understanding the evidence or determining a fact in issue or it is purely speculative." *United States v. Davis,* 772 F.2d 1339, 1333–43 (7th Cir.1985) (citing *United States v. West,* 670 F.2d 675, 682–83 (7th Cir.1982)).

It is unclear whether several of Dehus' opinions would "assist the trier of fact to understand the evidence or determine a fact in issue" as required by Federal Rule of Evidence 702. For example, Dehus opines that "[t]here is no indication that all of the clothing of Tramiane [sic] Gibson had been tested with respect to gunshot evidence or trace evidence." (United States' Mot. *In Limine* to Bar Defense Expert Testimony Ex. A, ECF No. 213.) Yet, since Dehus does not indicate the specific materials on which he based this opinion, the court cannot determine whether Dehus merely read a note on a sheet of paper that said "not tested" or whether Dehus decoded an abbreviation that the average juror would find unintelligible. In addition, Dehus is of the opinion that the investigators did not exercise "due care" since one document said that there were 12 latex gloves collected while another said there were 13. Noting discrepancies in documentation is within the understanding of the average juror. The jury, not an expert, should be charged with judging whether such discrepancies meant that the investigators did not use "due care."

Accordingly, even had Vance's disclosure adequately described Dehus' opinions, qualifications, and the bases and reasons for those opinions as required by Federal Rule of Criminal Procedure 16(b)(1) (C), several of Dehus' opinions would have been excluded because they do not assist the jury.

### III. CONCLUSION

Dehus' report is totally conclusory and completely inadequate to inform the court of: (1) the knowledge, skill, experience, training or education on which he relied in forming his opinions; (2) the methodology, if any, he utilized in reaching his opinions and (3) in some cases, such as the lack of certain testing, whether he will be telling the jury anything that it cannot easily discern itself. He has not indicated whether he is relying on any scientific theory, whether any such theory has been tested and whether it has been subjected to peer review and publication, among other things. Moreover, he has not indicated whether, if the evidence collection procedures were improper (such as placing 10 gloves in one package rather than in 10 packages or failing to evaluate certain trace evidence), there is any consequence in terms of the reliability of the evidence being offered by the government. Dehus' report contains no opinions about any such consequence of the government's allegedly improper evidence-gathering techniques, raising issues about his testimony's relevance. If the government's evidence collecting methods impair the reliability of the government's evidence, not only does Dehus' report fail to so indicate, but no basis for any such opinion is given, rendering his testimony inadmissible under Rule 702, Rule 16, and *Daubert*. Without this information, the court cannot do its job as gatekeeper and the government cannot prepare to meet Dehus' testimony. Given the foregoing, the government's motion to bar Dehus' testimony is granted.

### Footnotes

1    Federal Rule of Criminal Procedure 16(b)(1)(C) provides:

   The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if—

   (i) the defendant requests disclosure under subdivision (a)(1) (G) and the government complies; or

   (ii) the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.

   This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 13

2008 WL 656045
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

MURATA MANUFACTURING CO., LTD., Plaintiff,
v.
BEL FUSE, INC., Bel Fuse, Ltd., Bel Stewart,
Ltd., and Bel Connector, Inc. d/b/a Stewart
Connector and Bel Stewart, Defendants.

No. 03 C 2934.  |  March 5, 2008.

### Attorneys and Law Firms

Patrick Joseph Kelleher, Brian C. Rupp, Michael E. Barry, Nicole M. Murray, Richard Andrew Wulff, Drinker Biddle & Reath LLP, Chicago, IL, for Plaintiff.

Andres N. Madrid, Steinberg & Raskin P.C., David B. Sunshine, Joshua L. Raskin, Kenneth G. Roberts, Martin G. Raskin, Wolf Block Schorr & Solis-Cohen LLP, New York, NY, David J. Sheikh, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for Defendants.

### Opinion

#### MEMORANDUM OPINION AND ORDER

JOAN B. GOTTSCHALL, District Judge.

**\*1** Plaintiff Murata Manufacturing Co., Ltd. ("Murata") has filed a motion to strike and bar portions of defendants Bel Fuse, Inc. et al .'s (collectively "Bel") brief in opposition to Murata's motion for summary judgment of literal infringement of Murata's U.S. Patent No. 5,069,641 ("the #641 patent"). Specifically, Murata seeks to strike five allegedly new theories of noninfringement that it claims Bel raises for the first time in its brief in opposition, and to further bar Bel from raising those theories at trial. Murata additionally seeks to strike the declarations of Bel's expert witnesses R. Lee Hill ("Hill") and Peter G. Bittner III ("Bittner") which were submitted as exhibits accompanying Bel's brief in opposition. For the reasons set forth below, Murata's motion is granted in part and denied in part.

### I. ANALYSIS

**1. First Alleged Theory of Noninfringement:**
In response to Murata's motion to strike, Bel has withdrawn any argument, in its brief or at trial, based upon the first allegedly novel theory of noninfringement; the reverse doctrine of equivalents. *See, e.g., Tate Access Floors, Inc. v. Interface Architectural Res., Inc.,* 279 F.3d 1357, 1368 (Fed.Cir.2002). The court therefore strikes that theory of noninfringement from both Bel's opposition to Murata's motion for summary judgment of literal infringement and at trial.

**2. Second Alleged Theory of Noninfringement:**
Murata argues that Bel also presents a new theory of noninfringement with respect to the Family 1 modular jacks, *viz.,* that the contactors are not "electrically connected" to the noise suppressing elements because the contactors engage pins in a toroid base which, in turn, fit into holes in the printed circuit board, engaging the traces on the board. Murata's Mot. to Strike § II ¶ 2. Bel retorts that its statement in opposition to Murata's motion to dismiss claims that "the Family 1 connectors still do not infringe because they lack a contactor being electrically connected with the electronic element 'by a wire on the printed board' as required by the claims." Bel's Opp. at 13. Bel cites the expert report submitted by Hill during discovery, which claims that "the capacitor is not 'electrically connected' to any contactor by a 'wire on the printed board.' Rather, the contactors are connected to the resistors or to other components. Bel's Brief in Opp. Ex. 2 ¶ 55. Hill's report thus clearly indicates that the connection between the contactor and the capacitor is not a direct contact mediated only via a "wire on the board," but that "other components" intervene. *Id.* Even a cursory glance at the illustrations of the Family 1 components at issue provided in both parties' briefs renders this argument apparent.

Murata replies, cryptically, that Bel's explanation of its argument is not more precise, but rather more abstract. Murata's Reply Brief 7-8. Furthermore, it claims that because the phrase "other components" appears, Bel can then continue to plug any component it wants into its defense theory. *Id.* at 8. Murata claims that Bel's factual submissions and arguments therefore violate Federal Rule of Civil Procedure 26(a)(2)(B), which requires disclosure in expert reports of "a complete statement of all opinions to be expressed and the basis and reasons therefore." *Id.* at 8. Murata complains

that the Hill report says nothing about "intermediate pins" or "toroid bases" despite its alleged requirement to do so. *Id.*

 **\*2** Murata's argument, however, is a canard; Hill's report states that there is not a direct connection from contactor to "wire on the board" to capacitor, but rather that another component intervenes and thus the accused device lies outside the scope of the claims. Bel is not required to list every possible permutation of potential components; rather, its argument is that the connection is not direct, but indirect. That much is clear from Hill's report, and a straightforward reading of the report should have put Murata on notice of Bel's argument in this respect. Moreover, Murata's invocation of *Salgado v. General Motors Corp.* avails it little. 150 F.3d 735 (7th Cir.1998). *Salgado* describes the requirement that an expert's report must be sufficiently "detailed and complete" so that opposing counsel will not be ambushed at trial. 150 F.3d at 741 n. 6. Hill plainly asserts that there is no connection between the contact and the capacitor via a "wire on the board", but rather a connection between the contacts and resistors and other components. Bel's Brief in Opp. Ex. 2 ¶ 55. The court finds that Hill's argument is sufficiently detailed and complete, and supported by facts, so as to adequately satisfy the requirements of Rule 26(a)(2)(B).

Nor is Murata's argument that Hill's prior report is contradicted by the new report convincing. The court's understanding of electronics is not so unsophisticated as to fail to comprehend the difference between "connected" (implying a physical contact connection) and "electrically connected" (which implies existence of a conductive pathway through which current may flow from one component to another [1] ). The court therefore finds that Bel adequately disclosed the facts underlying this particular argument and denies Murata's motion to strike this particular theory of noninfringement.

**3. Third Alleged Theory of Noninfringement:**
Next, Murata argues, also with respect to Family 1, that the contactors are not connected via a "wire on a printed board" to noise suppressing elements because "the terminals are connected to wires wound around toroids and only part of this path is a trace." Murata's Mot. to Strike § II ¶ 3.

Bel counters with the argument that "the Family 1 connectors do not infringe because they lack a terminal that is 'electrically connected' to the electronic element 'by a wire on the printed board' as required by the claims." Bel Opp.

at 16. Bel's expert report by Hill states explicitly that none of the contactors "are 'electrically connected' to any of the terminals ... because of the presence of the isolation transformers." Brief in Opp. Ex. 2 ¶ 60. Bel contends that the presence of the isolation transformers precludes any electrical connection by a wire on the board due to the electrical isolation created by the wire wrapped toroids in the base. Bel Opp. at 17.

Murata argues in reply that Bel's expert report comprises a novel theory of noninfringement that is related to an entirely different claim limitation ("electrically connected") in addition to prior theories that were related to the limitation "by a wire on the board." Murata Reply Brief 10.

 **\*3** The court finds that the plain language of Hill's report corresponds sufficiently to Bel's argument in its opposition to Murata's motion for summary judgment to satisfy the requirements of Federal Rule of Civil Procedure 26(a)(2)(B). Murata's motion with respect to this argument is consequently denied.

**4. Fourth Alleged Theory of Noninfringement:**
Next, Murata argues that, with respect to Family 3, Bel's contention that the #641 patent "indicates" that the substrate in a chip is not a printed board is a new and impermissible noninfringement theory. Murata's Mot. to Strike § II ¶ 4.

Bel counters by arguing that the distinction between a printed board and a chip has been explicitly presented in Hill's report. Brief in Opp. Ex. 2 ¶ 114 ("I have never to my recollection ever read, heard, or even conceived of the notion that the substrate of a chip resistor could be considered by anyone in the electronics industry as constituting a printed board"). Bel argues that Murata's new argument, raised in its motion for summary judgment, is that the chip resistor includes a printed board, and that their argument in opposition constitutes a proper rebuttal. Brief in Opp. 10 (citing *Aircraft Gear Corp. v. Marsh,* No. 02 C 50338, 2004 WL 1899982, at \*5 (N.D.Ill. Aug.12, 2004).

Murata retorts that Bel's argument in opposition to Murata's motion for summary judgment is the very first time that Bel has argued that there is a "clear line of demarcation" between printed boards and substrates in chip resistors, and argues that Bel has never before made that argument. Murata Reply Brief 10. Murata argues that Bel has moved for summary judgment based on this differentiation between printed boards and chip resistors.

Murata Mfg. Co., Ltd. v. Bel Fuse, Inc., Not Reported in F.Supp.2d (2008)

Hill's statement, however, explicitly states that, as an expert, he believes that there is a cognizable dichotomy between chip resistors and printed boards. Murata argues that "determination of what a patent teaches is fact finding, not interpretation." *Id.* at 11 (citing *Graham v. John Deere Co. of Kansas City,* 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)). Nevertheless, it is precisely such a factual inquiry that is the function of this court, and Hill's opinion, explicitly stated in his report, stakes out a dispute over that factual inquiry that is fairly included in Bel's opposition. Murata's motion to strike this portion of Bel's opposition is denied.

**5. Fifth Alleged Theory of Noninfringement:**
Finally, Murata has submitted a final argument in its supplement to its motion to strike. Murata contends that Bel's claim that the alumina substrate layer of the chip resistor does not constitute a printed board (and therefore does not infringe the #641 patent) is a new theory of noninfringement. Murata argues that this argument was not supported by expert testimony, and that it was only raised in Bel's response in opposition to Murata's motion for summary judgment. Supp. to Murata's Mot. to Strike 2. Murata claims that Bel's theory relies solely on dictionary definitions that were supplied by Bel only at the last minute.

 **\*4**  In response, Bel cites explicit testimony from Hill's report that the alumina substrate layer does not contain a plurality of the electrically interconnected components that this court construed to be elements of a printed board in its *Markman* hearing.[2] Brief in Opp. Ex. 2 ¶ 114; *Murata Mfg. Co., Ltd. v. Bel Fuse Inc.,* 445 F.Supp.2d 938, 947 (N.D.Ill.2006). As such, it is evident that Murata could have deposed Bel's expert on that explicit statement during discovery. Moreover, Bel advanced this theory of infringement in its response brief (and not a reply brief, as alleged by Murata), to Murata's motion for summary judgment of literal infringement. Murata has consequently had the opportunity to rebut Bel's argument in its reply brief and will again have that opportunity at trial. Murata's motion to strike the argument and bar it from further proceedings is consequently denied.

**6. The Declarations of Bittner and Hill**
Murata also opposes the submission of two affidavits, by Hill and Bittner respectively, submitted by Bel with its brief in opposition to Murata's motion for summary judgment. According to Murata, Bel is attempting to use these declarations to support the allegedly new theories of noninfringement submitted in its opposition to Murata's motion for summary judgment. Murata's Mot. to Strike § III. Murata complains that because the affidavits were submitted after the close of discovery, it had no opportunity to depose Hill or Bittner on the facts alleged in their affidavits concerning their contentions of noninfringement. Murata cites no legal support for their motion to strike the affidavits and their argument has little merit.

Rule 56(e) of the Federal Rules of Civil Procedure explicitly permits the submission of affidavits in conjunction with, or in opposition to, a motion for summary judgment. Fed.R.Civ.P. 56(e). Moreover, the Rule requires that an "opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." *Id.* These requirements are mandatory. *Toro Co. v. Krouse, Kern & Co., Inc.,* 827 F.2d 155, 162 n. 3 (7th Cir.1987).

An affidavit submitted in conjunction with a brief in opposition to a motion for summary judgment must be limited to facts, and the facts must be alleged on personal knowledge. Fed.R.Civ.P. 56(e); *In re Morris Paint and Varnish Co.,* 773 F.2d 130, 135-36 (7th Cir.1985) (citing *Ashwell & Co. v. Transamerica Ins. Co.,* 407 F.2d 762, 766 (7th Cir.1969)). Thus, ultimate or conclusory facts and conclusions of law, as well as statements made on belief, may not be employed in a summary judgment motion. *See Corder v. Lucent Technologies Inc.,* 162 F.3d 924, 927 (7th Cir.1998); *Resolution Trust Corp. v. Juergens,* 965 F.2d 149, 152-53 (7th Cir.1992). However, expert witnesses, who are not strictly "fact witnesses," may opine in their affidavits, provided they do more than offer mere naked conclusions; they must also provide a process of reasoning underlying those conclusions, beginning with a firm foundation. *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir.1989) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process."); *See also Zarecki v. National R.R. Passenger Co.,* 914 F.Supp. 1566, 1575 (N.D.Ill.1996).

 **\*5**  Finally, the facts contained within the affidavits must be admissible as evidence at trial. *Reeves v. Commonwealth Edison Co .,* No. 06 C 5540 2008 WL 239030 (N.D.Ill. Jan. 28, 2008). The admissibility of expert testimony is governed by Federal Rule of Civil Procedure 702 and the U.S. Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals,*

Murata Mfg. Co., Ltd. v. Bel Fuse, Inc., Not Reported in F.Supp.2d (2008)

*Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

Under *Daubert,* this Court must conduct a two-step analysis to determine whether an expert's opinion is admissible. First the court must determine whether the expert's testimony pertains to scientific, technical, or other specialized knowledge. *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The district court must consider whether the testimony has a reliable basis in the in the knowledge and experience of the discipline; it must rule out subjective belief or unsupported speculation. *Kumho,* 526 U.S. at 149 (citing *Daubert,* 509 U.S. at 590). Second, the district court must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue. That is, the suggested expert testimony must 'fit' the issue to which the expert is testifying." *Porter v. Whitehall Lab.,* 9 F.3d 607, 616 7 th Cir.1993). Essentially, purpose of the rule in *Daubert* is "to make sure that when [scientists/ engineers/technical experts] testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work." *Rosen v. Ciba-Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996).

The court finds that there is sufficient factual foundation, presented on firm and accepted technical footing, to support the opinions and conclusions set forth in Hill's and Bittner's affidavits. Both Hill and Bittner appear from their resumes and affidavits to be competent to provide expert testimony, and the scientific (engineering, to be precise) bases forming the underpinnings of their opinions and conclusions appear to meet the standards required by *Daubert* and *Kumho* [3] for admissibility as expert testimony. Moreover, the subject matter that both affiants opine upon is material to the case and likely to assist the court in understanding the evidence or in determining the factual issues before it at trial. Thus, both prongs of the *Daubert* analysis are satisfied and Hill's and Bittner's testimony are admissible as evidence. Murata's motion to strike and bar the affidavits of Hill and Bittner is consequently denied.

## II. CONCLUSION

For the reasons set forth above, Murata's motion to strike and bar Bel's noninfringement theories and expert affidavits is granted with respect to Bel's theory based upon the reverse doctrine of equivalents, and denied with respect to the rest of its motion.

---

Footnotes

1    Although to remain within the scope of the claims, the connection through which the current flows must include a "wire on the board."

2    In its *Markman* hearing, the court construed "printed board" as "a generally flat piece of material typically fabricated from insulating material that provides support and structural integrity for a plurality of electrically interconnected components comprising a circuit, with some or all of the conducting interconnection pattern formed on the board." *Murata,* 445 F.Supp.2d at 947.

3    In *Daubert,* the Court identified several factors that should be considered when determining whether testimony has been subjected to the scientific method: (1) whether the theory can be and has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique; and (4) whether the theory has been generally accepted by the relevant scientific community. *Daubert,* 509 U.S. at 593-94. The Court's conclusion must be based solely on the principles and methodology underlying the expert's conclusion, not the conclusion itself. *Id.* at 593-93. Of these four factors, the first-whether the proffered theory has been tested-has been deemed the most important. *See, e.g., Zarecki,* 914 F.Supp. at 1574; *Schmaltz v. Norfolk & W. Ry. Co.,* 878 F.Supp. 1119, 1121 (N.D.Ill.1995). The methodology and analysis performed by both Hill and Bittner reflect general and widely accepted principles of electrical engineering sufficient to ensure admissibility under these *Daubert* criteria. *See Kumho,* 526 U.S. at 141.

---

**End of Document**        © 2013 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 14

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| MARILYN F. QUIRIN, as Executor of the Estate of RONALD J. QUIRIN, Deceased, | ) ) ) |
| Plaintiff, | ) Civil Action No. 13-cv-02633 ) |
| v. | ) Judge Joan B. Gottschall ) ) |
| LORILLARD TOBACCO COMPANY., *et al.*, | ) ) ) |
| Defendants. | ) ) |

## AFFIDAVIT OF SURESH H. MOOLGAVKAR, M.D., PH.D.

Dr. Suresh H. Moolgavkar, being duly sworn, deposes and states as follows:

FURTHER AFFIANT SAYETH NAUGHT

_____
Suresh H. Moolgavkar, M.D., Ph.D.

Subscribed and sworn before me on this 30th day of July 2013,

_____
Notary Public

MICHELLE RANI AWASTHI
NOTARY PUBLIC
STATE OF WASHINGTON
COMMISSION EXPIRES
APRIL 21, 2014

My commission expires April 21, 2014

1

## INTRODUCTION

In this declaration, I discuss briefly the basic biological principles underlying carcinogenesis and describe the appropriate scientific framework for establishing cancer causation following exposure to environmental agents, such as asbestos.

1. Most chronic diseases, including cancer, have multi-factorial etiologies, i.e., may occur after exposure to one or more of a number of agents and can even occur spontaneously without exposure to any environmental agent. This fact makes the attribution of cause much more difficult than for infectious disease. For example, tuberculosis is, by definition, a disease caused by infection with the tubercle bacillus (mycobacterium tuberculosis). Once the diagnosis of tuberculosis is established, the cause of the disease is known, although the exact strain of the bacterium in any specific case may need further laboratory tests.

2. Furthermore, most chronic diseases, including cancer, develop many years after exposure (the latency period) making the attribution of cause even more difficult. For these reasons, it is important that the proper framework be developed when investigating the cause of any chronic disease, including cancer.

3. Dr. Brodkin opines that because mesothelioma has been called a sentinel disease for asbestos exposure and because it is a "dose-responsive" disease, every exposure to any type of asbestos fiber, no matter how small, is a substantial contributing factor in the causation of mesothelioma. I believe, for the reasons set forth below, that this opinion is not scientifically defensible. The scientific literature clearly demonstrates that not every type of asbestos fiber is equally potent as a mesotheliogen. In addition, there is credible evidence derived from diverse sources suggesting that mesothelioma, like all other cancers, can occur spontaneously as a result of naturally occurring biological processes without exposure to asbestos or any other environmental agent. Furthermore, numerous well-conducted epidemiologic studies have failed to demonstrate an increased risk of mesothelioma among vehicle mechanics known to be exposed to low concentrations of chrysotile asbestos, suggesting there is a level of exposure to chrysotile asbestos below which there is no detectable increase in mesothelioma risk. Moreover, there is no epidemiologic evidence that work as a vehicle mechanic increases the risk of mesothelioma imposed by other exposures to asbestos, suggesting that exposure to low levels of chrysotile asbestos does not increase the risk of mesothelioma imposed by other exposures.

4. Essentially, Dr. Brodkin argues that because exposure to high levels of commercial chrysotile contaminated with amphiboles increases the risk of developing mesothelioma, exposure to low levels of Calidria chrysotile, which is not known to be contaminated with amphiboles, also increases the risk of mesothelioma. This argument is fatally flawed as I show in the rest of this affidavit. To support his opinions, Dr. Brodkin cites highly selective literature, fails to acknowledge the limitations of the studies he cites, and fails to cite and review critically the studies that do not support his position. I will give examples of this bias in the body of this affidavit.

## BACKGROUND AND QUALIFICATIONS

5. I am a physician with a Ph.D. in Mathematics and post-doctoral training in Pharmacology, Biophysics, Epidemiology, and Biostatistics. In April 2007, I became a Corporate Vice President and the Director of the Center for Epidemiology, Biostatistics and Computational Biology at Exponent, Inc., an international scientific consulting company. I retired from my position as a Full Member of the Fred Hutchinson Cancer Research Center in August 2008. I continue to be an Affiliate Investigator at the Center and Professor of Epidemiology and Adjunct Professor of Applied Mathematics at the University of Washington in Seattle. I was also Adjunct Professor of Biostatistics at the University of Washington between 1984 and 2008. I am a cancer epidemiologist and research scientist. My main research interest is cancer epidemiology. I was instrumental in developing a biologically-based mathematical model, the two-stage clonal expansion (TSCE) model, often called the Moolgavkar-Venzon-Knudson (MVK) model, for the quantitative estimation and prediction of cancer risk. This model is recognized and used by cancer researchers worldwide.

6. I have served on the faculties of the Johns Hopkins University, Indiana University, the Fox Chase Cancer Center and the University of Pennsylvania. I have been a visiting scientist at the Radiation Effects Research Foundation in Hiroshima, the International Agency for Research on Cancer (IARC) in Lyon, and the German Cancer Research Center in Heidelberg.

7. I have served on numerous review panels and as a consultant to the National Cancer Institute (NCI); the Environmental Protection Agency (EPA); the California Air Resources Board; Health and Welfare, Canada; IARC; the CIIT Centers for Health Research; and the Health Effects Institute. I am the author or co-author of more than 160 papers in the areas of Epidemiology, Biostatistics, and Quantitative Risk Assessment, and have edited three books in these areas. Among these is a monograph, "Quantitative Estimation and Prediction of Human Cancer Risk," published by IARC, the agency that conducts cancer research under the auspices of World Health Organization. I have served on the editorial boards of *Genetic Epidemiology* and *Inhalation Toxicology.* In 2012, I stepped down from my position as one of the editors of *Risk Analysis – An International Journal*, but continue to serve on the editorial board. I am an elected member of the American Epidemiological Society. I was given the Founders' Award by the CIIT Centers for Health Research in 1990, the Distinguished Achievement Award by the Society for Risk Analysis (SRA) in 2001 and the Outstanding Service Award by SRA in 2012. I am one of a few members of SRA to have received both the Distinguished Achievement and Outstanding Service Awards. I am a Fellow of SRA, the pre-eminent international scientific society for risk assessment.

8. Among my publications are several papers on carcinogenesis following exposure to fibers. I was an Invited Expert at a workshop, "Mechanisms of Fiber Carcinogenesis," held at IARC in Lyon, France, in early November, 2005. I was the lead panelist for a symposium on fiber carcinogenesis held in Brussels in 2005.

9. My employer, Exponent, Inc., charges $575 per hour for my consulting services. My curriculum vitae is attached as Appendix 1 of this affidavit.

## PURPOSE OF AFFIDAVIT

10. In this affidavit, I describe the appropriate framework for examining issues of causality associated with exposure to putative carcinogens, and apply it to discuss issues of causality in mesothelioma.

11. Any framework for a discussion of causality in mesothelioma must address the following facts.

   a) Mesothelioma, like other cancers, can occur spontaneously without exposure to any environmental agents.

   b) In addition to exposure to amphibole asbestos, the risk of mesothelioma can be increased by exposure to other fibers, such as erionite, and to ionizing radiation.

   c) Independently of exposure to environmental agents such as amphibole and erionite fibers and ionizing radiation, age is a strong risk factor for the development of mesothelioma with the risk of developing mesothelioma increasing strongly with age as is true for other adult-onset cancers.

   d) There is still controversy in the literature regarding whether chrysotile asbestos uncontaminated by amphiboles can increase the risk of pleural mesothelioma.

   e) There is general consensus that amphibole asbestos is far more potent as a pleural mesotheliogen than chrysotile, if pure chrysotile increases the risk of mesothelioma at all.

   f) Numerous epidemiologic studies of the association between work as a vehicle mechanic and mesothelioma have found no increased risk, suggesting strongly that there is a level of exposure to chrysotile asbestos below which no increase in the risk of mesothelioma can be detected in well-designed epidemiologic studies.

   g) There is no epidemiologic evidence that drywall finishers not exposed to amphiboles are at increased risk of mesothelioma.

12. In any specific case, evaluation of whether a particular asbestos exposure is a substantial contributing factor requires that the background risk of mesothelioma be considered, along with all other exposures that could have increased the risk of mesothelioma in that individual. The importance of any specific exposure clearly depends on what other exposures were received. The appropriate concept from Epidemiology that needs to be applied here is that of attributable fraction (AF), which I discuss this in greater detail below.

13. I begin with a brief discussion of the biological principles underlying the process of

4

carcinogenesis and the role of environmental agents, such as asbestos and ionizing radiation, in modifying the rate at which this process occurs. I then discuss general principles of epidemiology and set up the framework for assessing causality. Finally, I apply this framework to mesothelioma and show that the proposition that every exposure to asbestos, no matter how small, is a substantial contributing factor to mesothelioma is not scientifically defensible.

14. I have reached my conclusions based on my knowledge as a physician, epidemiologist, and biostatistician. The basic biological principles underlying carcinogenesis have been elucidated and described in the peer-reviewed literature. A large number of epidemiologic studies published in the peer-reviewed literature have investigated the association between exposure to asbestos and the subsequent development of mesothelioma. More recent studies have evaluated the various types of asbestos fibers with respect to their relative potencies for causing mesothelioma. Other studies have specifically investigated a possible association between exposure to low levels of chrysotile exposure while working as a vehicle mechanic and mesothelioma. My opinions in this affidavit depend heavily on this entire body of literature. I hold these opinions to a reasonable degree of scientific and medical certainty. I reserve the right to revise my opinions as more information becomes available.

## FUNDAMENTAL PRINCIPLES OF CARCINOGENESIS

15. It is generally recognized that cancer is the end result of an accumulation of critical mutations[1] in a cell. Mutations in a cell can and do occur spontaneously (*i.e.*, during the normal process of cell division, without any exposure to environmental agents). There are approximately 50 trillion cells in the average human body (Tomlinson et al., 2002). When a cell divides into two daughter cells, the DNA, which carries the genetic blueprint for the cell, is duplicated faithfully, with one copy being inherited by each of the daughter cells. The DNA is a very large molecule, however, consisting of some 5 billion units called base pairs.

16. Despite the existence of sophisticated cellular machinery that oversees the fidelity of DNA replication, mistakes in replication occur regularly. Once these mutations are fixed in the DNA, they are faithfully passed on to future generations of cells and accumulate over the life of an individual. Tomlinson et al. (2002) estimate that, by the age of 15 years, there are thousands of mutations in an individual human body, and this number increases with age. When a cell accumulates multiple mutations at critical gene loci, it can escape from the normal growth restraints and grow uncontrollably, to give rise to cancer (Moolgavkar and Knudson, 1981; Moolgavkar et al., 1999; Knudson, 2001). Along the pathway to cancer, a cell that has acquired some, but not all, mutations required to make it malignant may partially escape growth control and begin to replicate

---

[1] A mutation is an alteration of the genetic material in a cell that is passed down to daughter cells when the cell divides. Most mutations are neutral, in that they do not affect the normal functioning of the cell. However, the accumulation of mutations in critical genes can release the cell from normal growth constraints, leading to uncontrolled growth, which is the hallmark of cancer.

somewhat faster than its neighbors. Since this cell carries some of the critical mutations on the pathway to cancer, and since these mutations are passed on to its daughters when it divides, the preferential division of this cell leads to a population of cells that carry some of the mutations on the pathway to cancer. This process of clonal[2] expansion of partially altered cells on the pathway to cancer greatly increases the probability of cancer in the tissue by increasing the population of cells that carry critical mutations.

17. While the specific gene loci involved in carcinogenesis are not known for most cancers, recent work in molecular genetics has shed some light on a locus involved in some cases of mesothelioma (Testa et al., 2011). A germline[3] mutation at this locus confers a high risk of developing mesothelioma in the individual who inherits it. The hereditary transmission of this mutation explains the high incidence of mesothelioma in some families; however, it is not known how common this mutation is, so it is not currently possible to estimate quantitatively the contribution made by this germline mutation to the burden of mesothelioma in the general population. Nonetheless, the discovery of this susceptibility locus does suggest that a final common pathway for mesothelioma pathogenesis in both hereditary and sporadic (non-hereditary) cases involves mutation at the locus.

### Age is a strong risk factor for the development of cancer

18. Because the process of accumulation of mutations occurs spontaneously and continuously throughout life, a certain background rate of spontaneously arising cancer must be expected in the general population. The strong impact of age on the risk of cancer has been recognized for more than 50 years (e.g., Armitage and Doll, 1954; Moolgavkar and Knudson, 1981; Meza et al., 2008; World Health Organization [WHO], 2011). For most cancer sites, including mesothelioma (Moolgavkar and Knudson, 1981; Meza et al., 2008; Moolgavkar et al., 2009), the incidence rate of spontaneously occurring cancer increases strongly with age. Thus, at age 70, the risk of pleural mesothelioma is approximately 30-fold the risk at age 35 (Moolgavkar et al., 2009).

### Action of environmental agents

19. As described in the previous section, the current paradigm views carcinogenesis as a process of mutation accumulation, with clonal expansion of partially altered cells increasing the efficiency of the process. While, as discussed above, this process occurs spontaneously without exposure to any external agents, it can be greatly accelerated in the presence of environmental agents such as radiation, tobacco smoke, and asbestos (Moolgavkar and Knudson, 1981; Moolgavkar et al., 1999). Although the specific details are different for different environmental agents, all agents that increase the risk of cancer act, in the final analysis, in one or both of two ways: 1) by increasing the rate of mutations and/or 2) by increasing the rate of clonal expansion of partially altered cells on the pathway to cancer. Agents that increase the rate of mutations in cells are known as mutagens. Agents that increase the rate of clonal expansion of partially altered cells are

---

[2] A clone of cells is the population of cells consisting of a cell and all its descendants.
[3] A germline mutation is inherited from one of the parents.

known as promoters.[4]  Cigarette smoke is a complex mixture that contains both mutagens and promoters.  Asbestos fibers can, under certain circumstances, set up an inflammatory reaction in tissues that leads to the release of agents that act as both mutagens and promoters (Berman and Crump, 2003).

20. This brief discussion of carcinogenesis and the action of environmental agents provides a framework for understanding the concept of causal associations between exposures to environmental agents and specific cancers.  An environmental agent is causally associated with a specific cancer if it increases the risk of spontaneously occurring cancer, *i.e.*, if the risk in exposed populations is larger than the risk in populations not exposed to the environmental agent.  The science that investigates risks in exposed human populations is epidemiology.  Thus, properly designed, conducted, and analyzed epidemiologic studies establish whether or not risk is increased in exposed populations and, therefore, provide the critical link in establishing causal associations between exposure to environmental agents and cancers at specific sites.

**Case reports cannot be used to infer associations, let alone causality**

21. In my experience plaintiffs' experts often cite case reports of mesothelioma among patients allegedly exposed to pure chrysotile or to low levels of asbestos to support the propositions that pure chrysotile and low levels of asbestos exposure can cause mesothelioma. Dr. Brodkin clearly relies heavily on case reports.  Many of his primary citations are to case reports and some of the reviews on which he relies (e.g., Kanarek, 2011) are based heavily on case reports. Case reports can raise suspicion that a specific exposure is associated with disease; however, properly designed analytical epidemiologic studies need to be performed to establish associations between environmental exposures and disease as is discussed below.  A number of analytical epidemiologic studies have been prompted by clinical reports of exposures in patients with a specific disease; however, case reports cannot by themselves establish associations, let alone causality, between the exposure and the disease because they lack a critical element of a properly designed study, namely a control group.

22. The inadequacy of case reports to establish associations between putative risk factors and disease has been recognized for many years.  For example, in a well-regarded text book, Hennekens et al. (1987) state, "While case reports and case series are very useful for hypothesis formulation, they cannot be used to test for the presence of a valid statistical association.  One fundamental limitation of the case report is that it is based on the experience of only one person. **The presence of any risk factor, however suggestive, may simply be coincidental.**  Although case series are frequently sufficiently large to permit quantification of frequency of an exposure, the interpretability of such information

---

[4] The term "promotion" is used in somewhat different ways by different investigators.  Here, by promotion I will mean the clonal expansion (i.e., the preferential growth) of partially altered cells on the pathway to cancer.  A promoter is any agent that increases the rate of spontaneously occurring promotion.  Promoters can be either endogenous or exogenous.  For example, hormones are well known to be endogenous promoters of breast and prostate cancer.  Cigarette smoke contains a number of agents that act as exogenous promoters in lung cancer.

is severely limited by the lack of an appropriate control group. This lack can either obscure a relationship or suggest an association where none actually exists" (emphasis added). In the same vein, in his book titled "Causal relationships in medicine: A practical system for critical appraisal," Elwood (1988) recognizes a hierarchy of evidence for the establishing of causal relationships. The best evidence is derived from randomized trials, followed by epidemiologic studies. Case series, which are a collection of case reports, are at the bottom of the list. Randomized trials clearly could not be used to investigate the toxicity of asbestos in human subjects; thus, Epidemiology is our best scientific tool to investigate the potential toxicity of asbestos in human populations.

23. In some instances, properly designed epidemiologic studies confirm the suspicion raised by case reports. The best example of this is provided by the causal association between cigarette smoking and lung cancer, which has been demonstrated in numerous epidemiologic studies. The original suspicion of such an association was raised by reports of cigarette smoking among patients with lung cancer. A more recent example is provided by vinyl chloride, which is causally associated with hepatic angiosarcoma (Bosetti et al., 2003). Other examples indicate, however, that suspicions raised by case reports are not always supported by properly conducted epidemiologic studies. Two examples are provided by the cases of Bendictin an effective anti-nausea agent during pregnancy, which was driven off the market by the suspicion that it caused birth defects, and silicone breast implants, which were reported to cause auto-immune disorders in women. In both these examples, properly conducted epidemiologic studies showed no associations between exposure to these agents and the suspected health effects (McKeigue et al., 1994; Janowsky et al., 2000).

24. Plaintiffs' experts, including often cite case reports of mesothelioma among automobile mechanics to support their contention that this occupational group is at increased risk of mesothelioma. Kanarek (2011), one of Dr. Brodkin's reliance documents, relies on case reports of mesothelioma among automobile mechanics while completely ignoring the large body of epidemiologic studies on this topic as I discuss later. The conclusion that automobile mechanics are at increased risk of mesothelioma is not justified, however, as is shown by the following example. In a 1991 letter to the editor, Woitowitz and Rödelsperger reported on cases of mesothelioma among motor mechanics in an outpatient clinic and concluded, "In summary, we have found an increased incidence of mesothelioma among car mechanics exposed to only chrysotile…" Wong (1992) pointed out that Drs. Woitowitz and Rödelsperger had not conducted a proper epidemiologic study and that no associations could be inferred from case reports. In their response to Dr. Wong's letter Drs. Woitowitz and Rödelsperger (1992) conceded that he was correct and that "…it is not possible without further information to infer an increased incidence of mesothelioma from these case figures…" Finally, Drs. Woitowitz and Rödelsperger (1994) completed a case-control study based on their preliminary observations and concluded, "From these results there is no evidence that car mechanics are exposed to an increased risk of mesothelioma if they do brake repairs…" Thus, in this example, case reports led to the hypothesis that work on brakes posed an increased risk of mesothelioma; however, a properly conducted case-control study subsequently showed no evidence of increased risk.

25. These examples illustrate that a hierarchy of evidence is used for decision-making in the biomedical and health sciences. When case reports suggest associations between a putative risk factor and disease, it may be prudent health policy to accept this observation as indicating a causal relationship in the absence of any epidemiologic evidence. As well-designed epidemiologic studies become available, however, the scientific data and results from these studies supersede the case reports. As discussed above, in some instances, the epidemiologic studies confirm the suspicions aroused by the case reports. In others, the epidemiologic studies indicate that the suspicions were unfounded. Epidemiologic studies of brake work and mesothelioma have been undertaken precisely because of the suspicion that brake workers might be at risk for mesothelioma. As discussed later in this report, not one single epidemiologic study has shown a positive association between brake work and mesothelioma. These studies span several different countries, study designs, and investigators – and all come to the same conclusion: no increased risk of mesothelioma in automobile mechanics. These same epidemiologic studies have confirmed, on the other hand, the positive association between other non-brake occupational exposures to asbestos and mesothelioma. The studies of vehicle mechanics and brake workers suggest strongly that there is a level of exposure to chrysotile asbestos, possibly contaminated with low levels of tremolite, below which no increased risk of mesothelioma can be detected in properly-designed epidemiologic studies.

**Properly designed epidemiologic studies are required to establish causality between exposures and disease**

26. Epidemiology is the study of diseases in populations. The science of Epidemiology investigates the distribution and determinants of diseases in populations. Epidemiology is fundamental to establishing causal relationships between exposures and disease. Epidemiology is also central to establishing quantitative exposure-response[5] relationships between exposure to an environmental agent and the risk of disease. As I discuss below, quantitative exposure-response relationships are essential in attributing risks to a specific exposure and, therefore, in determining whether or not that exposure is a "substantial contributing factor" to the risk of disease.

**FUNDAMENTAL PRINCIPLES OF EPIDEMIOLOGY**

27. Broadly speaking, there are two types of epidemiologic studies: descriptive and analytic. Descriptive studies, which are most often conducted on data from disease and mortality registries maintained by public health departments and government agencies, are generally used as surveillance tools to monitor the temporal trends and spatial distribution

---

[5] Technically, distinction should be made between exposure, which refers to the concentration of the agent of interest in the ambient environment, and dose, which refers to the concentration of the agent in the biologic tissue of interest. However, in epidemiology, this distinction is not often made because most epidemiologic studies deal with exposures in the ambient environment. In this report, exposure and dose will be used interchangeably.

of diseases. Such studies can raise concern if either the temporal trends or spatial distribution of the disease under consideration show unusual or unexpected patterns but cannot establish causal associations between a suspect environmental factor and the disease of interest. However, carefully collected registry data[6] can form the basis of analytic studies that shed light on factors influencing temporal trends in disease and, in the case of cancer registry data, provide insights into mechanisms of carcinogenesis (e.g., Armitage and Doll, 1954; Moolgavkar and Knudson, 1981; Luebeck and Moolgavkar, 2002; Jeon et al., 2006; Meza et al., 2008).

28. The most common analytic epidemiology studies used to investigate associations between exposures and disease are the cohort and case-control studies. When a number of such independently conducted analytic studies yield consistent results, epidemiologists conclude that the association between the exposure and the disease could be causal. In general, however, to infer causality, in addition to the finding of an association, epidemiologists consider guidelines often referred to as the Hill criteria, after Sir Austin Bradford Hill, a British statistician who first enunciated them (Hill, 1965). If, on the other hand, repeated analytic studies find no evidence of an association between the exposure and the disease, it is safe to conclude that the exposure does not increase the risk of the disease, and is, therefore, not causally associated with the disease. These principles are generally accepted in the scientific community.

**Measures of risk**

29. The two main kinds of analytic studies in epidemiology are cohort and case-control studies.

    a. In a cohort study, the incidence of the disease under investigation is compared among groups of individuals who are exposed and unexposed to the environmental agent of interest.

    b. In a case-control study, on the other hand, exposures to the agent of interest are compared between diseased and non-diseased individuals.

30. The target of estimation in both cohort and case-control studies is the relative risk (RR); *i.e.*, the risk of disease among exposed individuals divided by the risk of disease among unexposed individuals. An RR of 1 or smaller indicates no increased risk associated with exposure. As with all statistical procedures, there is a margin of error associated with the estimation of RR from epidemiological studies. This margin of error is usually reported as a 95% confidence interval (CI), which is a range of values containing the estimated RR. If the 95% CI includes 1, the estimated RR is statistically insignificant; if the 95% CI does not include 1, the RR is statistically significant. A statistically significant RR greater than 1 suggests that exposure may be causally associated with the disease. However, in epidemiological studies, one statistically significant result suggests only an association. Inferences regarding causality are strong when multiple analytical studies in different populations all yield similar results.

---

[6] Population-based cancer registries are also often used for identification of cases for case-control studies.

## EPIDEMIOLOGY OF MESOTHELIOMA

31. Mesothelioma has often been called a sentinel or signal tumor for asbestos exposure. Plaintiffs' experts, including Dr. Brodkin,[7] often misinterpret this statement to mean that mesothelioma cannot occur without exposure to asbestos. In fact, the correct interpretation of this statement is that every case of mesothelioma should arouse suspicion of possible asbestos exposure. There is a fundamental misperception that every case of mesothelioma involves exposure to asbestos. In fact, like every other cancer, mesothelioma can occur spontaneously, without exposure to any external agent, as discussed below. Moreover, in addition to exposure to amphibole asbestos, exposure to ionizing radiation can also increase the risk of mesothelioma (Travis et al., 2005; Tward et al., 2006; Teta et al., 2007; Hodgson et al., 2007; De Bruin et al., 2009; Goodman et al., 2009; Gibb et al., 2013; Farioli et al., 2013).

### Epidemiologic studies of asbestos and mesothelioma

32. A number of analytical epidemiology studies have investigated the association between exposure to asbestos and the occurrence of mesothelioma. These studies have shown that occupational exposure to amphibole asbestos is causally associated with mesothelioma. However, these studies have also shown unequivocally that all occupational exposures are not equal in their potential to cause mesothelioma. To quote Irving Selikoff et al. (1965), one of the pioneers in the study of asbestos and mesothelioma, "It is inadequate to speak now of 'asbestos workers'. With the growth of asbestos utilization, including rapid multiplication of the number and variety of its applications, it would perhaps be more accurate to categorize workmen exposed to asbestos as 'asbestos textile workers', 'asbestos insulation workers', 'asbestos miners', 'asbestos mill workers', 'asbestos-cement workers', etc. **The different occupations vary widely in important respects; in intimacy, intensity and duration of exposure, in variety and grade of asbestos used, in working conditions, in concomitant exposure to other dusts or inhalants."** (emphasis added). Thus, there is no scientific support for the position that all asbestos exposure contributes equally to the development of mesothelioma.

### Mesothelioma can occur without exposure to asbestos

33. In addition to the general biological argument, several lines of evidence support the conclusion that mesothelioma can occur without asbestos exposure. Mesothelioma is known to occur in individuals with no history of exposure to asbestos. Epidemiologic studies (*e.g.*, Pelnar, 1988; Peterson et al., 1984; Spirtas et al., 1994; Agudo et al., 2000; Teschke et al., 1997; Rake et al., 2009) report that a significant fraction of mesothelioma cases had no history of exposure to asbestos, with a larger fraction of female cases

---

[7] When Dr. Brodkin was asked in his deposition whether he found any evidence of other asbestos-related conditions in Mr. Quirin, he responded, "Certainly the malignant mesothelioma is a signal marker for asbestos exposure, but in terms of nonmalignant markers, I didn't see any evidence of plaques on the contralateral right side or evidence of asbestosis."

reporting no exposure. Spirtas et al. (1994) reviewed the literature and reported that estimates of the fraction of mesothelioma cases exposed to asbestos in epidemiologic studies have varied from a low of 13% to a high of 100%.

34. Spirtas et al. (1994) undertook a formal analysis to estimate the fraction of mesothelioma cases that could be attributed to asbestos exposure. They concluded that, in their study, among men, 88% of pleural mesotheliomas and 58% of peritoneal mesotheliomas could be attributed to asbestos exposure. Among women, they could not estimate the population attributable fraction (PAF) separately for pleural and peritoneal mesotheliomas, but reported that only 23% of all mesotheliomas were attributable to asbestos exposure. This study provides strong evidence that both pleural and peritoneal mesothelioma can occur without asbestos exposure and that the fraction of peritoneal mesothelioma occurring without asbestos exposure is larger than the fraction of pleural mesothelioma occurring without asbestos exposure.

35. A recent large case-control study of mesothelioma in Great Britain (Rake et al., 2009) concludes that 86% of male and 38% of female cases were attributable to either occupational or domestic asbestos exposure. Price and Ware (2009) estimate that approximately 70–75% of mesotheliomas among males and only 3–10% of mesotheliomas among females in the U.S. in 2008 were attributable to asbestos exposure. Aguilar-Madrid et al. (2010) conclude that only 44% of cases of pleural mesothelioma in Mexico over the period 2004–2006 were attributable to occupational asbestos exposure. Lacourt et al. (2010) show that control selection can have a substantial impact on estimates of PAF from case-control studies, but conclude that the PAF for mesothelioma, i.e., the fraction of cases attributable to asbestos exposure, in France was between about 50% and 70%. Mesothelioma has also been reported to occur in young children and even congenitally (World Trade Organization [WTO], 2000; Huncharek, 2002). Such cases are manifestly not associated with asbestos exposure. Thus, mesothelioma can clearly occur idiopathically.

36. A recent analysis of the Surveillance, Epidemiology and End Results (SEER) data (Price and Ware, 2004) indicates that the background (spontaneous) rate of mesothelioma (pleural and peritoneal combined) in the United States is between 2 and 4 cases per million individuals per year and that the lifetime risk of spontaneous mesothelioma is between 2 and 4 per 10,000 individuals. Price and Ware (2004) do not provide separate estimates for pleural and peritoneal mesothelioma.

37. In an updated analysis of the SEER data, Moolgavkar et al. (2009) estimate that the background rate of peritoneal mesothelioma in the U.S. is approximately 1 per million per year and that the lifetime risk of spontaneously occurring peritoneal mesothelioma is approximately 1 in 10,000. For pleural mesothelioma, Moolgavkar et al. (2009) estimate that background rates are between 2 and 3 per million individuals per year and the lifetime probability is approximately 3 per 10,000 individuals. A recent large case-control study of mesothelioma (Rake et al., 2009) in the U.K. estimated a lifetime risk of mesothelioma (pleural and peritoneal combined) among individuals not exposed to asbestos of about 1 in 1,000, approximately three times that estimated by Moolgavkar et

12

al. (2009) in the U.S.

38. Observed trends in mesothelioma incidence in the SEER registry over the period 1973 to 2005 also strongly support the notion that some fraction of mesotheliomas over this period of time was not attributable to asbestos exposure. Figure 1 shows the trends in age-adjusted rates of mesothelioma over this period of time.



**Figure 1**. *Observed and expected age-adjusted incidence rates over the period 1973–2005. Upper panel: pleural mesothelioma; lower panel: peritoneal mesothelioma (from Moolgavkar et al., 2009).*

39. Age-adjusted incidence of pleural mesothelioma among males increased from 1973 to the early nineties and appears to be declining thereafter. This trend reflects the trend in the commercial use of asbestos in the U.S. with an approximately forty year lag. The incidence rates of pleural mesothelioma among females shows a much weaker trend suggesting that a large fraction of pleural mesotheliomas among females over this period cannot be attributed to asbestos exposure. The age-adjusted incidence of peritoneal mesotheliomas in both males and females is essentially flat. The lack of trends in incidence reflecting trends in asbestos usage suggests that a large fraction of peritoneal mesothelioma in both males and females over the period 1973 to 2005 cannot be attributed to asbestos exposure.

40. Trends in some European countries also indicate that a large proportion of peritoneal

13

mesotheliomas in those countries is unrelated to asbestos exposure. Hemminki and Li (2003) examined trends in the incidence of peritoneal mesothelioma in Sweden over the period 1961 to 1998. Among men, they reported that only 29% had "typical asbestos-related jobs …." Interestingly, the age-adjusted incidence rates were virtually identical in men and women. Since men were much more likely to be occupationally exposed to asbestos, this finding suggests that a large fraction of peritoneal mesotheliomas in Sweden over this period were unrelated to asbestos exposure. Moreover, the generally increasing trends in incidence over this period are probably attributable to factors other than asbestos.

41. Burdorf et al. (2007) examined the incidence of peritoneal mesothelioma among men and women in Sweden and the Netherlands over the period 1989 to 2003, and reported that the trends were flat. They concluded, "[t]he absence of a time trend in the incidence rate of peritoneal mesothelioma in Sweden and the Netherlands in the past 15 years may point to a more limited role of occupational exposure to asbestos in the aetiology of peritoneal mesothelioma than for pleural mesothelioma, especially among women."

42. The discussion of peritoneal mesothelioma is relevant here because, even though Mr. Quirin suffered from pleural mesothelioma, it underscores the fact that mesothelioma can occur in the absence of exposure to asbestos.

## Chrysotile and mesothelioma

43. Plaintiffs' experts are often opine that pure chrysotile, uncontaminated by amphiboles, can cause mesothelioma. The issue is far from settled, however, and continues to be debated in the literature (e.g., Yarborough, 2006, 2007).

44. The only way to determine whether pure chrysotile can increase the risk of mesothelioma is to conduct properly designed epidemiologic studies. But herein lies the problem: for most epidemiologic studies of mesothelioma among workers supposedly exposed to pure chrysotile, it has later been reported that the chrysotile was, in fact, contaminated by amphiboles. For example, Dr. Brodkin cites the study by Yano et al. (2001) in China reporting mesothelioma in a factory using chrysotile to support his contention that pure chrysotile can cause mesothelioma; however, Chinese chrysotile has been shown to be contaminated by amphiboles (Tossavainen et al., 2001). Furthermore, it is now known that one of the two cases of mesothelioma in the Yano study was probably exposed to high levels of asbestos (of unknown type) as a result of a textile weaving business run by his parents in their home (Yano et al., 2009). Yano et al. (2009) also performed a lung burden analysis on one of the cases of mesothelioma and found that the main fiber type in the lung was tremolite, an amphibole. Thus, these cases were clearly exposed to substantial quantities of amphibole asbestos.

45. Dr. Brodkin also cites the studies of Italian chrysotile miners in Balangero, Italy (Mirabelli et al., 2008; Pira et al., 2009). He fails to note, however, that these miners were exposed to the fiber balangeroite, in addition to chrysotile. There is evidence that the toxicological properties of balangeroite are similar to those of amphibole asbestos

14

(Groppo et al., 2005; Turci et al., 2005; Gazzano et al., 2005). Furthermore, some crocidolite,[8] the most potent form of amphibole asbestos, was processed at Balangero (Browne, 2001). A recent paper by Turci et al. (2009) suggests that balangeroite may not possess the toxic properties of amphiboles; however, this suggestion is based purely on *in vitro* studies, rather than epidemiologic studies. Epidemiologic studies on balangeroite would be impossible to conduct because the mineral is present only in combination with chrysotile. At the very least, properly designed *in vivo* studies are required to address the issue of whether the presence of balangeroite contributed to the risk of mesothelioma at Balangero. While Dr. Brodkin relies on the Yano and the Balangero studies, he fails to note that these studies of workers exposed to large quantities of chrysotile asbestos contaminated with amphibole or amphibole-like substances have little relevance to the risks associated with exposure to much lower levels of amphibole-free chrysotile.

46. Some plaintiffs' experts use an argument advanced by Smith and Wright (1996) to contend that chrysotile asbestos is the predominant cause of pleural mesothelioma. This argument has been convincingly countered by Hodgson and Darnton (2000) who state, "What this argument ignores is any quantification of exposure. Without quantification it is very difficult to draw any conclusion about relative risk from a simple ranking by mesothelioma rate. In relation to the 25 cohorts identified in this review an equally pertinent observation might be that all of them involved exposure to one or other of the amphibole fibres."

47. Kanarek (2011) reviewed the literature on exposure to chrysotile and mesothelioma and concluded that chrysotile alone, uncontaminated with amphibole, can cause mesothelioma. Yarborough (2006, 2007) reviewed the same epidemiologic studies reviewed by Kanarek (2011) except for the few that have appeared after 2006 and arrived at a completely different conclusion. Yarborough noted that contamination with, or use of, amphibole occurred in most so-called 'pure' chrysotile cohorts. I have reviewed in some detail here many of the recent studies that Kanarek (2011) relies on for his conclusions. Kanarek (2011) relies on a mix of case reports and epidemiologic studies and it is clear that he has not critically reviewed the literature that he cites. An egregious example is provided by his reliance on the study by Madkour et al. (2009), a study on which Dr. Brodkin also relies. This is a study that reports high risks associated with environmental exposure to asbestos around a cement plant in Egypt; however, the results reported in the paper suggest strongly that environmental and occupational exposures may not have been accurately estimated. For example, Table 1 of Madkour et al. (2009) reports that mesothelioma risks are far higher in those environmentally exposed than in those occupationally exposed (who are also presumably environmentally exposed if they live in the vicinity of the plant). About the only conclusion that can be drawn from the study is that the rates of mesothelioma are high in the vicinity of the cement plant. Moreover, several publications (Emara et al., 1970; Kamal et al, 1992; Gaafar and Eldin, 2005; Gaafar, 2007) report the presence of crocidolite at Egyptian cement factories. Another major deficiency of Kanarek's paper is that he relies on case reports for his

---

[8] Pooley (unpublished, 1990) has reported the presence of amphiboles, including crocidolite, in the lung tissue of workers at the Balangero mines and residents of the area.

conclusions even when multiple well-conducted epidemiologic studies arrive at completely different conclusions from those he arrives at based on case reports. An example is provided by his discussion of brake repair workers in the U.S. I consider this in more detail below.

48. While there is still debate as to whether or not pure chrysotile increases the risk of mesothelioma, there is little doubt that amphiboles are much more potent mesotheliogens than chrysotile, if chrysotile causes mesothelioma at all. The epidemiologic evidence, discussed and summarized both by Hodgson and Darnton (2000) and Berman and Crump (2003; 2008a, b), demonstrates convincingly that exposure to amphiboles is far more potent than exposure to chrysotile as a cause of mesothelioma. Hodgson and Darnton (2000) concluded that amosite is 100 times and crocidolite 500 times as potent as chrysotile in causing mesothelioma. Berman and Crump (2008b) considered various measures of exposure as they relate to the risk of mesothelioma in 11 cohorts occupationally exposed to asbestos. They concluded that the hypothesis that chrysotile and amphibole asbestos are equally toxic was strongly rejected no matter which measure of exposure was used. The estimates of the potency of chrysotile relative to that of amphibole ranged from zero to about 0.005, depending on the measure of exposure used. Epidemiologic studies of vehicle mechanics exposed to low levels of chrysotile asbestos have failed to reveal an increased risk of mesothelioma, as discussed below.

49. Dr. Brodkin completely ignores these studies, which are the only systematic attempts at evaluating, in a statistically rigorous way, the relative potencies of amphiboles and chrysotile. Instead, in his deposition, he opines that the mesotheliogenic potency of amphiboles is about three times that of chrysotile. He provides no support for his opinion. Plaintiffs' experts often opine that the estimates of relative potency derived by Hodgson and Darnton (2000) and Berman and Crump (2003) cannot be considered reliable because of serious problems with exposure assessment. In fact, these authors readily acknowledge that there are problems with accurate assessment of exposure to exposure. Hodgson and Darnton (2000) choose to consider only the mean cumulative exposure in each cohort because they argue that this measure is less prone to error than individual-level estimates of exposure. Berman and Crump (2003) use methodology that is completely different from that used by Hodgson and Darnton (2000). Whereas Hodgson and Darnton (2000) draw their conclusions regarding relative potency by looking at the fraction of mesothelioma deaths in an occupational cohort as a function of mean cumulative exposure in that cohort, Berman and Crump (2003) consider individual level exposures for each member of the cohort and model the risk of mesothelioma as a function of both intensity of exposure and duration of exposure using a model originally developed by Julian Peto and adopted by the EPA for its 1986 risk assessment (Nicholson, 1986). The fact that these two completely different methods of analyses yield broadly similar estimates of relative potency – amphiboles are approximately two orders of magnitude more potent than chrysotile – suggests strongly that the estimates are reliable.

50. Plaintiffs' experts also cite a recent analysis of a textile worker cohort in North Carolina (Loomis et al., 2009), which reported an increased risk of mesothelioma among workers

16

exposed predominantly to chrysotile asbestos. There were eight cases of pleural cancer, of which four were confirmed to be mesothelioma. Three of the cases of pleural cancer occurred in a plant where some amosite had been used; however, all confirmed cases of mesothelioma had no recorded exposure to amphiboles,[9] although most of the chrysotile used in the plants was Canadian and could have been contaminated with tremolite. The Hodgson-Darnton index for pleural cancer (including mesothelioma) in this study was reported to be 0.0058% per f/ml-year in the entire cohort and 0.0098% per f/ml-year among workers followed for at least 20 years. Based on the latter figure, Hodgson and Darnton (2010) suggested that the mesothelioma risk associated with exposure to chrysotile asbestos could be about an order of magnitude higher than estimated in their 2000 paper; however, this figure is an upper bound on risk because all pleural cancers, some of which may not have been mesotheliomas, were included in the calculation and the calculation was done only on workers who were followed for at least 20 years. Moreover, three of the eight pleural cancers occurred in a plant where amosite had been used. Based on the Loomis et al. (2009) paper, the relative potency of amphiboles to chrysotile may have to be revised down from the estimates in Hodgson and Darnton (2000) and Berman and Crump (2008a, b). It is clear, however, despite the new information in the Loomis et al. (2009) paper, that amphibole asbestos is considerably more potent than chrysotile as a mesotheliogen, if pure chrysotile causes mesothelioma at all.

51. If, on further review, it is confirmed that the cases of mesothelioma in the North Carolina cohort had not been exposed to amphiboles, then the relative potency of amphibole to chrysotile will have to be revised downward. There have been instances in the past, however, when on more careful examination, so-called pure chrysotile cohorts were discovered to have been exposed to amphiboles. For example, the South Carolina Textile Workers' cohort has sometimes been referred to as a pure chrysotile cohort. But, in fact, small quantities of crocidolite were used at this plant between the 1950s and 1975 (Yarborough, 2006, 2007). Moreover, lung burden analyses (Green et al., 1997; Case et al., 2000) indicated also that this cohort was exposed to commercial amphiboles. Another example is provided by the Yano et al. (2001) cohort discussed above. Although, as I have noted above, Dr. Brodkin relies on the Yano et al. (2001) paper, he does not acknowledge the facts that Chinese chrysotile contained tremolite (Tossavainen et al, 2001), that at least one of the two cases of mesothelioma in the Yano cohort had been heavily exposed as a child and that the predominant fiber type found in the lungs of one of the cases was tremolite (Yano, 2009).

52. Toxicological evidence also supports the conclusion that chrysotile has much lower carcinogenic potency than amphiboles. Recent work (e.g., Mossman et al., 2011) show that chrysotile is more rapidly cleared from tissues than amphibole asbestos suggesting that it can be more effectively dealt with by the defense mechanisms of the body and is

---

[9] As indicated elsewhere in this report, lung burden analyses have shown that members of cohorts thought to be exposed predominantly to chrysotile have amphiboles in their lungs (e.g., Green et al., 1997; Case et al., 2000). Interrogatories suggest that substantial quantities of amphibole could have been used at the North Carolina facility at issue when it was operated by Unarco Industries.

less biopersistent. Analyses of toxicological data on fiber biopersistence have shown that biopersistence is strongly correlated with carcinogenicity (Moolgavkar et al., 2001). Other experimental work (Shukla et al., 2004, 2009) shows that chrysotile is less potent than other types of asbestos in triggering critical biological events thought to be important in the carcinogenic process.

**Well-conducted epidemiologic studies fail to report an increased risk of mesothelioma among vehicle mechanics suggesting that there is a level of exposure to chrysotile asbestos below which no increase in the risk of mesothelioma can be detected**

53. The debate over whether pure chrysotile uncontaminated with amphiboles can increase the risk of mesothelioma is largely academic because most commercially available chrysotile has some amphibole contamination, primarily as tremolite. The important issue is whether exposure to low levels of commercial chrysotile, whether or not contaminated with amphibole, can increase the risk of mesothelioma. One way to address this question is to conduct properly designed epidemiologic studies of occupations exposed to low levels of chrysotile asbestos.

54. The issue of whether exposure to low levels of commercial chrysotile increases the risk of mesothelioma can be addressed in epidemiologic studies of the association between work as an automobile mechanic and mesothelioma. Because brake pads contain chrysotile asbestos bound in a resin, vehicle mechanics are potentially exposed to it when engaged in work on brakes.[10] Garage and brake mechanics have, therefore, been included in a number of analytic epidemiologic studies investigating the risk of mesothelioma in specific occupational groups. These studies have been conducted by independent and reputable researchers.

55. The most important of these studies are 13 case-control studies (McDonald and McDonald, 1980; Teta et al., 1983; Spirtas et al., 1985, 1994; Woitowitz and Rödelsperger, 1994; Teschke et al., 1997; Agudo et al., 2000; Hansen and Meersohn, 2003; Hessel et al., 2004; Welch et al., 2005; Rolland et al., 2005, 2010; Rake et al., 2009; Aguilar-Madrid et al., 2010), all of which conclude that vehicle mechanics are not at increased risk of mesothelioma. In fact, the study by Teschke et al. (1997) concludes that vehicle mechanics are at no greater risk of mesothelioma than accountants and school teachers. These studies reported estimated RRs associated with work as a motor vehicle mechanic or brake worker fluctuating around 1, with most RRs being actually less than 1.0 and not a single RR being statistically significant (Table 1). Moreover, Hessel et al. (2004) and Peto et al. (2009), which is the full report on which Rake et al. (2009) is based, find no evidence that work as a vehicle mechanic increases the risk of mesothelioma associated with other asbestos exposures.

56. In addition to the 13 case-control studies cited above, four cohort studies of vehicle mechanics in Europe (Hansen, 1989; Järvholm and Brisman, 1988; Gustavsson et al.,

---

[10] The time-weighted average (TWA) for exposure to chrysotile fibers longer than 5 µm over a work day for brake mechanics has been estimated to be 0.04 f/ml (Paustenbach et al., 2003), and the upper bound on cumulative exposure is approximately 3 f/ml-year (Finley et al., 2007).

1990; Merlo et al., 2010) likewise provide no evidence of an association between work as a vehicle mechanic and mesothelioma.

**Table 1.** *Epidemiologic studies of automobile mechanics and mesothelioma*

| *Author* | *Year* | *Increased Risk (Yes / No)?* |
|---|---|---|
| **Case Control Studies** | | |
| McDonald and McDonald | 1980 | No |
| Teta et al. | 1983 | No |
| Spirtas et al. | 1985 | No |
| Woitowitz and Rödelsperger | 1994 | No |
| Teschke et al. | 1997 | No |
| Agudo et al. | 2000 | No |
| Hansen and Meersohn | 2003 | No |
| Hessel et al | 2004 | No |
| Rolland et al. | 2005, 2010 | No |
| Welch et al. | 2005 | No |
| Rake et al. | 2009 | No |
| Aguilar-Madrid et al. | 2010 | No |
| | | |
| **Cohort Studies** | | |
| Järvholm and Brisman | 1988 | No |
| Hansen | 1989 | No |
| Gustavsson et al. | 1990 | No |
| Merlo et al. | 2010 | No |
| **PMR Studies** | | |
| Petersen and Milham | 1980 | No |
| Olsen and Jensen | 1987 | No |
| Coggon et al. | 1995 | No |
| Hodgson et al. | 1997 | No |
| Milham and Ossiander (WOMD) | 2001, 2011 | No |
| NIOSH | 2002 | No |
| McElvenny et al. | 2005 | No |
| Roelofs et al. | 2013 | Yes |

57. Similarly, seven descriptive studies, the so-called proportional mortality ratio (PMR) and proportional incidence ratio (PIR) studies (Petersen and Milham, 1980; Olsen and Jensen, 1987; Coggon et al., 1995; Hodgson et al., 1997; Milham and Ossiander, 2001;[11] National Institute for Occupational Safety and Health [NIOSH], 2002; McElvenny et al. 2005), provide no evidence of an association between work as a vehicle mechanic and mesothelioma. These studies indicate that the fraction of deaths due to mesothelioma or

---

[11] Milham and Ossiander (2001) is an unpublished government report discussing various results and analyses from the Washington Occupational Mortality Database (WOMD). These data were updated in 2011. The updated data and analyses from the WOMD are available on the following website: https://fortress.wa.gov/doh/occmort/OMQuery.aspx (Washington Department of Health, 2011).

the fraction of disease attributable to mesothelioma among vehicle mechanics is not different from other occupational groups in which exposure to asbestos does not occur.

58. A recent PIR study (Roelefs et al., 2013) reported a statistically significant increased standardized incidence odds ratio (SIOR) among automobile mechanics. The SIOR was estimated by exploiting a formal equivalence between the standardized incidence ratio (SIR) design and the case-control design. Despite this formal equivalence, the SIOR derived from this PIR study is not a reliable indicator of an increased risk of mesothelioma among automobile mechanics. Like any PIR study, this study has information on only a single occupation for each subject in the study making the control of confounding impossible. A second serious problem with this study is the biased selection of controls. However controls are chosen, their occupations must be representative of the occupations in the population in which the mesotheliomas arise (i.e., the base population). Life-style habits, such as smoking, that influence the risk of many cancers are different in the different occupations. Occupations, such as work as an automobile mechanic, in which smoking rates are typically high (Bang and Kim, 2001; Leigh, 1996) will have a higher incidence and prevalence of the smoking-associated cancers. By eliminating these cancers from the comparison group, the authors have selected out a proportion of individuals in some occupations and, therefore, inflated the SIOR for such occupations, including automobile mechanics. In other words, by removing the lung cancers as possible comparison cancers, the authors have decreased the probability of selecting comparison cancer patients employed in occupations with a high prevalence of smoking, and therefore increased the SIOR for these occupations.

59. When the entire body of epidemiologic literature is evaluated, it is absolutely clear that work as an automobile mechanic does not increase the risk of mesothelioma. A single study using the weakest of epidemiologic designs and with other serious methodologic flaws cannot change that conclusion.

60. Kanarek (2011) does not mention any of these multiple epidemiologic studies exonerating exposure to low-level chrysotile asbestos as a cause of mesothelioma. He relies, instead, on a series of case reports and studies based on case reports to support his conclusion that brake repair work increases the risk of developing mesothelioma. Dr. Brodkin, who relies on the Kanarek study, does not allude to this serious limitation of the study. Kanarek's conclusion is as untenable as his methods for arriving at it. In fact, Nicholson et al. (1984) estimated that there were approximately 5,000,000 million current and former automobile mechanics in the U.S. at the time of his study. Based on a background rate of 3 to 4 per million person-years for idiopathic mesothelioma, one would expect 300 to 400 cases of mesotheliomas to arise spontaneously among automobile mechanics over a 20-year period.

61. The few available epidemiologic studies of mesothelioma among workers potentially exposed to joint compound have been recently reviewed by McCoy et al. (2010). These studies provide no evidence that exposure to joint compound increases the risk of mesothelioma. This finding is consistent with the conclusion derived from the epidemiologic studies of automobile mechanics that exposure to low levels of chrysotile

asbestos does not increase the risk of mesothelioma. The conclusions in McCoy et al. (2010) have been criticized by Dement and Lipscomb (2012). I agree that the McCoy et al. (2010) paper does not provide affirmative evidence that exposure to joint compound does not increase the risk of mesothelioma; however the McCoy paper does show that there is no epidemiologic evidence of an increased risk of mesothelioma from exposure to joint compound. Phelka and Finley (2011) reviewed the health hazards associated with exposures to asbestos-containing drywall-accessory products and concluded that there was no evidence of increased risk of mesothelioma. These studies are not cited by Dr. Brodkin and apparently were not considered by him in arriving at his opinions. Dr. Brodkin was asked about the McCoy paper at his deposition and appeared to suggest that the data in the paper actually supported an increased risk of mesothelioma from exposure to joint compound. This conclusion is totally untenable scientifically.[12]

62. In addition to these published studies, I have personally performed analyses of mesothelioma rates in the SEER data for San Benito and Monterey Counties, where UCC's Calidria mines are located (Moolgavkar, 2012). My analyses indicated that the mesothelioma incidence rates in San Benito and Monterey counties are not elevated when compared with rates in other California registries or with rates in the entire SEER registry. This finding indicates that persons living in the vicinity of the Calidria mines in California are not at increased risk of developing mesothelioma.

**Epidemiologists do not arrive at conclusions on the basis of one or a few studies**

63. Plaintiffs' experts often assert that the case-control studies of work as a vehicle mechanic and mesothelioma have limitations and are therefore unreliable. The specific criticisms they level at the case-control studies of mesothelioma are well known to epidemiologists. I recognize that epidemiologic studies have limitations because most epidemiologic studies rely on observational data, unlike randomized studies where investigators can assign exposures, such as experimental studies among animals and clinical trials for new medical therapies. Such assignment of exposure is not generally possible in epidemiologic studies of human populations because of ethical considerations. Therefore, to account for these potential limitations, epidemiologists do not arrive at conclusions on the basis of one or a few studies, relying instead on a larger body of evidence from which to draw conclusions. However, when multiple epidemiologic studies conducted by different investigators in different parts of the world yield consistent

---

[12] Dr. Brodkin argued that in the CARET study, one case of mesothelioma was found among plasterers, an occupational group that includes individuals working with joint compound. He failed to mention, however, that plasterers also included individuals who worked with spray-on insulation. Nothing is known about other asbestos exposure that this single case may have received. Dr. Brodkin also disputes McCoy's interpretation of a study performed by Stern et al. (2001) in which they report a non-significant PMR for mesothelioma among plasterers. Here again, Dr. Brodkin fails to acknowledge that plasterers could have been exposed to substantial quantities of amphibole asbestos. Dr. Brodkin points to the fact that on a detailed review of death certificates, 40 cases of mesothelioma were found among the plasterers in this study. He ignores, however, one of the fundamental tenets of epidemiologic investigation: the same methods must be applied to all groups in a study. The death certificates of all individuals in the study should have received the SAME scrutiny as the death certificates of the plasterers.

results, the findings can be considered reliable.  This is exactly the situation with the epidemiologic studies of mesothelioma and work as a vehicle mechanic.  Furthermore, these same studies have identified occupations, such as shipyard, insulation and construction work, causally associated with risk of mesothelioma.

**Evidence cited by plaintiffs' experts in support of the proposition that low exposures to asbestos can increase the risk of mesothelioma is fatally flawed**

64. Plaintiffs' experts often rely on case-control studies conducted by Iwatsubo et al. (1998) and Rödelsperger et al. (2001) and Lacourt et al. (2010) to conclude that even very small exposures to asbestos can increase the risk of mesothelioma substantially; however, a critical review of these studies reveals that, in addition to the usual limitations of epidemiologic studies, these papers contain fatal flaws, which makes their quantitative conclusions unreliable.  Moreover, the results reported in these studies are inconsistent with each other and with other epidemiologic literature on exposure-response relationships in mesothelioma.

65. Iwatsubo et al. (1998) conducted a case-control study of pleural mesothelioma in France to examine exposure-response relationships at low exposure levels.  They had no direct information on actual exposure levels in the various jobs held by the subjects of the study.  The authors had a panel of industrial hygienists reconstruct exposure, although there is only sparse description of how this was done and no references to typical exposure levels in the various job categories are provided.  For the latter point, due to the latency period for mesothelioma, the authors were interested in exposure levels that existed 20 or more years prior to the diagnosis; however, these exposure levels are generally unknown or highly uncertain.  It is highly likely that Iwatsubo et al. (1998) under-estimated exposure substantially, particularly at the low exposure levels.  First, they defined low exposure intensity as being less than 1 f/ml, but in their exposure reconstruction, they assigned an exposure concentration of 0.1 f/ml to the low exposure category.  Similarly, they define medium exposure intensity as being between 1 and 2 f/ml, but assign a concentration of 1 f/ml to exposures in this category in the reconstruction process.  Thus, they could have under-estimated exposure by a factor of 10 in the lowest exposure intensity group and by a factor of 2 in the medium intensity exposure group.  Second, they did not consider any exposure during the 20 years prior to the diagnosis of mesothelioma (under the assumption that the latency period for mesothelioma is at least 20 years).  The EPA model for mesothelioma (Nicholson, 1986; Berman and Crump, 2003; 2008a) assumes that the latency period is 10 years.  By ignoring exposures that occurred between 10 and 20 years before the diagnosis of the disease, the investigators could have substantially under-estimated total exposures.  As a consequence of the under-estimation of exposure, the investigators have in all probability grossly over-estimated the mesothelioma risks associated with low cumulative exposure to asbestos.[13]

---

[13] The fact that these authors obtained a positive exposure-response relationship (*i.e.*, higher risks were associated with higher exposures) in this study suggests that the rank ordering of the exposures was correct, even if the absolute exposure levels were incorrect.

66. There are other problems with this study, including:

    a. The investigators could not distinguish between asbestos fiber types, so that their conclusions cannot be applied to exposure to pure chrysotile.

    b. The investigators designed their study as a matched pairs study; however, because they could not get matched controls for all the cases, they broke the matching for their analyses. This procedure could have led to substantial bias in their estimates of risk, although the direction of the bias cannot be predicted.

    c. The investigators report that there were more blue-collar workers among cases than controls. This could bias the estimates of risk upwards since blue collar workers are more likely to be exposed to asbestos in the workplace.

67. Rödelsperger et al. (2001) conducted a case-control study of mesothelioma in Germany. As in the Iwatsubo et al. (1998) study, they had no direct information on asbestos exposure concentrations and had industrial hygienists estimate exposures associated with various job categories. Therefore, this study shares some of the serious limitations of the Iwatsubo study outlined above. Other specific limitations of this study include:

    a. As in the Iwatsubo study, the investigators could not distinguish between fiber type, though they recognized the importance of this distinction stating, "In addition, the type of asbestos – chrysotile or amphibole – is unknown in spite of its well-known importance."

    b. Lung fiber burden analysis in this study shows only modest correlation between exposure estimates and lung burden for amphiboles but no correlation for chrysotile, suggesting that the industrial hygiene exposure estimates could be in error.

    c. The reported results are highly sensitive to choices of cut-points for categorical exposures. Results are also sensitive to whether hospital-based or population-based controls are used.

68. Lacourt et al. (2010), reports on two case-control studies conducted in France using methods similar to those used by Iwatsubo et al. (1998) and suffers from the same deficiencies. In particular, the results of the two case control studies reported in the paper are not consistent with each other.

69. These three studies of low exposure levels thus share some of the same limitations. Furthermore, the results of the three studies are not consistent with each other, with the Rödelsperger study reporting much higher risks than the Iwatsubo and Lacourt studies. For example, the Rödelsperger study reports an odds ratio (OR) (a measure of relative risk) of 9.2 in the group exposed to less than 0.15 f/ml-years, whereas Iwatsubo et al. (1998) report an odds ratio of 8.7 in the group exposed to more than 10 f/ml-years.[14] In

---

[14] Both odds ratios assume a 20-year latency.

every exposure category, Rödelsperger et al. (2001) report risks that are far larger than the risks reported in Iwatsubo et al. or in Lacourt et al. (2010). These huge discrepancies in risk estimates among the three studies cannot be attributed simply to chance. They suggest fundamental problems with the exposure estimates in these studies. It is interesting to note in this regard that the highest estimated exposure concentration in the Iwatsubo study was 100 f/ml, whereas in the Rödelsperger study it was 10 f/ml, even though the studies covered approximately the same period of time. In the Lacourt study the highest exposure concentration was simply reported as being greater than 10 f/ml with no specific numerical value.

70. A recent analysis (Larson et al., 2010) of the cohort of miners at Libby, Montana, who were exposed to a mixture of amphiboles reports a significantly increased relative risk of 17.1 for mesothelioma only in the group exposed to more than 44 f/ml-year of the mixed amphibole fibers found at Libby. Thus, the risk of mesothelioma reported for the mixture of amphiboles found at Libby is far smaller than the risks reported in Iwatsubo et al. (1998), Rödelsperger et al. (2001), and Lacourt et al. (2010). Moolgavkar et al. (2010) estimated the potency of the Libby fibers for mesothelioma and concluded that it was in the middle of the range of potencies for the mixed fiber cohorts as reported in Hodgson and Darnton (2000) and Berman and Crump (2003; 2008a, b). Combined with the results reported by Larson et al. (2010), this finding strongly suggests that the estimates of risks in the Iwatsubo, Rödelsperger and Lacourt papers are much higher than, and inconsistent with, the risks in the mixed fiber cohorts considered by Hodgson and Darnton (2000) and Berman and Crump (2003; 2008a, b).

71. In a study of environmental and household exposures to crocidolite, the most carcinogenic form of asbestos, at Wittenoom, Western Australia, Reid et al. (2007) found that relative risks were below 10 even for cumulative exposures above 10 f/ml-year. Because of the high potency of crocidolite as a mesotheliogen, one would expect mixed fiber exposures, such as those investigated by Iwatsubo et al. (1998), Rödelsperger et al. (2001), and Lacourt et al. (2010) to carry lower risks than the Reid study of crocidolite exposures.

72. In conclusion, numerous well-designed epidemiologic studies of mesothelioma and work as a vehicle mechanic are consistent in suggesting that low levels of exposure to chrysotile asbestos do not pose an increased risk of mesothelioma. In contrast, three case-control studies (the Rödelsperger, Iwatsubo and Lacourt studies), the results of which are inconsistent with one another and with other literature on exposure-response relationships in mesothelioma, suggest that even low-level exposures to asbestos can increase the risk of mesothelioma. Given their serious deficiencies and inconsistent results, these latter studies cannot be considered to be reliable. Moreover, these studies involved mixed exposures to both chrysotile and amphiboles and therefore cannot address questions pertaining to low-level chrysotile-only exposures.

<u>Ionizing radiation can increase the risk of mesothelioma</u>

73. Plaintiffs' experts often do not acknowledge that asbestos is not the only cause of

mesothelioma in the U.S. As noted earlier in this report, recent epidemiologic literature provides strong evidence that ionizing radiation can cause mesothelioma (Travis et al., 2005; Tward et al., 2006; Teta et al., 2007; Hodgson et al., 2007; De Bruin et al., 2009; Goodman et al., 2009; Gibb et al., 2013; Farioli et al., 2013).

## EXPOSURE-RESPONSE RELATIONSHIPS AND THRESHOLDS

74. Plaintiffs' experts argue that no threshold for asbestos-induced cancer has been demonstrated and, therefore, every exposure, no matter how small, is a substantial contributing factor to disease. The contention that there is no threshold for asbestos-associated cancer is based not on direct observation, but on mathematical risk assessments conducted by regulatory agencies. Risk assessment is a tool used to put bounds on the possible risks associated with specific exposure scenarios. In the absence of relevant data, a number of conservative assumptions are used in the process of risk assessment. By conservative, I mean the assumptions are chosen to err on the side of safety, i.e., they are much more likely to overstate, rather than understate, the risks associated with exposure. For all carcinogens, the EPA and other regulatory agencies start out with the **assumption** that there is no threshold. A quantitative risk assessment is not an epidemiological study and the results of the assessment should not be interpreted as meaning that a health problem has been detected at low exposure levels, which is what plaintiffs' experts contend.

75. A central problem in risk assessment is that most often potential risks have to be estimated at very low levels of exposure where no direct observations are available. In the case of asbestos, quantitative dose-response relations are based on occupational cohorts with average exposures greater than about 15 f/ml-year (Hodgson and Darnton, 2000). Risks at lower exposure levels are then estimated using a mathematical extrapolation, **which makes the explicit assumption that there is no threshold**. Moreover, it can be argued on theoretical statistical grounds that the existence of a threshold can never be established from epidemiological studies. However, the lack of evidence of a threshold is not equivalent to absence of a threshold. There may well be a threshold below which asbestos exposure causes no disease. We simply do not know whether or not a threshold exists. But, as I have discussed above, well-conducted epidemiologic studies have failed to demonstrate an increase in the risk of mesothelioma among vehicle mechanics who are exposed to low levels of chrysotile asbestos.

76. The problem of low-dose extrapolation, which is one of most contentious in quantitative risk assessment, is illustrated in Figure 2. In Figure 2, which diagrams the process of low dose extrapolation used in risk assessment, the observed data lie to the right of the dashed vertical line. The dose-response relationship in this region is depicted by a solid line. To the left of the vertical line, in the range of inference, no reliable information is available and the response (risk) in this region must be inferred from a mathematical relationship derived from observations in the observable range, *i.e.*, at high doses. The straight dashed line is based on the commonly used procedure of linear extrapolation.[15] This is

---

[15] However, see comments below regarding linearity of the mesothelioma models.

widely considered to be a conservative procedure in that it could, and probably does, over-estimate, but not under-estimate, the true risk. The possible true risks are shown by the curved dashed lines. The further one gets from the observable range, *i.e.*, the lower the dose, the less certain is the quantitative estimate of risk.



**Figure 2**. *The problem of low-dose extrapolation. The observed data lie to the right of the dashed vertical line in the zone of observation. Inferences regarding the risk (response) have to be made at much lower doses, in the zone of inference. Usually a mathematical dose-response function is fit to the data in the observed range and used to extrapolate risks to lower doses in the zone of inference. Agencies charged with protecting the public health often assume that the dose-response function is linear with no threshold. However, see comments below regarding linearity of the commonly used mesothelioma models. In fact, the actual shape of the dose-response curve in the zone of inference is unknown and could include a threshold. The figure shows also some critical benchmark exposure levels in asbestos epidemiology. Quantitative dose-response relationships in asbestos epidemiology are based on occupational cohorts with large cumulative exposures. The lowest average exposure among cohorts considered by Hodgson and Darnton (2000) is about 15 f/ml-year. The "threshold" for asbestosis is widely accepted to be 25 f/ml-yr (Doll and Peto, 1985). Finally, most career auto mechanics are exposed to about 3 f/ml-yr or less (Finley et al., 2007).*

77. Dose-response relationships for asbestos-associated cancer are based largely on occupational cohort studies with high levels of asbestos exposure; average exposures in these cohorts are generally greater than about 15 f/ml-year (Hodgson and Darnton, 2000). For asbestos, two distinct mathematical approaches can be used to extrapolate risks to low doses, one proposed by Hodgson and Darnton (2000), and another proposed by Peto

26

et al. (1982) and used by the EPA (Berman and Crump, 2003; ERG, 2003) and Berman and Crump (2008a, b). These two approaches yield distinctly different results showing that estimates of risk at low exposure levels are unreliable. In a recent discussion of issues in asbestos risk assessment, Case et al. (2011) concluded, "In summary, extrapolation from high to low risk, whether based on inferential statistical (e.g., linear no-threshold) models or mode-of-action-based models, is fraught with uncertainty."

78. Plaintiffs' experts often opine that the commonly-used models for asbestos risk assessment are linear. They are mistaken. In fact, neither the EPA model, based on the work done by Nicholson (1986), nor the Hodgson and Darnton (2000) model is linear in cumulative exposure. In the latter model (Hodgson and Darnton, 2000), which has separate expressions for pleural and peritoneal mesothelioma and by fiber type, the risk of mesothelioma is a non-linear function of cumulative exposure. The EPA model (Nicholson, 1986; Berman and Crump, 2008a, b) has separate terms for fiber concentration and duration of exposure. The mesothelioma risk is modeled as a linear function of fiber concentration and a power function of duration of exposure. As a consequence, in the EPA model, risk cannot be modeled as a function of cumulative exposure. For example, a cumulative exposure of 10 f/ml-year accrued as 2 f/ml over a five year period will carry a different risk from 10 f/ml-year accrued as 5 f/ml over a two year period. The EPA model only appears to be linear because the duration of exposure is kept constant for calculations involving the unit risk.

**Not every exposure to asbestos is a significant contributing factor in the development of mesothelioma**

79. From the discussion above, it is clear that there is absolutely no direct evidence that exposure to low levels of asbestos increases the risk of mesothelioma. The risks of mesothelioma at low levels of exposure are estimated by the use of mathematical extrapolations, and the results depend on which particular mathematical formula is used to make the extrapolation. Despite this fact, plaintiffs' experts use the "no threshold has been demonstrated" argument to contend that every exposure to asbestos, no matter how small, is a significant contributing factor to mesothelioma risk. When there are substantial other exposures to asbestos or radiation, plaintiffs' experts use a variation of this argument, the "last straw" argument, to contend that even the smallest exposure above the large exposure already experienced by the plaintiff from other sources increased substantially the risk of his/her mesothelioma because it was the last straw that broke the proverbial camel's back. The absurdity of the position that every exposure to asbestos makes a substantial contribution to the risk of disease in this situation can be seen from the following example. An individual who smoked two packs of cigarettes a day for forty years develops lung cancer and then claims that the second-hand smoke he breathed in as he walked past the open door of a bar was a substantial contributing factor in causing his disease.

80. Plaintiffs' experts ignore or dismiss the large and growing body of epidemiologic literature, consisting of multiple cohort, case-control, and PMR studies, which provides consistent and compelling evidence that work as an automobile mechanic, including work

27

on brakes, does not increase the risk of mesothelioma. They rely instead on a flawed syllogism. Their argument is that an increase in risk of mesothelioma is seen in occupational cohorts exposed to several hundred fiber/ml-yr of chrysotile contaminated with amphibole. Therefore, they argue, even an exposure two orders of magnitude below the exposure for which an increase in risk was observed must be associated with a substantial increase in risk under a non-threshold model.

81. Plaintiffs' experts, including Dr. Brodkin, often invoke the Helsinki Criteria to support their assertion that any history of exposure to asbestos in a case of mesothelioma is sufficient to conclude that the exposure caused the disease. This conclusion is simply wrong. The Helsinki Criteria (Henderson et al., 1997) are now more than ten years old and do not reflect the large amount of literature that has appeared since 1997. When the criteria were enunciated, it was widely believed that mesothelioma could not occur idiopathically and that asbestos was the only cause of mesothelioma. Both these beliefs are wrong as I have discussed above.

82.

    a. First, there is compelling evidence that mesothelioma can occur spontaneously (idiopathically), that a substantial fraction of mesotheliomas, particularly peritoneal mesotheliomas occur idiopathically, and that as the use of asbestos declines, the fraction of idiopathic mesotheliomas is increasing.

    b. Second, we know now that, in addition to amphibole asbestos, ionizing radiation can increase the risk of mesothelioma. To assert that any history of exposure to asbestos in a case of mesothelioma implies that the exposure caused the disease is completely analogous to saying that any history of exposure to cigarette smoke, no matter how small, in a lung cancer case implies that the exposure caused the disease. It is completely analogous to saying that any exposure to ionizing radiation such as a single CAT scan in a case of mesothelioma caused the mesothelioma. Plaintiffs' experts need to understand the concept of attributable or etiologic fraction, which is taught in any first-year course in epidemiology and is discussed below.

83. In fact, if Plaintiffs' experts want to make the argument that every exposure to asbestos over background is a substantial contributing factor to the development of mesothelioma, then they must be willing to accept that every exposure to ionizing radiation above background, including chest X-rays, is also a substantial contributing factor. Like asbestos, ionizing radiation is known to be a human carcinogen. Like asbestos, different forms of ionizing radiation have different carcinogenic toxicities. Like long-fiber amphibole asbestos, high-dose ionizing radiation has been shown to increase the risk of mesothelioma. Like asbestos, we are all exposed to a background level of ionizing radiation. And, like asbestos, there is considerable debate as to whether the dose-response relationship is monotonic without a threshold all the way down to the lowest doses. In fact, as for asbestos, regulatory agencies recognize no threshold for radiation-associated cancer.

84. Therefore, if Dr. Brodkin wants to assert that Mr. Quirin's bystander exposure to

chrysotile from joint compound was a substantial contributing factor to his mesothelioma, then he must be willing to also at least entertain the possibility that every chest X-ray that Mr. Quirin had and every airplane flight he took could also have contributed substantially to the risk. I see no evidence in Dr. Brodkin's notes that he even considered the possibility that ionizing radiation could have made a substantial contribution to the risk of Mr. Quirin's mesothelioma. The background dose of naturally occurring radiation is approximately 3 mSv/year.[16] A single round-trip flight[17] between New York and London exposes passengers, on average, to 0.1 mSv over background of ionizing radiation (Brenner et al., 2003). Thus, one round-trip flight between New York and London leads to incremental exposure equivalent to about 3.3% of the background radiation received naturally in one year.

85. The ATSDR (2001) estimates that the average ambient concentration of asbestos in the U.S is 1 $f/m^3$ in rural areas and 10 $f/m^3$ in urban areas   Dr. Brodkin concedes that exposure to ambient levels does not increase the risk of mesothelioma but then appears to assert that any exposure occupational exposure above ambient levels does increase the risk. What if a resident of a rural area is exposed to chrysotile from joint compound that results in total exposure that is less than the total ambient exposure received by an urban dweller? By asserting that such exposure increases the risk of mesothelioma, Dr. Brodkin is clearly contradicting himself.

## FRAMEWORK FOR ATTRIBUTION OF RISK OF MESOTHELIOMA TO SPECIFIC EXPOSURES

86. From the brief discussion above, it is clear that mesothelioma, like every other cancer, can occur spontaneously as a natural consequence of basic biological processes, and that risk of the disease can be increased by exposure to amphibole and, possibly, chrysotile exposure, and also by exposure to ionizing radiation. Once mesothelioma has occurred, the question of interest is whether a specific exposure to asbestos was a substantial contributing factor in the disease. For infectious diseases, the attribution of cause to specific agents is straightforward. For example, the sole cause of tuberculosis is a specific bacterium. It is therefore clear that any case of tuberculosis can be attributed to infection by the tuberculosis bacillus. There could be some doubt regarding the specific strain of the organism that is responsible for a specific case. But, generally, this issue can be settled by the appropriate laboratory tests.

87. The question of attribution becomes much more complex when a disease can occur spontaneously and/or have multiple causes. Most chronic diseases, such as cardiovascular disease and cancer, including mesothelioma as discussed above, have a multifactorial etiology, so that it is not generally possible to attribute the disease to any specific environmental exposure or life-style factor. It may be possible, however, to

---

[16] Biologically relevant radiation doses are measured in Sieverts. This unit of measurement incorporates consideration of the relative biological effectiveness of various kinds of ionizing radiation. A milliSievert, 1 mSv, is one thousandth of a Sievert.

[17] Naturally occurring ionizing radiation increases with altitude.

apportion the probability of causation quantitatively to specific exposures. That is, it may be possible to estimate the probability that the specific exposure in question was a causal factor in the development of the disease. What is clear is that, in any specific individual, any single exposure must be considered within the framework of all the factors that could have contributed to disease in that individual, including the probability of spontaneous occurrence. For example, consider a 70 year-old individual who develops lung cancer after a 50 pack-year[18] smoking history. Suppose this individual was also exposed to second-hand smoke in the workplace. Although the second-hand smoke could have made some contribution to this individual's risk of lung cancer, the most important and significant contribution was made by his/her smoking habit. Consider a second individual, a non-smoker who develops lung cancer at age 70 and was exposed to second-hand smoke in the workplace during his/her entire working life. In this case, second-hand smoke could have contributed substantially to the development of lung cancer. Thus, whether or not an exposure is a substantial contributing factor in disease causation depends on all other exposures received by the individual.

88. Attribution of cause has often been based on the notion of AF in epidemiology. Suppose that a disease has a certain spontaneous probability of occurrence and consider exposure to an agent that increases that probability. Consider now a population of individuals exposed to the agent and suppose that there are 100 cases of the disease in the population. What is the number of disease cases that can be attributed to the exposure? If we know the probability of disease among the non-exposed, we can compute the number of cases of disease in that population that would be expected spontaneously, *i.e.*, without any exposure. Suppose that number is 70. This is the number that would have occurred in the population anyway even without exposure. Then a total of 100-70 = 30 cases of the disease are attributable to exposure and the attributable fraction is 30/100 = 0.3. Formally, the AF is given by the formula:

$$AF = (P_E-P_0)/P_E = 1 - 1/RR = (RR - 1)/RR \qquad \text{Eqn. (1)}$$

where $P_E$ is the probability of the disease among the exposed, $P_0$ is the probability of the disease among the unexposed, and $RR = P_E/P_0$ is the relative risk. The AF has often been interpreted as the probability that the disease in a diseased individual was caused by the exposure, and an attributable fraction of 0.5 or above, which corresponds to a RR of 2 or more, has been interpreted to mean that it was more likely than not that the exposure caused the disease. With more than one significant exposure, the situation is more complicated.

89. As I have stressed above, cancers are the end result of the accumulation of critical mutations in cells. These mutations can occur spontaneously during cell division without any exposure to a carcinogen. Therefore, cancers occur spontaneously, with the incidence of most cancers increasing with age. As described briefly above, environmental agents increase the probability of cancer in one of two ways, either by increasing the rates at which mutations occur or by increasing the net growth rate of

---

[18] This value corresponds to a smoking history of one pack of cigarettes per day for 50 years.

populations of cells that have acquired some of the mutations on the pathway to malignancy. Furthermore, multiple agents may act independently or in concert to increase the risk of cancer. Thus, estimating the contribution made by a specific exposure to total cancer risk in an individual requires knowledge of the entire exposure history of that individual to all environmental agents that could increase the risk of the cancer under question. Consider, for example, a male who develops mesothelioma at age 70 and who was exposed to crocidolite asbestos at a concentration of 2 f/ml between the ages of 25 and 40, to amosite at a concentration of 5 f/ml between the ages of 40 and 50, and was treated with radiation therapy for testicular cancer that had metastasized to the lung at age 50. Every one of these exposures could have contributed to his developing mesothelioma at age 70. In this example, however, only a fraction of this individual's risk of developing mesothelioma is attributable to his amosite exposure between the ages of 40 and 50. Consider, on the other hand, another male who develops mesothelioma at age 70 and is exposed to the same level of amosite (5 f/ml) between the ages of 40 and 50, but has no other exposures. In this second example, a much larger fraction of the individual's risk is attributable to his amosite exposure. This example illustrates that two individuals with mesothelioma may have identical exposures to amosite asbestos. In one of these individuals this exposure may be a substantial contributing factor to the mesothelioma, whereas in the other it might not. The role that other exposures played in the development of mesothelioma in these two individuals determines whether or not amosite exposure made a substantial contribution.

90. A proper analysis of the contribution made by each exposure to cancer risk often requires more information than is available. For the first individual in the example above, such an analysis would require good quantitative information on the following.

   a. The risk of spontaneous mesothelioma at age 70;

   b. The risk of mesothelioma at age 70 following exposure to crocidolite between the ages of 25 and 40;

   c. The risk of mesothelioma at age 70 following exposure to amosite between the ages of 40 and 50;

   d. The risk of mesothelioma following radiation therapy at age 50;

   e. Information on the interaction of these various exposures in causing mesothelioma.

91. In the second example above, the analysis is much simpler and requires only knowledge of the risk of spontaneous mesothelioma at age 70 and how this risk is modified by amosite exposure between the ages of 40 and 50. The crucial point that needs to be kept in mind here is that, although exposure to amosite is identical in the two hypothetical scenarios described above, this exposure contributed a much larger fraction of the risk of the mesothelioma in scenario 2 than in scenario 1. Thus, the fractional contribution made

by any exposure to asbestos to mesothelioma risk depends on the other exposures that the individual might have received.

92. The examples above deal with specific fiber types and the risk of mesothelioma. Similar considerations apply when attributing risk to specific occupations. For example, consider an individual who worked both as an insulator and a pipe-fitter. Both jobs, including the length of time spent in each job, should be considered in any estimation of the contribution to mesothelioma risk made by each occupation. Certain jobs involving work with friction products, such as automobile mechanics, have been shown not to increase the risk of mesothelioma in multiple epidemiologic studies. Such jobs make no contribution to the risk of mesothelioma whether or not the individual worked at other jobs associated with asbestos exposure (e.g. Hessel et al., 2004). A framework for the attribution of the risk of mesothelioma to specific asbestos exposures has been developed by Price and Ware (2005).

## CONCLUSIONS

93. The evidence makes it abundantly clear that, like other cancers, mesothelioma can occur spontaneously without exposure to asbestos. Multiple, well-conducted epidemiological studies show that the risk of mesothelioma is not increased among automobile mechanics, suggesting strongly that low level exposures to chrysotile do not increase the risk of mesothelioma. The contention that small exposures over background contribute substantially to the development of mesothelioma is simply not supported by the science.

94. As I have discussed above, the only way to determine whether a specific exposure to asbestos was a factor in causing a plaintiff's disease is to conduct an explicit evaluation of the role of that asbestos exposure in causing the disease relative to the risk of developing the disease spontaneously and the additional risks imposed by other exposures, including other asbestos exposures and ionizing radiation. Such an evaluation involves estimating the additional risk, if any, imposed by the exposure at issue after taking into account the probability that the disease occurred spontaneously and the probability that other exposures, including other asbestos exposures and ionizing radiation, caused the disease. The contribution to risk made by any specific exposure will depend on how that exposure fits into the general pattern of exposure to asbestos and ionizing radiation for that individual. While detailed information is not always available, at the very least the total exposure, and the type of the asbestos fibers to which exposure occurred, need to be considered. If there are no other exposures to either asbestos or ionizing radiation, then the role of the exposure of interest must be evaluated within the framework of spontaneous occurrence of mesothelioma. When making this evaluation, it must be kept in mind that there is excellent affirmative epidemiologic evidence that exposure to low levels of chrysotile asbestos does not increase the risk of mesothelioma. Furthermore, there is little direct epidemiologic evidence that exposure to low levels of any kind of asbestos increases the risk of mesothelioma.

95. I have been asked to evaluate the methodology used by Dr. Brodkin to assess causation in this matter. In his notes and deposition in this matter, Dr. Brodkin identifies the following exposure sources related to Mr. Quirin: 1) employment in the U.S. Navy, 2) work as a telephone line installer at various construction sites, 3) smoking Kent cigarettes with micronite filters. Taking Dr. Brodkin's assessment as true, Mr. Quirin probably received substantial exposure to amphibole asbestos from all three.

96. There is compelling evidence that the U.S. Navy used substantial quantities of amphibole asbestos (Navy Bureau of Ships, [NBS] 1959, 1962; Rushworth, 2005; Franke and Paustenbach, 2011). In addition, numerous epidemiology studies have reported increased risk of mesothelioma associated with Navy and shipyard work (e.g., Blot and Fraumeni, 1981; Kolonel et al., 1985; Newhouse et al., 1985; Muscat and Wynder, 1991; Danielsen et al., 1993, 2000; Puntoni et al., 2001; Pan et al., 2005; Krstev et al., 2007). The scientific evidence establishes the risk, not just for the individuals handling the asbestos materials in shipyards or aboard ship, but also for those working in the vicinity (e.g., Selikoff et al., 1964; Kolonel et al., 1985; Danielsen et al., 1993; Puntoni et al., 2001). Amphibole asbestos has also been used in the construction industry and construction workers are known to be at increased risk of mesothelioma (Fletcher et al., 1993; Coggon et al., 1995; Robinson et al., 1996; Burnett et al., 1997; Wang et al., 1999; Hemminki and Li, 2003; Koskinen et al., 2003; NIOSH, 2003; McElvenny et al., 2005; Rake et al.; 2009). In addition, Mr. Quirin allegedly smoked Kent cigarettes with a micronite filter during a period when these filters could have contained crocidolite asbestos, the most potent asbestos fiber. Mr. Quirin's amphibole exposures, along with his age, are sufficient to have caused his mesothelioma.

97. Dr. Brodkin opines, however, that in addition to these very substantial exposures to amphibole asbestos, Mr. Quirin's bystander exposure to chrysotile asbestos from joint compound also contributed substantially to the development of his mesothelioma. Clearly, Dr. Brodkin has not critically evaluated whether Mr. Quirin's alleged bystander exposure to chrysotile asbestos added to the substantial risk imposed by his total amphibole exposure. Dr. Brodkin offers not a shred of evidence that chrysotile asbestos from joint compound increases the risk of mesothelioma.[19] He appears to base this conclusion on the assumption that any exposure over background to any kind of asbestos fiber increases the risk of mesothelioma. He ignores the large body of epidemiologic literature showing that exposure to low levels of chrysotile asbestos does not increase the risk of mesothelioma and does not add to the risk imposed by other exposures. He relies

---

[19] If Dr. Brodkin wants to contend that exposure to joint compound increases the risk of mesothelioma, then he must cite properly conducted analytic epidemiology studies showing that work with joint compound increases the risk of mesothelioma. It is not sufficient to cite the construction literature because construction workers are exposed to asbestos, and particularly amphibole asbestos, from various sources. If Dr. Brodkin wants to make the argument that joint compound is mesotheliogenic because of exposure to chrysotile, then he must be able to demonstrate that cumulative exposure from joint compound is in the several hundred fibers/ml-year range, because increased risk in predominantly chrysotile cohorts is seen only with such high exposures. Dr. Brodkin claims that he took the dose into account but, in reality, he has no quantitative estimate of the exposure that Mr. Quirin received from joint compound.

instead on case reports and on epidemiologic studies of commercial chrysotile contaminated with amphibole and involving very large exposures in the range of several hundred f/ml-year. He concludes from these very high exposure studies of chrysotile contaminated with amphibole that exposure to much lower levels of pure chrysotile increases the risk of mesothelioma. This conclusion is scientifically untenable.

Suresh H. Moolgavkar, M.D., Ph.D.
Corporate Vice President and Principal Scientist

# REFERENCES

Agency for Toxic Substances and Disease Registry (ATSDR). 2001. Toxicological profile for asbestos. U.S. Department of Health and Human Services (DHHS), Public Health Service, Agency for Toxic Substances and Disease Registry (ATSDR). September.

Agudo A, González CA, Bleda MJ, Ramirez J, Hernández S, López F, Calleja A, Panadès R, Turuguet D, Escolar A, Baltrán M, González-Moya JE. 2000. Occupation and risk of malignant pleural mesothelioma: A case-control study in Spain. Am J Ind Med 37:159–168.

Aguilar-Madrid G, Robles-Perez E, Juarez-Perez CA, Alvarado-Cabrero I, Rico-Mendez FG, K-G Javier K-G. 2010. Case-control study of pleural mesothelioma in workers with social security in Mexico. Am J Ind Med 53:241–251.

Armitage P, Doll R. 1954. The age distribution of cancer and a multistage theory of carcinogenesis. Br J Cancer 8:1–12.

Bang KM, Kim JH. 2001. Prevalence of cigarette smoking by occupation and industry in the United States. Am J Ind Med 40:233–239.

Berman DW, Crump KS. 2003. Environmental Protection Agency. Final draft: Technical support document for a protocol to assess asbestos-related risk. EPA# 9345.4-06. U.S. Environmental Protection Agency (EPA), Office of Solid Waste and Emergency Response, Washington, DC. October.

Berman DW, Crump KS. 2008a. Update of potency factors for asbestos-related lung cancer and mesothelioma. Crit Rev Toxicol 38(S1): 1–47.

Berman DW, Crump KS. 2008b. A meta-analysis of asbestos-related cancer risk that addresses fiber size and mineral type. Crit Rev Toxicol 38(S1): 49–73.

Blot WJ, JF Fraumeni, Jr. 1981. Cancer among shipyard workers. In, Quantification of occupational cancer. Banbury Report No. 9. Peto R, M Schneiderman (Eds.). Cold Spring Harbor Laboratory, Cold Spring Harbor. Pages 37–49.

Bosetti C, La Vecchia C, Lipworth L, McLaughin JK 2003. Occupational exposure to vinyl chloride and cancer risk: A review of the epidemiologic literature. Eur J Cancer Prev (5):427–430.

Brenner DJ, Doll R, Goodhead DT, Hall EJ, Land CE, Little JB, Lubin JH, Preston DL, Preston RJ, Puskin JS, Ron E, Sachs RK, Samet JM, Setlow RB, Zaider M. 2003. Cancer risk attributable to low doses of ionizing radiation: Assessing what we really know. PNAS 100(24):13761–13766.

Browne K. 2001. The quantitative risks of mesothelioma and lung cancer in relation to asbestos exposure: Asbestos and cancer. Ann Occup Hyg 45(4):327–329.

Burdorf A, Järvholm B, Siesling S. 2007. Asbestos exposure and differences in occurrence of peritoneal mesothelioma between men and women across countries. Occup Environ Med 64(12):839–842.

Burnett, C, J Maurer, HM Rosenberg, M Dosemeci. 1997. Mortality by occupation, industry, and cause of death, 24 Reporting States (1984–1988). U.S. Department of Health and Human Services (DHHS), Public Health Service, Centers for Disease Control and Prevention (CDC), National Institute for Occupational Safety and Health (NIOSH), DHHS (NIOSH) Publication No. 97-114. June.

Case BW, Abraham JL, Meeker G, Pooley FD, Pinkerton KE. 2011. Applying definitions of "asbestos" to environmental and "low-dose" exposure levels and health effects, particularly malignant mesothelioma. J Toxicol Environ Health, Part B 14(1):3–39.

Case BW, Dufresne A, McDonald AD, McDonald JC, Sebastien P. 2000. Asbestos fiber type and length in lungs of chrysotile textile and production workers: Fibers longer than 18 µm. Inhalat Toxicol 12(Suppl 3):411–415.

Coggon D, Inskip H, Winter P, Pannett B. 1995. Differences in occupational mortality from pleural cancer, peritoneal cancer, and asbestosis. Occup Environ Med 52:775–777.

Danielsen TE, S Langard, A Andersen, O Knudsen O. 1993. Incidence of cancer among welders of mild steel and other shipyard workers. Br J Ind Med 50:1097–1103.

Danielsen TE, S Langard, A Andersen. 2000. Incidence of cancer among welders and other shipyard workers with information on previous work history. J Occup Environ Med 42(1):101–109.

De Bruin ML, Burgers JA, Baas P, van't Veer MB, Noordijk EM, Louwman MWJ, Zijlstra JM, van den Berg H, Aleman BMP, van Leeuwen FE. 2009. Malignant mesothelioma following radiation treatment for Hodgkin's lymphomas. Blood 113(16):3679–3681.

Doll R, Peto J. 1985. Asbestos: Effects on health of exposure to asbestos. Health and Safety Commission. Her Majesty's Stationery Office (HMSO), London. 58 pp.

Elwood JM. 1988. The diagnosis of causation (Chapter 8). In: Causal relationships in medicine: A practical system for critical appraisal. JM Elwood (Ed.). Oxford University Press, New York. pp. 163–182.

Emara AM, El-Ghawabi SH, El Samra GH, Abou-Aly AN. 1970. Asebstosis: A clinical, radiological, and spirometric study. The world's knowledge. Pages 97–117.

Farioli A, Violante FS, Mattioli S, Curti S, Kriebel D. 2013. Risk of mesothelioma following external beam radiotherapy for prostate cancer: A cohort analysis of SEER database. Cancer Causes Control. Epub ahead of print doi:10.1007/s10552-013-0230-0.

Finley BL, Richter RO, Mowat FS, Mlynarek S, Paustenbach DJ, Warmerdam JL, Sheehan PJ. 2007. Cumulative asbestos exposure for U.S. automobile mechanics involved in brake repair (circa 1950s–2000). J Exp Sci Environ Epidemiol 17:644–655.

Fletcher, AC, G Engholm, A Englund. 1993. The risk of lung cancer from asbestos among Swedish construction workers: Self-reported exposure and a job exposure matrix compared. Int J Epidemiol 22(6 Suppl 2):S29–S35.

Franke K, D Paustenbach. 2011. Government and Navy knowledge regarding health hazards of asbestos: A state of the science evaluation (1900 to 1970). Inhalat Toxicol 23(S3):1–20.

Gaafar RM. 2007. Asbestos and mesothelioma in Egypt: P1–118. J Thoracic Oncol 2(8):S597.

Gaafar, RM and NHA Eldin. 2005. Epidemic of mesothelioma in Egypt. Lung Cancer 49S1: S17–S20.

Gazzano E, Riganti C, Tomatis M, Turci F, Bosia A, Fubini B, Ghigo D. 2005. Potential toxicity of nonregulated asbestiform minerals: Balangeroite from the western Alps. Part 3: Depletion of antioxidant defenses. J Toxicol Environ Health A 68:41–49.

Gibb H, Fulcher K, Nagarajan S, McCord S, Fallahian NA, Hoffman HJ, Haver C, Tolmachev S. 2013. Analyses of radiation and mesothelioma in the U.S. Transuranium and Uranium Registries. Am J Public Health (forthcoming).

Goodman JE, Nascarella MA, Valberg PA. 2009. Ionizing radiation: A risk factor for mesothelioma. Cancer Causes Control 20:1237–1254.

Green FH, Harley R, Vallyathan V, Althouse R, Fick G, Dement J, Mitha R, Pooley F. 1997. Exposure and mineralogical correlates of pulmonary fibrosis in chrysotile asbestos workers. Occup Environ Med 54:549–559.

Groppo C, Tomatis M, Turci F, Gazzano E, Ghigo D, Compagnoni R, Fubini B. 2005. Potential toxicity of nonregulated asbestiform minerals: Balangeroite from the western Alps. Part 1: Identification and characterization. J Toxicol Environ Health A 68:1–19.

Gustavsson P, Plato N, Lidstrom EB, Hogstedt C. 1990. Lung cancer and exposure to diesel exhaust among bus garage workers. Scand J Work Environ Health 16:348–354.

Hansen ES. 1989. Mortality of auto mechanics: A ten-year follow-up. Scand J Work Environ Health 15:43–46.

Hansen J, Meersohn A. 2003. *Kræftsygelighed blandt danske lønmodtagere (1970-97) fordelt på Arbejdstilsynets 49 branchegrupper*. Sections 4-4.2.2 [Materials and Methods]. Institut for Epidemiologisk Kræftforskning, Kræftens Bekæmpelse, København.

Hemminki K, Li X. 2003. Time trends and occupational risk factors for peritoneal mesothelioma in Sweden. J Occup Environ Med 45(4):451–455.

Henderson DW, Rantanen J, Barnhart S, Dement JM, De Vuyst P, Hillerdal G, Huuskonen MS, Kivisaari L, Kusaka Y, Lahdensuo A, S Langård S, Mowe G, Okubo T, Parker JE, Roggli VL, Rödelsperger K, Rosler J, Tossavainen A. 1997. Asbestos, asbestosis, and cancer: The Helsinki criteria for diagnosis and attribution. Scand J Work Environ Health 23:311–316.

Hennekens CH, JE Buring. 1987. Epidemiology in medicine. Mayrent SL (Ed.). Boston, Massachusetts: Little, Brown & Co.

Hessel PA, Teta MJ, Lau E, Goodman M. 2004. Mesothelioma among brake mechanics: an expanded analysis of a case-control study. Risk Anal 24: 547–552.

Hill AB. 1965. The environment and disease: Association or causation? Proc R Soc Med 58:295–300.

Hodgson JT, Darnton A. 2000. The quantitative risks of mesothelioma and lung cancer in relation to asbestos exposure. Ann Occup Hyg 44:565–601.

Hodgson JT, Darnton A. 2010. Mesothelioma risk from chrysotile. Occup Environ Med 67(6):432.

Hodgson JT, Peto J, Jones JR, Matthews FE. 1997. Mesothelioma mortality in Britain: Patterns by birth cohort and occupation. Ann Occup Hyg 41:129–133.

Hodgson DC, Gilbert ES, Dores GM, Schonfeld SJ, Lynch CF, Storm H, Hall P, Langmark F, Pukkala E, Andersson M, Kaijser M, Joensuu H, Fossa SD, LB Travis LB. 2007. Long-term solid cancer risk among 5-year survivors of Hodgkin's lymphoma. J Clin Oncol 25:1489–1497.

Huncharek M. 2002. Non-asbestos related diffuse malignant mesothelioma. Tumori 88(1):1–9.

Iwatsubo Y, Pairon JC, Boutin C, Menard O, Massin N, Caillaud D, Orlowski E, Galateau-Salle F, Bignon J, Brochard P. 1998. Pleural mesothelioma: Dose-response relation at low levels of asbestos exposure in a French population-based case-control study. Am J Epidemiol 148:133–142.

Janowsky EC, Kupper LL, Hulka BS. 2000. Meta-analyses of the relation between silicone breast implants and the risk of connective-tissue diseases. N Engl J Med 342(11):781–790.

Järvholm B, Brisman J. 1988. Asbestos associated tumors in car mechanics. Br J Ind Med 45(9):645–646.

Jeon J, Luebeck EG, Moolgavkar SH. 2006. Age effects and temporal trends in adenocarcinoma of esophagus and gastric cardia. Cancer Causes Control 17:971–981.

Kamal AM, El Khafif M, Koraah S, Massoud A, Caillard JF. 1992. Blood superoxide dismutase and plasma malondialdehyde among workers exposed to asbestos. Am J Ind Med 21: 353–361.

Kanarek MS. 2011. Mesothelioma from chrysotile asbestos: Update. Ann Epidemiol 21:688–697.

Knudson AG, Jr. 2001. Two genetic hits (more or less) to cancer. Nature Rev Cancer 1:157–162.

Kolonel LN, CN Yoshizawa, T Hirohata, BC Myers. 1985. Cancer occurrence in shipyard workers exposed to asbestos in Hawaii. Cancer Res 45:3924–3928.

Koskinen K, E Pukkala, K Reijula, A Karjalainen. 2003. Incidence of cancer among the participants of the Finnish Asbestos Screening Campaign. Scand J Work Environ Health 29(1):64–70.

Krstev S, P Stewart, J Rusiecki, A Blair. 2007. Mortality among shipyard Coast Guard workers: A retrospective cohort study. Occup Environ Med 64:651–658.

Lacourt A, Rolland P, Gramond C, Astoul P, Chamming's S, Ducamp S, Frenay C, Galateau-Salle F, Glig Soit Ilg A, Imbernon E, Le Stang N, Pairon JC, Goldberg M, Iwatsubo Y, Salmi L-R, Brochard P. 2010. Attributable risk in men in two French case-control studies on mesothelioma and asbestos. Eur J Epidemiol 25:799–806.

Larson TC, Antao VC, Bove FJ. 2010. Vermiculite worker mortality: Estimated effects of occupational exposure to Libby amphibole. J Occup Environ Med 52(5):555–560.

Leigh JP. 1996. Occupations, cigarette smoking, and lung cancer in the epidemiological follow-up to the NHANES I and the California Occupational Mortality Study. Bull NY Acad Med 73(2):370–397.

Loomis D, Dement JM, Wolf SH, Richardson DB. 2009. Lung cancer mortality and fibre exposures among North Carolina asbestos textile workers. Occup Environ Med 66:535–542.

Luebeck EG, Moolgavkar SH. 2002. Multistage carcinogenesis and the incidence of colorectal cancer. PNAS 99:15095–15100.

Madkour MT, El Bokhary MS, Awad Allah HI, Awad AA, Mahmoud HF. 2009. Environmental exposure to asbestos and the exposure-response relationship with mesothelioma. East Mediterr Health J 15(1)25–38.

Marr WT. 1964. Asbestos exposure during naval vessel overhaul. Am Ind Hyg Assoc J :264–268.

McCoy MJ, ME Wolter, KE Anderson. 2010. Mesothelioma in drywall finishing workers. J ASTM Int 8(1):1–14.

McDonald AD, McDonald JC. 1980. Malignant mesothelioma in North America. Cancer 46(7):1650–1656.

McElvenny DM, Darnton AJ, Price MJ, Hodgson JT. 2005. Mesothelioma mortality in Great Britain from 1968 to 2001. Occup Med 55:79–87.

McKeigue PM, Lamm SH, Linn S, Kutcher JS. 1994. Bendictin and birth defects: I. A meta-analysis of the epidemiologic studies. Teratology 50:27–37.

Merlo DF, Stagi E, Fontana V, Consonni D, Gozza C, Garrone E, Bertazzi PA, Pesatori AC. 2010. A historical mortality study among bus drivers and bus maintenence workers exposed to urban air pollutants in the city of Genoa, Italy. Occup Environ Med 67:611–619.

Meza R, Jeon J, Moolgavkar SH, Luebeck EG. 2008. The age-specific incidence of cancer: Phases, transitions and biological implications. PNAS 105:16284–16289.

Milham S, Ossiander E. 2001. Occupational mortality in Washington State 1950–1999. Epidemiology Office, Washington State Department of Health.

Mirabelli D, Calisti R, Barone-Adesi F, Fornero E, Merletti F, Magnani C. 2008. Excess of mesotheliomas after exposure to chrysotile in Balangero, Italy. Occup Environ Med 65:815–819.

Moolgavkar SH, Knudson AG. 1981. Mutation and cancer: A model for human carcinogenesis. JNCI 66:1037–1052.

Moolgavkar SH, Luebeck EG, Turim J, Hanna L. 1999. Quantitative assessment of the risk of lung cancer associated with occupational exposure to refractory ceramic fibers. Risk Anal 19:599–611.

Moolgavkar SH, Brown RC, Turim J. 2001. Biopersistence, fiber length, and cancer risk assessment for inhaled fibers. Inhalat Toxicol 13:755–772.

Moolgavkar SH, Meza R, Turim J. 2009. Pleural and peritoneal mesotheliomas in SEER: Age effects and temporal trends, 1973–2005. Cancer Causes Control 20(6):935–944.

Moolgavkar SH, Turim J, Alexander DD, Lau EC, Cushing CA. 2010. Potency factors for risk assessment at Libby, Montana. Risk Anal 30(8):1240–1248.

Moolgavkar SH. 2012. Analyses of mesothelioma rates in San Benito and Monterey Counties, California. November 26.

Mossman, BT, M Lippmann, TW Hesterberg, KT Kelsey, A Barchowsky, JC Bonner. 2011. Pulmonary endpoints (lung carcinomas and asbestosis) following inhalation exposure to asbestos. J Toxicol Environ Health B 14:76–121.

Muscat JE, Wynder EL. 1991. Cigarette smoking, asbestos exposure, and malignant mesothelioma. Cancer Res 51:2263–2267.

National Institute for Occupational Safety and Health (NIOSH). 2002. Letter to M.J. Teta from J.T. Walker regarding inquiry about PMRs for auto mechanics, with attached data sheets. Department of Health and Human Services (DHHS), Public Health Service, NIOSH.

National Institute for Occupational Safety and Health (NIOSH). 2003. Work-related lung disease surveillance report 2002. DHHS (NIOSH) Number 2003-111 (WoRLD report). U.S. Department of Health and Human Safety (DHHS), Public Health Service, Centers for Disease Control and Prevention (CDC), National Institute for Occupational Safety and Health (NIOSH), Division of Respiratory Disease Studies, Cincinnati, Ohio. May.

Navy Bureau of Ships. 1959. Military specification: Insulation felt, thermal, asbestos fiber. ML-I-0015091B (SHIPS). December 15.

Navy Bureau of Ships. 1962. Military specification: Insulation felt, thermal, asbestos fiber. ML-I-0015091C (SHIPS). July 3.

Newhouse ML, Oakes D, Woolley AJ. 1985. Mortality of welders and other craftsmen at a shipyard in NE England. Br J Ind Med 42:406–410.

Nicholson WJ, Daum SM, Lorimer WV, Velez H, Lilis R, Selikoff IJ, Miller A, Anderson HA, Fischbein SA, Holstein EC, Rom WN, Rosenman K, Todaro JD, Cheng W, Li V, Tarr DT. 1984. Investigation of health hazards in brake lining repair and maintenance workers occupationally exposed to asbestos. National Institute for Occupational Safety and Health (NIOSH), Cincinnati, Ohio. August.

Nicholson WJ. 1986. Airborne asbestos health assessment update. EPA/600/8-84/003F. U.S. Environmental Protection Agency (EPA), Office of Health and Environmental Assessment. June.

Olsen JH, Jensen OM. 1987. Occupation and risk of cancer in Denmark: An analysis of 93,810 cancer cases, 1970–1979. Scand J Work Environ Health 13(suppl 1):1–91.

Pan X-l, Day HW, Wang W, Beckett LA, Schenker MB. 2005. Residential proximity to naturally occurring asbestos and mesothelioma risk in California. Am J Respir Crit Care Med 172:1019–1025.

Pelnar PV. 1988. Further evidence of nonasbestos-related mesothelioma: A review of the literature. Scand J Work Environ Health 14:141–144.

Petersen GR, Milham S. 1980. Occupational Mortality in the state of California 1959–61. NIOSH Research Report NO1-CP-33353.

Peterson JT, Greenberg SD, Buffler PA. 1984. Non-asbestos-related malignant mesothelioma: A review. Cancer 54:951–960.

Peto J, Seidman H, Selikoff IJ. 1982. Mesothelioma mortality in asbestos workers: implications for models of carcinogenesis and risk assessment. Br J Cancer 45(1): 124–135.

Peto J, Rake C, Gilham C, Hatch J. 2009. Occupational, domestic and environmental mesothelioma risks in Britain: A case-control study. Research Report RR696 (Rake 2009 Supplemental Report). Prepared by the Institute of Cancer Research and the London School of Hygiene and Tropical Medicine for the Health and Safety Executive, HSE Books.

Phelka AD, BL Finley. 2012. Potential health hazards associated with exposures to asbestos-containing drywall accessory products: A state-of-the-science assessment. Crit Rev Toxicol 42(1):1–27.

Pira E, C Pelucchi, Piolatto PG, Negri E, Bilei T, La Vecchia C. 2009. Mortality from cancer and other causes in the Balangero cohort of chrysotile asbestos miners. Occup Environ Med 66:805–809.

Pooley FD. 1990. Investigation of the importance of tremolite in the production of asbestos-related disease and its relevance as a long-term indicator of chrysotile exposure. Unpublished.

Price B, Ware A. 2004. Mesothelioma trends in the United States: An update based on surveillance, epidemiology, and end results data for 1973 through 2003. Am J Epidemiol 159:107–112.

Price B, A Ware. 2005. Mesothelioma: Risk apportionment among asbestos exposure sources. Risk Anal 25(4):937–943 with erratum Risk Anal 27(3):787.

Price B, Ware A. 2009. Time trend of mesothelioma incidence in the United States and projection of future cases: An update based on SEER data for 1973 through 2005. Crit Rev Toxicol 39(7):576–588.

Puntoni R, F Merlo, L Borsa, G Reggiardo, E Garrone, M Ceppi. 2001. A historical cohort mortality study among shipyard workers in Genoa, Italy. Am J Ind Med 40:363–370.

Rake C, Gilham C, Hatch J, Darnton A, Hodgson J, Peto J. 2009. Occupational, domestic and environmental mesothelioma risks in the British population: A case-control study. Br J Cancer 100:1175–1183.

Reid A, Berry G, de Klerk N, Hansen J, Heyworth J, Ambrosini G, Fritschi L, Olsen N, Merler E, Musk AW. 2007. Age and sex differences in malignant mesothelioma after residential exposure to blue asbestos (crocidolite). Chest 131(2):376–382.

Robinson, CF, M Petersen, WK Sieber, S Palu, WE Halperin. 1996. Mortality of carpenters' union members employed in the U.S. construction or wood products industries, 1987–1990. Am J Ind Med 30:674–694.

Rödelsperger K, Jockel KH, Pohlabeln H, Romer W, Woitowitz H-J. 2001. Asbestos and man-made vitreous fibers as risk factors for diffuse malignant mesothelioma: Results from a German hospital-based case-control study. Am J Ind Med 39:262–275.

Roelofs CR, Kernan GJ, Davis LK, Clapp RW, Hunt PR. 2013. Mesothelioma and employment in Massachusetts: Analysis of cancer registry data 1988–2013. Am Ind Med. Epub ahead of print doi: 10/1002/ajim.22218.

Rolland P, C Gramond, H Berron, S Ducamp, E Imbernon, M Goldberg, P Brochard. 2005. Pleural mesothelioma: Professions and occupational areas at risk among humans [Mesotheliome pleural: Professions et secteurs d'activite a risque chez les hommes]. Institut de Veille Sanitaire, Departement Sante Travai, Saint-Maurice, France. October. Available at http://www.invs.sante.fr

Rolland P, Gramond C, Lacourt A, Astoul P, Chamming's S, Ducamp S, Frenay C, Galateau-Salle F, Ilg AGS, Imbernon E, Le Stang N, Pairon JC, Goldberg M, Brochard P. 2010. Occupations and industries in France at high risk for pleural mesothelioma: A population-based case-control study (1998–2002). Am J Ind Med 53(12):1207–1219.

Rushworth DH. 2005. The Navy and asbestos thermal insulation. Naval Engineers J Spring:35–42.

Selikoff IJ, J Churg, EC Hammond. 1964. Asbestos exposure and neoplasia. JAMA 188(1):22–26.

Selikoff IJ, Churg J, Hammond EC. 1965. The occurrence of asbestosis among insulation workers in the United States, Ann NY Acad Sci. 132:139–155.

Shukla A, Vacek P, Mossman BT. 2004. Dose-response relationships in expression of biomarkers of cell proliferation in in vitro assays and inhalation experiments. Nonlinearity in Biology, Toxicology and Medicine 2:117–128.

Shukla A, MacPherson MB, Hillegass J, Ramos-Nino ME, Alexeeva V, Vacek PM, Bond JP, Pass HI, Steele C, Mossman BT. 2009. Alterations in gene expression in human mesothelial cells correlate with mineral pathogenicity. Am J Respir cell Mol Biol 41:114–123.

Smith AH, Wright CC. 1996. Chrysotile asbestos is the main cause of pleural mesothelioma. Am J Ind Med 30:252–266.

Spirtas R, Keehn R, Wright W, Stark A, Beebe G, Dickson E. 1985. Mesothelioma risk related to occupational or other asbestos exposure: Preliminary results from a case-control study. Am J Epidemiol 122(3):518.

Spirtas R, Heineman EF, Bernstein L, Beebe GW, Keehn RJ, Stark A, Harlow BL, Benichou J. 1994. Malignant mesothelioma: Attributable risk of asbestos exposure. Occup Environ Med 51:804–811.

Stern F, E Lehman, A Ruder. 2001. Mortality among unionized construction plasterers and cement masons. Am J Ind Med 39:373–388.

Surveillance, Epidemiology, and End Results (SEER) Program Populations (1969–2005) (www.seer.cancer.gov/popdata), National Cancer Institute, DCCPS, Surveillance Research Program, Cancer Statistics Branch.

Teschke K, Morgan MS, Checkoway H, Franklin G, Spinelli JJ, van Belle G, Weiss NS. 1997. Mesothelioma surveillance to locate sources of exposure to asbestos. Can J Public Health 88(3):163–168.

Testa JR, Cheung M, Pei J, Below JE, Tan Y, Sementino E, Cox NJ, Dogan AU, Pass HI, Trusa S, Hesdorffer M, Nasu M, Powers A, Rivera Z, Comertpay S, Tanji M, Gaudino G, Yang H, Carbone M. 2011. Germline BAP1 mutations predispose to malignant mesothelioma. Nature Genetics 43(10):1022–1026.

Teta MJ, Lewinsohn HC, Meigs JW, Vidone RA, Mowad LZ, Flannery JT. 1983. Mesothelioma in Connecticut, 1957–1977, Occupational and geographic associations. J Occup Med 25(10):749–756.

Teta MJ, Lau E, Sceurman BK, Wagner ME. 2007. Therapeutic radiation for lymphoma. Risk of malignant mesothelioma. Cancer 109:1432–1438.

Tomlinson I, Sasieni P, Bodmer W. 2002. How many mutations in a cancer? Am J Pathol 160:755–758.

Tossavainen A, Kotilainen M, Takahashi K, Pan G, Vanhala E. 2001. Amphibole fibres in Chinese chrysotile asbestos. Ann Occup Hyg 45(2):145–152.

Travis LB, Fossa SD, Schonfeld SJ, McMaster ML, Lynch CF, Storm H, Hall P, Holowaty E, Andersen A, Pukkala E, Andersson M, Kaijser M, Gospodarowicz M, Joensuu T, Cohen RJ, Boice JD, Dores GM, Gilbert ES. 2005. Second cancers among 40 576 testicular cancer patients: focus on long-term survivors. J Natl Cancer Inst. 97:1354–1365.

Tward JD, Wendland MMM, Shrieve DC, Szabo A, Gaffney DK. 2006. The risk of secondary malignancies over 30 years after the treatment of non-Hodgkin lymphoma. Cancer 107:108–115.

Turci F, Tomatis M, Gazzano E, Riganti C, Martra G, Bosia A, Ghigo D, Fubini B. 2005. Potential toxicity of nonregulated asbestiform minerals: Balangeroite from the western Alps. Part 2: Oxidant activity of the fibers. J Toxicol Environ Health A 68:21–39.

Turci F, Tomatis M, Compagnoni R, Fubini B. 2009. Role of associated mineral fibres in chrysotile asbestos health effects: The case of balangeroite. Ann Occup Hyg 53(5):491–497.

Wang, E, JM Dement, H Lipscomb. 1999. Mortality among North Carolina construction workers, 1988–1994. Appl Occup Environ Hyg 14(1):45–58.

WOMD. 2011. Washington Occupational Mortality Database. Washington State Department of Health. Available at https://fortress.wa.gov/doh/occmort/OMQuery.aspx.

World Health Organization (WHO) and International Agency for Research on Cancer (IARC). 2011. IARC monographs on the evaluation of the carcinogenic risks to humans. Part B: Biological agents. Vol 100. International Agency for Research on Cancer (IARC), World Health Organization (WHO). IARC Working Group on the Evaluation of Carcinogenic Risks to Humans. Lyon, France.

Welch LS, Acherman YIZ, Haile E, Sokas RK, Sugarbaker PH. 2005. Asbestos and peritoneal mesothelioma among college-educated men. Int J Occup Environ Health 11:254–258.

Woitowitz H-J, Rödelsperger K. 1991. Chrysotile asbestos and mesothelioma. Am J Ind Med 19:551–553.

Woitowitz H-J, Rödelsperger K. 1992. Chrysotile asbestos, mesothelioma and garage mechanics: Response to Dr. Wong. Am J Ind Med 21:453-455.

Woitowitz H-J, Rödelsperger K. 1994. Mesothelioma among car mechanics? Ann Occup Hyg 38(4):635–638.

World Trade Organization (WTO). 2000. European Communities - Measures affecting asbestos and asbestos-containing products, Report of the panel WT/DS135/R. World Trade Organization (WTO). September 18.

Wong, O. 1992. Chrysotile asbestos, mesothelioma, and garage mechanics. Am J Ind Med 21:449–451.

Yano E, Wang ZM, Wang XR, Wang MZ, Lan YJ. 2001. Cancer mortality among workers exposed to amphibole-free chrysotile asbestos. Am J Epidemiol 154(6):538–543.

Yano, E, Z-M Wang, X-R Wang, M-Z Wang, A Takata, N Kohyama, and Y Suzuki. 2009. Mesothelioma in a worker who spun chrysotile asbestos at them during childhood. Am J Ind Med 52(4):282–287.

Yarborough CM. 2006. Chrysotile as a cause of mesothelioma: An assessment based on epidemiology. Crit Rev Toxicol 36:165–187.

Yarborough CM. 2007. The risk of mesothelioma from exposure to chrysotile asbestos. Curr Opin Pulm Med 13:334–338.

**Appendix 1.  Curriculum Vitae of Suresh Moolgavkar**



Exponent
15375 SE 30th Place
Suite 250
Bellevue, WA 98007

telephone 425-519-8700
facsimile 425-519-8799
www.exponent.com

## Suresh H. Moolgavkar, M.D., Ph.D.
**Corporate Vice President and Director of the Center for Epidemiology, Biostatistics, and Computational Biology**

**Professional Profile**

Dr. Suresh Moolgavkar has more than 30 years of experience in the fields of epidemiology, biostatistics, and quantitative risk assessment. He is internationally known for his work in developing mechanistically based dose-response models for carcinogenesis, and, in particular, for the two-mutation clonal expansion model, also known as the Moolgavkar-Venzon-Knudson (MVK) model. For the past decade, Dr. Moolgavkar has also been keenly interested in air pollution epidemiology. Dr. Moolgavkar retired from his position as a Full Member of the Fred Hutchinson Cancer Research Center in August 2008. He continues to be an Affiliate Investigator at the Center and Professor of Epidemiology and Adjunct Professor of Applied Mathematics at the University of Washington in Seattle. Dr. Moolgavkar has served on the faculties of Johns Hopkins University, Indiana University, University of Pennsylvania, and Fox Chase Cancer Center. He has been a visiting scientist at the Radiation Effects Research Foundation in Hiroshima, the International Agency for Research on Cancer in Lyon, and the German Cancer Research Center in Heidelberg. Dr. Moolgavkar has served on numerous review panels and as a consultant to the National Cancer Institute, EPA, Health and Welfare, Canada, The International Agency for Research on Cancer (IARC), the California Air Resources Board (CARB), and the CIIT Centers for Health Research, among others.

Dr. Moolgavkar is the author or co-author of more than 160 papers and contributed chapters in the areas of epidemiology, biostatistics, and quantitative risk assessment, and has edited three books in these areas. He was the senior editor of a monograph, *Quantitative Estimation and Prediction of Human Cancer Risk*, published by the International Agency for Research on Cancer. He is an elected member of the American Epidemiological Society. Dr. Moolgavkar has served on the editorial boards of *Genetic Epidemiology* and *Inhalation Toxicology*, and is currently Associate Editor for Health and Environment of *Risk Analysis—An International Journal.* Dr. Moolgavkar has published numerous epidemiological and toxicological papers on lung cancer, including lung cancer following radiation and exposure to fibers. Dr. Moolgavkar was a member of the working group involved in the writing of the IARC monograph on tobacco smoking in 1986 (IARC monograph 38).

Dr. Moolgavkar was given the Founders' Award by the CIIT Centers for Health Research in 1990 and the Distinguished Achievement Award by the Society for Risk Analysis in 2001. He is an elected member of the American Epidemiological Society and a Fellow of the Society for Risk Analysis, the premier international organization for risk assessment.

Dr. Moolgavkar's research has been supported largely by grants from the National Institutes of Health, the U.S. Department of Energy, and EPA.

03/12

**Academic Credentials and Professional Honors**

Senior Fellow, Department of Epidemiology, University of Washington, 1976–1977
Ph.D., Mathematics, Johns Hopkins University, Baltimore, Maryland, 1973
Postdoctoral Fellow, Departments of Pharmacology and Biophysics, Johns Hopkins Medical
    School, Baltimore, Maryland, 1966–1968
M.B.B.S., (M.D.) Bombay University, 1965

Elected Member, American Epidemiological Society
Distinguished Achievement Award, Society for Risk Analysis, 2001
Founders' Award, Chemical Industry Institute of Toxicology, 1990
Lester R. Ford Award of Mathematical Association of America, 1977
Faculty Research Fellowship of Indiana University, 1974–1976

**Academic Appointments**

Professor, Department of Epidemiology, University of Washington, 1984–present
Adjunct Professor, Department of Biostatistics, University of Washington, 1984–2009
Adjunct Professor, Department of Applied Mathematics, University of Washington, 2004–present
Member, The Fred Hutchinson Cancer Research Center, Seattle, 1984–2008
Affiliate Investigator, The Fred Hutchinson Cancer Research Center, 2008–present
Member, Graduate Faculty, University of Washington, 1984–present
Adjunct Associate Professor, Department of Research Medicine, University of Pennsylvania
        School of Medicine, 1980–1984
Research Physician, The Institute for Cancer Research, Fox Chase Cancer Center, Philadelphia,
        1979–1984
Clinical Assistant Professor, Department of Research Medicine, University of Pennsylvania
        School of Medicine, 1977–1980
Associate, American Oncologic Hospital, Philadelphia, 1977–1984
Epidemiologist, The Fox Chase Cancer Center, Philadelphia, 1977–1984
Member, Graduate Group in Epidemiology, University of Pennsylvania, 1977–1984
Assistant Professor of Mathematics, Indiana University, Bloomington, 1973–1977
Instructor in Mathematics, Johns Hopkins University, 1972–1973

**Editorships and Editorial Review Boards**

Editorial Board, *Inhalation Toxicology*, 2006–2008
Guest Editor, *Modeling and Data Analysis in Cancer Studies*, special issue of Mathematical and
    Computer Modelling, 33(12–13), 2001
Associate Editor, *Risk Analysis—An International Journal*, 2000–present
Senior Editor, *Risk Analysis – An International Journal* , special issue on impact of reduced
tobacco smoking on lung cancer mortality in the U.S., 1975-2000, To appear, 2012
Senior Editor, *Quantitative Estimation and Prediction of Human Cancer Risk*, International
    Agency for Research on Cancer, Scientific Publications 131, 1999
Editor, *Scientific Issues in Quantitative Cancer Risk Assessment*, Birkhauser, Boston, 1990



Co-Editor, *Modern Statistical Methods in Chronic Disease Epidemiology*, John Wiley, 1986
Editorial Board, *Genetic Epidemiology*, 1984–1988

## Publications

*Mathematical*

Ewing J, Moolgavkar S, Smith L, Stong RE.  Stable parallelizability of lens spaces.  J Pure Appl Algebra 1977; 10:177–191.

Ewing J, Moolgavkar S.  Euler characteristics of complete intersections.  Proc Am Math Soc 1976; 56:390–391.

Ewing J, Gustafson E, Halmos P, Moolgavkar S, Wheeler W, Ziemer W.  American mathematics from 1940 to the day before yesterday.  Am Math Monthly 1976; 83:503–516.

Ewing J, Moolgavkar S.  On a conjecture of Atiyah and Thom.  Preprint, Indiana University, 1976.

Ewing J, Moolgavkar S.  On the group of holomorphic line bundles on an algebraic surface.  Preprint, Indiana University, 1976.

Moolgavkar S.  On the existence of a universal germ of deformations for elliptic pseudo group structures on compact manifolds.  Trans Am Math Soc 1975; 212:173–197.

Ewing J, Moolgavkar S.  On the signature of Fermat surfaces.  Michigan Math J 1975; 22:257–268.

*Biomedical*

McCarthy WJ, Meza R, Jeon J, Moolgavkar SH.  Lung cancer in never-smokers. Risk Analysis, in press.

Hazelton WD, Jeon J, Meza R, Moolgavkar SH.  FHCRC lung cancer model.  Risk Analysis, in press.

Moolgavkar SH.  Multistage carcinogenesis and epidemiologic studies of cancer.  In:  Modeling and Inference in Biomedical Science—In Memory of Andrei Yakovlev.  Almudevar AL, Hall WJ, Oakes D (eds), Institute of Mathematical Statistics Collections Series, in press.

Moolgavkar SH, Holford TR, Levy DT, et al.  Impact of reduced tobacco smoking on lung cancer mortality in United States during 1975–2000.  JNCI 2012; doi. 10.1093/jnci/djs 136.

Meza R, Jeon J, Moolgavkar SH.  Quantitative cancer risk assessment of nongenotoxic carcinogens.  In:  Cancer Risk Assessment: Chemical Carcinogenesis, Hazard Evaluation, and Risk Quantification.  New York, Joh, Wiley & Sons, 2010.



Moolgavkar SH, Turim J, Alexander D, Lau E, Cushing C. Potency factors for risk assessment at Libby, Montana. Risk Analysis – An International Journal, 2010; 30:1240–1248.

McClellan RO, Frampton MW, Koutrakis P, McDonnell WF, Moolgavkar S, et al. Critical considerations in evaluating scientific evidence of health effects of ambient ozone: A conference report. Inhalation Toxicology, 2009; 21(S2):1–36.

Moolgavkar SH, Meza R, Turim J. Pleural and peritoneal mesothelioma in SEER: Age effects and temporal trends, 1973–2005. Cancer Causes Control 2009. Epub ahead of print.

Meza R, Jeon J, Moolgavkar SH, Luebeck EG. The age-specific incidence of cancer: phases, transitions and biological implications. Proceedings, Natl Acad Sci, U.S.A, 2008 105:16284–16289.

Luebeck EG, Moolgavkar SH, Liu A, Ulrich N. Does folic acid supplementation prevent or promote colon cancer? Results from model-based predictions. Cancer Epidemiol Biomarkers Prev 2008; 17:1360–1367.

Little M, Heidenreich W, Moolgavkar SH, Schoellnberger H, Thomas DC. Systems biological and mechanistic modelling of radiation-induced cancer. Rad Environ Biophys 2008; 47:39–47.

Meza R, Hazelton WD, Colditz GA, Moolgavkar SH. Analysis of lung cancer incidence in the nurses' health and the health professionals' follow-up studies using a multistage carcinogenesis model. Cancer Causes Control 2008; 19:317–328.

Jeon J, Meza R, Moolgavkar SH, Luebeck EG. The evaluation of cancer screening strategies using multistage carcinogenesis models. Math Biosci 2008; 213:56–70.

Reiss R, Anderson EL, Cross CE, Hidy G, Hoel D, McClellan R, Moolgavkar S. Evidence of health impacts of sulfate and nitrate containing particles in ambient air. Inhal Toxicol 2007; 19:419–449.

Moolgavkar SH. Pollution analysis flawed by statistical model. Correspondence. Nature 2007; 445:21.

Hazelton WD, Moolgavkar SH, Curtis SB, Zielinski JM, Ashmore JP, Krewski D. Biologically based analysis of lung cancer incidence in a large Canadian occupational cohort with low-dose ionizing radiation exposure, and comparison with Japanese atomic bomb survivors. J Toxicol Environ Health 2006; 69:1013–1038.

Moolgavkar SH. Fine particles and mortality. Inhal Toxicol 2006; 18:93–94.

Jeon J, Luebeck EG, Moolgavkar SH. Age effects and temporal trends in adenocarcinoma of esophagus and gastric cardia. Cancer Causes Control 2006; 17:971–981.



Clements MS, Hakulinen T, Moolgavkar SH. Bayesian projections: What are the effects of excluding data from the younger age groups? Am J Epidemiol 2006; 164:292–293.

Luebeck EG, Moolgavkar SH. Biological and mathematical aspects of multistage carcinogenesis. In: Quantitative Methods for Cancer and Human Health Risk Assessment. Edler I, Kitsos CP (eds). Wiley-Liss, 2005.

Luebeck EG, Buchmann A, Schneider D, Moolgavkar SH, Schwarz M. Modulation of liver tumorigenesis in Connexin32-deficient mouse. Mutat Res 2005; 570:33–47.

Moolgavkar SH. A review and critique of the EPA's rationale for a fine particle standard. Regulat Toxicol Pharmacol 2005; 42:123–144.

Hazelton WD, Clements MS, Moolgavkar SH. Multistage carcinogenesis and lung cancer mortality in three cohorts. Cancer Epidemiol Biomarkers Prevent 2005; 14:1171–1181.

Clements MS, Armstrong B, Moolgavkar SH. Lung cancer rate predictions using generalized additive models. Biostatistics 2005; 6:576–589.

Dewanji A, Luebeck EG, Moolgavkar SH. A generalized Luria-Delbruck process. Math Biosci 2005; 197:140–152.

Meza R, Luebeck EG, Moolgavkar SH. Gestational mutations and carcinogenesis. Math Biosci 2005; 197:188–210.

Zheng CJ, Luebeck EG, Byers B, Moolgavkar SH. On the number of founding germ cells in humans. Theor Biol Med Model 2005; 24:2, 32.

Curtis SB, Hazelton WD, Luebeck EG, Moolgavkar SH. From mechanism to risk estimation— bridging the chasm. Adv Space Res 2004; 34:1404–1409.

Moolgavkar SH. Fifty years of the multistage model: Remarks on a landmark paper. Int J Epidemiol 2004; 33:1182–1183.

Little MP, Blettner M, Boice JD Jr, Bridges BA, Cardis E, Charles MW, de Vathaire F, Doll R, Fujimoto K, Goodhead D, Grosche B, Hall P, Heidenreich WF, Jacob P, Moolgavkar SH, Muirhead CR, Niwa O, Paretzke HG, Richardson RB, Samet JM, Sasaki Y, Shore RE, Straume T, Wakeford R. Potential funding crisis for the Radiation Effects Research Foundation. Lancet 2004; 364:557–558.

Heidenreich WF, Luebeck EG, Hazelton WD, Paretzke HG, Moolgavkar SH. Response to the commentary of Donald A. Pierce (Radiat Res 2003; 160:718–723). Radiat Res 2004; 161:369–370.

Heidenreich WF, Luebeck EG, Moolgavkar SH. Effects of exposure uncertainties in the TSCE model and application to the Colorado miners data. Radiat Res 2004; 161:72–81.



Moolgavkar SH, Luebeck EG. Multistage carcinogenesis and the incidence of human cancer. Genes Chromosomes Cancer 2003; 38:302–306.

Moolgavkar SH. Air pollution and daily mortality in two U.S. counties: season-specific analyses and exposure-response relationships. Inhal Toxicol 2003; 15:877–907.

Moolgavkar SH. Air pollution and daily deaths and hospital admissions in Los Angeles and Cook counties. pp. 183–198. In: Health Effects Institute Special Report, Revised Analyses of Time-Series Studies of Air Pollution and Health. Health Effects Institute, 2003.

Krewski D, Zielinski JM, Hazelton WD, Garner MJ, Moolgavkar SH. The use of biologically based cancer risk models in radiation epidemiology. Radiat Prot Dosimetry 2003; 104:367–76.

Gregori G, Hanin L, Luebeck G, Moolgavkar S, Yakovlev A. Testing goodness of fit for stochastic models of carcinogenesis. Math Biosci 2002; 175:13–29.

Heidenreich WF, Luebeck EG, Hazelton WD, Paretzke HG, Moolgavkar SH. Multistage models and the incidence of cancer in the cohort of A-bomb survivors. Rad Res 2002; 158:607–614.

Dewanji A, Moolgavkar SH. Choice of stratification in Poisson process analysis of recurrent event data with environmental covariates. Statist Med 2002; 21:3383–3393.

Curtis SB, Luebeck EG, Hazelton WD, Moolgavkar SH. Does radiation enhance promotion of already-initiated cells via a bystander effect? Int Congress Series 2002; 1236:283–287.

Curtis SB, Luebeck EG, Hazelton WD, Moolgavkar SH. A new perspective of carcinogenesis from protracted high-LET radiation arises from the two-stage clonal expansion model. Adv Space Res 2002; 30:937–944.

Luebeck EG, Moolgavkar SH. Multistage carcinogenesis and the incidence of colorectal cancer. Proc National Acad Sci 2002; 99:15095–15100.2.

Moolgavkar SH, Turim J, Brown RC, Luebeck EG. Long man-made fibers and lung cancer risk. Regulat Toxicol Pharmacol 2001; 33:138–146.

Hazelton WD, Luebeck EG, Heidenreich WF, Moolgavkar SH. Analysis of a historical cohort of Chinese tin miners with arsenic, radon, cigarette, and pipe smoke exposures using the biologically-based two-stage clonal expansion model. Rad Res 2001; 156:7–94.

Moolgavkar SH, Turim J, Brown RC. The power of the European Union protocol to test for carcinogenicity of inhaled fibers. Regulat Toxicol Pharmacol 2001; 33:350–355.

Moolgavkar SH, Brown RC, Turim J. Biopersistence, fiber length, and cancer risk assessment for inhaled fibers. Inhal Toxicol 2001; 13:755–772.



Moolgavkar SH, Luebeck EG, Turim J, Brown RC. Lung cancer risk associated with exposure to man-made fibers. Drug Chem Toxicol 2000; 23:223–242.

Moolgavkar SH, Hazelton WF, Luebeck EG, Levy D, Sheppard L. Air pollution, pollens, and admissions for chronic respiratory disease in King County. Inhal Toxicol 2000; 12(Supplement 1):157–171.

Dewanji A, Moolgavkar SH. A Poisson process approach for recurrent event data with environmental covariates. Environmetrics 2000; 11:665–673.

Moolgavkar SH. Air pollution and hospital admissions for diseases of the circulatory system in three U.S. metropolitan areas. J. Air Waste Manage Assoc 2000; 50:1199–1206.

Moolgavkar SH. Air pollution and daily mortality in three U.S. counties. Environ Health Perspect 2000; 108:777–784.

Moolgavkar SH. Air pollution and hospital admissions for chronic obstructive pulmonary disease in three metropolitan areas in the US. Inhal Toxicol 2000; 12(Suppl 4):75–90.

Luebeck EG, Buchmann A, Stinchcombe S, Moolgavkar SH, Schwarz M. Effects of 2,3,7,8-tetrachlorodibenzo-*p*-dioxin (TCDD) on initiation and promotion of GSTP-positive foci in rat liver: A quantitative analysis of experimental data using a stochastic model. Toxicol Appl Pharmacol 2000; 167:63–73.

Grasl-Kraupp B, Luebeck G, Wagner A, Loew-Baselli A, De Gunst M, Waldhor T, Moolgavkar S, Schulte-Hermann R. Quantitative analysis of tumor initiation in rat liver: Role of cell replication and cell death (apoptosis). Carcinogenesis 2000; 21:1411–1421.

Moolgavkar SH, Moller H, Woodward A. Principles of the epidemiologic approach to quantitative estimation and prediction of cancer risk. pp. 61–74. In: Quantitative Estimation and Prediction of Cancer Risk. Moolgavkar SH, Krewski D, Zeise L, Cardis E, Moller H (eds). IARC Scientific Publications, 1999.

Moolgavkar SH, Krewski D, Schwarz M. Mechanisms of carcinogenesis and biologically-based models for quantitative estimation and prediction of cancer risk. pp. 179–238. In: Quantitative Estimation and Prediction of Cancer Risk. Moolgavkar SH, Krewski D, Zeise L, Cardis E, Moller H (eds). IARC Scientific Publications, 1999.

Moolgavkar SH, Woodward A, Krewski D, Cardis E, Zeise L. Future perspectives and research needs. pp. 305–322. In: Quantitative Estimation and Prediction of Cancer Risk. Moolgavkar SH, Krewski D, Zeise L, Cardis E, Moller H (eds). IARC Scientific Publications, 1999.

Cardis E, Zeise L, Schwarz M, Moolgavkar S. Review of specific examples of QEP. pp. 239–304. In: Quantitative Estimation and Prediction of Cancer Risk. Moolgavkar SH, Krewski D, Zeise L, Cardis E, Moller H (eds). IARC Scientific Publications, 1999.



Moolgavkar SH, Luebeck EG, Turim J, Hanna L.  Quantitative assessment of the risk of lung cancer associated with occupational exposure to refractory ceramic fibers.  Risk Anal 1999; 19:599–611.

Dewanji A, Goddard M, Krewski D, Moolgavkar SH.  Two stage model for carcinogenesis: Number and size distributions of premalignant clones in longitudinal studies.  Math Biosci 1999; 155:1–12.

Luebeck EG, Heidenreich WF, Hazelton WD, Paretzke HG, Moolgavkar SH.  Biologically-based analysis of the data for the Colorado Plateau uranium miners cohort:  Age, dose and dose-rate effects.  Rad Res 1999; 152:339–351.

Moolgavkar SH.  Stochastic models for estimation and prediction of cancer risk.  pp. 237–259. In:  Statistics for the Environment 4:  Pollution Assessment and Control.  Barnett V, Stein A, Feridun Turkman K (eds).  John Wiley, NY, 1999.

Moolgavkar SH, Luebeck EG, Anderson EL.  Estimation of unit risk for coke oven emissions. Risk Anal 1998; 18:813–825.

Gaylor DW, Moolgavkar S, Krewski D, Goldstein LS.  Recent bioassay results on coal tars and benzo[a]pyrene:  Implications for risk assessment.  Regul Toxicol Pharmacol 1998; 28:178–179.

Moolgavkar SH.  Comments on papers on U-shaped dose-response relationships for carcinogens.  Hum Exper Toxicol 1998; 17:708–710.

Moolgavkar SH.  Two-mutation carcinogenesis model.  pp. 4635–4639.  In:  Encyclopedia of Biostatistics.  Armitage P, Colton T (eds).  John Wiley, 1998.

Moolgavkar SH, Lee JAH, Stevens RG.  Analysis of vital statistical data.  In:  Modern Epidemiology.  2nd edition.  Rothman K, Greenland S (eds).  Lippincott-Raven, PA, 1998.

Moolgavkar SH, Luebeck EG, Anderson, EL.  Air pollution and hospital admissions for respiratory causes in Minneapolis-St. Paul and Birmingham.  Epidemiology 1997; 8(4):364–370.

Heidenreich W, Luebeck EG, Moolgavkar SH.  Some properties of the hazard function of the two-mutation clonal expansion model.  Risk Anal 1997; 17:391–399.

Moolgavkar SH.  Stochastic cancer models:  application to analyses of solid cancer incidence in the cohort of A-bomb survivors.  Nucl Ener 1997; 36(6):447–451.

Kai M, Luebeck EG, Moolgavkar SH.  Analysis of solid cancer incidence among atomic bomb survivors using a two-stage model of carcinogenesis.  Rad Res 1997; 148:348–358.



Luebeck EG, Moolgavkar SH. Biologically based cancer modelling. Drug Chem Toxicol 1996; 19:221–243.

Luebeck EG, Curtis SB, Cross FT, Moolgavkar SH. Two-stage model of radon-induced malignant lung tumors in rats: effects of cell killing. Rad Res 1996; 145:163–173.

Moolgavkar SH, Luebeck EG, Buchmann A, Bock KW. Quantitative analysis of enzyme-altered foci in rats initiated with dieethylnitrosamine and promoted with 2,3,7,8-tetrachlorodibenzo-p-dioxin or 1,2,3,4,6,7,8-heptachloro-p-dioxin. Toxicol Appl Pharmacol 1996; 138:31–42.

Moolgavkar SH, Luebeck EG, Hall TA, Anderson EL. Particulate air pollution and mortality. Letter to the Editor. Epidemiology 1996; 7:212–213.

Moolgavkar SH, Luebeck EG. A critical review of the evidence on particulate air pollution and mortality. Epidemiology 1996; 7:420–428.

Leroux BG, Lesenring WM, Moolgavkar SH, Faustman EM. A biologically based dose-response model for developmental toxicology. Risk Anal 1996; 16:449–458.

Dewanji A, Luebeck EG, Moolgavkar SH. A biologically-based model for the analysis of premalignant foci of arbitrary shape. Math Biosci 1996; 135:55–68.

Moolgavkar SH, Luebeck EG, Hall TA, Anderson EL. Particulate air pollution, sulfur dioxide, and daily mortality: A reanalysis of the Steubenville data. Inhal Toxicol 1995; 7:35–44.

Schwarz M, Buchmann A, Stinchcombe S, Luebeck EG, Moolgavkar SH, Bock KW. Role of receptors in human and rodent hepatocarcinogenesis. Mutat Res 1995.

Luebeck EG, Grasl-Kraupp B, Timmermann-Trosiener I, Bursch W, Schulte-Hermann R, Moolgavkar SH. Growth kinetics of enzyme altered liver foci in rats treated with phenobarbital or α-hexachlorocyclohexane. Toxicol Appl Pharmacol 1995; 130:30–315.

Luebeck EG, Moolgavkar SH. Biologically based cancer modeling. pp. 533–555. In: Toxicology and Risk Assessment. Fan AM, Chang LW (eds). Marcel Dekker, Inc., New York, 1995.

Moolgavkar SH. When and how to combine results from multiple epidemiological studies in risk assessment. pp. 77–90. In: The Proper Role of Epidemiology in Regulatory Risk Assessment. Graham J (ed). Elsevier, New York, 1995.

Moolgavkar SH, Luebeck EG, Hall TA, Anderson EL. Air pollution and daily mortality in Philadelphia. Epidemiology 1995; 6:476–484.

Moolgavkar SH, Luebeck EG. Incorporating cell proliferation kinetics into models for cancer risk assessment. Toxicology 1995; 102:141–147.



Stayner L, Smith R, Bailer J, Luebeck EG, Moolgavkar SH. Methods for modelling occupational studies for cancer risk assessment. Am J Indust Med 1995; 27:155–170.

Luebeck EG, Moolgavkar SH. Simulating the process of carcinogenesis. Math Biosci 1994; 123:127–146.

Moolgavkar SH. Air pollution and mortality (letter). N Eng J Med 1994; 330:1237–1238.

Moolgavkar SH. Biological models of carcinogenesis and quantitative cancer risk assessment. Guest Editorial. Risk Anal 1994; 14:879–882.

Moolgavkar SH. Cell proliferation and carcinogenesis models: General principles with illustrations from the rodent liver system. Environ Health Perspect 1993; 101(Suppl. 5):91–94.

Moolgavkar SH, Luebeck EG, Krewski D, Zielinski JM. Radon, cigarette smoke, and lung cancer: A reanalysis of the Colorado Plateau miners' data. Epidemiology 1993; 4:204–217.

Moolgavkar SH, Luebeck EG. A two-mutation model for radiation carcinogenesis in humans and rodents. pp. 199–210. In: New Frontiers in Cancer Causation. Iversen OH (ed). Taylor and Francis, Washington, DC, 1993.

Zheng CJ, Byers B, Moolgavkar SH. Allelic instability in mitosis: A unified model for dominant disorders. Proc Natl Acad Sci 1993; 90:10178–10182.

Moolgavkar SH, Luebeck EG. Interpretation of labelling indices in the presence of cell death. Carcinogenesis 1992; 13:1007–1010.

Moolgavkar SH, Luebeck EG. Risk assessment of non-genotoxic carcinogens. Toxicol Lett 1992; 64/65:631–636.

Moolgavkar SH. A population perspective on multistage carcinogenesis. pp. 381–392. In: Multistage Carcinogenesis. Proc. 22nd International Symposium of The Princess Takamatsu Cancer Research Fund. Harris CC, Hirohashi S, Ito N, Pitot HC, Sugimura T, Terada M Yokota J (eds). Japan Scientific Societies Press, Tokyo, 1992.

Moolgavkar SH. Cancer models. pp. 239–252. In: Biophysical Modelling of Radiation Effects. Chadwick K, Moschini G, Varma M (eds). Adam Hilger, Bristol, 1992.

Moolgavkar SH. Carcinogenesis models: An overview. pp. 767–781. In: Indoor Radon and Lung Cancer: Reality or Myth? Cross FT (ed). Battelle Press, 1992.

Luebeck EG, Moolgavkar SH. Stochastic analysis of intermediate lesions in carcinogensis experiments. Risk Anal 1991; 11:149–157.



Dewanji A, Moolgavkar SH, Luebeck EG. Two-mutation model for carcinogenesis: Joint analysis of premalignant and malignant lesions. Math Biosci 1991; 104:97–109.

Nandakumar A, Davis S, Moolgavkar S, Witherspoon R, Schwartz S. Myeloid leukemia following therapy for a first primary cancer. Br J Cancer 1991; 63:782–788.

Moolgavkar SH. Cell proliferation in carcinogenesis (letter). Science 1991; 251:143.

Moolgavkar SH, Luebeck EG. The role of somatic mutations and cell replication kinetics in quantitative cancer risk assessment. pp. 469–479. In: Chemically Induced Cell Proliferation: Implications for Risk Assessment. Butterworth BE, Slaga TJ, Farland W, McClain M (eds). Wiley Liss, 1991.

Luebeck EG, Moolgavkar SH, Buchman A, Schwarz M. Effects of polychlorinated biphenyls in rat liver: Quantitative analysis of enzyme altered foci. Toxicol Appl Pharmacol 1991; 111:469–484.

Moolgavkar SH, Luebeck EG. Multistage carcinogenesis: A population-based model for colon cancer. JNCI 1991; 84:610–618.

Luebeck EG, Moolgavkar SH. Stochastic description of initiation and promotion in experimental carcinogenesis. Annali dell'Istituto Superiore di Sanita 1991; 27: 575–580.

Moolgavkar SH. Stochastic models of carcinogenesis. pp. 373–393. In: Handbook of Statistics, Volume 8. Rao CR, Chakraborty R (eds). Elsevier, 1991.

Moolgavkar SH, Cross FT, Luebeck G, Dagle GE. A two-mutation model for radon-induced lung tumors in rats. Rad Res 1990; 121:28–37.

Moolgavkar SH, Luebeck G. Two-event model for carcinogenesis: Biological, mathematical and statistical considerations. Risk Anal 1990; 10:323–341.

Moolgavkar SH, Luebeck G, DeGunst M. Two mutation model for carcinogenesis: Relative roles of somatic mutations and cell proliferation in determining risk. pp. 136–152. In: Scientific Issues in Quantitative Cancer Risk Assessment. Moolgavkar SH (ed). Birkhauser, Boston, 1990.

Moolgavkar SH, Luebeck G., de Gunst M, Port RE, Schwarz M. Quantitative analysis of enzyme altered foci in rat hepatocarcinogenesis experiments. Carcinogenesis 1990; 11:1271–1278.

Moolgavkar SH. Cancer models, invited editorial. Epidemiology 1990; 1:419–420.

Dewanji A, Venzon DJ, Moolgavkar SH. A stochastic two-stage model for cancer risk assessment II: The number and size of premalignant clones. Risk Anal 1989; 9:179–186.



Moolgavkar SH.  Multistage models for cancer risk assessment.  pp. 9–20.  In:  Biologically Based Methods for Cancer Risk Assessment.  Travis C (ed).  NATO ASI Series A:  Life Science Vol. 159, Plenum NY, 1989.

Moolgavkar SH, Dewanji A, Luebeck G.  Cigarette smoking and lung cancer:  A reanalysis of the British doctors' data.  JNCI 1989; 81:415–420.

Moolgavkar SH.  Dominant inheritance of colonic polyps and adenocarcinomas.  N Engl J Med 1989; 320:316.

Hahn RA, Moolgavkar SH.  Nulliparity, decade of first birth and breast cancer in Connecticut cohorts.  Am. J. Public Health 1989; 79:1503–1507.

Moolgavkar SH.  A two-stage carcinogenesis model for risk assessment.  Cell Biol Toxicol 1989; 5:445–460.

Moolgavkar SH, Dewanji A.  Combined effect of childbearing, menstrual events, and body size on age-specific breast cancer risk.  Am J Epidemiol 1988; 128:1177–1178.

Venzon DJ, Moolgavkar SH.  Origin invariant relative risk functions for case-control and survival studies.  Biometrika 1988; 75:325–333.

Venzon DJ, Moolgavkar SH.  An algorithm for computing profile-likelihood-based confidence intervals.  Appl Stat 1988; 37:87–94.

Moolgavkar SH, Dewanji A.  Biologically-based models for cancer risk assessment:  A cautionary note.  Risk Anal 1988; 8:5–6.

Moolgavkar SH, Dewanji A.  Discussion of "From Mouse to Man:  The Quantitative Assessment of Cancer Risks" by D.A. Freedman and H. Zeisel.  Stat Sci 1988; 3:39–41.

Moolgavkar SH, Dewanji A, Venzon DJ.  A stochastic two-stage model for cancer risk assessment.  I:  The hazard function and the probability of tumor.  Risk Anal 1988; 8:383–392.

Moolgavkar SH.  Some remarks on general relative risk regression models.  Proc. Biopharmaceutical Section of ASA, 1988.

Moolgavkar SH.  Biologically motivated two-stage model for cancer risk assessment.  Toxicol Lett 1988; 43:139–150.

Moolgavkar SH, Venzon DJ.  Confidence regions in curved exponential families:  Application to matched case-control and survival studies with general relative risk function.  Ann Stat 1987; 15:346–359.

Moolgavkar SH, Venzon DJ.  Confidence regions for parameters of the proportional hazards model:  A simulation study.  Scand J Stat 1987; 14:43–56.



Lustbader ED, Moolgavkar SH. Some problems of inference in cohort studies. J Chron Dis 1987; 40(Suppl. 2):133–137.

Moolgavkar SH, Prentice RL. Discussion of the paper "Parameter Orthogonality and Approximate Conditional Inference," by D.R. Cox and N. Reid. JR Statist Soc 1987; B 49:34–35.

Moolgavkar SH, Venzon DJ. General relative risk models for epidemiologic studies. Am J Epidemiol 1987; 126:949–961.

Moolgavkar SH. Carcinogenesis modelling: From molecular biology to epidemiology. Ann Rev Pub Health 1986; 7:151–170.

Moolgavkar SH, Venzon DJ. Confidence regions for case-control and survival studies with general relative risk functions. In: Modern Statistical Methods in Chronic Disease Epidemiology. Proc. SIMS Conference. Moolgavkar SH, Prentice RL (eds). John Wiley, 1986.

Knudson AG, Moolgavkar SH. Inherited influences on susceptibility to radiation carcinogenesis. In: Radiation Carcinogenesis. Upton AC (ed). Elsevier/North Holland, 1986.

Prentice RL, Moolgavkar SH, Farewell VT. Biostatistical issues and concepts in epidemiologic research. J Chron Dis 1986; 38:1169–1183.

Moolgavkar SH. Hormones and multistage carcinogenesis. Cancer Surv 1986; 5:635–648.

Moolgavkar SH. Antioncogenes and cancer. pp. 19–30. In: Pathophysiological Aspects of Cancer Epidemiology. Mathe' G, Reizenstein P (eds). Pergamon Press, 1985.

Moolgavkar SH. Mutation and human cancer. pp. 31–38. In: Pathophysiological Aspects of Cancer Epidemiology. Mathe' G, Reizenstein P (eds). Pergamon Press, 1985.

Venzon DJ, Moolgavkar SH. Cohort analysis of malignant melanoma in five countries. Am J Epidemiol 1984; 119:1, 62–70.

Stevens RG, Moolgavkar SH. A cohort analysis of lung cancer and smoking in British males. Am J Epidemiol 1984; 119:624–641.

Stevens RG, Moolgavkar SH. Malignant melanoma: Dependence of site-specific risk on age. Am J Epidemiol 1984; 119:890–895.

Moolgavkar SH, Lustbader ED, Venzon DJ. A geometric approach to non-linear regression diagnostics with application to matched case-control studies. Ann Stat 1984; 12:816–826.



Stevens RG, Moolgavkar SH. Smoking and cancer in Britain. Proc. 5th World Conference on Smoking and Health, 1984.

Moolgavkar SH. Some comments on the resources at RERF. pp. 274–279. In: Utilization and Analysis of Radiation Effects Research Foundation Data. Proc. SIMS Conference. Prentice RL, Thompson DJ (eds). SIAM, 1984.

Lustbader ED, Moolgavkar SH, Venzon DJ. Tests of the null hypothesis in case-control studies. Biometrics 1984; 1017–1024.

Moolgavkar SH. Model for human carcinogenesis: Action of environmental agents. Environ Health Perspect 1983; 50:285–291.

Moolgavkar SH. A model for human carcinogenesis: Hereditary cancers and premalignant lesions. Proc. 7th Chicago Cancer Symposium, Cancer: Etiology and Prevention. Crispen RG (ed). Elsevier Science Publishing Co., Inc., 1983.

Stevens RG, Moolgavkar SH, Lee JAH. Temporal trends in breast cancer. Am J Epidemiol 1982; 115:759–777.

Moolgavkar SH. Risk assessment using vital data. pp. 175–192. In: Environmental Epidemiology: Risk Assessment. Proc. SIMS Conference. Prentice RL, Whittemore AS (eds). SIAM, 1982.

Moolgavkar SH, Knudson AG. Mutation and cancer: A model for human carcinogenesis. JNCI 1981; 66:1037–1052.

Moolgavkar SH, Stevens RG. Smoking and cancers of bladder and pancreas: Risks and temporal trends. JNCI 1981; 67:15–23.

Stevens RG, Lee JAH, Moolgavkar SH. No association between oral contraceptives and malignant melanoma. N Engl J Med 1980; 302:966.

Moolgavkar SH. The Neyman-Scott carcinogenesis model for low-dosage extrapolation. Math Biosci 1980; 50:155–156.

Moolgavkar SH, Day NE, Stevens RG. Two-stage model for carcinogenesis: Epidemiology of breast cancer in females. JNCI 1980; 65:550–569.

Moolgavkar SH. Multistage models for carcinogenesis. JNCI 1980; 65:25.

Moolgavkar S, Stevens RG, Lee JAH: The effect of age on the incidence of breast cancer in females. JNCI 1979; 62:493–501.

Moolgavkar SH, Venzon DJ. Two-event model for carcinogenesis: Incidence curves for childhood and adult tumors. Math Biosci 1979; 47:55–77.



Stevens RG, Moolgavkar SH. Estimation of relative risk from vital data: Smoking and cancers of the lung and bladder. JNCI 1979; 63:1351–1357.

Moolgavkar S, Lee JAH, Hade RD. Comparison of age-specific mortality from breast cancer in males in the U.S. and Japan. JNCI 1978; 60:1223–1225.

Moolgavkar S. The multistage theory of carcinogenesis and the age distribution of cancer in man. JNCI 1978; 61:49–52.

Moolgavkar S. The multistage theory of carcinogenesis. Int J Cancer 1977; 19:730.

Jarabak R, Colvin M, Moolgavkar S, Talalay P. Δ5-3-ketosteroid isomerase of Pseudomonas Testosteroni. pp. 642–651. In: Methods in Enzymology, Vol. XV. Clayton RB (ed). Academic Press, NY, 1970.

**Books**

Moolgavkar SH, Krewski D, Zeise L, Cardis E, Moller H (eds). Quantitative estimation and prediction of human cancer risk. IARC Scientific Publications, Volume 131, 1999.

Moolgavkar SH (ed). Scientific issues in quantitative cancer risk assessment. Birkhauser Boston, 1990.

Moolgavkar SH, Prentice RL (eds). Modern statistical methods in chronic disease epidemiology. John Wiley, 1986.

Tobacco Smoking. IARC monographs on the evaluation of the carcinogenic risk of chemicals to humans. IARC, Volume 38, Lyon, 1986 (member of the working group).

**Selected Invited Presentations**

Moolgavkar SH. False discoveries: Challenges for understanding the environment. AAAS annual meeting, San Diego, February 2010.

Moolgavkar SH. Effects of education and primary prevention on lung cancer mortality trends. Erasmus University, Rotterdam, June 2009.

Moolgavkar SH. Multistage carcinogenesis and epidemiologic studies of cancer. University of Rochester Symposium in honor of Professor Andrei Yakovlev, April 2009.

Moolgavkar SH. Clonal expansion and carcinogenesis. International Conference on Systems Biology in Radiation Carcinogenesis, Munich, Germany, February 2007.

Moolgavkar SH. Epidemiology of colon cancer. AEK Cancer Congress, Frankfurt, Germany, February 2007.



Moolgavkar SH.  Multistage carcinogenesis and epidemiologic studies of cancer.  Distinguished Seminar Series, Fox Chase Cancer Center, PA, October 2005.

Moolgavkar SH.  Multistage carcinogenesis and lung cancer prevention.  IARC Seminar Series, Lyon, France, July 2004.

Moolgavkar SH.  Radiation-induced gestational mutations and cancer.  COSPAR meeting, Paris, France, July 2004.

Moolgavkar SH.  Multistage carcinogenesis and radiation risk assessment.  International Congress of Radiation Research, Brisbane, Australia, August 2003.

Moolgavkar SH.  Cancer models and risk assessment.  Environmental Mutagen Society, Annual Meeting, Miami, May 2003.

Moolgavkar SH.  Methodological issues in time-series analyses of air pollution data.  Meeting the Environmental Challenge of the 21st Century, Monterey, CA, March 2003.

Moolgavkar SH.  Multistage carcinogenesis and risk assessment.  International Biometrics Conference, Homburg, Germany, March 2001.

Moolgavkar SH.  Multistage models of carcinogenesis: historical perspective, overview, implications for radiation carcinogenesis.  International Workshop on Mathematical Models in Radiation Carcinogenesis, Kyoto, March 2001.

Moolgavkar SH.  Modeling altered hepatic foci: issues and outstanding problems.  6th European Meeting on Hepatocarcinogenesis, Vienna, September 1999.

Moolgavkar SH.  Intermediate lesions in carcinogenesis.  Netherlands Institute for Health and the Environment Seminar Series, 1997.

Moolgavkar SH. Multistage model for lung cancer.  International meeting of the Bernoulli Society, Calcutta, India, 1997.

Moolgavkar SH.  Stochastic cancer models:  Application to analyses of solid cancer incidence in the cohort of A-bomb survivors.  Keynote Speaker, International symposium on low-dose and low-dose-rate radiation, Stratford-on-Avon, UK, 1997.

Moolgavkar SH.  Stochastic models for estimation and prediction of cancer risk.  International Symposium on Statistics in the Environment, Enschede, The Netherlands, 1997.

Moolgavkar SH.  Time-series analyses of air pollution data.  International Symposium on Health Effects of Particulate Air Pollution, Prague, 1997.

Moolgavkar SH.  Multistage carcinogenesis, benzene exposure and leukemia risk.  Berkeley Symposium on Benzene and Leukemia, Napa Valley, 1996.



Moolgavkar SH.  Mutations and cell proliferation in cancer risk assessment.  AACR International Workshop on Risk Assessment, Whistler BC, 1994.

Moolgavkar SH.  Analysis of altered foci in rodent hepatocarcinogenesis experiments.  European Toxicology Meeting, Mainz, Germany, 1993.

Moolgavkar SH.  Biologically-based cancer risk assessment.  International Symposium on Quantitative Risk Assessment, Research Triangle Park, NC, 1993.

Moolgavkar SH.  Analysis of altered foci in rodent hepatocarcinogenesis experiments.  International Workshop on Mouse Liver Tumors, Washington DC, 1992.

Moolgavkar SH.  Cancer models and low-dose extrapolation of risk.  Workshop on Risk Assessment and Low Dose Extrapolation, Zurich, Switzerland, 1992.

Moolgavkar SH.  Cell proliferation and carcinogenesis.  International Conference on Cell Proliferation in Carcinogenesis, NIEHS, North Carolina, 1992.

Moolgavkar SH.  Multistage carcinogenesis and risk assessment.  International Toxicology Conference, Rome, Italy, 1992.

Moolgavkar SH.  A population perspective on multistage carcinogenesis.  Princess Takamatsu Cancer Congress, Tokyo, Japan, 1991.

Moolgavkar SH:  Cancer models.  International Workshop on Biophysical Modelling of Radiation Carcinogenesis, Padua, Italy, 1991.

Moolgavkar SH.  Carcinogenesis models:  An overview.  Hanford Symposium on Health and the Environment, Battelle PNL, Richland, WA, October 1990.

Moolgavkar SH.  Analyses of altered foci in rat hepatocarcinogenesis experiments.  University of Vienna Cancer Center, Vienna, Austria, July 1990.

Moolgavkar SH.  Multistage models of carcinogenesis.  University of Tübingen Seminar Series, Tübingen, July 1990.

Moolgavkar SH.  Analyses of intermediate lesions in experimental carcinogenesis.  German Cancer Research Center, Heidelberg, Germany, June 1990.

Moolgavkar SH.  Analyses of altered foci in rat hepatocarcinogenesis experiments.  BASF, Toxicology Group, Mannheim, 1990.

Moolgavkar SH.  Cell proliferation and carcinogenesis.  International Cancer Congress, Hamburg, 1990.



Moolgavkar SH.  Multistage carcinogenesis.  University of Pittsburgh, Department of Biostatistics Seminar Series, 1990.

Moolgavkar SH.  Analysis of altered foci in hepatocarcinogenesis experiments.  McArdle Laboratory, University of Wisconsin, Madison, WI, 1989.

Moolgavkar SH.  Biologically-based cancer risk assessment.  Society for Risk Analysis, Annual Meeting, San Francisco, CA, 1989.

Moolgavkar SH.  Multistage carcinogenesis and radiation risk assessment.  Radiation Research Society, Annual Meeting, Seattle, WA, 1989.

Moolgavkar SH.  The role of somatic mutations and cell replication kinetics in quantitative cancer risk assessment.  International Conference on Chemically Induced Cell Proliferation: Implications for Risk Assessment, Austin, TX, 1989.

Moolgavkar SH.  Two mutation model for carcinogenesis:  Relative roles of somatic mutations and cell proliferation in determining risk.  SIMS Conference on Scientific Issues in Quantitative Cancer Risk Assessment, Alta, Utah, 1989.

Moolgavkar SH.  Cancer models and risk assessment.  NATO Workshop on Biologically-based Methods for Cancer Risk Assessment, Corfu, Greece, June 1988.

Moolgavkar SH.  A two-stage model for carcinogenesis and its implications for risk assessment.  University of Nebraska Medical Center, May 1988.

Moolgavkar SH.  Biologically-based carcinogenesis models for risk assessment.  Risk Assessment Workshop, Washington, DC, March 1988.

Moolgavkar SH.  Biologically-based carcinogenesis models for risk assessment.  Health and Welfare, Ottawa, Canada, March 1988.

Moolgavkar SH.  Curvature and inference in exponential families:  Application to Relative Risk Regression Models.  Carleton University, Ottawa, Canada, March 1988.

Moolgavkar SH.  Cox regression for the innocent bystander.  Fox Chase Cancer Center Seminar, Philadelphia, PA, December 1987.

Moolgavkar SH, Prentice R.  Modern statistical methods in chronic disease epidemiology.  Biopharmaceutical Section of ASA (tutorial and short course), Newark, NJ, December 1987.

Moolgavkar SH.  Biologically motivated two-stage model for carcinogenesis.  17th Conference on Toxicology, Wright-Patterson Air Force Base, Dayton, OH, November 1987.

Moolgavkar SH.  Two-stage model for carcinogenesis.  University of Wisconsin Seminars, "Curvature and Inference in Exponential Families:  Application to Relative Risk Regression Models," Department of Human Oncology, Madison, OH, November 1987.



Moolgavkar SH. Two mutation model for cancer risk assessment. EPA Toxicology and Microbiology Seminar Series, Cincinnati, OH, October 1987.

Moolgavkar SH. Origin invariant relative risk functions: multi-stage models for cancer risk assessment. American Statistical Association Annual Meeting, San Francisco, CA, August 1987.

Moolgavkar SH. Biologically-based carcinogenesis models for risk assessment. Risk Assessment Workshop, Washington, DC, March 1987.

Moolgavkar SH. Two-stage model for carcinogenesis: implications for risk assessment. Symposium on Quantitative Assessment of Cancer Risk, Washington, DC, February 1987.

Moolgavkar SH. A cohort analysis of smoking and cancers of the lung, bladder and pancreas. School of Public Health grand rounds, Department of Biostatistics Seminar on General Relative Risk Regression Models for Epidemiologic Studies, University of Pittsburgh, Pittsburgh, PA, January 1987.

Moolgavkar SH. Two-stage model for carcinogenesis and the IPI protocol. Battelle PNL, Richland, WA, 1986.

Moolgavkar SH. Modern statistical methods in chronic disease epidemiology. SIMS conference, Alta, UT, June 1985.

Moolgavkar SH. Time related factors in cancer epidemiology. NIH International Symposium, April 1985.

Moolgavkar SH. General relative risk models for case-control studies. Johns Hopkins University, School of Public Health, Baltimore, MD, 1985.

Moolgavkar SH. Stochastic models for carcinogenesis and risk assessment. EPA, Washington, DC, 1985.

Moolgavkar SH. Risk assessment using vital data. SIMS Conference on Environmental Epidemiology and Risk Assessment, Alta, UT, June 1982.



**Selected Professional Activities**

- Consultant, Fox Chase Cancer Center
- Consultant, Health and Welfare, Canada
- Consultant, University of Nebraska Medical Center
- Member, IARC (International Agency for Research on Cancer) working group on Tobacco Smoking
- Member, NIH Special Study Section for Biometry
- Member, NSF panel to review scientific bases of risk assessment methodologies
- Member, External Science Advisory Board, RISC-RAD project of the European Union, ongoing
- Member, External Science Advisory Board, California Air Resources Board, ongoing
- Invited Expert, Workshop on Mechanisms of Fiber Carcinogenesis, IARC, Lyon, France, November, 2005
- Area Editor for Health and Environment, *Risk Analysis—An International Journal*, Jan 2000–present
- Senior Editor of monograph *Quantitative Estimation and Prediction of Cancer Risk* IARC Scientific Publications, No. 131, 1999
- Co-chairman, International Conference on Mathematical Models in Cancer, Park City, Utah, 1998
- Member, Health Effects Institute Expert Panel for re-analyses of critical air pollution studies, 1997–2000
- Member, Working Group on quantitative estimation and prediction of cancer risk, IARC, Lyon, 1993
- Member, Scientific Advisory Panel to the CIIT Centers for Health Research, 1992–2005
- Member, Scientific Advisory Panel to review the EPA Dioxin Health Assessment document, 1992
- Member, Scientific Advisory Panel to review Risk Assessment program of the National Center for Toxicologic Research, 1992
- Organizer and Chair, SIMS conference "Scientific Issues in Quantitative Cancer Risk Assessment", held in Snowbird, Utah, June 1989
- Member, Advisory Committee to review risk assessment program of Armstrong Laboratories, Wright-Patterson Air Force Base, 1987
- Member, External Scientific Committee to review the program of the Radiation Epidemiology Branch, NCI, 1987
- Co-chairman of SIMS conference "Modern Statistical Methods in Chronic Disease Epidemiology" held in Alta, Utah, in June 1985
- Session Chairman at International Symposium: "Time Related Factors in Cancer Epidemiology," held at NIH in April 1985



# EXHIBIT 15

2010 WL 1266659
Only the Westlaw citation is currently available.
United States District Court,
S.D. Indiana,
Indianapolis Division.

U.S. AUTOMATIC SPRINKLER, CO., Plaintiff,
v.
The RELIABLE AUTOMATIC SPRINKLER
CO., and Ferguson Fire & Fabrication, Inc.,
f/k/a the Clark Group, Inc., Defendants.

No. 1:07–cv–00944–SEB–
TAB.    |    March 25, 2010.

**Attorneys and Law Firms**

Donald G. Orzeske, John D. Meyer, Goodin Orzeske & Blackwell, P.C., Indianapolis, IN, for Plaintiff.

James William Roehrdanz, Nicholas Ward Levi, Kightlinger & Gray, Offer Korin, Ronald George Sentman, Katz & Korin P.C., Indianapolis, IN, for Defendants.

**Opinion**

**ORDER ADDRESSING MOTIONS TO EXCLUDE**

SARAH EVANS BARKER, District Judge.

 **\*1**  This cause is before the Court on Defendant, The Reliable Automatic Sprinkler Company's ("Reliable"), Motion to Exclude Testimony of George Langford, Ph.D [Docket No. 104], filed on July 10, 2009; Defendant Ferguson Fire & Fabrication, Inc.'s ("Ferguson") Motion to Exclude Testimony of Dr. George Langford for Trial [Docket No. 106], filed on July 10, 2009; and Ferguson's Motion to Exclude Testimony of Dr. George Langford for Summary Judgment [Docket No. 113], filed on July 20, 2009. Although filed separately, each of these motions seeks substantially the same result: the exclusion of Plaintiff's proffered expert testimony, on both admissibility and procedural grounds. For the reasons detailed in this entry, these motions are *GRANTED* in part and *DENIED* in part.

***Background***

Plaintiff U.S. Automatic Sprinkler, Co. ("USAS") installed a sprinkler system at a project in Greenwood, Indiana ("Greenwood Project") using sprinkler heads manufactured by and purchased from Reliable, as well as "female" weld-o-lets purchased from Ferguson. After this installation had been completed, leaks began to occur. Although these leaks were promptly fixed, soon thereafter leaks began to occur with increasing regularity. Eventually, USAS was forced to undo and reinstall each sprinkler head, a process that included the replacement of the original sealant with a more expensive sealant.

Because of the high costs incurred in connection with resolving this problem, USAS hired Dr. George Langford to test the sprinkler heads and weld-o-lets USAS had originally installed to determine whether, in his opinion, these products were correctly manufactured, and whether a defect in their manufacture was the possible proximate cause of the leaks that occurred at the Greenwood Project. With regard to the Reliable sprinkler heads, Dr. Langford concluded that, in some cases, the heads incorporated what he referred to as "drunken threads," which is a variation in the helix angle of the threads. He also determined that some of the weld-o-lets were "out-of-round," a physical irregularity that can affect the performance of the threads during installation.

Dr. Langford's conclusion, which Plaintiff proffered in its summary judgment briefing and intends to offer at trial, was that the leaking at the Greenwood Project occurred during installation and was caused by this combination of mechanical irregularities. According to Dr. Langford, when the "drunken" sprinkler heads were mated with the "out-of-round" weld-o-lets, gaps occurred that created the potential for the type of leaking experienced at the project.

***Discussion***

Defendants seek to exclude the expert testimony of Dr. Langford. The admissibility of expert testimony is governed by the framework set out in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms. Inc.* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Applying this framework, courts must undertake:

   a three-step analysis: the witness must be qualified "as an expert by knowledge, skill, experience, training, or education"; the expert's reasoning or methodology underlying the testimony must be scientifically reliable;

U.S. Automatic Sprinkler, Co. v. Reliable Automatic..., Not Reported in...

82 Fed. R. Evid. Serv. 102

and the testimony must assist the trier of fact to understand the evidence or determine a fact in issue.

**\*2** *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007) (quoting Fed.R.Evid. 702); *see also Kumhoe Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (extending the *Daubert* admissibility framework to expert testimony in the social sciences). "The *Daubert* standard applies to all expert testimony, whether it relates to an area of traditional scientific competence or whether it is founded on engineering principles or other technical or specialized expertise." *Smith v. Ford Motor Co.,* 215 F.3d 713, 719 (7th Cir.2000) (citing *Kumho,* 536 U.S. at 141).

### I. Dr. Langford's Qualifications

We begin by examining Dr. Langford's expertise to determine whether he is qualified to perform the calculations and arrive at the conclusions contained in his report. "A court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith,* 215 F.3d at 718. The "scientific knowledge" contemplated by *Daubert* "connotes more than subjective belief or unsupported speculation." *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 613–14 (7th Cir.1993). To suffice, the proffered expert's knowledge must have "a grounding in the methods and procedures of science." *Daubert,* 509 U.S. at 590.

Defendants do not substantially challenge Dr. Langford's qualifications to testify as to this opinion. Dr. Langford possesses an undergraduate degree in metallurgy from the Massachusetts Institute of Technology and a Doctor of Science degree also from MIT. He has more than thirty-five years of experience as a metallurgist and has investigated hundreds of material-related problems in the areas of corrosion, mechanical and dimensional analysis, physical, mechanical, and chemical metallurgy, microstructural analysis, and optical and electron microscopy. He has consulted and testified in more than fifty cases involving insurance claims in the fire sprinkler industry. Dep. Of Langford at 8, 75. Based on this experience and knowledge, we find that Dr. Langford is fully qualified to testify as an expert on the issues presented in this case.

### II. The Reliability and Helpfulness of Dr. Langford's Testimony

Even a "supremely qualified expert cannot waltz into the courtroom and render opinions unless those opinions are based on some recognized scientific method and are reliable and relevant under the test set forth by the Supreme Court in *Daubert." Clark v. Takata Corp.,* 192 F.3d 750, 759 n. 5 (7th Cir.1999). The testimony of a "well credentialed expert who employs an undisclosed methodology" or who offers opinions lacking "analytically sound bases" must be excluded. *Tuf Racing Products, Inc. v. American Suzuki Motor Corp.,* 223 F.3d 585, 591 (7th Cir.2000). Thus, although the Court's role does not include an assessment of the credibility or persuasiveness of the proffered testimony, which factual issues are left for the jury to determine, *Deputy v. Lehman Brother's, Inc.,* 345 F.3d 494, 506 (7th Cir.2003), the Court, "in its role as a gate-keeper," must nonetheless determine if Dr. Langford's opinions are based on reliable methodology, and whether they would be helpful to a jury. *Winters v. Fru–Con, Inc.,* 498 F.3d 734, 743 (7th Cir.2007).

**\*3** Defendants challenge Dr. Langford's methodology on the following grounds: (1) that he did not properly "test" his method; (2) that he sampled too few outlets to form a reasonably accurate opinion; (3) that his measuring methods were novel and unproven; (4) that his measuring equipment was tainted; (5) that he engaged in speculation rather than calculation at more than one juncture in his analysis; and (6) that his testimony is, at certain points, internally contradictory. Defendants' briefing, which is extensive, mounts numerous cogent and robust challenges to the accuracy and worthiness of Dr. Langford's methodology and conclusions. Among other specific challenges, Defendants point out that Dr. Langford made questionable assumptions, [1] failed to quantify numerous data that he collected, [2] failed to account for certain possible alternative explanations, [3] and failed to account for the different metallurgical properties of the components at issue.

Notwithstanding the force of these arguments, we find that by and large they go to the *weight* of the evidence Dr. Langford offers, rather than the admissibility of that evidence. "The trial court's gatekeeper role ... is not meant to supplant the adversary system, or the role of the jury: '[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, are the traditional and appropriate means of attacking shaky, but admissible evidence." *United States v. Grace,* 455 F.Supp.2d 1148, 1153 (D.Mont.2006) (quoting *Daubert,* 509 U.S. at 596). In essence, Defendants seek exclusion by subjecting Dr. Langford to a contest with the opinions offered by their expert

U.S. Automatic Sprinkler, Co. v. Reliable Automatic..., Not Reported in...

82 Fed. R. Evid. Serv. 102

and with hypothetical alternative methods and explanations for the facts presented in the case. This is not an appropriate approach to the *Daubert* inquiry.

Significantly, Dr. Langford subjected the evidence before him to multiple tests prior to arriving at the conclusions contained in his report. Whether the expert has subjected his theory to testing has been recognized as the most important reliability factor. *Chapman v. Maytag Corp.,* 297 F.3d 682, 688 (7th Cir.2002). In developing his testing methods, Dr. Langford clearly reviewed relevant studies related to similar experimentation undertaken by others in the field. Dep. of Langford at 142. [4] Furthermore, as part of the process he undertook to test the data, Dr. Langford employed various scientific controls, established an error rate, and repeatedly tested allegedly defective components to verify his results. Dep. of Langford at 51, 151, 155. Whether additional or alternative testing would undercut or support his testimony is a question of the weight to be given his conclusions, which shall be addressed at summary judgment or at trial. *See Marvin Lumber v. PPG,* 401 F.3d 901, 916 (8th Cir.2005).

As acknowledged by Defendants' expert, the methodologies that Dr. Langford referenced in designing his method are accepted and recognized in the relevant scientific community. For all of these reasons, we conclude that Dr. Langford evaluated the data before him with a sufficiently reliable methodology to satisfy the standards outlined in *Daubert.*

**\*4** We also find that Dr. Langford's testimony will assist the trier of fact. Dr. Langford was the only person, expert or otherwise, to conduct a detailed examination of the sprinkler heads and weld-o-lets that are the subject of Plaintiff's claims in the case at bar. His expertise, coupled with his substantial personal knowledge, indicate that his proffered testimony will be helpful to the resolution of the factual issues at stake.

Dr. Langford's educational background, experience in conducting tests similar to those that formed the basis of his report, and the reliability of his method allow us to conclude with relatively little difficulty that his expert report and testimony are admissible under *Daubert* requirements. Defendants' extensive challenges to his methods are more appropriately adduced at the summary judgment phase of the proceedings; the Court will resolve those issues at that time. For all of the foregoing reasons, Defendants' motions to exclude, insofar as the relate to the standards set forth in *Daubert* and Rule 702, shall be *denied.*

### III. Dr. Langford's Newly Offered Affidavit

Defendants also contend that Dr. Langford's recent affidavits (Docket Nos. 102–9, 103–9, 119–8, 120–8) contain conclusions and opinions that must be excluded because they were not contained within his original report and were filed outside the deadlines established by the Court. District courts are empowered with broad discretion to set and enforce deadlines, including those established for the disclosure of expert witness testimony. *See, e.g., Bevolo v. Carter,* 447 F.3d 979, 981 (7th Cir.2006). According to Defendants, Dr. Langford's newly filed affidavits constitute an impermissible supplementation of Plaintiff's expert disclosures because those affidavits offer opinion testimony that Plaintiff was required to disclose in the original expert report. Pursuant to Federal Rule of Civil Procedure 26(a), which governs the circumstances under which a party may offer such supplemental evidence, a party's right to file rebuttal and supplementary expert reports does not permissibly extend the disclosure deadlines or "give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report." *In re Ready– Mixed Concrete Antitrust Litig.,* 261 F.R.D. 154, 159 (S.D.Ind.2009).

Plaintiff rejoins that the late filing of these affidavits was justified because Defendants did not disclose that their expert would utilize the information upon which Dr. Langford's supplemental affidavits rely, referred to as the "ESI Report" as well as specific American National Standard Institute ("ANSI") standards. Plaintiff's argument is not, however, supported by the facts before the Court. From our review of the record, it is clear that Defendants discussed their use of this information in a timely fashion and placed Plaintiff on notice that this information would be used in the formulation of Defendants' expert evidence. Plaintiff and its expert were therefore responsible for being prepared to discuss the specific portions of the ANSI standards and the ESI Report in question. Plaintiff has provided no satisfactory reason for its failure to comply with the deadlines for the disclosure of expert witness testimony, as established by the Court's case management plan and Fed.R.Civ.P. 26. Permitting Plaintiff to sidestep its own error by now allowing Dr. Langford's additional, late-filed affidavits to be considered would unfairly prejudice Defendants. *See Musser v. Gentiva Health Services,* 356 F.3d 751, 757 (7th Cir.2004). Accordingly, Defendants' motions are *granted* to this extent, and the subject affidavits shall be stricken.

U.S. Automatic Sprinkler, Co. v. Reliable Automatic..., Not Reported in...

82 Fed. R. Evid. Serv. 102

### *IV. Conclusion*

 **\*5**  For the reasons detailed in this entry, Defendants' Motions to Exclude the Testimony of Dr. George Langford are *GRANTED* in part and *DENIED* in part.

IT IS SO ORDERED.

**Parallel Citations**

82 Fed. R. Evid. Serv. 102

Footnotes

1    The most prominent of these is his assumption that the outlet threads were perfect when originally manufactured by a non-party. According to Defendants, making such an assumption is not appropriate.

2    Specifically, Defendants contend that he failed to quantify the "drunkenness" and "out-ofroundness" of the allegedly faulty components as well as failed to statistically account for the role played by heat in the installation process.

3    Here, Defendants detail at length the opposing theories offered by their expert.

4    Dr. Langford documented his testing methods in detail, such that another expert with his notes at hand could replicate his work. Moreover, his methods reflected common approaches to problems such as those presented in this litigation. He took detailed measurements of the tapered threads in the sprinkler heads using tools such as a screw-cutting lathe with a taper attachment, dial indicators with a probe component, and a commercial data plotting program, all of which are commonly used in scientific measurements similar to those involved in the case at bar.

**End of Document**                    © 2013 Thomson Reuters. No claim to original U.S. Government Works.